# EXHIBIT 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLAUDE A. REESE, individually and on
behalf of all others similarly situated,

          Plaintiffs,

      v.

JOHN BROWNE and ROBERT A.
MALONE, et al.

          Defendants.

CASE NO. C08-1008MJP

ORDER DISMISSING CASE

     This matter comes before the Court on Defendants' motion to dismiss Plaintiffs' Second

Amended Complaint. (Dkt. No. 181.) Having reviewed the motion, Plaintiffs' response (Dkt. No.

187), Defendants' reply (Dkt. No. 190), and all related documents, the Court GRANTS

Defendants' motion and DISMISSES this action with prejudice.

**Background**

     Plaintiffs bring this case as a class action on behalf of purchasers of BP stock between

June 30, 2005, and Aug. 4, 2006. (Second Am. Compl. ("SAC") ¶ 1.) Plaintiffs seek to represent

shareholders who held two types of BP stock: BP's ordinary shares, which are traded in Europe,

and BP's American Depository Receipts ("ADRs"), which are traded in the United States. (SAC ¶ 15.)

Plaintiffs claim that Defendants committed securities fraud by making a number of false statements regarding two oil spills that occurred in 2006. (SAC ¶ 103.) The first spill was discovered on March 2, 2006, resulting from a quarter-inch-wide hole in a pipeline in the Western Operating Area ("WOA") of Prudhoe Bay, Alaska. (SAC ¶¶ 78-80.) The leak remained undetected for about five days, spilling an estimated 4,800 barrels onto the Alaskan tundra. (Id.) On August 5 and 6, 2006, BP discovered that there had been a new spill of approximately 25 barrels of oil from a different corroded pipeline in the Eastern Operating Area ("EOA"), on the other side of Prudhoe Bay. (SAC ¶ 103.)

These spills resulted in the temporary shutdown of Alaska's Prudhoe Bay oil production area, which then accounted for more than 8 percent of total U.S. oil production. (SAC ¶ 172.) Plaintiffs claim that, as a result of BP misrepresenting the conditions of their pipelines, BP's share price dropped nearly 4 percent over the course of two days when the second spill was revealed, causing investors to suffer billions of dollars in losses. (SAC ¶¶ 171-179.) Plaintiffs bring suit against BP; BPXA, the wholly-owned subsidiary of BP based in Anchorage, Alaska; John Browne, the CEO of BP during the class period; and Maureen Johnson, BPXA's Senior Vice President and Greater Prudhoe Bay Performance Unit Leader during the class period. (SAC ¶¶ 16-19.)

Plaintiffs' complaint includes three separate claims for relief. The first alleges violation of § 10(b) of the 1934 Securities Exchange Act and SEC Rule 10b-5(b), which prohibit the making of untrue statements of material fact to commit fraud or deceit in connection with the purchase or sale of any security. (SAC ¶¶ 181-203); 15 U.S.C. § 78b(b); 17 C.F.R. § 240.10b-5.

1    The second alleges "scheme liability" under SEC Rule 10b-5(a) and (c) for BPXA's allegedly

2    deceptive conduct, rather than its statements. (SAC ¶¶ 204-215); 17 C.F.R. § 240.10b-5(a) and

3    (c). The third seeks to assert controlling person liability against the parent company, BP, BP's

4    then CEO and BPXA's Senior Vice President, under § 20(a). (SAC ¶¶ 216-223); 15 U.S.C. §

5    78t(a).

6           This Court and the Ninth Circuit have previously considered the sufficiency of Plaintiffs'

7    complaint, but the complaint has been amended to add new details. In February 2009, this Court

8    ruled that Plaintiffs' statements were not "deceptive at the level required by the PSLRA" because

9    the complaint "does not connect the list of omissions to the challenged statements or show how

10   the facts about Defendants' mismanagement of their pipelines render the statements misleading."

11   (Dkt. No. 120 at 11.) Instead, this Court held, "The chronicle of omissions and negligent care

12   amount to corporate mismanagement on a massive scale, but that does not make them actionable

13   as securities fraud." (Id.) However, in the same order, this Court permitted Plaintiff's action to

14   stand on one alleged misstatement, concerning the company's statement it would act as a prudent

15   oil field operator. (Id. at 13.) Ruling on an interlocutory appeal, the Ninth Circuit reversed on this

16   point because it held that a statement contained in a private contract filed with the SEC is not

17   actionable because it is not "the sort of traditional fraudulent misrepresentation of fact that could

18   induce investors mistakenly to buy securities." (Dkt. No. 158 at 20-21.)

19          Since the Ninth Circuit's ruling, Plaintiffs have eliminated the statements dismissed by

20   the Ninth Circuit and have added new evidence, including facts arising from two lawsuits filed

21   by the U.S. Department of Justice and the State of Alaska in March 2009. (Dkt. No. 187 at 7.)

22   Plaintiffs have reduced the number of Defendants from seven to four: BP plc, BPXA, former

23   CEO John Brown, and BPXA Senior Vice President Maureen Johnson. (Id.)

24

1    The issues presently before the Court are (1) whether any of the alleged misstatements or

2    omissions alleged in the second amended complaint state a valid claim under SEC Rule 10b-5(b)

3    when viewed under the PSLRAs' heightened pleading standard, (2) whether Plaintiffs state a

4    valid "scheme liability" claim under Rule 10b-5(a) or (c), and (3) whether Plaintiffs may assert

5    claims under the Securities Exchange Act on behalf of purchasers of BP ordinary shares, which

6    trade only in London and Frankfurt and not on any U.S. exchange. (Dkt. No. 181 at 7-9.)

7                                           **Discussion**

8    I.    <u>Heightened Pleading Requirements</u>

9            Because this matter comes before the Court on a motion to dismiss, the Court must accept

10   all of Plaintiffs' well-pled factual allegations as true. <u>In re Gilead Scis. Sec. Litig.</u>, 536 F.3d

11   1049, 1055 (9th Cir. 2008). However, Plaintiffs are subject to the requirements of Federal Rule

12   9(b), which requires they "state with particularity the circumstances constituting fraud or

13   mistake," and to the heightened pleading standard of the Private Securities Litigation Reform Act

14   of 1995 ("PSLRA"). Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1). Under the PSLRA,

15   complaints alleging misrepresentations or omissions must "specify each statement alleged to

16   have been misleading, the reason or reasons why the statement is misleading, and, if an

17   allegation regarding the statement or omission is made on information and belief, the complaint

18   shall state with particularity all facts on which that belief is formed." <u>Id.</u>

19   II.   <u>Section 10(b) and Rule 10b-5(b)</u>

20           The Court's first task is to consider whether Plaintiffs have adequately pled facts showing

21   Defendants' representations violate §10(b) of the Securities Exchange Act and the rules

22   promulgated thereunder. Section 10(b) makes it unlawful "[t]o use or employ, in connection with

23   the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

24   contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. §

78j(b). Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful:

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

To plead an action for securities fraud under § 10(b) and Rule 10b-5(b), the plaintiff must allege, in connection with the purchase or sale of securities: (1) a misstatement or omission of fact, (2) made with scienter, (3) on which plaintiff relied, (4) which proximately caused the plaintiff's damages. 15 U.S.C. §78u-4(b)(1); 17 C.F.R. § 240.10b-5; Dura Pharms, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

"Scienter" is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In order to qualify as "strong" within the meaning of the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc., v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).

Because falsity and scienter "are generally strongly inferred from the same set of facts . . . the two requirements may be combined into a unitary inquiry under the PSLRA." In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005) (internal quotation marks omitted). In this case, the second amended complaint includes seven alleged false statements, which can be grouped into five categories. (Dkt. No. 187 at 16-25.) Each grouping is analyzed below.

A. <u>Statement about Low Manageable Corrosion Rate</u>

Plaintiffs' first alleged misrepresentation concerns a statement that Defendant Maureen Johnson, Senior Vice President of BPXA, made to the press on March 15, 2006, denying BP had any warning of high corrosion before the first pipeline leak. (SAC ¶¶ 185-86; Dkt. No. 187 at 16.) Specifically, the news article reported that "Johnson said corrosion was seen in the 34 inch oil transit line [that caused the March 2 spill] in a September [2005] inspection but it appeared to be occurring at a 'low manageable corrosion rate.'" (SAC ¶ 185.)

Plaintiffs allege Johnson's "low manageable corrosion rate" statement was objectively false, because BP's internal documents from the time show that the corrosion rate was 32 mills (thousands of an inch) per year ("MPY") in 2005, compared to only 3 MPY in 2004. (Dkt. No. 187 at 17.) Plaintiffs argue that a level of corrosion above 30 MPY is the highest of three levels in BP's own internal classification metric. (SAC ¶ 186.) While the corrosion rate that BP detected in 2004 might have been low and manageable, Plaintiffs argue that the measurements taken in September 2005 showed a "sharp and rapid spike in the corrosion rate." (<u>Id</u>.) Plaintiffs also support their allegation of falsity by referencing the detailed report of their expert, Dr. John S. Smart III, who opined that a corrosion rate of 32 MPY was "high" and "not manageable." (SAC ¶ 68.)

A statement is false if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." <u>Brody v. Transitional Hospitals Corp.</u>, 250 F.3d 997, 1006 (9th Cir. 2002). Taken together, Plaintiffs' evidence of BP's internal measurements and Dr. Smart's statements adequately allege that the level of corrosion in the oil transit line that caused the March 2 spill was objectively not "low" or "manageable."

However, Plaintiffs have a more difficult task supporting a strong inference of scienter. The timing of Johnson's statement undermines Plaintiffs' argument. Johnson's "low manageable

1   corrosion rate" statement was reported March 15, 2006, nearly two weeks after the first pipeline

2   leak on March 2. (SAC ¶ 185.) To show scienter, Plaintiffs must show it was likely Johnson had

3   the intent to deceive, manipulate, or defraud when she made the statement. Ernst & Ernst, 425

4   U.S. at 194.

5       Plaintiffs do not articulate with particularity facts giving rise to an inference Johnson

6   thought this information could be deceptive. Johnson had no way of knowing in March 2006 that

7   another oil leak would occur just six months later in a separate pipeline on the other side of

8   Prudhoe Bay, so it seems unlikely she would have intended that her statements deceive investors

9   about the possibility of future spills in other areas. "[I]n determining whether the pleaded facts

10  give rise to a 'strong' inference of scienter, the court must take into account plausible opposing

11  inferences." Tellabs, 551 U.S. at 323. Here, the inference that Plaintiffs would like the Court to

12  make—that Johnson intended to mislead investors by "falsely reassuring them that BP's

13  corrosion efforts were adequate"—is not as strong as the opposing inferences that Johnson

14  misunderstood BP's data or that she did not have access to the data. (Dkt. No. 187 at 18.)

15  Plaintiffs offer no evidence that suggests Johnson had the intent to mislead investors with these

16  statements, so they fail to show plead scienter on this statement.

17      B.  Statements Distinguishing the WOA and EOA Lines

18      Plaintiffs next attack two statements Johnson made contrasting the conditions in the

19  pipeline that spilled in March 2006 with conditions in BP's other Prudhoe Bay pipelines. (SAC ¶

20  187.) On March 15, 2006, Johnson said "the highly corrosive conditions were unique to the

21  [WOA] line [which had leaked]." (SAC ¶ 187.) On May 14, 2006, Johnson said, "We've looked

22  at all of the oil transit lines . . . none other has the same combination of factors . . . bacteria in the

23  facility, low flow rate and low corrosion inhibitor carry over . . . ." (SAC ¶ 189.)

24

1   In its February 2009 order, the Court found "nothing actionably false" about these

2   statements because they were vague, and because Johnson's statement "does not mean that the

3   combination of factors which produced a leak in one [line] could not be a one-time confluence of

4   events." (Dkt. No. 120 at 7-8.) In their second amended complaint, however, Plaintiffs have

5   added significant new facts to support these allegations. Specific new documents include

6   communications between BP and its regulator, the Pipeline and Hazardous Materials Safety

7   Administration ("PHMSA"); a September 2006 memorandum preparing BP officials to testify

8   before Congress; and statements in BPXA's 2006 plea agreement with the U.S. Attorney for the

9   District of Alaska for violation of the Clean Water Act relating to the spills. (SAC ¶¶ 126, 89, 47,

10  86, 127.)

11          Taken together, these documents persuade the Court that Plaintiff has adequately pled

12  falsity regarding Johnson's statements comparing the two pipelines. Particularly persuasive is the

13  Aug. 31, 2006 letter sent by BPXA to PHMSA stating that both the EOA and WOA pipelines

14  have "low flow velocities" and were susceptible to "Microbiologically Induced Corrosion and/or

15  Under Deposit Corrosion." (SAC ¶ 47.) Plaintiffs' allegation of falsity is further supported by the

16  April 2007 letter sent by BPXA's regulator, PHMSA, stating that BP has indicated to authorities

17  that corrosion in both pipelines was promoted by "low crude oil flow velocities; the corrosivity

18  of the material transported; the presence of water and sediments" and other factors. (SAC ¶ 126.)

19  Taken together, these documents undermine Johnson's statement that the two pipelines were

20  "unique" and did not have "the same combination of factors." (SAC ¶ 189.)

21          However, Plaintiffs again fail to adequately allege scienter with regard to these

22  statements. Timing is the first issue. Each of the documents contradicting Johnson's March and

23  May 2006 statements regarding the two pipelines is dated after she made the statements in

24

1   question. (Dkt. No. 187 at 10-12.) The letter from PHMSA is dated April 2007. (SAC ¶ 126.)

2   BPXA's letter to PHMSA is dated Aug. 31, 2006. (SAC ¶ 47.) The memo preparing BP officials

3   for Congressional testimony was from September 2006. (SAC ¶ 89.) While Johnson's statements

4   may have been objectively false when made, Plaintiffs do not plead facts supporting an inference

5   that her comments were made with a state of mind approaching deliberate recklessness, the state

6   of mind required for scienter in the Ninth Circuit. See South Ferry, LP, No. 2 v. Killinger, 542

7   F.3d 776, 782 (9th Cir. 2008). Because Johnson's statements were made shortly after the first

8   spill and before the second spill, Defendants' argument that Johnson's statements simply

9   "summarize[d] the preliminary results of BPXA's ongoing investigation of the March spill" is

10  more plausible than the inference of scienter that Plaintiffs ask the Court to make. (Dkt. No. 190

11  at 7.)

12          Plaintiffs' scienter argument also fails because Plaintiffs do not show that Johnson was

13  aware of the information making her statements false. In Glazer Capital Mgmt., the Ninth Circuit

14  distinguished circumstances "in which a company's public statements were so important and so

15  dramatically false that they would create a strong inference that at least some corporate officials

16  knew of the falsity upon publication" from situations where the "limited nature and unique

17  context of the alleged misstatements" requires a plaintiff to plead scienter with respect to those

18  individuals who actually made the false statements. 549 F.3d at 744. To illustrate the first

19  category, the Ninth Circuit cited the Seventh Circuit's hypothetical in Tellabs, 513 F.3d 702, 710

20  (7th Cir. 2008), where an automobile company announced that it had sold one million SUVs in a

21  year when the actual number was zero. 549 F.3d at 744. In this case, Defendant Johnson's

22  description of the corrosive conditions of the EOA pipeline are not as dramatic or obviously false

23  as the hypothetical statements the auto company made in the Seventh Circuit's SUV example, so

24

1  Johnson's statement falls into the second category, where a plaintiff is required to plead scienter

2  with respect to the individual speaker. Id. Plaintiffs do not meet that burden here, because they

3  do not show that Johnson was aware of the information contradicting her statements when she

4  made them.

5      C.  Statement Regarding Compliance with Laws and Regulations

6          Next, Plaintiffs argue that BP's 2005 Annual Report issued on June 30, 2006 falsely

7  stated the company's pipelines were in compliance with applicable state and federal law. (Dkt.

8  No. 187 at 20.) Specifically, the 2005 Annual Report said, "Management believes that the

9  Group's activities are in compliance in all material respects with applicable environmental laws

10  and regulations." (SAC ¶ 196.)

11         To show this statement was a misrepresentation, Plaintiffs cite new documents from civil

12  and criminal cases against the company, namely BPXA's 2007 guilty plea and $20 million

13  settlement with the U.S. Department of Justice and the State of Alaska's ongoing lawsuit against

14  BPXA related to the spills. (SAC ¶ 127-128; 137.) According to these documents, BP admitted

15  that it knew of the corrosion and failed to properly inspect, monitor, and maintain the pipelines.

16  (Id.) Plaintiffs also point to a June 2006 an internal memorandum to BP's then-Director and

17  Chief Executive for Exploration and Production, Anthony Hayward, stating that BP would not be

18  able to complete the requirements of the Corrective Action Order issued by PHMSA by

19  "pigging" of all the oil transit lines. (SAC ¶ 98.)

20         Taken together, these documents do not support an allegation that the statement in the

21  2005 Annual Report was false. See Brody, 250 F.3d at 1006. The statement that BP was "in

22  compliance in all material respects" is vague and ambiguous enough to encompass the state of

23  affairs described in the Hayward memorandum—that "efforts [were] underway with the

24  [regulator] to either amend or extend the compliance order to address these issues." (SAC ¶ 98.)

1    Indeed, the 2005 Annual Report at another point said that BPXA was "in discussion with

2    PHMSA on assuring compliance with the corrective actions outlined in the order." (Dkt. No. 120

3    at 10.) This was objectively true.

4        The use of the words "management believes" and "material" in the statement at issue also

5    weighs against a finding of falsity. Even if BP had failed to comply with the PHMSA Corrective

6    Action Order, BP's management still may have reasonably believed they were in compliance

7    with "material" regulations, especially if the company was involved in ongoing negotiations with

8    the regulator. (Dkt. No. 190 at 10.)

9        Plaintiffs also fail to allege scienter with regard to the statement the company was "in

10   compliance with applicable state and federal law." Again, the timing is critical. The

11   memorandum to Hayward was prepared for a June 12 meeting, and the annual report was

12   published June 30. (SAC ¶ 196.) Even if Defendants had known in mid-June that they might not

13   be in full compliance with applicable laws and regulations, Plaintiffs do not allege that the

14   annual report was written after the Hayward memorandum, only that its publication date was

15   June 30. (Id.) It seems entirely possible that the annual report could have been prepared and sent

16   to press well before the information discussed in the Hayward memorandum became known.

17   Second, and more importantly, Plaintiffs do not allege that information regarding compliance

18   with the COA was "prominent enough that it would be absurd to suggest that top management

19   was unaware" of the information. Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 988-89

20   (9th Cir. 2008). In contrast, given Plaintiffs' detailed allegations of "corporate mismanagement

21   on a massive scale," it seems more plausible that management was simply unaware of the details

22   of the company's compliance with the oil pipeline regulations.

23

24

1    D.   Statement Regarding Leak Detection System and Corrosion Monitoring Program

2         Plaintiffs next focus on a statement made by BP's then-CEO John Browne at an April

3    2006 press conference stating that the first spill occurred "in spite of the fact that we have both

4    world class corrosion monitoring and leak detection systems, both being applied within

5    regulations set by Alaskan authorities." (SAC ¶ 192.) With the benefit of hindsight, this

6    statement appears to be false. Later investigations revealed the pipelines at Prudhoe Bay were

7    under-inspected, under-maintained, and subject to a severe risk of corrosion-related failure.

8    (SAC ¶ 193.) Subsequent events—the August 2006 spill, the shutdown of Prudhoe Bay, and the

9    DOJ and Alaska criminal investigations—suggest Browne's April 2006 statement was false.

10        However, Plaintiffs do not allege facts sufficient to create a strong inference of scienter

11   because they do not allege that Browne knew about the problems when he made his statement.

12   Outside of the rare circumstance when the relevant fact is so prominent it would be "absurd to

13   suggest management was without knowledge of the matter," allegations that corporate officers

14   knew key facts independently satisfy the PSLRA only "where they are particular and suggest that

15   defendants had actual access to the disputed information." South Ferry LP, #2 v. Killinger, 542

16   F.3d 776, 786 (9th Cir. 2008). Here, it is not absurd to suggest that Browne, the then-CEO of

17   BP's global operations, may not have been informed specifically about BP's Prudhoe Bay

18   pipeline maintenance program. And Plaintiffs do not allege that Browne had actual access to the

19   information about BP's noncompliance with corrosion regulations when he made the statements

20   at issue on April 25, 2006.

21        In fact, Plaintiffs' complaint shows the opposite. Plaintiffs allege that the Board was

22   given a detailed update about the spill at a Board meeting on or about May 5, 2006—10 days

23   after Browne's April 25 press conference. (SAC ¶ 93.) Earlier information about the situation in

24   Prudhoe Bay came only from a 2004 letter from an advocate for BP workers in Alaska, a 2001

ORDER DISMISSING CASE- 12

1   report on corrosion conditions, and the March 15, 2006 Corrective Action Order, which set a

2   schedule for pigging the pipelines, but did not speak in terms of specific legal violations. (SAC

3   ¶¶ 48-59; 84.) At no point do Plaintiffs allege facts sufficient to support an inference that Browne

4   had "actual access" to the information when he made his statement.

5        Plaintiffs' allegations that rely on plea agreements and allegations made by other parties

6   in ongoing cases must also be viewed in context. The Ninth Circuit has cautioned courts from

7   giving too much weight to plea agreements and settlements that contain "largely legal

8   conclusions, rather than particularized facts." See Glazer Capital Mgmt., 549 F.3d at 748. The

9   documents Plaintiff cites, such as BPXA's 2007 guilty plea and the 2009 DOJ complaint, do not

10  contain particularized facts sufficient to support a strong inference that Browne knew this

11  information when he made his April 2006 statement. (SAC ¶¶ 127-137.)

12       E.   Statement Regarding "Best Environmental Practices"

13       Lastly, Plaintiffs attack statements in BP's 2004 and 2005 Annual Reports, filed on June

14  30, 2005 and 2006, that BP employed "best environmental practices" with regard to pipelines.

15  (SAC ¶ 183; Dkt. No. 187 at 24.) Plaintiffs allege the 2005 Annual Report statement was false

16  because BP's environmental practices were "criminal and in violation of the Clean Water Act,"

17  and they allege the 2006 Annual Report statement was false because BP had already failed to

18  comply with the Corrective Action Orders issued after the March 2006 spill. (SAC ¶¶ 183-184;

19  196-197.) Plaintiffs argue BP could not have been engaged in "best environmental practices"

20  because BP was breaking the law. (Id.)

21       These attacks fail because "best environmental practices" is vague and amorphous

22  language that does not constitute a material misrepresentation. See In re Ford Motor Co. Sec.

23  Litig., 381 F.3d 563 570-71 (6th Cir. 2004). A fact is material in the securities fraud context if it

24  significantly alters the "total mix" of information made available to an investor. TSC Indus. V.

1    <u>Northway</u>, 426 U.S. 438, 449 (1976). When read in context, neither statement qualifies as

2    material because it does not alter the information available to investors in a significant way. <u>Id.</u>

3           The statement in the 2004 Annual Report (issued June 30, 2005) reads: "throughout

4    2004, BP continued to comply with a plea agreement with the U.S. Justice Department to

5    develop, implement and maintain a nationwide environmental management system (EMS)

6    consistent with the best environmental practices at Group facilities . . . ." (SAC ¶ 183.) In that

7    statement, the words "continued to comply" and "develop" indicate that the company was

8    working to achieve a level of compliance, not that it had already achieved such compliance. (<u>Id.</u>)

9    Plaintiffs also fail to allege any facts that BPXA had violated Alaska's regulations at the time the

10    2004 Annual Report was filed. (Dkt. No. 190 at 11.)

11           The statement in the 2005 Annual Report (issued June 30, 2006) is immaterial for the

12    simple reason that the words "best environmental practices"—repeated largely verbatim from the

13    prior year's annual report—provide little new information to investors coming just over three

14    months after a "massive spill" that was "by far the largest ecological disaster caused by a failed

15    pipeline in the history of oil exploration in Alaska." (SAC ¶ 3.) The June 2006 statement is not

16    actionable because, for all intents and purposes, the March 2006 oil spill informed investors that

17    BP was not in compliance with best environmental practices. <u>See</u> <u>Roots P'ship v. Lands' End</u>,

18    965 F.2d 1411, 1420 (7h Cir. 1992) (misstatement immaterial where truth already known to

19    market). Coming in the immediate aftermath of a large oil spill, a statement about the company's

20    "best environmental practices" was unlikely to significantly alter the mix of information that

21    would drive investment decisions. <u>See</u> <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231 (1988).

22      F.   "Holistic" Scienter Analysis

23           Under <u>Tellabs</u> and Ninth Circuit law, a district court is to conduct a two-part inquiry for

24    scienter. 551 U.S. at 323; <u>N.M State Inv. Council v. Ernst & Young LLP</u>, 641 F.3d 1089, 1095

1   (9th Cir. 2011). First, the court determines whether any of the allegations, standing alone, are

2   sufficient to create a strong inference of scienter. Id. Second, if no individual allegation is

3   sufficient, the court is to conduct a "holistic" review of the same allegations to determine

4   whether the insufficient allegations combine to create a strong inference of intentional conduct or

5   deliberate recklessness. Id. Put differently, the court is to determine "whether all of the facts

6   alleged, taken collectively, give rise to a strong inference of scienter." 551 U.S. at 323.

7          Here, a holistic review yields the same result, because in every case the strength of the

8   inferences that Plaintiffs ask the Court to draw is exceeded by plausible, nonculpable

9   explanations for the defendant's conduct. Id. at 324. At all periods, the statements and conduct

10  that Plaintiffs allege more closely resembles simple corporate mismanagement than actionable

11  securities fraud. (See Dkt. No. 120 at 11.) BP's 2004 Annual Report sentence about "best

12  environmental practices," spoke in general terms about environmental and safety efforts, but did

13  not discuss pipeline maintenance in any detail. (SAC ¶ 183.) The statements following the first

14  spill—Maureen Johnson's March 15 statement about "low and manageable" risk (SAC ¶¶ 185-

15  186); her March 15 and May 14 statements comparing the WOA and EOA pipelines (SAC ¶¶

16  187-189); John Browne's April 25 press conference statement about "world class corrosion

17  monitoring and leak detection systems" (SAC ¶¶ 192-193); and the BP 2005 Annual Report

18  statement about "best environmental practices" (SAC ¶ 183)—portray a company that poorly

19  understood the challenges it faced in Prudhoe Bay, not one that engaged in securities fraud.

20  Indeed, this conclusion is supported by BP's decision to shut down all of Prudhoe Bay after

21  discovering a leak one two hundredth the size of the original WOA leak in the EOA pipeline.

22  (SAC ¶ 5.) In sum, Plaintiffs' allegations, taken collectively, do not give rise to a strong

23  inference of scienter. 551 U.S. at 323.

24

III.     Scheme Liability

Plaintiff's second claim recharacterizes their misstatement or omission claim as a claim against BPXA under Rule 10b-5(a) and (c) for scheme liability based on BPXA's criminal conduct. (Dkt. No. 187 at 31.) Whereas Rule 10b-5(b) prohibits material misrepresentations and omissions, sections (a) and (c) prohibit "any device, scheme or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. 17 C.F.R. §§ 240.10b-5(a), (c). The key difference is that a claim for scheme liability focuses on deceptive conduct rather than deceptive statements. See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008).

Here, Plaintiffs allege that BPXA engaged in a fraudulent scheme by attempting to boost profits at Prudhoe Bay through cost cutting, and therefore failed to devote sufficient resources to the corrosion problems that ultimately caused the 2006 spills. (SAC ¶¶ 204-215.) Plaintiffs rely primarily on the Sentencing Memorandum prepared by the United States in connection with BPXA's 2007 guilty plea to a criminal violation of the Clean Water Act in connection with the oil spills at Prudhoe Bay, which states that "[c]ost cutting was the emphasis for operation of the Greater Prudhoe Bay Unit of BPXA for many years without regard for the ever-increasing costs of running an aging oil field." (SAC ¶ 208.) Plaintiffs also cite BPXA's guilty plea, which stated, "BPXA did not expend sufficient resources to address the complex issues of corrosion control in the OTLs." (SAC ¶ 209.)

Plaintiffs' scheme liability claim fails for two reasons. First, Plaintiffs' pleadings do not come close to alleging facts sufficient to satisfy Federal Rule 9(b), which requires they "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Ninth Circuit has held that Rule 9(b) requires specific pleading of evidentiary facts, such as time,

1  place, persons, statements, and explanation of why statements are misleading. See In re Glenfed,

2  Inc. Sec. Litig., 42 F.3d 1541, 1547 n.7 (9th Cir. 1994); Ebeid ex rel. United States v. Lungwitz,

3  616 F.3d 993, 998 (9th Cir. 2010) (party must state with particularity circumstances constituting

4  fraud, including the "who, what, when, where and how" of the misconduct charged).

5        Here, Plaintiffs' complaint does not allege with any particularity the circumstances

6  constituting BPXA's alleged scheme, and does not state details about the who, what, when,

7  where, and how, besides realleging facts from its complaint under Rule 10b-5(b) and citing to

8  BPXA's plea agreements. (SAC ¶¶ 204-215.) Further, a review of BP's 2007 guilty plea does not

9  itself contain particularized facts sufficient to support a claim for scheme liability. (Dkt. No. 182-

10  10 at 9-14.) Instead, the plea contains largely the same description of negligent maintenance of

11  the Prudhoe Bay pipelines as alleged in Plaintiffs' claim for relief under Rule 10b-5(b).

12        Second, Plaintiffs scheme liability allegations fail because they ignore the Ninth Circuit's

13  recent holding that a "Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged

14  misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim." WPP

15  Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011)

16  (hereinafter "WPP Luxembourg"). "A defendant may only be liable as part of a fraudulent

17  scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the

18  scheme also encompasses conduct beyond those misrepresentations or omissions." Id. Here,

19  while Plaintiffs attempt to argue that their scheme liability claim is premised on BPXA's

20  "conduct," their bare-bones description of this alleged conduct, mostly by way of reference to

21  documents associated with BPXA's 2007 guilty plea, does not satisfy the requirements of WPP

22  Luxembourg. Id. at 1058 (contrasting Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223,

23  237 (D. Mass. 2004), where court find allegations sufficient where defendant, in addition to

24

ORDER DISMISSING CASE- 17

1  issuing misleading investor reports, worked extensively to boost company's market price

2  artificially through activities that were not omissions).

3      Nor does it make sense for the Court to grant Plaintiffs' request to be permitted to plead

4  scheme liability in the alternative to their misrepresentation and omission claims. (Dkt. No. 187

5  at 34.) In WPP Luxembourg, the Ninth Circuit emphasized "the importance of maintaining a

6  distinction among the various Rule 10b-5 claims from one another." 655 F.3d at 1057. Here,

7  permitting Plaintiffs to pursue a separate scheme liability claim based essentially on the same

8  facts as their Rule 10b-5(b) claim would blur the "carefully maintained" and "well-established"

9  distinctions between the different claims. Id.

10     IV.    Section 20(a)

11     Plaintiffs third claim seeks to impose controlling person liability against BP, and against

12  Defendants Johnson and Browne, under § 20(a) of the Securities Exchange Act. (SAC ¶¶ 216-

13  223); 15 U.S.C. § 78t(a). In order to prove a prima facie case under § 20(a), plaintiff must prove:

14  (1) a primary violation of federal securities law; and (2) that the defendant exercised actual

15  power or control over the primary violator. See Howard v. Everex Sys., 228 F.3d 1057, 1065

16  (9th Cir. 2000). Here, because Plaintiffs fail to prove an underlying violation, there is no

17  controlling person liability.

18     V.    Morrison

19     Lastly, the Supreme Court's recent decision in Morrison v. Nat'l Australia Bank, 130 S.

20  Ct. 2869 (2010), requires dismissal of Plaintiffs' § 10(b) claims based on transactions in BP

21  ordinary shares, which are traded on foreign exchanges. The Supreme Court's new rule is that §

22  10(b) only applies to "transactions in securities listed on domestic exchanges, and domestic

23  transactions in other securities." Id. at 2884. Therefore, under Morrison, Plaintiffs may assert a

24  claim on behalf of holders of BP's American Depository Shares ("ADSs"), which each represent

1   six ordinary shares of BP, but may not make a claim on behalf of holders of BP's ordinary

2   shares, which are traded only abroad. (SAC ¶ 24.)

3      Plaintiffs attempt to circumvent this rule by arguing that BP's ordinary shares were

4   "listed" on the New York Stock Exchange, because "[t]he NYSE requires foreign private issuers,

5   such as BP, who enter into a deposit agreement with an American depositary for the purpose of

6   sponsoring their ADRs, to have first entered into a 'basic Listing Agreement' with the exchange

7   on which the ADRs will be listed." (SAC ¶ 28.) However, the listing argument advanced by

8   Plaintiffs is "badly undercut by the fact that the issuer in Morrison . . . had ADRs traded on the

9   NYSE." In re Royal Bank of Scotland Group plc Sec. Litig., 765 F. Supp. 2d 327, 336 (S.D.N.Y.

10  2011).

11     Indeed, every court that has considered this argument has rejected it. See, e.g., In re

12  Alstom SA Sec. Litig., 741 F. Supp. 2d 469, 473 (S.D.N.Y. 2010); In re UBS Sec. Litig., 2011

13  WL 4059356 (S.D.N.Y. 2011); In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512

14  (S.D.N.Y. 2011).  The Supreme Court's recent decision in Morrison requires that Plaintiffs'

15  claims be limited to the claims of BP's ADRs, which are listed and traded in the United States.

16  (SAC ¶ 24.)

17                                      **Conclusion**

18     Because Plaintiffs' complaint does not adequately allege scienter as required by the

19  PSLRA, the Court DISMISSES Plaintiffs' claim under § 10(b) and Rule 10b-5(b). Because

20  Plaintiffs' claim for scheme liability does not allege facts independent from their

21  misrepresentation or omission claim, the Court DISMISSES Plaintiffs' scheme liability claim.

22  Because Plaintiffs have failed to prove an underlying securities violation, there is no controlling

23

24

1  person liability under § 20(a) of the Securities Exchange Act. Plaintiffs' complaint is

2  DISMISSED with prejudice.

3      The clerk is ordered to provide copies of this order to all counsel.

4      Dated this 14th day of March, 2012.

5

6

7                 _____

8                 Marsha J. Pechman
               United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24