UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re ANADARKO PETROLEUM
CORP. CLASS ACTION LITIGATION

Lead Case No. 4:12-CV-00900

Honorable Keith P. Ellison

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

John C. Browne
Jeremy P. Robinson
Brett Van Benthysen
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400
Facsimile:    (212) 554-1444

*Attorneys for Lead Plaintiffs*

## TABLE OF CONTENTS

**PAGES**

I.      NATURE OF THE ACTION ......................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 9

III.    PARTIES ......................................................................................................... 9

        A.      Lead Plaintiffs ................................................................................... 9

        B.      Defendants ........................................................................................ 10

                1.      Anadarko ................................................................................ 10

                2.      The Individual Defendants .................................................... 10

        C.      Relevant Non-Parties ..................................................................... 11

IV.     BACKGROUND ........................................................................................... 12

        A.      Anadarko Touts Itself As The "Premier Deepwater Producer In The Gulf
                Of Mexico" And Assures Investors That A "Safety First Culture Is A Way
                Of Life At Anadarko" ...................................................................... 12

        B.      Anadarko And BP Become Co-Owners Of The Macondo  Oil Well And
                Anadarko Is Provided With Detailed  Information Regarding The Well ............. 14

V.      DRILLING THE MACONDO OIL WELL ................................................ 25

        A.      Overview Of The Deepwater Drilling Process  And The Initial Plan For
                The Macondo Well ........................................................................... 25

        B.      Anadarko And BP Start Drilling The Macondo Well And  Immediately
                Encounter Significant Delays And Additional Costs............................ 26

        C.      "The Nightmare Well":  Faced With Extensive Delays And Millions Of
                Dollars Over-Budget, Anadarko and BP Sacrifice Safety In Order To
                Reduce Costs And Save Time............................................................ 28

                1.      Anadarko Approved The Use Of A Less Safe Well Casing Design
                        That Saved Time And Money .............................................. 30

                2.      Anadarko Approved The Use Of A Dangerously Small Number Of
                        Well Casing Centralizers In Order To Save Time:  "Who Cares,
                        It's Done, End Of Story, [It] Will Probably Be Fine" ................ 36

                3.      Anadarko Approved The Failure To Conduct Proper Cement
                        Circulation Or Properly Test The Cement Job ........................ 39

VI.  THE DEEPWATER HORIZON RIG EXPLODES AND THE MACONDO CO-OWNERS ARE UNABLE TO STEM THE FLOOD OF OIL GUSHING INTO THE GULF OF MEXICO ........................................................................ 43

    A.  The Explosion And Fire On The *Deepwater Horizon* ........................................... 43

    B.  The Macondo Co-Owners Are Unable To Contain The Oil Spill For Months ...................................................................................................................... 44

    C.  The Woefully Deficient And Materially False And Misleading  Oil Spill Response Plan And Exploration Plan ....................................................................... 47

        1.  Government Regulations Required An OSRP And EP To Be Publicly Filed for the Macondo Well......................................................... 47

        2.  The OSRP and EP Were Materially False ................................................. 50

VII.  THE TRUTH IS REVEALED ............................................................................. 54

VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .............................................................................. 67

    B.  Defendants' Materially False And Misleading Statements In The OSRP and EP ...................................................................................................................... 67

    C.  Defendants' Materially False And Misleading Statements Published On Anadarko's Website Throughout The Class Period............................................. 70

    D.  Defendants' Materially False And Misleading Statements Made During The Second Quarter Of 2009 ................................................................................. 73

    E.  Defendants' Materially False And Misleading Statements Made During The Third Quarter Of 2009 .................................................................................... 73

    F.  Defendants' Materially False And Misleading Statements Made During The Fourth Quarter Of 2009 ................................................................................. 75

    G.  Defendants' Materially False And Misleading Statements Made During The First Quarter Of 2010......................................................................................... 79

    H.  Defendants' Materially False And Misleading Statements  Made During The Second Quarter Of 2010 ................................................................................. 83

IX.  ADDITIONAL ALLEGATIONS CONFIRMING ANADARKO'S  WILFUL OR RECKLESS MISCONDUCT AT THE MACONDO WELL .......................................... 88

    A.  Defendants Acknowledge That Recklessness Or Willful Misconduct Caused The Macondo Disaster ............................................................................. 88

B.     Anadarko Willfully Or Recklessly Ignored BP's Abysmal Safety Record .......... 89

C.     Anadarko Is Sued By The U.S. Government For Its Role In The Disaster ......... 94

D.     Numerous Investigations Confirm That The Spill Was  Preventable And Resulted From Reckless Decisions  Made To Save Time And Money ................ 96

E.     Anadarko Sues BP And Admits That The Macondo Well Disaster Was Caused By A Series Of Deliberate Or Reckless Decisions Onboard The Deepwater Horizon ............................................................................................ 101

F.     Anadarko Pays $4 Billion To BP To Settle Macondo-Related Claims .............. 103

X.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 103

XI.    LOSS CAUSATION ..................................................................................... 106

XII.   CLASS ACTION ALLEGATIONS ................................................................ 111

XIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................... 113

XIV.  PRESUMPTION OF RELIANCE .................................................................. 114

XV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................... 115

COUNT ONE  FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS ........................................................................................... 115

COUNT TWO  FOR VIOLATIONS OF SECTION 20(A) OF  THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS .................................................. 118

DEMAND FOR JURY TRIAL ............................................................................. 119

PRAYER FOR RELIEF ...................................................................................... 119

Court-appointed Lead Plaintiffs, the Pension Trust Fund for Operating Engineers and the Employees' Retirement System of the Government of the Virgin Islands (collectively, "Lead Plaintiffs") bring this consolidated class action alleging violations of the federal securities laws on behalf of themselves and all other persons and entities, other than Defendants, their affiliates, and BP (defined below in ¶29), who purchased or otherwise acquired the publicly-traded securities of Anadarko Petroleum Corporation (together with its affiliates, including Anadarko E&P Company, LP, "Anadarko" or the "Company") between June 12, 2009 and June 9, 2010 (the "Class Period) and were injured thereby.

## I.   NATURE OF THE ACTION

1.     This securities class action arises out of one of the largest environmental catastrophes in United States history.  The April 20, 2010 explosion and fire on board the Deepwater Horizon oil-rig, located forty-nine miles off the Louisiana coast in the Gulf of Mexico, killed eleven people and injured dozens more.  The resulting oil spill from the ruptured Macondo well lasted approximately 87 days and leaked approximately 206 million gallons of crude oil into the Gulf of Mexico, polluting hundreds of miles of beaches, killing untold numbers of fish, birds and other wildlife, and inexorably damaging millions of acres of wetlands.  The President deemed it the "worst environmental disaster the United States has ever faced."

2.     During the Class Period, Anadarko – one of the world's largest independent oil and gas production companies – owned 25% of the Macondo well, in which BP owned a majority 65% interest.  As alleged below, in partnering with BP on the Macondo well, Anadarko expressly approved and funded a series of extremely risky decisions made in connection with drilling the well.  These decisions, which contributed directly to the disaster, represented extreme departures from industry standards and deliberately sacrificed safety in favor of saving time and money.  As also alleged below, as Anadarko's share price began to decline in the immediate

aftermath of the oil spill, Defendants assured investors that Anadarko had limited involvement in drilling the well, and faced minimal financial liability (all of which would be covered by insurance) arising from the spill.  These statements were false.  Between April 20, 2010, when the explosion occurred, and June 9, 2010, when the full truth about Anadarko's extensive role in the Macondo disaster was finally revealed, the Company's stock price dropped from $73.94 to $34.83, an astounding decline of over $39, with a resulting loss of approximately $19.3 billion in market capitalization.

3.      Anadarko was formed in 1985 and initially focused on drilling for oil in Texas and Oklahoma.  As oil and gas prices skyrocketed to unprecedented levels starting in 2005, Anadarko began investing in expensive and risky – but potentially lucrative – deepwater oil exploration and drilling in the Gulf of Mexico.  By 2009, Defendants were telling investors that the Company was "[o]ne of the most successful explorers in the Gulf of Mexico" and had a "competitive advantage within the Gulf of Mexico."  As Anadarko's Chief Executive Officer and Chairman of the Board, Defendant James Hackett ("Hackett"), told investors in May 2009, deepwater exploration in the Gulf of Mexico is "a phenomenal growth area for us."

4.      At the same time Defendants were telling investors that Anadarko was developing an expertise in drilling in the Gulf of Mexico, they repeatedly assured the market that the Company had the highest possible regard for safety and environmental compliance.  Drilling for oil in the deepwater of the Gulf of Mexico exposed the Company to potentially massive liability in the event of an environmental mishap.  In order to assuage investor concerns, Defendants stressed that "a safety-first culture is a way of life at Anadarko."  Indeed, Anadarko told its investors that the Company's "Gulf of Mexico operations team views <u>safety as a top priority</u>,"

and that the Company "is one of the industry's safest and most successful deepwater explorers," that has "proven we can develop these [oil] resources safely while protecting the environment."

5.       Defendants similarly assured investors that the Company closely monitored its drilling projects and conducted extensive due diligence before undertaking new projects.  For instance, Defendants stated that "whenever we undertake a new project, we work to understand the environmental issues . . . [and] create a balanced plan that couples new energy development with oftentimes innovative techniques to protect the locations in which we operate."  In addition, Defendants stated that Anadarko had a purportedly "rigorous" approach to managing risk and that "[i]t is rigorous and it's applied throughout the world to each of the prospects we drill."

6.       On October 1, 2009, Anadarko formally agreed to partner with BP on the Macondo oil well, purchasing a 25% ownership interest in return for an initial payment of approximately $24 million.  BP retained a 65% interest in the well, while a third minority partner, MOEX Offshore 2007 LLC ("MOEX"), owned the remaining 10% interest.  Each of the co-owners' interests in the Macondo well were filed with the United States government and publicly available, including through a public registry maintained by the U.S. Department of the Interior's Minerals Management Service ("MMS") (now the Bureau of Ocean Energy Management, Regulation and Enforcement or "BOEMRE").

7.       Prior to making its multi-million dollar investment, Anadarko was provided numerous key documents concerning the Macondo well, including the well design plan, and the critical Oil Spill Response Plan ("OSRP") and Exploration Plan ("EP") (together, the "Macondo Spill Response Plan").  The Macondo Spill Response Plan was a publicly-available document that was required by the MMS to set forth the Macondo co-owners' planned response and oil recovery efforts in the event of a spill at the Macondo well.  In addition to the Macondo Spill

Response Plan and other important documents, Anadarko was also provided with documents relating to the design of the well, and estimates of the costs and timeline for drilling the Macondo well.  The project was originally budgeted for $96.2 million and estimated to take 51 working days.

8.     BP was designated as the operator of the Macondo well and took the lead in drilling operations.  Anadarko was granted broad rights to monitor and approve activities on the well pursuant to a comprehensive operating agreement between the co-owners (discussed below at ¶¶39; 45-57).   In addition to all government filings (including the OSRP and EP) and communications concerning the well, Anadarko was given continuous access to detailed information concerning all operations on the *Deepwater Horizon* oil rig, including daily drilling reports, copies of well test results and 24/7 access to "real time" drilling data detailing current and prospective activities at the well.  The operating agreement also required Anadarko's express approval for key operations on the well.  According to a June 29, 2010 article published in the Financial Times, "Anadarko was kept abreast of what was going on each morning when BP sent a report of what had happened at the rig in the previous 24 hours, both companies said."

9.     Contrary to its assurances to investors, Anadarko performed virtually no due diligence before agreeing to partner with BP on the Macondo oil well.  Among other things, Anadarko approved the facially absurd Macondo Spill Response Plan (discussed below at ¶¶121-137), which was riddled with errors and outright falsifications.  Anadarko also willfully or recklessly disregarded BP's abysmal safety record, which was notorious within the oil and gas industry.  For instance, between June 2007 and February 2010, BP received an astonishing ninety-seven percent of all egregious willful violations issued to all oil producers during that time.  This shocking safety record put Anadarko on notice of a heightened need to closely review

the contingency plans in place at the Macondo well, including the Macondo Spill Response Plan, in addition to carefully monitoring BP's operations in order to protect its interests and ensure that it would not be exposed to huge liabilities in the event of an accident.

10.     True to past form, BP proposed a series of reckless and dangerous actions on the Deepwater Horizon rig – which Anadarko approved and funded.  Almost from the outset, the Macondo well earned a reputation as a "nightmare well," and encountered numerous difficulties. As the project fell significantly behind schedule and became tens of millions of dollars over-budget, BP and Anadarko made a series of increasingly reckless decisions that deliberately sacrificed safety in order to save time and money.  As discussed below at ¶¶61-107, Anadarko knowingly and expressly approved BP's riskiest cost-cutting and time saving proposals.  These decisions were contrary to the initial plans on the well and were made despite open acknowledgement of the safety risks they imposed.  For instance, when BP and Anadarko agreed to depart from the original plans and use only six "centralizers" to secure the well (described in more detail below at ¶¶89-96), as opposed to the sixteen that the original plans called for, an internal email among BP personnel noted the risks but declared "who cares, it's done, end of story, [it] will probably be fine."

11.     On April 20, 2010, Anadarko's and BP's recklessness materialized when gas leaked into the well and caused an explosion on the Deepwater Horizon rig that left eleven people dead, many injured and the rig critically damaged.  Two days later, the *Deepwater Horizon* sank, causing a massive oil spill.  Lacking an adequate oil spill response plan, Anadarko and BP failed to contain the spill for nearly five months while millions of barrels of oil were discharged into the Gulf of Mexico.

12.     In the aftermath of the explosion, as it became clear that the oil spill was much larger than initially disclosed, investors became increasingly concerned about the potentially huge liabilities Anadarko faced.  Indeed, between April 20, 2010 and April 30, 2010, the price of Anadarko's common stock dropped from $73.94 per share to $62.16 per share, a decline of approximately 15.9%, wiping out more than $5.8 billion in market capitalization.  Anadarko and the Individual Defendants responded by falsely assuring investors that the Company had extremely limited involvement with the well, that the Company's potential liabilities were fully covered by insurance, and the Company was working diligently and effectively to contain the spill.

13.     For instance, on a May 4, 2010 conference call with investors, Defendant Daniels stated that Anadarko had no role in "looking at the detail, well design or procedures" on the Macondo well.  In fact, Daniels went so far as to say "<u>we were not involved in that at all on this well.</u>"  This statement was blatantly false.  As revealed in sworn testimony provided by Michael Beirne, an employee of BP who acted as the primary contact between BP and Anadarko, in the summer of 2009 Anadarko had been provided with the well design plan and well permit applications, which Anadarko expressly approved for use on the Macondo well (discussed below at ¶¶39-41).  Moreover, as Daniels was well aware, throughout the drilling process, Anadarko was given immediate and continuous access to detailed information concerning all operations on the *Deepwater Horizon* oil rig.

14.     Defendants also concealed the fact that the Macondo Spill Response Plan was riddled with "extraordinary and dramatic" false representations concerning the ability of BP and Anadarko to effectively respond to a spill.  Rather than revealing the truth – *i.e.,* that BP and Anadarko had comprehensively lied about their ability to respond to a spill and vastly

understated the potential environmental impacts of a spill at the Macondo well – Defendant Hackett stated on the May 4, 2010 conference call that the clean-up efforts were "foremost in everyone's mind" and he assured investors that Anadarko was "focused on making sure that this clean-up occurs and . . . assisting BP" in the clean-up efforts.  In addition, in connection with the May 4, 2010 conference call, Defendants falsely assured investors that their potential liability for the Macondo well would be relatively small, approximately $177.5 million, and fully covered by insurance – when their true exposure was in the billions of dollars.  Defendants' misrepresentations had their desired effect, and Anadarko's stock price immediately rose from $62.16 on April 30, 2010 to $64.40 on May 4, 2010, an increase of 3.6%.

15.     On June 9, 2010, multiple news organizations reported for the first time that the Macondo Spill Response Plan was replete with false statements, "omissions and glaring errors." As has since been widely publicized, the misrepresentations in the plan were so extensive that even a cursory review would have revealed to any executive in the oil industry that it was woefully inadequate and littered with outright falsehoods (discussed below at ¶¶121-137).  When the June 9, 2010 disclosures finally revealed the truth about Anadarko's ability to respond to the Macondo oil spill and the true extent of the potential liability the Company faced, Anadarko's stock price dropped from $42.80 to $34.83, an astounding decline of nearly 19% on a single day.

16.     Various government investigations followed.  To date, the evidence and conclusions from these investigations establish that not only was this tragedy preventable, but it was caused by a series of dangerous decisions made in drilling the well (most of which were expressly approved by Anadarko).  In the words of the Report To The President prepared by the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Presidential Commission"), these decisions reveal "systematic failures in risk management."

17.     Indeed, as alleged below, during the Class Period, Defendant Hackett instilled a corporate culture at Anadarko that was focused on cutting costs and bringing projects in on time and under budget.   These aggressive cost-cutting efforts, which Defendants falsely assured investors did not compromise safety, resulted in a steep rise in the Company's stock price. Defendant Hackett reaped enormous personal benefits from this by selling off more than $61 million in stock in just seven months during the Class Period, despite not having sold any of his stock holdings in the two years prior to the Class Period.  Moreover, an astonishing $42.7 million worth of Defendant Hackett's sales – approximately sixty-nine percent of his holdings – occurred on March 31, 2010, after the Macondo project had suffered significant delays and just three weeks before the Macondo well disaster.

18.     Anadarko initially attempted to defend itself by pointing the finger solely at its partner, BP.  For example, on June 18, 2010, Defendant Hackett stated in a press release that "[t]he mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions . . . BP's behavior and actions likely represent . . . willful misconduct."   Also on June 18, 2010, during an interview with <u>Reuters</u>, Hackett acknowledged that there were "signs of serious trouble during the drilling operation" but said that "Anadarko would have done things differently."  Incredibly, Hackett failed to acknowledge that each of the reckless decisions and actions <u>were expressly approved and even funded by Anadarko</u>.

19.     Anadarko has now paid more than $4 billion to settle litigation with BP concerning its role in the disaster, and it is clear that as a co-owner of the Macondo well with BP, Anadarko shares responsibility with BP for this disaster.  Investors who relied on Anadarko's

false statements – both before and after the spill – lost billions of dollars in value, and are entitled to recover for those losses.

## II.  <u>JURISDICTION AND VENUE</u>

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is permitted in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Defendant Anadarko is headquartered near Houston, Texas and conducts substantial operations there.  Furthermore, many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading statements, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.  <u>PARTIES</u>

### A.    **Lead Plaintiffs**

22.     Lead Plaintiff the Pension Trust Fund for Operating Engineers ("Operating Engineers") is a non-profit corporation that administers the employee benefit programs for over 35,000 participants of the International Union of Operating Engineers, Local 12, and their dependents and beneficiaries.  Operating Engineers purchased common stock and bonds issued by Anadarko during the Class Period, and suffered damages as a result of the violations of the federal securities laws pled herein.

23.     Lead Plaintiff the Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") is a public pension fund for officials and employees of the Government of the Virgin Islands.  As of September 30, 2009, Virgin Islands had more than $1.33 billion in net assets maintained for the benefit of active and retired government employees and elected public officials.  Virgin Islands purchased common stock and bonds issued by Anadarko during the Class Period, and suffered damages as a result of the violations of the federal securities laws pled herein.

**B.     Defendants**

**1.     Anadarko**

24.     Defendant Anadarko Petroleum Corporation (together with its affiliates, including Anadarko E&P Company, LP, "Anadarko" or the "Company") is a corporation organized under the laws of the state of Delaware.  Anadarko engages in the exploration and production of oil and gas properties in the United States and internationally.  Anadarko has its principal place of business located at 1201 Lake Robbins Drive, The Woodlands, Texas 77380, where its investor relations department is also located and from where the Company issues its public statements. The Company's annual meetings of stockholders are held in The Woodlands, Texas and Anadarko maintains substantial operations in Texas.

**2.     The Individual Defendants**

25.     Defendant James T. Hackett ("Hackett") resides in Houston, Texas and was at all relevant times Anadarko's Chief Executive Officer and Chairman of the Board of Directors. Hackett also served as President of Anadarko from 2003 to February 2010.  Defendant Hackett signed and certified the accuracy of Anadarko's Form 10-K for the fiscal year ended 2009, and also certified the accuracy of the Company's Forms 10-Q for the periods ended June 30, 2009, September 30, 2009 and March 31, 2010.  Defendant Hackett frequently spoke to investors

throughout the Class Period.  During the Class Period, Defendant Hackett sold over $61 million worth of Anadarko common stock.

26.     Defendant Robert G. Gwin ("Gwin") resides in Houston, Texas and was at all relevant times Anadarko's Chief Financial Officer ("CFO") and Senior Vice President of Finance of the Company.  During the Class Period, defendant Gwin signed and certified the accuracy of the Company's Form 10-K for the fiscal year ended December 31, 2009, and signed and certified the Company's Forms 10-Q for the periods ended June 30, 2009, September 30, 2009 and March 31, 2010.

27.     Defendant Robert P. Daniels ("Daniels") resides in Spring, Texas (near Houston) and was at all relevant times Anadarko's Senior Vice President, Worldwide Exploration.  During the Class Period, Defendant Daniels spoke on behalf of the Company during conference calls and at conferences, including the Bank of America Energy Conference on November 18, 2009 and the Credit Suisse Energy Summit on February 3, 2010 and Anadarko's 2010 Annual Investor Conference on March 2, 2010.

28.     Defendants Hackett, Gwin and Daniels are collectively referred to herein as the "Individual Defendants."  Together with Defendant Anadarko, the Individual Defendants are collectively referred to herein as "Defendants."

### C.     Relevant Non-Parties

29.     Relevant non-party BP p.l.c. (together with its affiliates, including BP Exploration & Production Inc., "BP"), a global oil and gas company, is incorporated under the laws of the state of Delaware.  BP America's Chairman and President resides in Texas, and BP maintains substantial operations in Texas, including oil and gas exploration and production operations.  As set forth herein, BP was a co-owner and partner with Anadarko of the Macondo well, having a 65% ownership interest.  Pursuant to the terms of a comprehensive Joint Operating Agreement

11

(defined below), BP and Anadarko in connection with the oil exploration activities undertaken at the Macondo well, sharing in the potential rewards, as well as the costs, risks and liabilities associated with the project.

## IV.   BACKGROUND

### A.   Anadarko Touts Itself As The "Premier Deepwater Producer In The Gulf Of Mexico" And Assures Investors That A "Safety First Culture Is A Way Of Life At Anadarko"

30.     Anadarko is one of the world's largest independent oil and gas exploration and production companies.  When Anadarko was initially formed in 1985, its primary focus was drilling for oil in Texas and the Oklahoma panhandle.  As oil and gas prices skyrocketed to unprecedented levels starting in 2005, Anadarko began to invest heavily in expensive – but potentially lucrative – deepwater oil exploration and drilling in the Gulf of Mexico.  By 2009, Anadarko boasted of having "one of the industry's largest deepwater drilling programs," and Defendants told investors that deepwater drilling in the Gulf of Mexico would be the primary driver of the Company's future growth.  For instance, at an energy-related investor conference held on May 28, 2009, Defendant Hackett told investors that "deepwater exploration … is still a phenomenal growth area for us in terms of organic growth.  I think we are in the top four acreage holders in the Gulf of Mexico, including major oil companies."

31.     Defendants also told investors that the Company was the "premier deepwater [oil] producer in the Gulf of Mexico," "[o]ne of the most successful explorers in the Gulf of Mexico," and "among the largest independent leaseholders and producers in the deepwater Gulf of Mexico."   During an investor conference held on August 13, 2009, Anadarko executives emphasized the strength of the Company's burgeoning Gulf of Mexico operations and told investors that "it's a great time to invest in Anadarko . . . it's got a strong growth vehicle for a combination of both low-risk and high-end exploration opportunities."

32.     At the same time Defendants were telling investors that Anadarko was developing an expertise in deepwater drilling operations in the Gulf of Mexico, they were also assuring that the Company had the highest possible regard for safety and environmental compliance – even going so far as to call Anadarko a "steward of the environment."  Defendants emphasized, for instance, the Company's supposed "industry-proven track record of project execution and development," and stressed that "a safety-first culture is a way of life at Anadarko."  In keeping with this theme, on the Company's website, Anadarko portrayed its oil exploration and production operations to investors as follows:  "At Anadarko, we are committed to safely producing the energy we all need in a manner that protects the environment, public health and supports our communities."  Anadarko's corporate website also praises the Company's safety practices, including specifically in the Gulf of Mexico.  For example, on a webpage titled "Deepwater Exploration," Anadarko states:

> Anadarko's expertise and focused pursuit of material exploration targets in the Gulf of Mexico have made us one of the industry's safest and most successful deepwater explorers.

33.     Anadarko also stressed the extensive due diligence that it supposedly undertook to ensure that each of its new business ventures adheres to the Company's purportedly rigorous "Environment, Health & Safety" standards:

> [W]henever we undertake a new project, we work to understand the environmental issues and cultural considerations of an area.  Then we create a balanced plan that couples new energy development with oftentimes innovate techniques to protect the locations in which we operate.  Fundamental to our operating philosophy is a commitment to adhere to the stricter of two standards: our own policies and principles or an individual country's regulations.

34.     Further, the Company's "Gulf of Mexico Fact Sheet," which is published on Anadarko's corporate website (www.anadarko.com), stresses Anadarko's disciplined and rigorous approach to managing risk, stating that Anadarko is:

> Positioned for continued success in the deepwater Gulf of Mexico and disciplined in its risking methodology.  This methodology incorporates a rigorous technical and commercial evaluation, risked economics for comparability and continuous high grading with commercial focus.

In touting its "risking methodology," Anadarko specifically points to its "[p]roven exploration track record," and "industry-leading project-management skills."

35.    Based on these and other representations (which, as discussed below, were materially false and misleading when made), the price of Anadarko's publicly-traded securities was artificially inflated during the Class Period – with the Company's common stock rising from $41.66 on July 7, 2009 to a Class Period high of $74.74 on April 5, 2010.  Anadarko took advantage of this rising stock price to raise hundreds of millions of dollars from public investors.  Indeed, just one month before the Macondo disaster, pursuant to a shelf registration statement effective on or about March 9, 2010, Anadarko sold $750 million worth of 6.200% Senior Notes due 2040 to the investing public.

### B.    Anadarko And BP Become Co-Owners Of The Macondo Oil Well And Anadarko Is Provided With Detailed Information Regarding The Well

36.    In March 2008, BP paid approximately $34 million to the MMS (now BOEMRE) for an exclusive lease to drill for oil in a nine-square-mile plot in the Gulf of Mexico referred to as Mississippi Canyon Block 252, which became known as the "Macondo" prospect.  Block 252 is located approximately 49 miles off the coast of Louisiana in the deepwater of the Gulf of Mexico.

37.    Based on available geological data, BP had good reason to believe that the area covered by the Macondo well would yield an oil well that could generate a large profit.  BP, however, would be the first company to drill a well in the Mississippi Block 252 area – an expensive and risky operation that had no guarantee of success.  Indeed, in its letter dated April

6, 2009 authorizing BP to begin activities at the Macondo well, the MMS specifically warned BP to "exercise caution while drilling due to indications of shallow gas and possible water flow." In addition, the MMS-approved "Application For Permit to Drill a New Well" dated September 8, 2009 again exhorted BP to "[p]lease use caution while drilling" because of both "possible shallow gas" and "potential shallow water flow."  As explained herein, these documents were provided to Anadarko when it purchased 25% of the Macondo well.

38.     BP sought to partner with other oil and gas companies in order to share the costs and risks involved in drilling the first exploratory deepwater oil well within the Block 252 area. During the Class Period, Anadarko agreed to become co-owners with BP in what came to be named the "Macondo" oil well.  In exchange for an initial payment to BP of approximately $24 million, Anadarko purchased a 25% ownership interest in the oil well.  According to an article published in <u>Bloomberg</u> on July 22, 2010, during an interview at Houston's River Oaks Country Club, Defendant Hackett told a reporter that he personally made the decision to "to buy a 25 per cent share of BP plc's Macondo well."

39.     Anadarko and BP entered into several agreements that formalized their status as co-owners of the Macondo well and partners on the oil exploration activities to be carried out on the well.  These agreements gave Anadarko significant control over the project.  Pursuant to a lease agreement (referred to as a "Lease Exchange Agreement") dated October 1, 2009, Anadarko became a co-lessee of the oil well.  A separate but related joint operating agreement entitled "Ratification and Joinder of Operating Agreement Macondo Prospect" (the "Joint Operating Agreement" or "JOA") gave Anadarko the rights to participate with BP in the exploratory drilling at the Macondo well site as well as sweeping rights to supervise and approve material operating decisions on the well.  As a result of these transactions, Anadarko owned a

25% interest in the lease of the Macondo well and BP held a 65% interest.  A third partner,

MOEX Offshore 2007 LLC ("MOEX"), owned the remaining 10% interest.

40.     Anadarko's ownership interest in the Macondo well was filed with the

government and publicly disseminated via a public registry maintained by the MMS (now the

Bureau of Ocean Energy Management, Regulation and Enforcement or "BOEMRE"), which was

available online.  For example, a page printed from the registry (which is dated February 24,

2010) identifies the "record title of interest…effective 10/01/2009" in "all of Block 252,

Mississippi Canyon" (*i.e.,* the Macondo well) to be held by:

| | |
|---|---|
| Anadarko E&P Company LP | 22.50000% |
| Anadarko Petroleum Corporation | 2.50000% |
| BP Exploration & Production Inc. | 65.00000% |
| MOEX Offshore 2007 LLC | 10.00000% |

Effective April 1, 2010, Anadarko E&P Company LP transferred its 22.5% lease interest in the

Macondo well to Anadarko Petroleum Corporation.

41.     Even prior to entering into the formal agreements regarding its ownership interest,

Anadarko was provided with detailed information concerning the design of the Macondo well.

For instance, in connection with an investigation into the oil spill being conducted jointly by the

U.S. Coast Guard and the Bureau of Ocean Energy Management (the "Joint Marine Board"),

Michael Beirne ("Beirne"), who was BP's Offshore Land Negotiator and the primary contact

between BP and Anadarko concerning the Macondo well, gave sworn testimony that, as early as

the summer of 2009, Anadarko was provided with the well design plan, well permit applications

and other filings with the U.S. Government, the estimated costs of the well and other key well-

related documents.  For example, Beirne testified *inter alia*:

> Q.     To your knowledge, did Anadarko or MOEX seek to amend or modify the
> temporary abandonment plan formulated by BP?

A.    Not that I'm aware. I know that that was part of the marketing presentation that we provided to both of them prior to them signing in and also it was part of the well plan in the original AFE.

Q.    The BP well plan?

A.    Yes, sir.

42.    In addition, Paul A. Chandler, Anadarko's project geological advisor for the Mississippi Canyon during the 2009 – 2010 time frame, was deposed on May 4, 2011 in connection with the Macondo spill-related action captioned *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 10-md-02179 (E.D.La.) (the "Louisiana Litigation") and testified as follows:

Q.    Now, did you play a role in the decision by Anadarko whether to acquire the interest in Macondo?

A.    Yes.

Q.    What role did you play?

A.    I did the geologic evaluation of it.  So from a geological perspective, I looked at the data that we had internally at Anadarko.  We were provided data by BP to do an initial evaluation of it.  And along with the asset team I worked with, we made a recommendation to try to acquire an interest in the lease.

[…]

Q.    Okay.  And the recommendation that you were prepared to make was what?

A.    The recommendation we were prepared to make was that we liked it from a engineering standpoint, from a geological point and our recommendation was to see if we could acquire an interest in it.

[…]

43.    Mr. Chandler also confirmed that Anadarko had full access to geological reports:

Q.      Okay.  And then it also shows here that you downloaded a number of – on the 16th, also – a number of geological reports.  Do you see that?  It continues on to the next page as well.

A.      Yes.

Q.      And the reason for downloading those reports, the geological reports was what?

A.      Again, this was near the end of the evaluation for the well.  For my concern, geologically, we had completed most of what we had intended to do to evaluate the reservoir.  So this was in connection with that and just making sure that all our reports were downloaded to the final analysis.

44.     The documents provided to Anadarko and the Individual Defendants prior to their entering into the Lease Exchange Agreement and the Joint Operating Agreement also included the Oil Spill Response Plan and Exploration Plan, which are described in more detail below.  The EP had been previously filed with the MMS on or about February 23, 2009 and available to the public no later than March 10, 2009 – when it was "deemed submitted" by the MMS.  The OSRP had been last revised and publicly filed with the Government on or about June 30, 2009.

45.     Under the Lease Exchange Agreement and the Joint Operating Agreement, BP was designated as the operator of the Macondo oil well and Anadarko was given the right to oversee and approve most of BP's actions.  Consistent with the large investment made by Anadarko and the risks involved in the venture, the Joint Operating Agreement between Anadarko and BP required that Anadarko be provided with virtually all information concerning activities at the well, gave Anadarko broad rights to monitor and approve any major decision undertaken by BP with respect to drilling or operating the well and required all press releases or public statements relating to the Macondo well, or the activities contemplated under the Joint Operating Agreement, to be provided to, and approved by, Anadarko before they could be released to the public.

46.     For example, Anadarko's rights under the Joint Operating Agreement included the following:

- **Access to Detailed Information**.  As noted above, section 5.6 of the Joint Operating Agreement required BP to provide Anadarko with copies of all reports provided to and communications with "all governmental authorities" as well as written notice of all meetings with the government concerning the Macondo well.

  Further, section 5.7 required BP to automatically and promptly provide Anadarko with detailed technical information regarding all operations performed in connection with the well, including copies of all applications for permits to drill (together with any amendments); detailed drilling reports via a "real time" database systems called INSITE (discussed in more detail below) and Well Space. Such information included: "[T]he current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and Hydrocarbon information, casing and cementation tallies, and estimated cumulative Costs."

  Section 5.7 of the Joint Operating Agreement also required BP to provide Anadarko with detailed reports concerning "all core data and analyses;" "copies of logs and surveys" as they were generated, including all digitally recorded data; copies of all "well test results," bottomhole pressure surveys, Hydrocarbon analyses, and other similar information, including PVT analyses; all "copies of reports made to regulatory agencies;" forty-eight (48) hours' "advance notice of logging, coring, or testing operations;" "samples of cutting and sidewall cores" (if requested); all "copies of drilling prognoses;" if conventional cores are taken, access to the rig to inspect and evaluate said cores; and samples of Hydrocarbons after performing routine tests.

  Section 5.7 also included a "catch-all" provision providing that, "upon written request", BP was required to furnish Anadarko with "any additional available information."

- **Anadarko Had Approval Authority Over Key Decisions And Expenditures Concerning The Well.**  Section 6.2 of the Joint Operating Agreement provided that BP "shall not undertake an activity or operations whose Costs are Five Hundred Thousand dollars ($500,000.00) or more, unless an AFE [Authorization for Expenditure]" has been approved by Anadarko.  Once Anadarko had authorized a particular operation, it became a "Participating Party" under the Joint Operating Agreement and thereby shared in the "[c]osts, risks and benefits (including rights to hydrocarbons) of an approved activity or operation."  As discussed below, Anadarko expressly approved all AFEs submitted by BP requesting authorization and additional funds.

- **Anadarko Had Approval Authority Over Virtually All Public Statements Made By BP Concerning The Macondo Well.** Section 9.1 expressly provided that "[a]ny Party may propose for issuance a New Release about the activities or operations covered by this Agreement." Pursuant to section 9.1, any proposed News Release required "the unanimous agreement of the Parties", including Anadarko, and provided 72 hours for Anadarko to determine whether it would "agree[] or disagree[]" to the proposed News Release. The term "News Release" is defined broadly in section 2.41 to mean:

  > "[a] press release or other public announcement or disclosure by a Party containing a reference, either directly or by implication, to this Agreement or the activities or operations herein contemplated, including, but not limited to, any public release via print media, broadcast news, internet . . .and discussions with journalists."

47.    Thus, BP was required to obtain Anadarko's agreement to the public release of virtually any information concerning the Macondo well or activities at the well. To the extent that Anadarko did not agree, BP was required to comply with the "content guidelines" set forth in section 9.1.1, which required BP to:

> "limit the content of the News Release to the following information:
> (a) the name of the well or operation and the water depth;
> (b) the location of the well by protraction area, block and adjacent state;
> (c) the lease bonus paid and the lease acquisition date;
> (d) the result of a Production Test, if conducted;
> (e) the participants in, and their Working Interest in, the well or operation; and
> (f) the surrounding acreage controlled by the participants."

Accordingly, throughout the Class Period, to the extent that a BP News Release contains information concerning the Macondo well or activities at the well other than the specific information set forth above, Anadarko had provided its agreement to the content of the BP News Release.

48.    The Joint Operating Agreement contemplated that AFEs and responses thereto were to be in writing (section 8.7). However, the Joint Operating Agreement also provided for communications between the co-owners to be conducted verbally – in order to ensure that costs did not mount while one party was waiting for another's written response. For example, section

8.7 expressly provides that "when a drilling rig is on location and day rate rigs charges are being charged to [the parties'] Joint Account, notices of responses thereto pertaining to operations utilizing a drilling rig <u>shall be given orally or by telephone.</u>  "Receipt" of an oral or telephone notice means actual and immediate communication to the Party to be notified."

49.     Accordingly, the Joint Operating Agreement contemplated that the co-owners would be in constant communication with each other during drilling, that Anadarko (as a co-owner and participating party) would have constant, immediate and full access to all relevant details concerning activities at the well and had to approve key decisions concerning the Macondo well.  In accordance with its contractual rights, at all relevant times Anadarko was provided with all relevant information concerning activities at the Macondo well, and approved all AFEs and other key decisions concerning operations at the well.

50.     According to testimony given by Beirne in connection with the Joint Marine Board Investigation, Anadarko was kept fully apprised of all activities on the Macondo well, consist with the contractual relations the Company had negotiated.  For instance, Beirne testified that, while the Macondo well was in operation, he had "day-to-day" contact with an Anadarko representative named Nick Huch – a Project Land Advisor with Anadarko – and regularly kept Mr. Huch informed about key decisions made by BP on the well.  Beirne also testified that at no time did Anadarko ever complain that they were "not receiving access to the information that the [Joint Operating Agreement] entitled them to have."

51.     In addition, Beirne testified that during the actual drilling on the well, BP gave "five or six" Anadarko personnel access to a web-based database called "INSITE Anywhere" ("INSITE"), which provided them with constant and immediate "realtime" access to a stream of data and information concerning drilling operations at the Macondo well.  INSITE is a service

provided by Halliburton, which provides real time information about wellsite drilling and operations. Halliburton's website describes INSITE as follows:

> If you have Internet access and a Web browser, you can access well logs from anywhere in the world using the INSITE Anywhere™ service. As data moves from your logging tools to a secure web site operated by Halliburton, your asset team can <u>review the results in real time and make collaborative decisions on the best avenues to pursue</u>.

> INSITE Anywhere service is all about making the most efficient use of your time and budget. <u>The system even allows you to participate in multiple wellsite operations from a single location.</u> Flexibility and functionality are the watchwords of the system, and displays of everything from log plots to pressure tests and samples can be configured to individual preferences.

52.     According to Beirne's testimony, the INSITE database ensured that Anadarko had "24/7" access to detailed technical information concerning activities at the Macondo well, including "realtime data" concerning "drilling depth, torque [and] rate of RPMs." For example, Beirne testified regarding an email dated April 5, 2010 from John Kamm at Anadarko to Bobby Bodack ("Bodack"), BP's operations geologist at the Macondo well. This email evidences that an Anadarko representative named Bob Quitzao was monitoring the Macondo well "from a drilling standpoint," and requested access to INSITE for Mr. Quitzao. Beirne also testified that Anadarko was monitoring drilling on the Macondo well through direct communications with several BP employees. For example, Beirne testified as follows:

> Q.     Did Mr. Bodack ask for Mr. Quitzao [Anadarko's representative] to be provided access to INSITE in response to Anadarko's request for Mr. Quitzao to monitor the well from a drilling standpoint?

> A.     Yes, ma'am.

> Q.     To be clear, that would be the realtime data that was coming from the rig?

> A.     Yes, ma'am.

> Q.     [...] From time to time in your experience did Anadarko request from the technical folks, Bobby Bodack in particular, information specific to the drilling of the well?

A.      Yes, ma'am.

Q.      And if you could turn to Tab 9 of that binder, and that would be the document bearing Bates stamp BP-HZN-MBI00173605?

A.      Yes, ma'am.

Q.      And if you look at the second email in that string, the one from Mr. Quitzao who was monitoring the well according to the other email, to Mr. Bodack, could you read us what Mr. Quitzao wrote to Mr. Bodack on March 24 of 2010?

A.      Good morning, Robert. I'm an Anadarko drilling engineer and taking over from your previous contact, Josh Nichols. I just started following the Macondo drilling progress. It looks like operations are starting to go well. Give me an update on the following: Is the core pressure expected to come in higher than planned? Are you still planning to set the 11 and three-quarter inch liner near 17,000 feet?  Are you still planning to case productive objectives with nine and seven-eighths inch casing? Thanks, Bob Quitzao.

Q.      Did Mr. Bodack respond to each of those requests?

A.      Yes, ma'am, he responded.

53.      Beirne also testified that "John Kamm, Paul Chandler, Dawn Peyton, Brian O'Neill, Rebecca Isabel and Alan O'Donnell" were individuals from Anadarko who had access to the real time INSITE data.  In addition, Beirne testified as follows:

JUDGE ANDERSEN:  As far as you know, were all those people getting access to the data provided through Halliburton [*i.e.,* through INSITE] on April 20, 2010?

THE WITNESS:      Yes, Your Honor.

54.      In addition, Beirne testified that Anadarko had access to additional detailed technical information concerning the Macondo well via another online database.  Beirne referred to this database as "Well Space" and testified that it was also available to Anadarko at all times during drilling at the well.  Beirne testified that the Well Space database provided Anadarko with up-to-date information such as "all the daily drilling reports, [mud] logs, geologic reports, things of that nature."  Beirne elaborated that the Well Space database provided Anadarko with "what

23

was done [on the rig] in the previous 24-hour period" and a "[f]orecast of the expected operations in the next 24 hours." According to Beirne, access to the Well Space database was for "operations critical" personnel at Anadarko – and more than five or six such "operations critical" personnel from Anadarko had access to the Well Space database.

55.    According to Beirne, Anadarko personnel also had regular email communications with BP personnel regarding critical decisions made at the Macondo drilling site. Further, Beirne testified that "technical folks" from Anadarko and BP would also "directly contact" each other. Thus, as required by the Joint Operation Agreement, at all relevant times Anadarko personnel knew exactly what was happening at the Macondo well.

56.    According to an article published by the Financial Times dated June 29, 2010, BP, and even Anadarko itself, publicly confirmed that all key information was provided to Anadarko during drilling at the Macondo well, as described above. The Financial Times reported:

> Anadarko was kept abreast of what was going on each morning when BP sent it a report of what happened at the rig in the previous 24 hours, both companies said. The report included information such as well test results, the technical procedures that had been undertaken and any unexpected challenges, such as a surge in gas.
>
> BP gave or made available to the co-owners Authorisation for Expenditure (AFE) documents, supplemental AFE documents, daily operations reports, and other documents that showed the well design, changes to the well design, and identified big well control events encountered during drilling operations," BP said in an e-mail in response to Financial Times' questions. "Further, personnel from the co-owners engaged in periodic communications with BP personnel about well design and other issues related to the well."

57.    Despite having unfettered access to all key documents relating to the Macondo oil well, Defendants willfully or recklessly disregarded the contents of most basic documents relating to the project. Indeed, despite being provided with copies of or at least full access to the OSRP and EP, Defendants willfully or recklessly disregarded the "glaring[ly] and egregious[ly]" false contents of these fundamental documents (which were required by MMS regulations) and

failed to exercise any type of "check" on activities at the Macondo well.  Defendants' failures in this regard are particularly shocking given BP's abysmal safety record, which was notorious within the oil and gas industry (as described below in ¶¶239-247), and should have caused the Defendants to give heightened scrutiny to BP's actions – and spill response plans – in order to protect Anadarko's investment and avoid the massive tragedy (and liability for Anadarko) that ultimately materialized.

## V.   DRILLING THE MACONDO OIL WELL

### A.   Overview Of The Deepwater Drilling Process And The Initial Plan For The Macondo Well

58.     Deepwater wells are drilled in sections.  The basic process involves drilling through rock at the sea floor towards oil deposits that can lie miles below the earth.   As each section of a well is drilled, the well is lined with a series of steel tubes called casing.  Each layer of casing is "cemented" into place against the well wall so that no oil or gas can leak into the space between the well wall and the outside of the casing.   After one section of casing is installed, the well is drilled deeper and then the process is repeated (*i.e.,* casing is cemented into place in the freshly drilled space and then drilling starts again).  Deepwater wells "telescope" down to smaller diameters at deeper depths.  A typical deepwater well will start at a diameter of three feet or more and telescope down to a wellhead diameter of 10 inches or less at the bottom.

59.     Wells are drilled using rotary drill bits that are lubricated and cooled with a blend of synthetic fluids referred to as "drilling mud," which is pumped through the drill pipe and flows into the well.  The drilling mud constantly circulates back to the drill rig, carrying to the surface pieces of rock and other material that has been cut by the drill bit.  This material is sieved out of the drilling mud at the rig level and then the mud is pumped back down into the well – thus the drilling mud travels in a closed loop from the rig to the drill head and back again.  The

drilling mud serves several purposes.   Not only does it cool and lubricate the drill bit, but it also plays an important part in stabilizing the pressure in the well.   The weight of the drilling mud, and the downward pressure it creates, ensures that oil and gas does not leak from the bottom of the well into the well shaft and cause a fire or explosion.   Therefore, drilling crews carefully monitor the pressure being exerted by the drilling mud throughout the process.

60.     The Macondo well was drilled using this basic process.   According to documents submitted to the government, which Anadarko received automatically pursuant to Section 5.7 of the Joint Operating Agreement, BP's original well design plan called for the Macondo well to be drilled to a depth of 19,650 feet, and was scheduled for completion within 51 days.   According to an initial Authorization For Expenditure (the "Original AFE") prepared by BP on August 28, 2009, and later expressly ratified by Anadarko, BP estimated the total costs of drilling the Macondo well to be $96.2 million.

**B.      Anadarko And BP Start Drilling The Macondo Well And
          Immediately Encounter Significant Delays And Additional Costs**

61.     On or about October 6, 2009, BP began drilling the Macondo well using an offshore oil drilling rig called the *Marianas*.   The *Marianas*, which was affixed to the ocean floor with huge mooring chains, was owned by a company called Transocean, Ltd. ("Transocean") and leased to BP.   By November 9, 2009, the *Marianas* had drilled to a depth of 9,090 feet below the ocean surface and 4,000 feet below the seabed.   Although the plans called for the well to be drilled to a total depth of approximately 19,650 feet, drilling was unexpectedly interrupted when Hurricane Ida swept through the Gulf of Mexico and damaged the *Marianas* rig.   The *Marianas*

had to be towed to shore for repairs, and drilling on the Macondo well was brought to a halt for approximately three months.[1]

62.     While the *Marianas* underwent repairs, BP arranged for the *Deepwater Horizon* oil rig to take over drilling the Macondo well.  Considered a state-of-the art piece of equipment, the $560 million, 33,000-ton *Deepwater Horizon* rig was very expensive to operate and, according to the *Report To The President* prepared by the Presidential Commission (defined above), which was released to the public on January 11, 2011, the Macondo co-owners were charged as much as $1 million per day to lease the *Deepwater Horizon*.

63.     On or about February 6, 2010, the *Deepwater Horizon* resumed drilling operations on the Macondo well.  The co-owners, however, soon experienced additional substantial delays as drilling progressed much more slowly than BP and Anadarko had anticipated.  Indeed, even though the *Deepwater Horizon* rig was scheduled to have completed the Macondo well and be drilling at a new location as early as March 8, 2010, the Macondo well was still not completed as of mid-April.

64.     These additional delays cost Anadarko and BP millions of dollars.  On or about February 18, 2010, Anadarko approved, pursuant to the Joint Operating Agreement, a supplemental AFE (the "First Supplemental AFE") submitted by BP, which requested approximately $27.9 million in additional funds from the Macondo well partners, including Anadarko, for costs associated with damage from Hurricane Ida and replacement of the *Marianas* rig with the *Deepwater Horizon*.

---

[1] The *Marianas* rig had experienced troubles in drilling even prior to Hurricane Ida.  For example, on or about May 13, 2009, while BP was using the *Marianas* rig to drill in the Mississippi Canyon, approximately $250,000 in damage was caused to the drill on the rig.  According to an MMS report – which, pursuant to the Joint Operating Agreement, was provided or available to Defendants – the incident resulted from human and mechanical error because "the driller was not paying attention" while drilling and the "crown saver system" failed or "was not activated after recalibration."

65.     On March 22, 2010, BP prepared a second supplemental AFE (the "Second Supplemental AFE") requesting another $27 million from the Macondo partners.  Anadarko approved the Second Supplemental AFE on or about March 30, 2010.  The Second Supplemental AFE sought additional funds to cover costs incurred as a result of a number of additional setbacks in the drilling process.

66.     For instance, in early March 2010 the drilling operations had been brought to a halt with the well at a depth of only 12,350 feet, when a "lost circulation event" occurred.  A lost circulation event is when the pressure exerted by drilling operations causes cracks to form in the well wall.  This, in turn, causes drilling mud to leak into the seabed through the fractures in the well wall, instead of flowing back up to the rig in the closed loop process described above in ¶59.  BP was eventually able to plug the fractures in the well wall and resume drilling, but the lost circulation event caused substantial delay and additional expense.  Another delay occurred on March 8, 2010, when the drill bit became stuck in the well and could not be freed, resulting in the need to drill around the abandoned drill bit.

67.     By this time, with total costs on the project around $150 million, the Macondo well was approximately $58 million – or 61 percent – above BP's cost estimate in the Original AFE.  The project was also weeks behind schedule with costs continuing to rise.

C.     **"The Nightmare Well":  Faced With Extensive Delays And Millions Of Dollars Over-Budget, Anadarko and BP Sacrifice Safety In Order To Reduce Costs And Save Time**

68.     As described below, faced with these substantial delays and rising costs, BP – acting at all times with Anadarko's knowledge and approval – made a series of decisions that sacrificed safety and violated industry guidelines in order to reduce costs and save time.  As the Congressional Energy Committee investigating the disaster opined in a letter to BP dated June 14, 2010 (after review of a substantial number of documents, interviews of numerous witnesses,

and review of thousands of pages of testimony), "it appears that BP repeatedly chose risky procedures in order to reduce costs and save time and made minimal efforts to contain the added risk."

69.     The "risky procedures" identified by the Congressional Energy Committee, and described below, substantially increased the danger of a catastrophic well failure and directly contributed to the explosion and oil spill that was to occur on April 20, 2010.  Significantly, Anadarko approved each of these decisions.

70.     Anadarko approved these decisions despite increased safety risks because, under Defendant Hackett's leadership, the Company was obsessed with driving down costs and ensuring that projects were completed on time.   Indeed, as described herein, Defendants repeatedly touted to investors Anadarko's project management skills and culture of controlling costs on its projects during the Class Period.  Defendants also falsely assured investors that these cost-cutting measures never impacted safety.  For example, in a press release dated August 3, 2009, Defendant Hackett discussed Anadarko's second quarter 2009 results and highlighted to investors that the Company was "continuing to drive down costs."   On December 9, 2009, Anadarko's Vice President of Investor Relations and Communications (VP Investor Relations) presented at a Wells Fargo Securities MLP Pipeline and E&P, Energy Services & Utility Symposium telling investors "one thing that we are very proud of is our project management skills.  We have a track record of being the industry leader in on-time, on-budget delivery on these megaprojects."

71.     Similarly, Defendant Daniels spoke at the Credit Suisse Group Energy Summit on February 3, 2010 and praised Anadarko's project management skills, informing investors that:

"[o]n the project development side, this is the second point I hope that you take away from here, is that we are very, very good at managing projects both from a

29

> time and a capital standpoint and bringing these very large megaprojects on
> production, on time, and on budget."

Defendant Daniels further elaborated on the "efficiencies" of Anadarko's projects, highlighting

this specifically as a reason to invest in Anadarko:

> So it really speaks to efficiencies, it speaks to the success of the exploration
> program, and the project management skills of our teams that we are able to drive
> our capital costs down, keep things on time and on budget, and grow our
> production in that kind of fashion.
>
> So, overall, it's a great time to invest in Anadarko.

72.     Thus, in the context of Anadarko's corporate culture, there was tremendous

pressure to cut corners – even by sacrificing safety – in order to save costs and time.

### 1.     Anadarko Approved The Use Of A Less Safe Well Casing Design That Saved Time And Money

73.     By early April 2010, the *Deepwater Horizon* had drilled the Macondo well to a

depth of approximately 18,193 feet below sea level.  At this point, the well encountered still

more difficulties.  On April 9, 2010, the well experienced another lost circulation event when

pressure exerted by the drilling mud exceeded the strength of the formation (*i.e.,* the earth around

the wellbore) and mud began flowing into cracks in the formation.  BP again attempted to seal

the cracks in the well wall – this time by pumping in 172 barrels of "lost circulation pill" into the

well.  While this successfully plugged the fractures that had formed in the well wall, BP

recognized that the situation had become delicate.  The increasing pressure of drilling was

placing too much stress on the well and it became apparent that additional drilling was likely to

cause more cracks in the well wall.

74.     BP's engineers drilled the well to a total depth of 18,360 feet and then determined

that they had "run out of drilling margin."  According to testimony given by Beirne in

connection with the Joint Marine Board Investigation (corroborated by the *Report To The*

*President*), pursuant to an email dated on or about April 13, 2010 between Beirne and Nick Huch of Anadarko, BP promptly informed Anadarko that the well should not be drilled deeper "due to safety concerns and well bore integrity issues."  Beirne testified that, after being informed of this decision, Anadarko gave its approval by reply email that same day.  BP then performed several tests on the well and determined that the co-owners had tapped into a large reservoir (at least 50 million barrels) of oil such that it would be economically beneficial for them to turn the "exploratory" well into a "production" well.

75.     In order to prepare the well for production, BP and Anadarko had to place a final well casing on the newly drilled portion of the well.  The Macondo co-owners had two primary options for the well casing to be used on the deepest section of the well.  One option involved hanging a steel tube called a "liner" from low in the well to the bottom of the well, and anchor it to the next higher section of casing already installed.  The other option involved running a single string of steel casing from the seafloor all the way to the bottom of the well – known as "long string" casing.

76.     The first option – the liner/tieback option – was a safer option because it provided more barriers to gas flowing into the well, and it also would be easier to "cement" into place than a long string casing.   The significant safety advantages of the liner/tieback option were recognized and explicitly acknowledged in BP's internal documents that were shared with Anadarko.   For instance, in connection with its investigation, the Congressional Energy Committee reviewed a BP document called a "Forward Plan Review," dating from mid-April 2010, that recommended against using a long string casing at the Macondo well because (1) it created fewer barriers between the bottom of the well and the seal at the wellhead, which increased the risk that gas (*i.e.,* hydrocarbons) could leak into the well and cause a "blow-out";

and (2) it was more difficult to cement into place.  Indeed, BP's mid-April Forward Plan Review gave four reasons against using a single string of casing:

- "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."

- "Unable to fulfill MMS regulations of 500` of cement above top HC zone [*i.e.*, Hydrocarbon zone]."

- "Open annulus to the wellhead, with . . . seal assembly as only barrier."

- "Potential need to verify with bond log, and perform remedial cement job(s)."

77.     The Forward Plan Review goes on to recommend that a "liner-tieback" casing be used because, among other things, it had the advantage of additional barriers to the flow of hydrocarbons (*i.e.,* "[l]iner hanger acts as second barrier for HC in annulus").  In other words, BP representatives had internally recommended <u>against</u> the long string casing option out of safety concerns.  Anadarko was provided with or had access to this document.  Indeed, Anadarko had specifically bargained for access to such documents in the Joint Operating Agreement.  Thus, section 5.7 of the Joint Operation Agreement required that Anadarko be provided with information about well operations, including information concerning "casing," and "complete report of all core data and analyses."

78.     Despite these known risks, BP chose to use the single long string casing instead of the liner/tieback option.  As the Congressional Energy Committee concluded, the decision to run a single string of casing "appears to have been made to <u>save time and reduce costs</u>."  Several internal emails among BP personnel note the significant time and cost savings that would be achieved by using a long string casing.  For instance, on March 25, 2010, Brian Morel (BP's drilling engineer) emailed Allison Crane, the Materials Management Coordinator for BP's Gulf of Mexico unit that the long string casing "saves a lot of time … at least 3 days."  On March 30, Mr. Morel emailed Sarah Dobbs, the BP Completions Engineer, and Mark Hafle, another BP

32

Drilling Engineer, that "[n]ot running the tieback . . . saves a good deal of time/money."  In an email to a colleague dated April 14, 2010 discussing the two casing approaches, Mr. Morel noted "this has been [a] nightmare well which has everyone all over the place."[2]  On April 15, BP estimated that using a liner instead of the single string casing "will add an additional $7 - $10 MM to the completion cost."  The same document calls the single long string casing to be the "best economic case . . ." for the well.

79.     Anadarko expressly approved the decision to use the riskier long string casing to seal the well.  Indeed, on April 14, 2010, BP prepared a third AFE seeking approximately $3 million in additional funds from the Macondo partners, including Anadarko.  According to testimony from the Marine Board Investigation, the third AFE sought money from Anadarko, among the other partners, to "fund the nine and seven-eighths by seven-inch production casing, casing hanger, cement casing accessories and set the lockdown sleeve" (the "Third AFE").  Thus, the third AFE expressly disclosed to Anadarko that BP was using a long string casing rather than a liner/tieback option.

80.     Confirming Anadarko's informed approval of the long string casing decisions, Beirne testified as follows:

> Q.     Turn, if you will, to Tab 11, and that would be document bearing Bates stamp BP-HZN-MBI00192559. And this is the authorization for expenditure, AFE, dated April 14, 2010?
>
>         Yes, ma'am.
>
> Q.     And this is the one signed by Anadarko?
>
> A.     Yes, ma'am.
>
> […]

---

[2] When called as a witness in connection with the Joint Marine Board Investigation, Morel asserted his Fifth Amendment right to refuse to testify to avoid self-incrimination.

Q.     And is there also reference in here to what the production casing was going to be that was going to be used, nine and seven-eighths by seven-inch?

A.     Yes, ma'am.

Q.     Was that information provided to Anadarko through this AFE?

A.     Yes, ma'am.

[…]

Q.     Did . . . Anadarko ever ask you for any information after you sent your email that you did not provide them with?

A.     No, ma'am. The next day was the day that we had sent the production casing AFE, which they approved the same day.

81.     In addition, on April 15, 2010, Bobby Bodack, a BP operations geologist, wrote an email to Anadarko and others, which gave Anadarko the opportunity to look over all the "posted data" and invited any "questions, comments, concerns or requests about what was proposed in the nine and seven-eighths and seven inch casing proposal."   As noted above, Beirne's testimony from the Joint Marine Board Investigation confirms that Anadarko had access to this posted information via two "real time" drilling databases referred to, respectively, as Well Space and INSITE.   For example, during his testimony, Beirne read aloud from the 24-hour forecast portion of a "daily operations report" printed from the Well Space database, which plainly discusses operations relating to the well casing:

> [T]his is BP-HZN-MBI00013986. In this 24-hour forecast, this one is a little more detailed, it has: Run in hole with seven-inch, 32.0, number sign, HCQ125, HYD513 by nine and seven-eighths, 62.8 number Q-125HYD, 523, abbreviation CSG casing, RT nine and seven-eighths casing tools, PU, pull up hanger, continue to run in hole.

82.     Beirne testified that he also sent an email to Anadarko and others providing data and other information concerning the Third AFE, and also stated that Anadarko had sufficient time to review the relevant information concerning the Third AFE.   According to Beirne:

> The way we tried to do it when the rig is on location is it has – the operating agreement has a 48-hour election period.  And we try to keep in verbal communication ahead of time so there is no surprises, where they just don't get a formal AFE.  And we were doing that with the counterparts, my counterparts.  We have an AFE that will be coming, so they can be ready to make a timely election.

According to Beirne, Anadarko also had the right to opt to no longer participate in this operation or to propose an alternative procedure or plan, but they chose not to do so.

83.     On April 15, 2010, fully aware that a long string casing was to be used, Anadarko approved the Third AFE.  Four days later, on April 19, 2010, BP installed the final section of steel tubing in the well.

84.     The use of a long string casing in this situation was against industry custom and best practices.  As the Presidential Commission concluded, it was unusual to employ a long string casing on a well like Macondo – "a deepwater well in an unfamiliar geology requiring a finesse cement job."  Indeed, several industry CEOs testified to Congress that they would never have used a long string production casing at the Macondo well and that this violated industry norms.  For instance, John Watson, the Chairman and Chief Executive Officer of Chevron Corporation testified before Congress that:

> There are several areas that appear . . . based on the information we've been able to gather, that suggests the practices that we would not put in place were employed here [by BP and Anadarko].  For example, the casing design and mechanical barriers that were put in place appear to be different than what we would use . . . we would not have run a full string [*i.e.,* the long string casing]

85.     The Chairman and Chief Executive Officer of Exxon-Mobile, Rex Tillerson, similarly testified that the blowout would not have happened if Exxon-Mobile had been drilling the well because:

> We would have run a liner, a tie-back liner [rather than the long string casing], we would have used a different cement formulation, we would have tested for cement integrity before we circulated the mud out, we would have had the locking seal ring at the casing hanger before proceeding.  And leading up to all of that, though, there was clearly . . . a lot of indications or problems with this well going on for

<u>some period of time leading up to the final loss</u> of control.  And why those – how those were dealt with and why they weren't dealt with differently I don't know.

86.     The President of Shell Oil Company, Marvin Odum, also told the Congressional Energy Committee that Shell would not have used the well design approved by Anadarko and BP, testifying that "it's not a well that we would have drilled in that mechanical set-up."  The Chairman and Chief Executive Officer of the ConocoPhillips Company, James Mulva, similarly confirmed that "we wouldn't have drilled the well that way."  Mr. Mulva elaborated "[w]e feel that it's most important to have two barriers to contain or control the hydrocarbons verified and tested by pressure to verify those two barriers exist."

87.     Shockingly, Anadarko itself has publicly stated that use of the long string casing was improper for the Macondo well (albeit this was only after the explosion).  In an article published by the <u>Wall Street Journal</u> on June 19, 2010 reported as follows:

> Anadarko Petroleum Corp., a minority partner of BP's in the destroyed well, used [long string casing] on 42% of its deepwater Gulf wells, though <u>it says it doesn't do so in the wells of the type drilled by BP [*i.e.,* the Macondo well]</u>.  […]
>
> Anadarko says it doesn't use long-string design for drilling exploration wells in unfamiliar areas.  The company also says it only uses long strings in lower-pressure wells.  <u>The well BP was drilling with the *Deepwater Horizon* was an exploration well, and was well above normal pressure.</u>

88.     As alleged above, despite Anadarko's admission that the long string well casing was improper for use at Macondo, Anadarko expressly approved of its use.

## 2.     Anadarko Approved The Use Of A Dangerously Small Number Of Well Casing Centralizers In Order To Save Time: "Who Cares, It's Done, End Of Story, [It] Will Probably Be Fine"

89.     Having decided to use a long string casing, the next task for the Macondo co-owners was to lower the casing into the well.  It is extremely important for safety reasons that the well casing be placed in the exact center of the well.  If not properly centered, there can be

severe difficulties with "cementing" the casing into place.  This is because when the casing hangs in the center of the wellbore, cement will flow evenly up the well around the casing and will push out any mud or debris that was previously in the borehole, leaving a clean column of strong cement securing the well.  On the other hand, if the casing is not centered, the cement will not flow evenly (it will instead avoid the narrow areas and naturally flow towards the broader ones) and may leave mud or debris trapped in the well, which will greatly weaken the cement job and increase the risk of a blowout.  This is well-known within the oil industry.  Indeed, the American Petroleum Institute's (API) Recommended Practice 65 explains, if the casing is not centered, "[i]t is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus," resulting in a failed cement job.

90.     Centralizers are devices that attach around the well casing as it is lowered into the well and ensure that the casing is aligned in the exact center of the borehole.  The original well design plan for the Macondo well called for 16 centralizers to be placed along the final string of casing.  But on April 1, 2010, BP learned that its supplier only had six centralizers in stock.  According to findings by both the Congressional Energy Committee and the Presidential Commission, on April 15, 2010, BP informed Halliburton that BP was planning to use six centralizers on the final casing string at the Macondo well.  Halliburton engineers spent that day running a computer analysis designed to assess the impact that so few centralizers would have on the cementing process, and Halliburton informed Mr. Morel (BP's drilling engineer) and other BP officials via email later that day that the well would need more than six centralizers to ensure a strong cement job.

91.     According to documents reviewed by the Congressional Energy Committee, Mr. Morel responded on April 15, 2010 by emailing:

> We have 6 centralizers, we can run them in a row, spread out, or any combination of the two.  It's a vertical hole, so hopefully the pipe stays centralized due to gravity.  As far as changes, it's too late to get any more product on the rig, our only option is to rearrange placement of these centralizers.

BP's own Drilling Engineering Team Leader disagreed with Mr. Morel and sent an email to several BP engineers on April 16, 2010 acknowledging that the long string casing needed at least 16 centralizers, and "we need to honor the modeling to be consistent with our previous decisions to go with the long string."

92.    Ultimately, however, BP decided to proceed with only the 6 centralizers based on the urging of a BP engineer who was concerned, among other things, about the delay it would take to add additional centralizers.  Specifically, in an email dated April 16, 2010, John Guide, BP's Well Team Leader, stated that "it will take 10 hours to install them . . . I do not like this." Apparently based on Mr. Guide's input, BP decided to proceed with just 6 centralizers.  An email also dated April 16, 2010 from Brett Cocales, BP's Operations Drilling Engineer, to Mr. Morel, noted the risks with this approach:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.  <u>But, who cares, it's done, end of story, [it] will probably be fine</u> . . . so Guide is right on the risk/reward equation.

93.    When Halliburton was informed that BP had decided to use only 6 centralizers, a Halliburton engineer ran an additional computer model.  According to Halliburton's April 18, 2010 report, using only six centralizers would likely result in a failure of the cement job and a "SEVERE gas flow problem."  Halliburton's report was available to Anadarko pursuant to the Joint Operating Agreement.

94.    In addition to Halliburton's warning, BP's own mid-April 2010 Forward Plan Review for the Macondo well, which was shared with or available to Anadarko (and later produced to the Congressional Energy Committee), showed that with only six centralizers

38

"[c]ement simulations indicate is it <u>unlikely</u> to be a successful cement job."   This was compounded by the fact that Anadarko's and BP's choice of a long string casing acted as another obstacle to a strong cementing.   As the Engineering & Research Committee (defined below) concluded in their Final Report, a long string casing is not able to "reciprocate or rotate . . . during the cementing operation . . . [t]hus, the possibility of mud-filled channels or poor cement existed."

95.     According to testimony from Beirne, Anadarko was expressly informed of the decision to run only six centralizers.  Further, BP's daily report to the Macondo partners on April 18, 2010, entitled "*Daily Operations Report – Partners (Completion)*," specifically discusses the fact that only six centralizers were going to be used with respect to the long string casing.  The fact that Anadarko received this document is demonstrated not only by testimony obtained by the Joint Marine Board Investigation confirming that Anadarko received daily operational reports but also BP was required to provide Anadarko with the daily operations reports pursuant to section 5.7 of the Joint Operating Agreement.  Further, Anadarko's receipt of this key document is plain from the very title of the document "*Daily Operational Report – <u>Partners.</u>*"

96.     According to the June 29, 2010 article published by the <u>Financial Times</u>, Anadarko publicly admitted that it knew of the decision to use only six centralizers.  The <u>Financial Times</u> reported: "Anadarko says it knew of BP's decision on April 16 to use only six centralizers despite the challenging nature of the well."

### 3.     Anadarko Approved The Failure To Conduct Proper Cement Circulation Or Properly Test The Cement Job

97.     The next step in the process of preparing the Macondo well for production, after the co-owners' decision to install the long string well casing with only six centralizers, was to

cement the casing to secure the casing to the well wall and seal off the bottom of the well so that no explosive gases could leak into the well chamber.

98.     The first step in the cementing process was to circulate the drilling mud.  The American Petroleum Institute's Recommended Practices state that oil companies should fully circulate all drilling mud in the well from the bottom to the top before starting the cementing process.  The API's Recommended Practice 65-Part 2, *Isolating Potential Flow Zones During Well Construction*, 4.8.4. at 36-37 states "when the casing is on bottom and before cementing . . . . The drilling fluid should be conditioned until equilibrium is achieved . . . .At a minimum, the [well] should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."  This permits well owners to test the well mud for gas influxes, to safely remove any pockets of gas, and to eliminate debris to prevent contamination of the cement.

99.     Circulating the drilling mud, however, takes time.  At the Macondo well, the mud circulation process could have taken as long as 12 hours.  Again, faced with the prospect of further delays, BP decided to forego this crucial safety step and conducted only a partial circulation of the drilling mud before the cement job.  Instead of the 2,760 barrels needed to complete a full "bottoms up" circulation, BP only circulated approximately 350 barrels of mud before cementing.  This was a serious departure from standard industry practice.

100.     According to the Presidential Commission's *Report to the President*, the relevant information concerning BP's partial circulation of the drilling mud was disclosed to Anadarko via the INSITE database (to which Anadarko had at all relevant times full and constant access).

101.     Compounding the failure to fully circulate the drilling mud, as confirmed by the Congressional Energy Commission, BP and Anadarko failed to properly test the cement job after

it was completed.  A "cement bond log" is an acoustic test conducted by running a tool inside the casing after the cementing is completed.  Essentially, the cement bond log determines whether the cement has bonded to the casing and surrounding formations such that there are no spaces or "channels" that would permit dangerous gases to flow through the cement.  If any such channels are found, the cement can be repaired by having additional cement injected into the channels.  However, this repair takes time.

102.    BP's mid-April plan review predicted cement failure, stating "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."  Despite this warning and Halliburton's prediction of severe gas flow problems, the co-owners of the Macondo well, including Anadarko, chose <u>not</u> to run a 9- to 12-hour procedure called a cement bond log to assess the integrity of the cement seal.

103.    According to evidence that has emerged from the investigation conducted by the Congressional Energy Committee, BP had a crew from an independent contractor flown out to the *Deepwater Horizon* rig on the morning of April 20 for the purpose of running a cement bond log, but they departed after BP told them their services were not needed.  It appears that this decision was made yet again to save time and reduce costs.  Documents produced by the third party contractor to the Congressional Energy Committee indicate that the cement bond log would have added $128,000 to the cost of the well, while cancelling the service cost only $10,000.  Further, remedying problems found during the cement bond log would have added additional delays to an already lagging operation.

104.    BP and Anadarko knew or ought to have known that a cement bond log should have been performed.  Indeed, MMS regulations required a cement bond log or equivalent test at the Macondo well.  According to regulations, if there is an indication of an inadequate cement

job, the oil company must "(1) Pressure test the casing shoe; (2) Run a temperature survey; (3) Run a cement bond log; or (4) Use a combination of these techniques."  30 CFR § 250.428.  The necessity of this procedure was also confirmed by testimony from a Halliburton representative who informed the Congressional Energy Commission that a cement bond log is "part of a comprehensive systems integrity test."   Similarly, two separate and independent engineers consulted by the Congressional Energy Commission confirmed that the decision not to run a cement bond log departed from standard industry protocols.  Indeed, Gordon Aaker, Jr. P.E. a Failure Analysis Consultant with the firm Engineering Services, LLP told the Congressional Energy Commission that such an approach is "<u>unheard of</u>" within the industry, and John Martinez, P.E., an independent production specialist on wellbore construction, confirmed that a cement bond log "should <u>always</u> be used on the production string."

105.    Anadarko knew or recklessly disregarded that a cement bond log had not been performed concerning the Macondo well.  Indeed, Anadarko had specifically contracted for receipt of "forty-eight (48) hours' advance notice of logging, coring, or testing operations" as well as real-time access to "cementation tallies," "a complete report of all core data and analyses," and "copies of logs and surveys as run, including all digitally recorded data."  Thus, Anadarko was either expressly informed of BP's decision not to perform the cement bond log, or, at the very least, knew that the procedure had not been performed.  Anadarko nonetheless turned a blind eye to this failure and, eager to stop mounting delays and expenses, ignored the fact that the integrity of the well's cement seal had not been properly assessed.

106.    This reckless omission is even more concerning given that Anadarko was well aware of previous cementing integrity issues at the well.  Prior to the explosion, on October 24, 2009, February 20, 2010, and March 6, 2010 BP listed "cement squeezes" as significant events

on reporting documents to the MMS.  A cement squeeze is a process designed to force cement into leak paths in order to repair poor primary cement jobs, isolate perforations or repair a damaged casing or liner.  The Joint Operating Agreement required that copies of these reports be provided to Anadarko.

107.    As set forth below in ¶¶266-268, the Company has since admitted in public statements and pleadings filed in connection with spill-related litigation that the decisions made at the Macondo well were "reckless" and likely represent "willful misconduct."

## VI.    THE DEEPWATER HORIZON RIG EXPLODES AND THE MACONDO CO-OWNERS ARE UNABLE TO STEM THE FLOOD OF OIL GUSHING INTO THE GULF OF MEXICO

### A.    The Explosion And Fire On The *Deepwater Horizon*

108.    On April 20, 2010, with the *Deepwater Horizon* rig at least 43 days late for its next drilling location and over-budget by approximately $58 million, the risks knowingly or recklessly taken by Anadarko and BP materialized with catastrophic consequences.

109.    Gas leaked through the improper cement job into the well.  By the time the gas reached the floor of the *Deepwater Horizon* rig, according to one witness quoted in the *Report to the President*, it was like "a 550-ton freight train that hit the rig floor," followed by "a jet engine's worth of gas" spewing onto the rig.  An attempt to contain the leaked gas by activating the blowout preventer – the last line of defense against loss of well control – failed.   An uncontrolled flow of hydrocarbons onto the *Deepwater Horizon* rig soon ignited, and the ensuing series of explosions resulted in the deaths of 11 crew members (the other 115 members of the crew were evacuated, many with serious injuries).  The *Deepwater Horizon* rig burned for more than a day, and sank on April 22, 2010.

110.    As the *Deepwater Horizon* rig sank, it took with it a pipe (called a "riser") connecting the rig to the well.  The riser eventually tore away from the well, and oil began to

gush uncontrolled into the Gulf of Mexico.  On April 24, the Coast Guard estimated that oil was leaking at a rate of 1,000 barrels of oil per day ("bbls/day").

111.    On April 26, 2010 the Coast Guard stated that the oil slick was approximately 48 miles by 39 miles in size.  On April 27, 2010 reports surfaced that BP and Coast Guard were considering controlled burns to contain the environmental threat caused by the oil leak.

112.    On April 30, 2010 Homeland Security Secretary Janet Napolitano warned of the coastal threat caused by the spill.  Calling this "a spill of national significance," the Federal Government moved to quickly create a second command post in Mobile, Alabama to monitor and control the oil.  Louisiana Governor Bobby Jindal declared a state of emergency and requested assistance from the National Guard to keep the oil off the Louisiana coast.  That same day, Interior Secretary Ken Salazar dispatched teams for an immediate review of the 30 offshore drilling rigs and 47 production platforms operating in the deepwater Gulf.  The following day, Mississippi, Alabama, and Florida all declared states of emergency as the oil gushing from the damaged well site started to wash ashore.

## B.    The Macondo Co-Owners Are Unable To Contain The Oil Spill For Months

113.    Contrary to their public representations to the MMS and other government agencies in the Macondo Spill Response Plan (discussed in more detail below), the Macondo co-owners were utterly unprepared to respond to an oil spill at the Macondo well.  As attempt after attempt to contain the spill failed, millions of barrels of oil continued to gush from the damaged well at an estimated rate of (what was later revealed to be) between 53,000 and 62,000 barrels per day.  While the Macondo Spill Response Plan falsely stated that Defendants could recover and contain up to 500,000 barrels per day, it quickly became apparent that there was no basis

whatsoever for this statement, or, indeed, any other statement in the Macondo Spill Response Plan.

114.   With no adequate response plan in place, Defendants embarked on an ineffectual trial and error approach to containing the spill, which relied on a number of methods that were not even mentioned in the OSRP or EP.   For instance, between April 22, 2010 and May 10, 2010, Defendants sprayed over 300,000 gallons of Corexit and other dispersants on the oil spreading over the water surface surrounding the Macondo well – an unprecedented use of Corexit, which is highly carcinogenic.   Indeed, its use was prohibited by the United States Coast Guard and Environmental Protection Agency on May 10, 2010.   On May 6, 2010, a 98-ton containment dome called a cofferdam was lowered onto the seafloor in an attempt to channel the oil leak into a pipe that would be collected by vessels on the surface.   The dome was referred to by a seasoned deepwater engineer as the "silliest contraption" that was "destined to fail."

115.   Beginning on May 26, 2010, a momentum or dynamic kill, commonly referred to as a "top kill" maneuver, was attempted at the Macondo well.   A "top kill," which was not mentioned in the Macondo Spill Response Plan, involves pumping mud at high pressure rates through the choke and kill lines of the blowout preventer (the "BOP").   If successful, the mud would force the oil back into the well.   However, after a few days, it became clear that the "top kill" effort had failed.   On June 1, 2010, a "top hat" was installed where the riser pipe that had been attached to the BOP had recently been cut off.   The "top hat," yet another response that was not mentioned in the Macondo Spill Response Plan, involved installing an oil collection device on the top of the BOP to collect the leaking oil and divert the oil into the *Discoverer Enterprise*, one of the vessels used in the response effort.   The "top hat" collected only about 25% of the oil being released into the gulf.

45

116.   By late June 2010, oil had contaminated the coastlines of Louisiana, Alabama, Mississippi and Florida – with devastating effect on the environment, wildlife and the livelihoods of thousands of people who work in the coastal Gulf region.

117.   Finally, on July 15, 2010, a device called a "capping stack," which looked like a smaller version of the BOP, was set in place and closed and oil stopped spewing from the well for the first time in 87 days.  Two months later a relief well finally reached the Macondo well and effectively sealed the leak.  However, the damage had been done; the oil spill that ensued after the April 20 rig explosion dumped approximately 206 million gallons of crude oil in the Gulf of Mexico, causing devastating damage to the ecosystem of the entire Gulf of Mexico and huge swaths of the coastline of the South Eastern United States.

118.   As evidenced by their feeble and poorly thought-out efforts to contain the Macondo oil spell, Anadarko and BP were haplessly unprepared to deal with the spill.  Indeed, as noted by the Presidential Commission:  "[The OSRP] claimed that response vessels . . . could recover nearly 500,000 barrels of oil per day" yet "[d]espite these claims, the oil-spill removal organizations were quickly outmatched" by the spill from the Macondo well.  And on June 2, 2010, BP's CEO, Anthony B. "Tony" Hayward ("Hayward") admitted in an interview with the Financial Times that "what is undoubtedly true is that we did not have the tools you would want in your tool-kit" to stop the spill.  According to the FT article, Hayward also admitted that it was "an entirely fair criticism" to say that the Macondo well co-owners were not "prepared for a deep-water oil leak."   In addition, in a November 8, 2010 interview with the BBC, Hayward admitted that Macondo well's "contingency plans [including the OSRP] were inadequate" and that the companies involved in the spill response were "making it up day to day."

119.    Anadarko shares full responsibility with BP for this failure.  As a partner and co-owner of the Macondo well, and pursuant to its rights and obligations under the Joint Operating Agreement, Anadarko was heavily involved in the failed efforts to respond to and contain the oil spill.   For example, in a press release dated April 30, 2010, BP confirmed Anadarko's involvement in the spill response stating that "BP has called on expertise from other companies including . . . Anadarko to help it activate the blowout preventer, and to offer technical support on other aspects of the response" to the Macondo oil spill.  During Anadarko's May 4, 2010 earning conference call, Defendant Hackett stated:

> we are mostly focused on making sure that this clean-up occurs and assisting, as part of the full industry effort on this, assisting BP.

120.    On May 13, 2010, Bloomberg reported that "Anadarko is assisting BP until the leaks [*i.e.,* at the Macondo well] are stopped and questions are answered."  Indeed, an Anadarko employee named Robert Quitzau testified on May 25-26, 2011 in the Louisiana Litigation, and confirmed that Anadarko was extensively involved in the spill response effort, worked closely with BP on the various failed attempts to contain the spill, and received all of the information from BP that they requested.

### C.    The Woefully Deficient And Materially False And Misleading Oil Spill Response Plan And Exploration Plan

121.    The inability of Anadarko and BP to effectively control the Macondo oil spill was a direct result of the materially false Oil Spill Response Plan and Exploration Plan that the co-owners had in place for the Macondo well.

### 1.    Government Regulations Required An OSRP And EP To Be Publicly Filed for the Macondo Well

122.    Pursuant to the Oil Pollution Act of 1990, the MMS (now known as the Bureau of Ocean Energy Management Regulation and Enforcement) is responsible for oil-spill planning

and preparedness.  MMS regulations require that all owners of offshore oil-handling, storage or transportation facilities prepare oil spill response plans for each offshore facility, which describes in detail what actions the owners will take in the event of an oil spill.  In that regard, the MMS regulations set out required elements of a spill response plan – *i.e.*, an emergency-response action plan (the "core" of the document), oil-spill response equipment inventory, oil-spill response contractual agreements, a calculation of the worst-case discharge scenario, plan for dispersant use, an *in-situ* burning plan, and information concerning oil-spill response training and drills.

123.    Additionally, prior to conducting any exploration activities on a lease, federal regulations required leasees/owners to submit an exploration plan demonstrating that they planned and prepared to conduct their proposed activities in a manner that conformed to applicable safety laws and regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  *See* 30 C.F.R. §§250.201, 250.202.    Exploration plans were also required to contain information concerning a "blowout scenario", as set forth below:

> **Blowout scenario**.  A scenario for the potential blowout of the proposed well in your [Exploration Plan] that you expect will have the highest volume of liquid hydrocarbons.   Include the estimated flow rate, total volume, and maximum duration of the potential blowout.   Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints.   Estimate the time it would take to drill a relief well.  30 C.F.R. §250.213(g).

Anadarko and BP were required to conduct all of their lease and unit activities according to the exploration plan, or suffer civil penalties or the forfeiture or cancellation of its lease.  30 C.F.R. §250.280.

124.   In accordance with these regulations, the Macondo co-owners filed with the MMS an OSRP and an EP relating to the Macondo well.  Both the OSRP and the EP were publicly-available documents.  The initial Oil Spill Response Plan for the Gulf of Mexico was filed by BP with the MMS on December 1, 2000, and a revised version of the OSRP was publicly filed on June 30, 2009.  The EP relating to the Macondo well was "deemed submitted" by the MMS and publicly available on or about March 10, 2009.  The EP is expressly identified as "public information" and states that it covers lease number G32306 for the Mississippi Canyon Block 252, which is referred to as the "Macondo" project area.

125.   Anadarko and the Individual Defendants, as experienced oil and gas industry participants and owners and co-owners of numerous oil wells, knew that an OSRP and an EP were necessary for the Macondo well, and that these documents would have to be filed with the MMS.  Indeed, Anadarko specifically bargained for the right to review the Macondo Spill Response Plan in the Joint Operating Agreement.  For example, section 5.7 of the JOA required BP to furnish Anadarko with "a copy of each application for a permit to drill [and all amendments thereto]" and "copies of reports made to regulatory agencies."  In accordance with these contractual rights, Anadarko was provided with a copy of the Macondo Spill Response Plan.  Indeed, Beirne (BP's Offshore Land Negotiator and the primary contact between BP and Anadarko concerning the Macondo well) testified that Anadarko was provided with detailed information concerning BP's plans for the Macondo well as early as the summer of 2009, including the well design plan, well permit applications and other filings with the U.S. Government, which would have included the Macondo Spill Response Plan.

126.   As a co-owner of the Macondo well, Anadarko had the ability to control the contents of the OSRP and EP.  For example, Beirne testified that Anadarko had the right to opt

out or no longer participate in any operation at the well, or to propose alternative procedures or plans – but Defendants chose not to do so.  To the contrary, by becoming a co-owner of the Macondo well and in partnering with BP, Defendants Anadarko, Hackett and Daniels approved, ratified and publicly adopted the OSRP and EP for purposes of the Macondo well.  In fact, as discussed herein, Anadarko deliberately concealed the gross inadequacies of the OSRP and EP even while making repeated public statements acknowledging their involvement in the clean-up efforts following the spill.

### 2.    The OSRP and EP Were Materially False

127.    In the aftermath of the Macondo disaster, it has been widely publicized that the OSRP and EP were egregiously false and riddled with material misrepresentations.  For instance, the publicly filed OSRP dramatically misstated Anadarko and BP's ability to respond to a spill at the Macondo well and their oil spill response capabilities.  According to the OSRP, the "TOTAL WORST CASE DISCHARGE" scenario that could be effectively responded to pursuant to the OSRP was up to "250,000 barrels of crude oil per day."  Indeed, the OSRP states that, in the event of an oil spill in the Gulf of Mexico, BP and its contractors could recover as much as 491,721 barrels per day.  Further, the OSRP stated that BP and its contractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills."  These statements were materially false and misleading.   Indeed, as noted by the Presidential Commission:  "Despite [the OSRP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill response organizations were quickly outmatched" at much lower flow rates.

128.    The OSRP also materially misstated the resources available to Anadarko and BP in the event of a spill.  For example, the OSRP asserted that they would be able to marshal enough "skimmer" vessels to scoop up all oil before any deepwater spill could reach shore – a

claim that was based on no facts whatsoever and proved wildly inaccurate.  Indeed, a June 16, 2010 memorandum to the National Incident Command from Rear Admiral J.A. Watson, Federal On-Scene Coordinator at the spill states:

> Pursuant to my authority contained in 46 U.S.C. § 55113, I have determined that an adequate number of oil spill response vessels (OSRVs)…capable of skimming oil <u>cannot be employed in a timely manner to recover the oil released from the . . .spill [at the Macondo well].</u>”

129.    The OSRP lists Peter Lutz as a national wildlife expert at the University of Miami who was recommended as a “go-to” resource to be contacted in the event of a spill.  Professor Lutz had not only left the University of Miami twenty years ago, he in fact <u>died in 2005</u>.  Other obvious inaccuracies in the OSRP include the fact that, under the heading “sensitive biological resources,” the plan lists marine mammals that do not live anywhere remotely near the Gulf of Mexico – including <u>walruses, sea otters, sea lions and seals</u>.  Moreover, the names and phone numbers of several Texas A&M University marine life specialists were incorrect, as were the numbers for marine mammal stranding network offices in Louisiana and Florida, which are no longer in service.  The website listed in the Oil Spill Response Plan is for Marine Spill Response Corp. – one of only two firms relied upon for equipment to clean a spill – linked to a defunct Japanese-language page.

130.    The OSRP also materially understated the dangers posed by an uncontrolled oil leak at the Macondo well site.  The plan provided only a cursory and unrealistic analysis of the risks and proposed responses to an oil spill.  For instance, it absurdly stated that if there were a leak at the *Deepwater Horizon* well site, there would be “no adverse impact” on birds, sea turtles or endangered marine mammals.

131.    It is abundantly clear that the statements contained in the OSRP were made without any basis and any analysis underlying the statements was based on wildly false

assumptions.  Indeed, according to Rick Steiner, a retired professor of marine science at the University of Alaska, commented:  "This response plan is not worth the paper it is written on." And according to a June 10, 2010 Associated Press article the OSRP represented a "slapdash effort to follow environmental rules."  For example, "[i]n the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster."  With respect to how much oil would eventually reach the shore, the OSRP failed to take into account "[t]he Gulf's loop current, which is projected to help eventually send oil hundreds of miles around Florida's southern tip and up the Atlantic coast."

132.    In a letter to other industry participants dated June 28, 2010, the Congressional Subcommittee on Energy and Environment investigating the Macondo disaster referred to the Oil Spill Response Plan as "tragically flawed" and described it as containing "embarrassing" flaws. Similarly, the Presidential Commission found that the OSRP "evidenced [a] serious [lack] of attention to detail."

133.    The EP contained similar false statements to the OSRP, and was just as obviously riddled with errors – indeed, the EP expressly incorporates the OSRP.  The EP also states that the worst-case scenario for an oil spill occurring in Mississippi Canyon Block 252 (*i.e.,* the Macondo well) was 162,000 barrels of oil per day.  Further, the EP represented that the Macondo co-owners had "the capability to respond to the appropriate worst-case scenario included in [the OSRP]" and certified that, since the estimated worst-case spill at the Macondo well was less than that stated in the OSRP, the co-owners had the "capability to respond . . . to a worst-case

discharge, or a substantial threat of such a discharge" resulting from the co-owners' activities at the Macondo well.

134.    As with the OSRP, these statements were materially false and misleading. In contrast to representations contained in the OSRP and the EP, Anadarko and BP were unable to contain the oil spilling from the Macondo well at a rate of between 53,000 and 62,000 gallons of oil per day, which was significantly less than the worst-case scenarios discussed in either the EP or the OSRP.  For example, as of June 18, 2010 (more than eight weeks after the spill began), the Macondo co-owners were recovering merely 15,000 barrels of oil per day.  Indeed, Anadarko and BP failed to stop the flow of oil for approximately 87 days while over 5 million barrels of oil (over 206 million gallons) were discharged into the Gulf of Mexico.  As reported in the New York Times, by August 4, 2010, only 17% of the oil was captured by the various containment mechanisms used at the well.

135.    In estimating the risk that any oil spill would spread to beaches or expand beyond the *Deepwater Horizon* site, the EP represented that there would be no coastline problems because the well site was far offshore.  "Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected."  Similarly, the Environmental Impact Analysis portion of the Exploration Plan discounts the harm from an oil spill to fisheries in the area, stating "it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities" and "[i]f such a spill were to occur . . . the effects would likely be sub-lethal . . . ." According to the plan, there was only a 21 percent chance oil could reach the Louisiana coast within a month of a spill.  In reality, however, oil reached the Mississippi River delta just nine days after the April 20 explosion.

136. In sum, the Oil Spill Response Plan and Exploration Plan were misleading and outdated documents that misrepresented the size of the spill that Anadarko and BP were prepared to respond to, failed to anticipate the most obvious issues associated with an oil spill, were based on obviously false assumptions, and were otherwise woefully inadequate.

137. There can be no question that the Individual Defendants knew or should have known that the Macondo Spill Response Plan was materially false. Even a cursory review of the plan would reveal to a person in the industry that it was woefully inadequate and riddled with errors and outright inaccuracies. Anadarko and the Individual Defendants willfully or recklessly disregarded these "glaring and egregious" errors in purchasing the Company's 25% interest in the Macondo well and in approving, ratifying and publicly adopting the OSRP and the EP.

## VII. THE TRUTH IS REVEALED

138. Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

139. The full impact of the Macondo/*Deepwater Horizon* disaster on Anadarko was not immediately revealed to the public. In the aftermath of the spill, the market gradually became aware of the vast scope of the disaster and the potential liability that Anadarko faced for its role in the calamity, despite Defendants' efforts to mislead investors into believing that Anadarko's liability would be capped at a fraction of the true potential liability. As set forth below, in the aftermath of the Macondo well explosion and resulting oil spill, the price of Anadarko's common stock fell repeatedly and dramatically (and in concert with BP's the stock price) as a series of partial disclosures gradually revealed the full truth concerning the role Anadarko played in the drilling of the well, the utter failure of Anadarko and BP's Macondo Spill Response Plan and the true extent of Anadarko's liability for the disaster.

140.    In the days immediately following the explosion, Anadarko's co-ownership of the Macondo well, which, as noted above, was a matter of public record, was widely reported.   For example, on April 22, 2010, the Wall Street Journal reported that "BP has a 65% stake in the [Macondo well] while Anadarko Petroleum (US: APC) has 25%..."

141.    New reports also focused on the Macondo Spill Response Plan, and emphasized that the spill could likely be contained and potential liability minimized as a result of the resources supposedly available according the OSRP and EP.   For instance, on April 22, 2010, the Wall Street Journal underscored the importance of the Macondo Spill Response Plan by noting that apparently "more than 171,000 barrels per day" could be recovered by "skimmers" ready to be deployed at the Macondo well.   On the same day, multiple other news sources reporting on the tragedy at the well, and similarly identified Anadarko as an owner of 25% the Macondo well, including the Dow Jones Energy Service, Platts Commodity News.    Indeed, the Platts Commodity News stated that "Anadarko Petroleum Thursday confirmed it is a 25% partner in Macondo."

142.    On April 27, 2010, news reports began to report that the spill was growing and that it might not easily be brought under control.   For example, the Natural Gas Week's Gas Market Reconnaissance reported:

> As the Deepwater Horizon disaster moved into its first full week, efforts continue on a huge scale to contain a growing spill that threatens Gulf Coast states from Louisiana to the Florida Panhandle.   The oil is escaping at a rate of about 1,000 barrels a day from a damaged riser rising from the wellhead.   [...]  BP is the operator of the well and has a 65% interest in it and its partners are Anadarko Petroleum (25%) and Mitsui (10%).

As investors grew concerned in response to this news, the price of Anadarko's common stock fell on April 27, 2010 by over $3 per share from a closing price of $73.18 per share on the prior

day's trading to $70.10 per share, or 4.2%, on above average trading volume of over 5,335,300 shares.

143.     On April 29, 2010, a <u>Dow Jones News Service</u> article revealed that the "oil spill…is much worse than originally thought."  Further, the article stated: "[w]ith the pressure growing and government anger spreading over the ongoing oil spill in the Gulf of Mexico, shares of the companies that ran the damaged rig fell sharply…"  With investor concerns heightened, the price of Anadarko's common stock fell precipitously.   Indeed, the <u>Dow Jones</u> article specifically stated that:

> Anadarko Petroleum Corp. (APC) was another [of the companies that "ran the damaged rig"] caught in the slippery tide, falling 4.1% to $67.33 on more than three times its average volume.  Anadarko has a 25% stake in the [Macondo well] where the [Deepwater Horizon rig] was drilling.

The <u>Dow Jones</u> article also reported that the companies involved in the Macondo well, including Anadarko, are "performing far worse than their peers…as oil prices were rising and the market rallied."  Indeed, by the close of trading on April 29, 2010, the price of Anadarko's common stock had fallen $2.87 per share from a closing price of $70.20 per share on the prior day's trading to $67.33 per share, or 4.1%, on above average trading volume of over 14,134,680 shares.

144.     On April 30, 2010, a <u>Dow Jones International News</u> article reported that the "Gulf Oil Spill Threatens Shore" and that preparations had begun to "prepar[e] the coastlines of Louisiana, Mississippi, Alabama and Florida for the arrival of an oil slick" due to the "escalating crisis in the Gulf of Mexico."  A <u>Dow Jones News Service</u> article titled "Shares Of Oil Servicers Fall As Gulf Disaster Concerns Spread" – which was published at 11:33 a.m. on April 30, 2010 – reported that "[t]he disaster that occurred last week…has worsened in recent days" and that, as a

result, "Anadarko Petroleum Corp…which owned a stake with BP on the region being drilled, fell 3.7% to $64.82."

145.    On April 30, 2010, <u>Platts Commodity News</u> article titled "Share prices tumble for five companies tied to USG rig disaster" stated:

> Share prices for the five companies connected most directly to the Deepwater Horizon disaster have taken their lumps since the April 20 event with analysts watching the ticker closely Friday for the end of the week.
>
> A review of closing New York Stock Exchange prices for those companies from April 19 to Thursday night's close shows Macondo filed operator BP off 12%, <u>Macondo field partner Anadarko Petroleum down 8%</u>...
>
> <u>At mid-day Friday…Anadarko was off 3%</u>...

146.    On April 30, 2010, a <u>Bloomberg</u> article reported that Louisiana Governor Bobby Jindal said that the effort to "protect Louisiana's shoreline and fisheries" from the spill "is inadequate" and "won't be effective."  On the same day, a <u>MarketWatch</u> article titled "Liability blowout…Speculation abounds on who will get stuck with oil-spill bill" reported that, in addition to BP, "Anadarko Petroleum (APC US) has a 25% stake in the [Macondo] lease...[and as] part of the consortium, [Anadarko is] also on the hook."  As a result of this news, Anadarko's share price continued to fall.  For example, the <u>StreetInsider.com</u> reported:

> Shares of companies tied to the massive Gulf of Mexico oil spill continue to get rocked on concerns about legal liability and clean-up costs.  It is now expected that the environmental mess could be bigger than Exxon Valdez.  Here is a run-down:  BP (NYSE: BP) 75% stake in the Macondo well.  Down 1.5% today to $51.80.  Was at $60.48 before the spill.  Lost market cap = approximately $27 billion. <u>Anadarko Petroleum (NYSE:  APC) 25% stake in Macondo well.  Down 4.5% today to $64.29.  Was at $73.94 before the spill.  Lost market cap = approximately $4.5 billion.</u>

By the close of trading on April 30, 2010, the price of Anadarko's common stock had fallen $5.17 per share from a closing price of $67.33 per share on the prior day's trading to $62.16 per share, or 7.7%, on high trading volume of 21,079,010 shares.

147.    On May 3, 2010, nearly three weeks after the explosion at the Macondo well, Anadarko issued a press release announcing the Company's results for the first quarter ended March 31, 2010.   In the press release, Defendants discussed the fact that Anadarko's 25% interest in the Macondo well potentially exposed the Company to liability in connection with the oil spill disaster.   Defendants, however, falsely reassured investors that Anadarko had sufficiently insured against any such potential exposure:

> About two weeks ago, in the Gulf of Mexico, the BP-operated Macondo exploration well on Mississippi Canyon block 252 discovered an oil accumulation. As reported in the press, an explosion and fire occurred on the Deepwater Horizon drilling rig during operations. The rig subsequently sank, hydrocarbons were released into the Gulf and a large-scale well-control and clean-up effort has ensued. Anadarko is a 25-percent working interest owner in this block, which is operated by BP Exploration & Production, Inc. A full response and investigation is being conducted by the operator of the well, the drilling rig owner and governmental entities. The company maintains insurance policies designed to provide financial protection for such events, for its share of gross covered costs up to an aggregate level of approximately $710 million, less deductibles.   Based on its 25-percent non-operated interest, the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million.

148.    On May 4, 2010, Anadarko filed its Form 10-Q for the first quarter ended March 31, 2010 with the SEC.  The Form 10-Q, which was signed by Defendant Gwin and certified by Defendants Gwin and Hackett, reiterated the statements made in the May 3 press release. According to the Form 10-Q, "[b]ased on its 25-percent non-operated interest in this well, the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million."

149.    That same day, Anadarko held an earnings conference call to discuss the Company's first quarter results.  During the conference call, Defendant Hackett repeatedly noted that Defendants were intently focused on the Macondo well and cleaning up the spill.  For example, Hackett emphasized that the spill was "foremost in everyone's mind" and assured the

investing public that Defendants "remain focused on managing through this event" and were "focused on making sure that this clean-up occurs and assisting, as part of the full industry effort on this, assisting BP" in the spill response.

150.    Also during the May 4 conference call, an analyst at RBC Capital Markets asked Anadarko executives "[h]ow passive typically are you when you are a nonoperator?  Were you a part of…the well's design on Macondo?"  In response, Defendant Daniels answered:

> You actually do know what targets you're going after and remembering we had farmed into this after the well had already spud.  So the well design and it's procedures, operating procedures were all done before we actually farmed in.  When you typically approve these as a nonoperator, you basically approve just the capital spending level in the targeted zones from a geological perspective, as opposed to looking at the detail, well design or procedures. We were not involved in that at all on this well.

151.    Analysts and investors were comforted by these remarks.  Indeed, an analyst from HSBC noted Anadarko's representations "that it has insurance coverage for this incident of USD177.5m less deductibles of USD15m based on its 25% working interest position" and that "the Oil Pollution Act of 1990 . . . is likely applicable in the current circumstance," which could cap liability at $75 million.  On May 4, 2010, the price of Anadarko's common stock rose from $64.03 on May 3, 2010 to $64.40, an increase of 0.58%.

152.    On May 5, 2010, investor concern over the uncontained oil spill at the Macondo well continued to increase.  Indeed, a Gimme Credit Research Brief dated May 5th noted that "APC's results were overshadowed by concern over the ongoing spill."  That same day, an article published in The Globe and Mail titled "BP looks to partners to share in rocketing cleanup costs" reported that "environmental recovery" costs could "soar as high as $15 billion (U.S.)."  The Globe and Mail article continued:

> But BP's chief executive officer Tony Hayward has insisted others should be held accountable as well, including…BP's partner in the project, Houston-based

Anadarko Petroleum Corp. [which] said yesterday that it expects insurance to cover most immediate costs.

On May 5, the price of Anadarko's common stock fell $2.57 per share from the prior day's closing price of $64.40 per share to $61.83 per share, or 4%, on high trading volume of 11,184,700 shares.

153.   On May 7, 2010, a Reuters News article reported that Moody's Investor Services had said that the ongoing oil spill from the Macondo well "could last for weeks and lead to negative rating actions for the five primary companies involved in the project [including] Anadarko Petroleum, which owns a 25 percent [stake] in Macondo [and is] likely to share in well-repair and clean-up costs."   In response, the price of Anadarko's common stock fell by $2.07 per share from the prior day's closing price of $60.95 per share to $58.88 per share on May 7th, or approximately 3.4%, on high trading volume of 8,296,862 shares.

154.   Indeed, in a report dated May 7, 2010, analysts at Oppenheimer directly linked Anadarko's stock price decline to the Macondo well and the ineffectual spill response effort, stating:

> "We expect APC, which has a 25% interest in [the] Macondo oil well in the GOM, to remain under pressure until the oil spill can be contained and clean-up costs are better understood.  APC shares have lost more than 19%, or $7.2 billion of market cap, since the [spill] on April 20."

The Oppenheimer analysts also noted that "we believe … if the attempt to place the "containment dome" over the next few days is successful, APC shares could rebound."

155.   On May 10, 2010, The Oil and Gas Journal reported that a relief well was being drilled as "one of several options . . .to kill a deepwater blowout in the Gulf of Mexico and stop a widening crude oil leak that has caused international concern" and again noted Anadarko's ownership of 25% of the well.  The article also reported that spill flow estimates were increasing

substantially:  "[i]nitially, the spill estimate was 1,000 b/d [*i.e.,* barrels per day]" but was now increased to "5,000 b/d."   In response to this news, including the revised and worsening spill estimate, Anadarko's common stock fell $1.25 per share from a closing price of $58.88 per share on the prior day's trading to $57.63 per share, or 2.1%, on a heavy trading volume of 13,281,750 shares.

156.   Anadarko's shares continued to fall the following day – May 11, 2010 – in response to news, as reported in <u>The Oil Daily</u>, that "[a]n estimated three million gallons of oil have leaked into the Gulf of Mexico since the Apr. 20 explosion," and that the United States Justice Department was "stepping up its efforts to determine whether there was any "malfeasance" in the deadly blowout that sank the Deepwater Horizon drilling rig and led to a massive oil spill in the US Gulf of Mexico."   <u>The Oil Daily</u> report went on to state that "the uncertainty about liability might also affect [among others] BP's minority partner [Anadarko]..." In response to this news, Anadarko's common stock fell $1.79 per share from a closing price of $57.63 per share on the prior day's trading to $55.84 per share, or 3.1%, on a heavy trading volume of 14,182,910 shares.

157.   On May 12, 2010, analysts at <u>Oppenheimer</u> lowered their rating on Anadarko shares from Outperform to Perform "on increased concerns about potential financial liabilities related to the oil spill in the Gulf of Mexico.  We expect shares of APC, which has a 25% interest in the . . . Macondo well, to remain under pressure until the oil spill can be contained and clean-up costs and any compensation can be estimated."   The report highlighted that "[l]ost market value since the [Macondo well explosion] is . . . $9.1B for APC."

158.   On May 13, 2010, an <u>Argus</u> analyst report further tied Anadarko's mounting losses to the potential liabilities associated with the oil spill.  For instance, the report noted that

"we think the near-term upside is limited, due primarily to the overhang on the shares arising from the recent accident at the Macondo well in the Gulf of Mexico [where] APC has a 25% non-operating interest in the well."  The report went on to state that "shares will likely be driven by greater clarity around the company's Macondo-related liability. . . ."

159.    Similarly, on May 14, 2010, J.P. Morgan issued a report which directly linked the precipitous decline in Anadarko's common stock to the Macondo well.  The report stated that "[Anadarko] has lost around $8.0B in market value, $6.5B of which we think is related to oil spill…"  J.P. Morgan also reported that if BP was found to have made decisions that caused the accident, Anadarko could seek legal recourse against the co-owner of the well.  "That effort could help APC reduce its liabilities," the report concluded.

160.    On May 19, 2010, Anadarko partially revealed the extent of its potential liability in connection with the clean-up and response efforts at the Macondo well, when CEO Hackett stated that the Company's balance sheet, including "more than $3 billion in cash and an unknown credit facility in excess of $1 billion" would allow Anadarko to "weather costs from the spill."  In response to this news, Anadarko's common stock fell $1.79 per share from a closing price of $58.04 per share on May 18, 2010 to $56.68 per share the following day, or 2.34%, on an above average trading volume of 6,336,735 shares.

161.    On May 21, 2010, Anadarko spoke about a recently approved drilling plan for the Lucius prospect, another deepwater exploratory well in the Gulf of Mexico.  Anadarko's statements in the Fort Wayne Journal Gazette admitted that the Macondo well was an extraordinarily risky prospect and that Anadarko knew that BP was unfamiliar with the terrain or the procedures for drilling such a complicated well.  Anadarko spokesperson John Christiansen stated that, "Anadarko already understands much of the prospect's geology [of the Lucius well],

unlike BP, which was drilling its first well at Macondo . . . [w]e've already drilled previous wells there, so it's a known pressure regime."

162.    Over the next week, information regarding the true extent of the disaster continued to reach the public, and continued to tether Anadarko's stock price to the Company's involvement in the response and clean-up efforts.  For example, on May 21, 2010, Investopedia Advisor confirmed that the "companies in the energy sector directly impacted by the Gulf of Mexico oil spill [including Anadarko] are well known to investors."   In addition, a Tudor, Pickering, Holt and Co. blog via the Houston Chronicle stated that "there isn't a single real long-term "winner" associated with this situation.  BP, Anadarko, and Mitsui face tremendous clean-up costs."  On May 25, 2010, Morgan Stanley issued a "Closed Research Tactical Idea" and tied Anadarko's stock price to the ability to stop the oil spill.  The report concluded that "[o]ver the past several weeks, efforts to stem the oil flow have proven unsuccessful and APC shares have continued to slip."  Finally, on May 27, 2010, Gannett News Service reiterated that Anadarko owns 25% of the Macondo well and that Anadarko could be affected by the spill clean-up costs. In response to these disclosures, on May 28, 2010, Anadarko's common stock fell $3.24 per share from the prior day's closing price of $55.57 per share to $52.33 per share, an approximately 5.8% decline, on high trading volume of 9,825,228 shares.

163.    On May 30, 2010, documents released by Congress revealed that emails were circulated on March 10, 2010 that highlighted fears concerning safety and significant problems related to the drilling operation at the Macondo well before the April 20, 2010 explosion.

164.    When the market reopened on June 1, 2010, approximately one month after Defendants estimated their potential liability in connection with the Macondo oil spill disaster to be approximately $177.5 million, it was reported that the "top kill" effort to stop the flow of oil

had failed.   Investors began to realize that the spill response being conducted pursuant to the

Macondo Spill Response Plan was ineffective.   In response, Anadarko's common stock

plummeted by over $10.27 per share – or approximately 19.5% – from the prior day's closing

price of $52.33 per share to close at $42.10 per share on extraordinarily high trading volume of

over 44.8 million shares.   This single day decline wiped out a staggering more than $5 billion of

the total market capitalization of Anadarko.

165.    On June 2, 2010, <u>MarketWatch</u> reported that the oil spill liability related to the

Macondo disaster would likely reach at least $40 billion, placing Anadarko's 25% interest in this

liability at approximately $10 billion – roughly $9.8 billion more than the Company's insurance

coverage.  Also on June 2, 2010, <u>RBC Capital Markets</u> published an analyst report stating that:

- "[Anadarko's Stock Price] Recovery Hinges on Oil Spill Containment."

- "Shares of Anadarko have fallen 43% since the Macondo well blowout. This compares to the peer group (EPX) decline of 13%."

- "APC shares could bleed lower if containment and remediation news continues to be unsuccessful."

- "there remains the uncertainty in the clean-up costs that will result and how much APC will be on the hook for."

166.    On June 4, 2010, Moody's ratings agency lowered its rating on Anadarko's credit

to "Outlook Negative" and directly linked the rating downgrade to Anadarko's liability for the

Macondo disaster.

167.    On June 8, 2010, rumors began to surface that the liability related to the oil spill

could be so large that BP, the oil giant, could be forced to file for bankruptcy.   Indeed, since the

spill, BP's shares had plummeted from $60 to $30, representing a total market value loss of $90

billion, and the spill had not yet been contained.   The possibility of BP going bankrupt stirred

concerns among investors of the possibility that Anadarko could be responsible for more than

$40 billion of potential liability for cleaning up the Gulf oil spill.   A <u>Dow Jones Newswires</u> report stated:

> BP PLC … and Anadarko Petroleum Corp. … continued to decline on worries about the oil spill in the Gulf of Mexico.  Analysts at Tudor Pickering Holt said that the recent market reaction to the stocks could mean that the liability for both companies could be bigger than appreciated….

In response to these disclosures, Anadarko's stock price declined more than 4.5% from the prior day's closing price to $42.80 on extremely heavy volume.

168.    Also on June 8, 2010, <u>Reuters</u> reported that the S&P had downgraded its outlook on Anadarko from "Stable" to "Negative."   "The negative rating actions are based on various concerns and possible operating disruptions for companies operating in the Gulf of Mexico due to the moratorium and the flow of oil from the well disaster," S&P said in a statement.  Further, S&P indicated that the Company may be cut into junk territory over the next one to two years. At the time, Anadarko was rated BBB-minus, the lowest investment-grade rating.  A <u>Bloomberg</u> article published on June 8th also reported on the S&P's credit outlook downgrade of Anadarko and BP, noting that "S&P cited a U.S. moratorium on deep-water drilling permits that has been extended six months and concerns about the ongoing oil spill in the Gulf."  Given that both the deepwater drilling moratorium and the spill resulted from the Macondo disaster, the S&P downgrade of Anadarko's credit outlook was directly related and attributable to the Company's role in and liability for the Macondo well.

169.    On June 9, 2010, prior to the opening of the market, news reports fully exposed the glaring and egregious false statements, errors and omissions in the Oil Spill Response Plan and Exploration Plan and the full extent of Anadarko's involvement in the Macondo disaster. For example, an article by the <u>Associated Press</u> released prior to the opening of the market on June 9 (and repeated in numerous publications, including the <u>Huffington Post</u>) revealed the fact

that both the OSRP and the EP were "riddled with omissions and glaring errors."  Indeed, the <u>AP</u>

article goes on to state that Anadarko and BP:

> have pretty much been making it up as they go along.  The lengthy plans approved by the federal government last year before BP [and Anadarko] drilled [the] ill-fated well <u>vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one.</u>

The <u>AP</u> article also cites additional "glaring errors" in the OSRP and EP, including the reliance

on dead experts, species that do not inhabit the Gulf.  Significantly, the article states "[i]n the

spill scenarios detailed in the [Macondo Spill Response Plan], fish, marine mammals and birds

escape harm; beaches remain pristine; water quality is only a temporary problem.  <u>And those are</u>

<u>the projections for a leak about 10 times worse than what has been calculated for the ongoing</u>

<u>disaster.</u>"

170.    The same day, <u>Reuters</u> reported that the cost to ensure Anadarko's debt "jumped

to new highs on concerns over the costs the companies face as a result of exposure to the largest

oil spell in U.S. history."  Further, Anadarko's bonds were placed on a "negative credit watch"

by several ratings agencies to "reflect uncertainties regarding the Company's potential share of

significant liabilities and clean-up costs associated with the Macondo well oil spill in the Gulf of

Mexico, which started on April 20, 2010."  In addition, also on June 9, 2010, a <u>Bloomberg</u> article

reported that "the Obama administration and lawmakers stepped up pressure to end [the] record

U.S. oil spill" and that "40 U.S. lawmakers called [for all resources to be shifted to] stopping and

cleaning up the oil spill."

171.    On June 9, 2010, as result of the above disclosures, Anadarko's common stock

fell $7.97, to $34.83 per share, from the prior day's close of $42.80 per share, an approximately

19% single day decline on extraordinarily high trading volume of over 45,636,020 shares.

Analysts attributed these additional stock price drops to the news concerning Anadarko's

inability to contain the spill and liability for the clean-up.  For example, a <u>Bloomberg</u> article published that day noted that "Anadarko has lost most than half its market value since the rig explosion."  <u>MarketWatch</u> similarly referred to the ongoing oil spill from the Macondo well in reporting that "Anadarko … which owns a 25% share of the leaking well in the Gulf of Mexico, fell 19% to $34.83."

## VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

172.   Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

### B.   Defendants' Materially False And Misleading Statements In The OSRP and EP

173.   Anadarko's partnership with BP and 25% co-ownership of the Macondo well was formally entered into and a matter of public record on or about October 1, 2009.  As discussed above, in connection with Anadarko's purchase of 25% of the Macondo well, Defendants received, approved and adopted the OSRP and EP.  The EP had been previously filed with the MMS on or about February 23, 2009 and available to the public no later than March 10, 2009 – when it was "deemed submitted" by the MMS.  The OSRP had been last revised and publicly filed with the Government on or about June 30, 2009.  Accordingly, at all relevant times during Anadarko's involvement with and ownership of the Macondo well and the statements contained in the OSRP and EP were explicitly or implicitly attributable to Anadarko.

174.   The OSRP – which covered the Gulf of Mexico region – stated that the "TOTAL WORST CASE DISCHARGE" scenario that could be effectively responded to pursuant to the OSRP was up to 250,000 barrels per day.  It further stated that, in the event of an oil spill in the Gulf of Mexico, as much as 491,721 barrels per day could be effectively recovered pursuant to the plan, and certified that BP "maintain[ed] the necessary spill containment and recovery

equipment to respond effectively to spills" in the Gulf of Mexico.  Further, according to the OSRP, in the "unlikely" event that a leak occurred in the Gulf of Mexico:

- Fish, marine mammals and birds would escape serious harm;

- beaches would remain pristine; and

- water quality would be only a temporary problem.

In addition, the OSRP also asserts that sufficient "skimmer" vessels would be marshaled to scoop up all oil spilled in the Gulf prior to it reaching the shore.

175.    The EP – which related specifically to the Macondo well – expressly incorporated the OSRP and identified the worst-case scenario for a spill at the Macondo well to be 162,000 barrels per day (*i.e.,* less than the worst-case scenario identified in the OSRP).   The EP represented that the Macondo co-owners had "the capability to respond to the appropriate worst-case scenario included in [the OSRP]" and certified that, since the estimated worst-case spill at the Macondo well was less than that stated in the OSRP, the co-owners had the "capability to respond … to a worst-case discharge, or a substantial threat of such a discharge" resulting from the co-owners' activities at the Macondo well.

176.    The EP also stated:

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

*            *            *

In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of [the] Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

An accidental oil spill from the proposed activities could cause impacts to beaches. However, <u>due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected</u>. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate <u>there is little risk of contact or impact to the coastline and associated environmental resources</u>.

177.   In addition, the EP stated:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.   Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources.

The EP also repeated substantially similar or identical versions of the above quoted language pertaining to wetlands, coastal wildlife, refuges, and wilderness areas.

178.   As discussed above, the statements contained in the OSRP and EP were egregiously false and misleading because, among other things:

(a)   they dramatically misstated the Macondo co-owners' ability to capably respond to a spill at the Macondo well, their oil spill response capabilities and the environmental and other consequences of a spill from the well.

(b)   they falsely assured the public that the Macondo co-owners were prepared to respond to a worst case spill release volume of between 162,000 barrels of oil per day (as per the EP's worst case scenario) to 250,000 barrels of oil per day (as per the OSRP's worst case scenario).   However, when the Macondo spill occurred, the co-owners were unable to contain the oil spewing from the well at a rate of between 53,000 and 62,000 gallons of oil per day – significantly less than the assurances provided in the EP and OSRP.

(c)   Contrary to the OSRP and EP, the Macondo co-owners had woefully inadequate equipment, technology and other resources to respond to the spill.  As explained by a group of eight U.S. Senators in a May 17, 2010 letter to U.S. Attorney General Eric H. Holder, Jr., there was no "proven equipment and technology" to respond to the spill.  Indeed, in an interview with the Financial Times on June 2, 2010, Macondo co-owner BP's CEO even admitted "what is undoubtedly true is that we did not have the tools you would want in your tool-kit" to stop the spill and accepted as "an entirely fair criticism" to assert that the Macondo well co-owners were not

"prepared for a deep-water oil leak."  In addition, in a November 8, 2010 interview with the BBC, BP's CEO admitted that Macondo well's "contingency plans [including the OSRP] were inadequate" and that the companies involved in the spill response were "making it up day to day."

(d)    The OSRP and EP falsely represented that that a spill from the Macondo well would not adversely impact the Gulf of Mexico coastline, beaches, wetlands, refuges and coastal wildlife.  As set forth herein, the spill has had a devastating effect on the Gulf coastline, polluting hundreds of miles of beaches, killing untold numbers of fish, birds and other wildlife, and inexorably damaging millions of acres of delicate wetlands.

179.    In sum, the OSRP and EP have been widely recognized as being patently – and materially – false and misleading.  For example, the Congressional Committee on Energy and Commerce (the "Congressional Energy Committee") investigating the Macondo disaster referred to the OSRP as "tragically flawed" and "embarrassing."

### C.    Defendants' Materially False And Misleading Statements Published On Anadarko's Website Throughout The Class Period

180.    During the Class Period, Anadarko's purported commitment to safety and environmental compliance featured prominently on the Company's website (www.anadarko.com).    For example, Anadarko described itself as a "steward of the environment" and as a company that is wholly committed to business practices that promote "health and safety."  For instance, the website states:

At Anadarko, we are committed to safely producing the energy we all need in a manner that protects the environment, public health and supports our communities.

181.    In describing the Company's "Expertise," Defendants assured the public that the Company is "committed to safely finding and producing the energy our world needs."  Similarly, the Company touts its ability to "safely leverage leading-edge technology to create pathways to new opportunities for energy development, while preserving the environment."

182.    In addition, Anadarko touts the Company's safety practices in the deepwater of the Gulf of Mexico:

> Anadarko's Gulf of Mexico operations team views safety as a <u>top priority</u>. Anadarko employees and contractors promote <u>a culture of safety</u> by following the LiveSAFE program.

Indeed, the Company stresses that "Anadarko's expertise and focused pursuit of material exploration targets in the Gulf of Mexico have made us one of the <u>industry's safest </u>and most successful deepwater explorers." Similarly, Anadarko's "Gulf of Mexico Fact Sheet" states that Anadarko is:

> Safely and responsibly providing the energy we all need, while protecting our people and the environment.  <u>Safety and environmental stewardship are highly valued at Anadarko and are inherent components of the culture of the company.</u> <u>[…]  At Anadarko, safety is no accident.</u>

183.    Anadarko also touts the Company's disciplined and rigorous approach to safely managing its oil exploration activities and the risks faced in Anadarko's oil exploration and production activities.  For example, the Company's discussion of "Corporate Responsibility" published on its website states, in relevant part, as follows:

> We are committed to doing things the right way at Anadarko.

> Anadarko manages and operates its worldwide assets in a manner consistent with our core values to protect health and safety, and comply with applicable environmental, health and safety laws, regulations and internal standards.

> <u>A safety-first culture is a way of life at Anadarko.</u> And whenever we undertake a new project, we work to understand the environmental issues and cultural considerations of an area. Then we create a balanced plan that couples new energy development with oftentimes innovative techniques to protect the locations in which we operate. Fundamental to our operating philosophy is a commitment to adhere to the stricter of two standards: our own policies and principles or an individual country's regulations.

184.    Anadarko further states that the Company's core "Values" include a commitment to "[m]aintain high standards for health, safety and the environment" and that the Company will "[a]ct responsibly with company assets."

185.    The Company's "Gulf of Mexico Fact Sheet" further emphasizes Anadarko's disciplined and rigorous approach to managing risk:

> Positioned for continued success in the deepwater Gulf of Mexico and <u>disciplined in its risking methodology.  This methodology incorporates a rigorous technical and commercial evaluation, risked economics for comparability and continuous high grading with commercial focus.</u>

In touting its "risking methodology" on its website, Anadarko specifically points to its "[p]roven exploration track record," and "industry-leading project-management skills."

186.    The statements set forth above were materially false and misleading when made because, among other things, Anadarko was not managing its projects, including the Macondo well, in a manner that was safe or designed to ensure environmental safety.  Nor did Anadarko have disciplined and rigorous risk management practices.  For instance, when partnering with BP on the Macondo well, Anadarko deliberately or recklessly approved and adopted the materially false and misleading Oil Spill Response Plan and Exploration Plan.  Anadarko also failed to properly investigate BP's safety record and practices.  Further, Anadarko approved dangerous and high-risk operational decisions for the Macondo well, failed to properly monitor operations on the Macondo well, risked the lives of the workers on the well, endangered wildlife, the environment and commercial interests along the Gulf coast, jeopardized the Company's multi-million dollar investment in the Macondo well project and exposed the Company to billions of dollars in potential civil and environmental liability.  Moreover, Anadarko completely failed to exercise any oversight over BP despite being alerted to BP's egregious safety record.

**D.     Defendants' Materially False And Misleading Statements Made During The Second Quarter Of 2009**

187.    As described above, Anadarko began evaluating and exploring the opportunity to partner with BP on the Macondo well during the summer of 2009.

188.    On June 12, 2009, the start of the Class Period, Defendant Hackett was featured in an interview published by Energy Tribune, an influential energy business trade publication, in which he stated that Anadarko's deepwater drilling program operated in a safe and environmentally responsible manner.  Defendant Hackett touted the Company's ability to use cutting-edge technology to produce oil from deepwater sources in a safe and environmentally friendly manner, stating "[i]t's technology like this that makes us scratch our heads as to why our government still holds so much of our natural resources off limits.   We've proven we can develop these resources safely while protecting the environment…."

189.    The above statements were materially false and misleading when made because, as set forth above in ¶¶121-137, while evaluating its partnership with BP on the Macondo well, Anadarko deliberately or recklessly disregarded any commitment to developing resources safely or protecting the environment by failing to meaningfully review the materially false and misleading Oil Spill Response Plan and Exploration Plan.   Anadarko also failed to properly investigate BP's safety record and practices.

**E.     Defendants' Materially False And Misleading Statements Made During The Third Quarter Of 2009**

190.    On July 8, 2009, Anadarko participated in the Morgan Stanley Energy Conference, during which Anadarko's Vice President of Exploration (VP Exploration) gave a presentation.   In the presentation, Anadarko's VP Exploration touted, among other things, Anadarko's rigorous risk management practices, stating, in relevant part, that the Company seeks to "to understand geological risk and a range of possible outcomes" and that it has a "separate

risk assessment team that interacts with each of our exploration teams to help them understand these risk factors."   According to Anadarko's VP Exploration, "the bottom line is – the point I want you to take away from this is that we have a consistent process.  It is rigorous and it's applied throughout the world to each of the prospects we drill."

191.    On August 3, 2009, Anadarko issued a press release announcing the Company's second quarter results for the period ended June 30, 2009.  The press release touts Anadarko's drilling expertise in the Gulf of Mexico, as well as the success of the Company's deepwater oil exploration teams.  The press release quotes Defendant Hackett as follows:

> Anadarko Chairman and CEO Jim Hackett said. "We are continuing to drive down costs to better align them with the current commodity-price environment. I am also very pleased with the excellent performance of our exploration teams, which have announced six deepwater discoveries so far this year.  […]

> Anadarko's exploration success," continued Hackett, "coupled with our strong operational performance . . . continues to deliver excellent value today and positions the company to continue to do so in the future."

192.    On August 4, 2009, Anadarko filed its Form 10-Q for the second quarter with the SEC (the "2Q2009 10-Q").  The 2Q2009 10-Q repeated the above statements made in the Company's August 3 press release and was signed by Defendant Gwin and certified by Defendants Gwin and Hackett.  The 2Q2009 10-Q also represented to investors that the Company had reviewed, among other things, the Company's risk profile, and had properly reserved for, and insured against, foreseeable drilling related liabilities.

193.    The Company's 2Q2009 10-Q also contained certifications by Defendants Hackett and Gwin that attested to the purported accuracy and completeness of the Company's 2Q2009 10-Q.

194.     On August 13, 2009, Anadarko presented at the EnerCom Incorporated Oil & Gas

Conference.   During the Company's presentation, Anadarko's Vice President of Operations

highlighted Anadarko's scrupulous project management practices, stating:

> [Anadarko has] … an industry-proven track record of project execution and
> development, with three mega-projects worldwide.  Third we've got a predictable
> and efficient capital base.  We manage where we drill and at what pace we drill
> throughout our assets.

195.     Further, on the August 13 call, Anadarko's Vice President of Operations

specifically reassured investors that, among other things, Anadarko's strong portfolio of low-risk

assets made the Company's stock a sound investment for shareholders:

> It's a great time to invest in Anadarko.  We offer a strong balance sheet.  It's built
> for uncertain times with good value-retention characteristics for the economic
> downturn.  It's got a strong growth vehicle for a combination of both low-risk and
> high-end exploration opportunities that will really start leveraging up as we see
> return and recovery in commodity prices."

196.     The above statements were materially false and misleading when made because,

as set forth above in ¶¶121-137, while evaluating its partnership with BP on the Macondo well,

Anadarko deliberately or recklessly failed to meaningfully review the materially false and

misleading Oil Spill Response Plan and Exploration Plan.   Anadarko also failed to properly

investigate BP's safety record and practices.

## F.     Defendants' Materially False And Misleading Statements Made During The Fourth Quarter Of 2009

197.     Anadarko 25% co-ownership of the Macondo well began on October 1, 2009 and

its partnership with BP was made effective as of October 1, 2009.  Drilling at the Macondo well

commenced on or about October 9, 2009.

198.     As set forth above in ¶¶121-137, when purchasing its 25% interest in the

Macondo well, Anadarko approved, ratified and publicly adopted the materially false and

misleading Oil Spill Response Plan (OSRP) and Exploration Plan (EP) for purposes of the

Macondo well, including in order to satisfy regulatory requirements applicable to the well.  The statements contained in the OSRP and EP were materially false and misleading because *inter alia* they misstated the Macondo co-owners' ability to capably respond to a spill at the Macondo well and their oil spill response capabilities.

199.    On October 20, 2009, Anadarko issued a press release touting its "commitment to … protecting the environment across all our operations."

200.    On November 3, 2009, Anadarko filed its Form 10-Q for the third quarter ended September 30, 2009 with the SEC (the "3Q2009 10-Q").  The 3Q2009 10-Q was signed by Defendant Gwin and certified by Defendants Gwin and Hackett.  In its 3Q2009 10-Q, Anadarko touted its "active" risk management practices – both above and below the surface of the water – on its oil exploration and development projects stating:

> Anadarko's global business development approach transfers core skills across the globe to assist in the discovery and development of world-class resources that are accretive to the Company's performance.  These resources help form an optimized global portfolio where both surface and subsurface risks are actively managed.

201.    Anadarko's 3Q2009 10-Q also represented to investors that the Company had reviewed its accounting principles, including its risk profile, and had properly reserved for, and insured against, foreseeable drilling related contingencies.  Also on November 3, 2009, defendants conducted an earnings conference call to discuss the Company's third quarter results with investors.  Defendant Hackett participated in the call, along with other Anadarko representatives.  During his presentation, Defendant Hackett continued to tout the success of Anadarko's deepwater oil exploration program stating "[d]ue to our successful deepwater exploration program, we are actively pursuing an aggressive appraisal drilling schedule during the remainder of this year and throughout 2010."

202.   On November 9, 2009, Anadarko issued a press release in which Defendant Hackett praised Anadarko and its employees for acting as "<u>as good stewards of the environment.</u>"  On November 11, 2009, following Hurricane Ida, Anadarko issued a statement representing to its shareholders that "[n]ow that Hurricane Ida has passed and weakened to a tropical depression.  […]  <u>We will begin ramping up production as quickly and safely as possible</u>…"

203.   Also on November 11, 2009, Anadarko's Board of Directors adopted a revised Code of Business Conduct and Ethics (the "Code"), which was disclosed on the Company's corporate website.  Among other things, the Code emphasizes that "Anadarko is committed to managing and operating its assets in a manner that protects and conserves the environment and is consistent with all environmental laws and regulations."  Further, according to the Company's Code, "<u>Anadarko will not compromise health or safety in the workplace.  Anadarko will take reasonable steps to protect employee health and safety. It is the goal at each Anadarko location to have and maintain a safe workplace.</u>"

204.   On November 18, 2009, Anadarko participated in the Bank of America Securities Energy Conference, at which Defendant Daniels presented.  During the presentation, Defendant Daniels praised Anadarko's project and risk management practices, telling investors:

> The project management skills that we think -- well, we're not just ourselves thinking this.   The outside consultants that do project management, benchmarking, have consistently shown that <u>Anadarko is one of the industry leaders in this and this is so important when you see that exploration success, how we translate that into value for our shareholders.  So that's critically important to us.</u>

> The predictable production profile is something that we build upon.   It's something that every quarter we can count on to deliver the results that we say we're going to deliver.

205.    On December 9, 2009, Anadarko participated in the Wells Fargo Securities MLP Pipeline and E&P, Energy Services & Utility Symposiums.  Anadarko's Vice President of Investor Relations and Communications ("VP Investor Relations") presented at this conference. During that presentation, Anadarko's VP Investor Relations touted the Company's expertise in managing major deepwater projects stating, in relevant part, that "one thing that we are very proud of is our project management skills.  We have a track record of being the industry leader in on-time, on-budget delivery on these megaprojects."

206.    The above statements were materially false and misleading when made because, among other things, Anadarko was not managing its projects, including the Macondo well, in a manner that was safe or designed to ensure environmental safety.  Nor did Anadarko have disciplined and rigorous risk management practices.  For instance, when partnering with BP on the Macondo well, Anadarko deliberately or recklessly approved and adopted the materially false and misleading Oil Spill Response Plan and Exploration Plan.  Anadarko also failed to properly investigate BP's safety record and practices.  Further, Anadarko approved dangerous and high-risk operational decisions for the Macondo well, failed to properly monitor operations on the Macondo well, risked the lives of the workers on the well, endangered wildlife, the environment and commercial interests along the Gulf coast, jeopardized the Company's multi-million dollar investment in the Macondo well project and exposed the Company to billions of dollars in potential civil and environmental liability.  Moreover, Anadarko completely failed to exercise any oversight over BP despite being alerted to BP's industry-wide safety record that should have made Anadarko pay particularly close to attention to BP's practices on the Macondo well.

### G.   Defendants' Materially False And Misleading Statements Made During The First Quarter Of 2010

207.    On January 31, 2010, the *Deepwater Horizon* arrived at the Macondo well to resume exploratory drilling operations on the site.

208.    On February 1, 2010, Anadarko issued a press release announcing the Company's financial results for the fourth quarter ending December 31, 2009.  In the press release, Defendant Hackett stated: "2009 was a very successful year in advancing our strategy and illustrating the high quality of our portfolio."

209.    On February 2, 2010, Anadarko held an earnings conference call to discuss the Company's fourth quarter financial results with investors.  Defendants Hackett and Gwin, among other Anadarko representatives, participated on the call, which, in large part, repeated the above the statements made in the Company's February 1 press release.

210.    On February 3, 2010, Anadarko participated in the Credit Suisse Group Energy Summit, at which Defendant Daniels presented.   During the call, Daniels emphasized the Company's project management expertise, informing investors that:

> "[o]n the project development side, this is the second point I hope that you take away from here, is that we are very, very good at managing projects both from a time and a capital standpoint and bringing these very large megaprojects on production, on time, and on budget."

211.    Defendant Daniels also highlighted to investors Anadarko's specific expertise in oil exploration in the Gulf of Mexico, and in particular noted, among other things, the Company's "demonstrated exploration success" in that region:

> Going on to the Gulf of Mexico.  We have been in the deepwater Gulf of Mexico for a long time; <u>that is the only place we focus now. We feel like we are a premier operator out here. We have got demonstrated exploration success … [t]he infrastructure we have is established and we can utilize that, and it shows very clearly our operating capabilities. The fact that we were able to bring those online, develop discoveries we had already had, have very efficient operations, and utilize that existing infrastructure to drive more value.</u>

212.    Also during the February 3, 2010 Credit Suisse conference call, Defendant Daniels specifically touted the Company's attractiveness to investors based on the success of Anadarko's exploration program and the efficiency Company's project management skills, stating:

> So it really speaks to efficiencies, it speaks to the success of the exploration program, and the project management skills of our teams that we are able to drive our capital costs down, keep things on time and on budget, and grow our production in that kind of fashion.

> So, overall, it's a great time to invest in Anadarko.

213.    On February 23, 2010, Anadarko filed with the SEC its Form 10-K for the fourth quarter and fiscal year ended December 31, 2009 (the "2009 10-K").  The 2009 10-K, which repeated the above statements made in the Company's February 1 press release, was signed by Defendants Hackett and Gwin, among other Anadarko executives.  The 2009 10-K was also certified by Defendants Hackett and Gwin.

214.    Anadarko's 2009 10-K touted the Company's active risk management practices, stating:

> "Anadarko's global business development approach transfers core skills across the globe to discover and develop world-class resources that are accretive to the Company's performance.   These resources help form an optimized-global portfolio _where both surface and subsurface risks are actively managed_."

215.    Anadarko's 2009 10-K also reassured investors concerning the insurance maintained by the Company, stating:

> Our business is subject to all of the operating risks normally associated with the exploration for and production, gathering, processing and transportation of oil and gas, including hurricanes, blowouts, cratering and fire, any of which could result in damage to, or destruction of, oil and natural-gas wells or formations or production facilities and other property and injury to persons.   _As protection against financial loss resulting from these operating hazards, we maintain insurance coverage, including certain physical damage, employer's liability, comprehensive general liability and worker's compensation insurance._  However, we are not fully insured against all risks in all aspects of our business, such as

political risk, business-interruption risk and risk of major terrorist attacks and piracy.

216.    In addition, Anadarko's 2009 10-K represented to investors that Defendants had reviewed the Company's accounting principles, including its risk profile, and had properly reserved for, and insured against, foreseeable drilling related contingencies, similar to the statements regarding these matters described above in ¶¶192-193; 200-201.

217.    Similar to the Form 10-Qs filed by the Company in prior quarters, and described above in ¶¶192-193; 200-201, Anadarko's 2009 10-K contained certifications by Defendants Hackett and Gwin attesting to the purported accuracy and completeness of the Company's financial condition and operational information.

218.    On March 2, 2010, Anadarko held its 2010 Annual Investor Conference, in which Defendants Hackett and Gwin, among other Anadarko representatives, participated.  During the Company's presentation, Defendant Hackett highlighted Anadarko's purportedly rigorous risk management practices, reassuring investors that "[w]e have a mindset towards exploration, prudent exploration, managed internationally <u>in a very strong risk-management perspective</u>, and we also think we've got the portfolio to be able to execute upon a very compelling plan."

219.    Also on the conference call, Defendant Daniels explained in detail the Company's rigorous risk management practices:

> I want to talk a little bit about the process.  I get an awful lot of questions about how we do things, how do we make decisions, how are we able to come up here and predict these kinds of resources and then deliver those. Where does the 3.5 billion barrels that we talked about in the exploration wedge, come from?  [...]
>
> <u>So we go through this process internally and this is something that we do very, very rigorously</u>. I know Al talked about the magic that the exploration group does. It really is magic. It's a lot of work, <u>the guys spend an awful lot of time on risk assessment subsurface risk assessment, commercial risk assessment, so that we can make the best decisions when we invest the Company's capital</u>.  The very first thing we do, is the technical team defines the opportunity sets, they define what they think the range of resources could be. <u>We have a group internally at</u>

<u>Anadarko called the RCT, Risk Consistency Team. They use a methodology, Rowe's methodology; a lot of other companies use it but we're very rigorous about it and we get every single opportunity through that group and it's not a onetime event. It's a continuum of the process.</u>

<u>Early in the process, they visit with the RCT; RCT helps focus on, what's the key risk elements in this prospect.  That's where you should put your effort, that's where you should put your capital, if required, to help mitigate those risk elements.</u>

<u>At the end of that, we feel like we've got a very good subsurface assessment of resource ranges and they are probabilistic resource ranges and subsurface risk assessment, based on the criterias that we have listed below which are the critical elements for hydrocarbon trapping and accumulation.</u> We then take that assessment to a team that's internal to the exploration group of engineers and that's the exploration/engineering group who gets together with our facilities team, our drilling team and gets costs estimates for conceptual development plans.

220.    Defendant Daniels further explained the Company's risk management philosophy:

We also have things that don't fall into what we call, the happy land, or the upper right quadrant, that we look at as, how do we get them up there? Typically these are less mature, higher risk, type of opportunities. <u>We can get new data that can help either minimize the risk or give us a better understanding. We can take technology to the existing data and help move those things up again, through our constant process of evaluating the risk, up into the area where there would be one that we would consider for investment.</u> Or, we can monetize them; we can get somebody else to come in and take those opportunities and drill those wells and keep a piece of it.

221.    The above statements were materially false and misleading when made because, among other things, Anadarko was not managing its projects, including the Macondo well, in a manner that was safe or designed to ensure environmental safety.  Nor did Anadarko have disciplined and rigorous risk management practices.  For instance, when partnering with BP on the Macondo well, Anadarko deliberately or recklessly approved and adopted the materially false and misleading Oil Spill Response Plan and Exploration Plan.  Anadarko also failed to properly investigate BP's safety record and practices.  Further, Anadarko approved dangerous and high-risk operational decisions for the Macondo well, failed to properly monitor operations on the Macondo well, risked the lives of the workers on the well, endangered wildlife, the environment

and commercial interests along the Gulf coast, jeopardized the Company's multi-million dollar investment in the Macondo well project and exposed the Company to billions of dollars in potential civil and environmental liability. Moreover, Anadarko completely failed to exercise any oversight over BP despite being alerted to BP's industry-wide safety record that should have made Anadarko pay particularly close to attention to BP's practices on the Macondo well.

### H. Defendants' Materially False And Misleading Statements Made During The Second Quarter Of 2010

222. On April 28, 2010, a joint press conference took place between BP and the United States Coast Guard to update the public on the inspection of the sunken rig and discuss the current estimates on how much oil was spilling into the Gulf of Mexico, otherwise known as the flow rate. During the press conference, BP's Chief Operations Officer Dean Suttles stated that BP's best estimate was that "1,000 barrels of oil per day were flowing from the Macondo well." Suttles stated that "while monitoring the blowout preventer area . . . we discovered a new point of leak." However, COO Suttles was quick to reaffirm his estimate, by stating that "given the location [of the Macondo well], we do not believe this changes the amount currently estimated to be released."

223. On April 29, 2010, BP restated its estimates during interviews on early morning talk shows. For example, on ABC's The Early Show, COO Suttles stated as follows: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." Suttles went on to state that "[w]hile we believed, established the 1,000 barrels a day estimate leaking from the well, NOAA [National Oceanic and Atmospheric Administration] experts believe the output can be as much as 5,000 barrels." Suttles reaffirmed the April 28 internal estimate of 1,000 barrels per day and distanced BP and the co-owners at the Macondo well from the significantly higher NOAA estimate. Suttles also reaffirmed the false and

misleading statements contained in the OSRP, stating in response to a question concerning the difference in flow rate estimates that the "spill plan actually recognized these amounts and actually what we're going to do out in the field, out on the surface of the sea, actually doesn't change based on that number."

224.    Also on April 29, 2010, later in the day, COO Suttles made nearly identical false statements during an interview on NBC's The Today Show.

225.    Anadarko knew BP's post-spill flow representations were false.  For example, sworn testimony given in connection with the Louisiana Litigation reveals that, on April 23, 2010, an Anadarko employee named Dawn Peyton did a "back of the envelope" calculation of the post-blowout flow rate from the Macondo well and determined that it was "35,000 barrels of oil per day" or more.

226.    On May 5, 2010, BP's CEO Tony Hayward conducted an interview with the Houston Chronicle and revised the previous projections stated by COO Suttles to conform to the NOAA estimate.  Hayward stated that the flow rate was a guesstimate, "[a]nd the guesstimate remains 5,000 barrels a day."

227.    These statements set forth in ¶¶222-224; 226 above are attributable to Anadarko because Anadarko must have agreed to their release pursuant to Article 9 of the Joint Operating Agreement.  As discussed above in ¶¶46-47, BP was required to provide notice to and obtain agreement from Anadarko to the public release, including through "discussions with journalists", of virtually all information concerning the Macondo well, including statements regarding the rate of oil spilling from the Macondo well.  Indeed, Anadarko's Form 10-Q for the second quarter of 2010 confirmed that the Company was receiving post-spill information from BP, including spill response costs, which, for example, the Company was using to "estimate activity based cost run-

rates for spill response activities, which, in turn, were projected forward according to the Company's estimates of the potential duration and extent of the spill response and clean-up.

228. In addition, the statements in ¶¶222-224; 226 were false and misleading when made, and were known or should have been known by Anadarko to be false at that time because they misrepresented that the best estimate flow rate at the Macondo well was between 1,000 and 5,000 barrels of oil per day, when in fact the co-owners best estimates were much higher. Indeed, Peyton's preliminary calculation on April 23, 2010 estimated the flow rate at 35,000 barrels of oil per day. Moreover, a report titled "Estimation of the Oil Released from the Deepwater Horizon Incident" listed several flow rate estimates as of April 26, 2010 – two days before COO Suttles first represented the flow rate at 1,000 barrels per day – which showed that the internal analysis was at least 5,000 barrels per day, and that "other sources would contribute additional oil." A second document dated the following day, which purported to use the ASTM international standard "Guide for Visually Estimating Oil Spill Thickness on Water" listed barrels emitted per day at the Macondo well between 5,758 and 14,266. Accordingly, by May 5, 2010, Hayward's revised projections were misleading because the internal analysis revised the best estimate flow rate upwards. Finally, Suttles's statement concerning the amount of oil the OSRP claimed it could recover was false and misleading because those figures were "invented out of thin air." *See, e.g., In re BP p.l.c. Sec. Litig.*, No. 4:10–md–2185, 2012 WL 432611, at *63-64 (S.D. Tex. Feb. 13, 2012).

229. Anadarko had access to and was provided the documents and reports pursuant to Section 5.1 of the JOA, and had access to the data that was used to develop the internal flow rate estimates. Nonetheless, despite its obligations under the JOA to approve all News Releases and

access to estimates backed by international standards, Anadarko failed to correct the false and misleading statements concerning the flow rate.

230.    On May 3, 2010, nearly three weeks after the spill, Anadarko issued a press release announcing the Company's results for the first quarter ended March 31, 2010.  In the press release, Defendants for the first time disclosed that Anadarko's 25% interest in the Macondo well potentially exposed the Company to liability in connection with the oil spill disaster.  To mitigate the market reaction to this news, Defendants falsely reassured investors that Anadarko had sufficiently insured against any such potential exposure:

> About two weeks ago, in the Gulf of Mexico, the BP-operated Macondo exploration well on Mississippi Canyon block 252 discovered an oil accumulation. As reported in the press, an explosion and fire occurred on the Deepwater Horizon drilling rig during operations. The rig subsequently sank, hydrocarbons were released into the Gulf and a large-scale well-control and clean-up effort has ensued. Anadarko is a 25-percent working interest owner in this block, which is operated by BP Exploration & Production, Inc. A full response and investigation is being conducted by the operator of the well, the drilling rig owner and governmental entities.  The company maintains insurance policies designed to provide financial protection for such events, for its share of gross covered costs up to an aggregate level of approximately $710 million, less deductibles.  Based on its 25-percent non-operated interest, the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million.

231.    On May 4, 2010, Anadarko filed its Form 10-Q for the first quarter ended March 31, 2010 with the SEC.  The Form 10-Q, which was signed by Defendant Gwin and certified by Defendants Gwin and Hackett, reiterated the statements made in the May 3 press release. According to the Form 10-Q, "[b]ased on its 25-percent non-operated interest in this well, the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million."

232.    Also on May 4, 2010, Anadarko held an earnings conference call to discuss the Company's first quarter results with investors.  During the conference call, Defendant Hackett

repeated the above representations concerning the adequacy of Anadarko's insurance to cover the clean-up costs associated with the spill.  For example, noting that he was focused on the spill clean-up and that the spill was "foremost" on his mind, Defendant Hackett stated:

> [The Company's] insurance is designed to cover costs associated with stopping the hydrocarbon release, drilling relief wells, clean-up and other liabilities of and associated costs.  Based on our 25% nonoperated interest, we estimate our deductibles will total about $15 million and our insurance will cover net cost to APC's working interest 25% up to approximately $178 million.

233.    The statements in ¶¶230-232 concerning the adequacy of the Company's insurance coverage to cover the clean-up costs associated with the spill were false when made because, at the time, Defendants knew or recklessly disregarded that the Company's share of the clean-up costs would far exceed $177.5 million and would not be satisfied by the Company's insurance coverage.

234.    Also during the May 4 conference call, an analyst at RBC Capital Markets asked Anadarko executives "[h]ow passive typically are you when you are a nonoperator?  Were you a part of … the well's design on Macondo?"  In response, Defendant Daniels answered that:

> You actually do know what targets you're going after and remembering we had farmed into this after the well had already spud.  So the well design and it's procedures, operating procedures were all done before we actually farmed in.  When you typically approve these as a nonoperator, you basically approve just the capital spending level in the targeted zones from a geological perspective, as opposed to looking at the detail, well design or procedures. We were not involved in that at all on this well.

235.    Defendant Daniels' May 4 statements that Anadarko and the Individual Defendants were "were not involved" in "looking at the detail, well design or procedures" with respect to the Macondo well were blatantly false when made.  As described herein, Anadarko was intimately involved in and had full access to all "detail, well design [and] procedures" at the Macondo well.  As confirmed by the testimony of Beirne and expressly bargained for by Anadarko in the Joint Operating Agreement, Anadarko received and/or had unfettered access to

copies of the well design, the OSRP, the EP, AFEs and other important documentation related to the well and the decisions made onboard the *Deepwater Horizon*, including all government filings and communications concerning the Macondo well, real-time data of wellsite drilling and operations from two separate databases that showed such specifics as drilling depth, torque and rate of RPM, as well as daily reports and mud logs. Further, as described above, Anadarko approved and funded four separate AFEs, including giving its express authorization to use the riskier long string casing, and acknowledging its awareness of the decision to run an inadequate number of centralizers.

## IX.  ADDITIONAL ALLEGATIONS CONFIRMING ANADARKO'S WILFUL OR RECKLESS MISCONDUCT AT THE MACONDO WELL

### A.  Defendants Acknowledge That Recklessness Or Willful Misconduct Caused The Macondo Disaster

236.    In the aftermath of the spill, Defendants repeatedly acknowledged that the disaster was preventable and resulted from a series of deliberately or recklessly dangerous decisions at the well. However, the Company initially sought to defend itself by pointing the finger solely at its partner, BP. For example, according to a Bloomberg News article published on May 21, 2010, Anadarko spokesperson John Christiansen admitted that the Macondo well was a risky proposition and that the co-owners failed to understand the "geology" of the Macondo prospect. Indeed, contrasting Anadarko's drilling of a new prospect in the Gulf of Mexico with the Macondo well, Christiansen stated "The [new] prospect isn't as risky as the [Macondo well] that went awry…Anadarko already understands much of the prospect's geology, unlike BP, which was drilling its first well at Macondo … [Lucius] isn't a wildcat prospect … it's a known pressure regime."

237.    On June 18, 2010, Anadarko published a press release admitting that the Macondo disaster resulted from "preventable" and "reckless" actions that "likely represent [among other

things] willful misconduct" – but, as noted above, sought to blame BP exclusively for that misconduct.  Defendant Hackett stated, in relevant part, the following:

> The mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions.  Frankly, we are shocked by the publicly available information that has been disclosed in recent investigations and during this week's testimony that, among other things, indicates BP operated unsafely and failed to monitor and react to several critical warning signs during the drilling of the Macondo well.  BP's behavior and actions likely represent gross negligence or willful misconduct and thus affect the obligations of the parties under the operating agreement.

238.    On August 3, 2010, Anadarko disclosed the Company's most recent financial statements in its second quarter Form 10-Q, which also admitted that the "publicly available evidence indicates that the blowout of the well, the explosion on the Deepwater Horizon drilling rig and the subsequent release of hydrocarbons were preventable" and the Macondo disaster was caused by reckless decisions or willful misconduct.  Yet again, however, Anadarko sought to lay the blame exclusively at BP's feet.

## B.    Anadarko Willfully Or Recklessly Ignored BP's Abysmal Safety Record

239.    At the time Anadarko considered entering into the Joint Operating Agreement for the Macondo well, BP's abysmal safety record was well-known within the oil and natural gas exploration and production industry.  Indeed, BP has for years evinced a corporate culture where concerns for safety standards and environmental laws have been disregarded in favor of cutting costs and maximizing profits.

240.    In an article dated May 16, 2010, The Center for Public Integrity reported that between the period of June 2007 and February 2010 BP received an astounding 862 citations for safety violations at its oil refineries – 760 of which were classified as "egregious willful."  As reported by ABC News in a subsequent article entitled *BP's Dismal Safety Record*, dated May 27, 2010, these 760 egregious willful violations accounted for approximately 97% of all

egregious willful violations issued to all oil producers during the above stated timeframe. According to The Center for Public Integrity:

> OSHA [the U.S. Occupational Safety and Health Administration] defines a willful violation as one 'committed with plain indifference to or intentional disregard for employee safety and health.'   An egregious willful violation is considered so severe that it can result in a penalty each time a violation occurs, rather than a single penalty for all violations of a regulation.  A serious violation is described as one creating a 'substantial probability' of death or serious injury.

Of BP's remaining 102 citations, 69 were considered "willful."

241.    To put this in perspective, no other oil company inspected by OSHA since June 2007 came remotely close to BP in the number of safety citations issues.  For example, in contrast to BP's 760 egregious willful violations, Sunoco, Inc. received eight willful violations, ConocoPhillips Co., four, and Citgo Petroleum Corp., two.  The Center for Public Integrity explained BP's abysmal safety record by stating that "BP was cited for more egregious willful violations than other refiners because it failed to correct the types of problems that led to the 2005 Texas City accident even after OSHA pointed them out."

242.    Indeed, in March 2005, an explosion at a BP refinery in Texas City, Texas killed fifteen people and caused nearly 200 other injuries.  BP's investigation of that deadly incident – which was conducted by a committee of independent experts – found that "significant process safety issues exist at all five U.S. refineries, not just Texas City."  The report also found that "instances of a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process safety risk existed at each refinery." In a separate investigation into these tragic events, OSHA cited "organizational and safety deficiencies at all levels of [] BP."  According to an article entitled *Renegade Refiner: OSHA Says BP Has "Systemic Safety Problem,"* dated May 16, 2010, the U.S. Chemical Safety Board, an independent federal agency, concluded that the Texas City explosion was caused by

"organizational and safety deficiencies at all levels of the BP Corporation.  Warning signs of a possible disaster were present for several years, but company officials did not intervene effectively to prevent it."  The U.S. Chemical Safety Board further concluded that "cost-cutting … [by] BP left the Texas City refinery vulnerable to a catastrophe."

243.    In connection with the Texas City disaster, BP pleaded guilty to violating the Clean Air Act and paid a fine of $50 million.  On October 29, 2009, OSHA fined BP $87 million – the largest fine in OSHA history – for failing to adequately correct the safety hazards previously identified at the Texas City refinery.  According to OSHA's website, the prior largest total penalty, $21 million, was issued by OSHA in 2005, also against BP.

244.    Further, an article published in Pro Publica on June 7, 2010, entitled *Years of Internal BP Probes Warned That Neglect Could Lead to Accidents*, detailed a series of other instances "over the past decade" warning that BP's flagrant disregard for safety and environmental rules risked a serious accident.  These events were sounded in various reports, lawsuits, and state inquiries, which Anadarko knew or should have known about prior to entering into the Joint Operating Agreement, and "portray[ed BP as] a company that systemically ignored its own safety policies across its North American operations - from Alaska to the Gulf of Mexico to California and Texas."  These events included the following:

- Prudhoe Bay, Alaska: In August 2006, BP was forced to shut down its oil operations in Prudhoe Bay, Alaska, months after discovering leaks over miles of its pipeline that released approximately 267,000 barrels of oil into the environment.  The Prudhoe Bay incident was dubbed the worst oil spill in the history of the North Slope, and, according to Bart Stupak, the chairman of the energy and commerce investigations subcommittee, "[a] review of the mountain of circumstantial evidence can only lead me to the

conclusion that severe pressure for cost cutting did have an impact on [BP's] maintenance of pipelines."   In October 2007, BP was fined $20 million for a single misdemeanor violation of the Clean Water Act in connection with the Prudhoe Bay disaster.

- <u>California Refinery</u>: In 2002, California state officials discovered that BP falsified its inspections of fuel tanks at a Los Angeles-area refinery.  Significantly, the California state officials found that more than 80 percent of the facilities in question failed to meet requirements to maintain storage tanks without leaks or damage.  In connection with this incident, BP settled a civil lawsuit brought by the South Coast Air Quality Management District for more than $100 million.

245.    BP had other well-publicized safety-related incidents prior to the beginning of the Class Period that should have alerted Anadarko to monitor and maintain constant oversight regarding activities at the Macondo well.  These incidents, some of which occurred at deepwater drilling locations, included:

- <u>Grangemouth Storage and Refining</u>:  Three incidents in May and June of 2010 caused the shutdown of an oil refinery.  The United Kingdom Health and Safety Executive issued a report that found "weaknesses in safety management system on-site over a period of time."  BP paid over £1 million in fines after pleading guilty to criminal charges.

- <u>Ocean King</u>:  A drilling rig in the deepwater Gulf of Mexico suffered two separate blowouts in August and November of 2002.  The first blowout caused the Ocean King to be evacuated and caused $2 million in damage to the rig.  An MMS investigation revealed that BP installed a non-compliant blowout diverter system.  Even more, the investigation showed that BP engineers knew that there was a shallow gas pocket at the

depth they were drilling at, but ultimately ignored it.  Three months later, the rig was evacuated again after a failed cement job.  After the second blowout, the MMS issued a "Safety Alert" and warned all drilling companies in the Gulf "of the serious risk of a blowout associated with failed cementing jobs."   Despite this warning, BP suffered additional blowouts in 2003 (again in the Gulf of Mexico) and 2004 (in the Nile delta).

- <u>Discoverer Enterprise</u>:  In May 2003, a rig on loan from Transocean (like the *Deepwater Horizon*) located in the Gulf of Mexico (like the Macondo well) drifted off the drilling site and broke the riser pipe linking the rig to the ocean floor.  The deadman switch on the rig's blowout preventer successfully closed and prevented oil and gas from flowing into the Gulf of Mexico.

- <u>GSF Adriatic IV</u>:  In August 2004, off the coast of Egypt, a failed cement job caused an explosion onboard the rig which set the rig on fire.  The blaze burned for over a week and reduced Egypt's natural gas production by 10-15 percent.

- <u>Thunder Horse PDQ</u>:  The rig was evacuated in July 2005 after water accumulation caused the rig to tilt.  A subsequent investigation revealed that an internal valve was installed backward.  While repairing the rig, engineers noticed cracks in the underwater pipelines beneath the rig that would have allowed oil to flow unrestricted into the ocean if an when the *Thunder Horse PDQ* began the production phase at the well.

246.    Finally, Anadarko should have been alerted to BP's safety failures as chronicled in the Baker Panel, an independent panel created by BP to "review and improve the Company's safety procedures."   The Baker Panel's final report, which was publicly available on BP's website, criticized BP's management for its failures related to process safety.  In the Baker Panel's final recommendations, they urged BP and its management, among other things, to:

"establish and implement an integrated and comprehensive process safety management system"; "implement a system to ensure . . . all U.S. refining personnel . . . possess an appropriate level of process safety knowledge and expertise"; "strengthen accountability for process safety performance at all levels in executive management"; and "implement an effective system to audit process safety performance."  Following the release of the Baker Panel report BP purported to address concerns over its safety record and made assurances to investors – similar to the representations in the OSRP that Anadarko adopted – that the company could "adequately address any oil spill that might occur in the Gulf of Mexico."

247.    In light of their considerable experience in the oil and natural gas exploration and production industry, the multitude of publicly available information concerning BP's checkered safety record, and the information that BP provided to the Defendants in order form them to evaluate the Macondo well as a viable investment opportunity, Defendants either knew or were reckless in not knowing about BP's abysmal safety record prior to partnering with BP.  In light of the foregoing, Defendants also knew or were reckless in not knowing that they needed to closely monitor BP's management and operation of the Macondo well to ensure that the Company's multi-million dollar investment was being responsibly looked after.   Further, Defendants were reckless in ignoring BP's egregious safety record when adopting the facially deficient OSRP and EP, which that assured investors that the co-owners could effectively respond to and contain a spill at the Macondo well with a significantly larger spill volume than the spill that actually transpired.

### C.    Anadarko Is Sued By The U.S. Government For Its Role In The Disaster

248.    On December 15, 2010, the United States government filed a civil lawsuit against Anadarko and others captioned *United States of America v. BP Exploration & Production, Inc. et*

*al.*, 10-cv-04536-CJB-SS (E.D. La.) relating to the *Deepwater Horizon* Disaster (the "Government Action").   According to the complaint filed in the Government Action (the "Government Complaint"), Anadarko and others violated important safety and operating regulations in the period leading up to the April 20th *Deepwater Horizon* disaster.  In that regard, the Government Complaint sets out detailed allegations against Anadarko and others, <u>including allegations of "willful misconduct" against Anadarko.</u>

249.    In particular, the Government Action alleges that, pursuant to the Joint Operating Agreement between Macondo co-owners Anadarko and BP, Anadarko's approval was necessary for BP to proceed with certain operations on the well and that Anadarko had access to substantial detailed technical information regarding the well, including daily reports, sampling and other "real time" data from the oil rig.  *See, e.g.,* Government Complaint at ¶¶35-36.  The Government Complaint also alleges that Anadarko caused and/or contributed to the *Deepwater Horizon* spill by, among other things, failing to assure well control was maintained by proper and adequate (i) cementing, (ii) inspection and maintenance of the blowout preventer stack, and (iii) well-monitoring.  *Id.* at ¶¶49-56.  Further, the Government Complaint alleges that the *Deepwater Horizon* spill was proximately caused by one or more of, among other things, the acts, joint acts, gross negligence and/or willful misconduct of Anadarko and/or others.  *Id.* at ¶¶69, 75.  The Government Action seeks, among other things, civil penalties under the Clean Water Act and a declaration that Anadarko and others are "liable without limitation" under the Oil Pollution Act for all removal costs and damages resulting from the *Deepwater Horizon* Spill.

250.    Also on December 15, 2010, the Attorney General of the United States Eric H. Holder Jr. delivered a speech announcing the Government Action.  The Attorney General stated:

> While oil spill response efforts were underway, the Department of Justice
> launched both criminal and civil probes into this matter.  We dispatched dozens of

top attorneys to the gulf region, and members of the Department's senior leadership have also made multiple trips to the area. For months, Department lawyers and investigators have been working night and day – and in close coordination with local U.S. Attorneys' Offices and State Attorneys General.

251.    The Attorney General further described the Government Action to be the product of extensive civil and criminal investigations involving multiple agencies of the United States Government, including the Environmental Protection Agency, the U.S. Coast Guard, the National Oceanic and Atmospheric Administration, and the Department of Interior's U.S. Fish and Wildlife Service and Bureau of Ocean Energy Management, Regulation and Enforcement. The Attorney General also noted that "[b]oth our criminal and civil investigations are continuing."

252.    In February 2012, the Honorable Carl J. Barbier, who presides over the multidistrict Louisiana Litigation, granted in part the Government's motion for summary judgment concerning the liability of *inter alia* Anadarko and BP under the Oil Pollution Act of 1990 ("OPA") and the Clean Water Act ("CWA").  Pursuant to the OPA, Judge Barbier concluded that Anadarko and BP, as co-lessees of the Macondo well, were "responsible parties" jointly and severally liable for removal costs and damages arising from the discharge of oil beneath the surface of the water.  Further, Judge Barbier held that, as co-owners of the "offshore facility from which oil discharged," Anadarko and BP were both liable for civil penalties under the CWA.

### D.    Numerous Investigations Confirm That The Spill Was Preventable And Resulted From Reckless Decisions Made To Save Time And Money

253.    Following the disaster at the Macondo well, several federal agencies commenced investigations to examine the causes of explosion and its impact on the Gulf region.  Though some of these investigations remain ongoing, and most of the underlying documents have not yet

been made public, the evidence emerging from these investigative efforts, as well as both preliminary and final conclusions that have been made publicly available, confirm that the decisions approved by Anadarko directly contributed to the disaster and were made in an effort to save costs while sacrificing safety.

254.   <u>The Congressional Energy Committee Investigation</u>.   The United States Committee on Energy and Commerce's Subcommittee on Oversight and Investigations, led by Chairman Henry A. Waxman, conducted an inquiry into the *Deepwater Horizon* oil spill.   The Congressional Energy Committee examined the root causes of the explosion, the environmental and human impact in the wake of the oil spill, the government's response efforts to the spill, as well as the conduct and actions taken by the owners and operators of the Macondo well.

255.   On June 14, 2010, the Congressional Energy Committee wrote a letter to Tony Hayward, CEO of BP, summarizing material defects in the design and operation of the Macondo well.   The Subcommittee letter confirms the allegations set out herein.   For example, the letter stated, in relevant part:

> At the time of the blowout, the Macondo well was significantly behind schedule. This appears to have created pressure to take shortcuts to speed finishing the well. In particular, the Committee is focusing on five crucial decisions made by BP: (1) the decision to use a well design with few barriers to gas flow; (2) the failure to use a sufficient number of "centralizers" to prevent channeling during the cement process; (3) the failure to run a cement bond log to evaluate the effectiveness of the cement job; (4) the failure to circulate potentially gas-bearing drilling muds out of the well; and (5) the failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below. The common feature of these five decisions is that they posed a trade-off between cost and well safety.

256.   <u>The Presidential Commission</u>.   On May 21, 2010, President Obama established the National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling (defined above as the "Presidential Commission") through Executive Order 13543.   The Presidential Commission was tasked with examining the facts relevant to the root causes of the explosion and

to develop preventative measures and recommendations to improve federal law and industry practice.

257.    On January 11, 2011, the Presidential Commission released the *Report to the President*, which provides an account of the *Deepwater Horizon* explosion and subsequent events.  As a result of the investigation, the Presidential Commission concluded, among other things, that the "immediate causes of the Macondo well blowout" were "identifiable mistakes by BP [and others] … that reveal[ed] … systematic failures in risk management …."

258.    The Joint Marine Board Investigation.  A joint investigation between the United States Coast Guard and the Bureau of Ocean Energy Management (formerly the Mineral and Management Service) (defined above as the Joint Marine Board) began on April 27, 2010 with the goal of developing conclusions and recommendations as they relate to the *Deepwater Horizon* explosion.  The Joint Marine Board was an independent investigatory body authorized by Congress pursuant to enabling statutes and regulations.

259.    On September 14, 2011, the Joint Marine Board released a report concerning the causes of the Macondo well disaster and explosion onboard the *Deepwater Horizon* (the "Marine Board Report").  The Marine Board Report was the product of an investigation that spanned 15 months.  During that time, 7 public hearings were held and approximately 80 witness interviews were conducted, including from Beirne (as described above) and expert testimony related to the rig explosion.  The Joint Marine Board Investigation also reviewed and analyzed hundreds of thousands of document and other physical evidence.  In accordance with federal statutes that govern the process and rules associated with marine board investigation, the Joint Marine Board designated certain "parties in interest," including BP and Anadarko, as companies involved in the Macondo well at the time of the explosion.

260.   The Marine Board Report concluded that "a central cause of the blowout was failure of a cement barrier in the production casing string, a high-strength steel pipe set in a well to ensure well integrity and to allow future production."  As set forth above, both the selection of the production casing and the preliminary steps to completing the cement job, including installing centralizers and completing a mud circulation, were among the crucial decisions made by BP and Anadarko that sacrificed safety in order to reduce the cost to the co-owners and not delay completion of the well any longer.  Further, according to the Marine Board Report, the explosion and subsequent oil spill resulted from, among other things, "poor risk management," and a "failure to observe and respond to critical indicators."

261.   The Marine Board Report also confirms that Anadarko approved several AFEs that included written descriptions for proposed well activities and operations as well as cost estimates.  In particular, the Marine Board Report notes that BP sought an additional $27 million in March 2010 due to exceeding costs from a well control event, and later one month later, sought another $3.5 million for setting the production casing.  As described above, the long string method selected for the Macondo well went against industry standards and was criticized in BP's mid-April Forward Plan Review (which Anadarko had access to) for having a lower likelihood of success and greater safety risks.  As for the April AFE, the Marine Board Report notes that, despite access to the available data and reports, Anadarko approved the April AFE and "did not propose any alternative operating plan."  In addition, the Marine Report confirms that Anadarko "had access to, and in fact reviewed, data and files related to the Macondo well that BP made available to them through shared website."

262.   Engineering & Research Committee.  The National Academy of Engineering and National Research Council established a committee (the "Engineering & Research Committee")

in September 2010, at the request of the Honorable Kenneth L. Salazar, Secretary, U.S. Department of the Interior, to examine the causes of the disaster and identify measures for preventing similar incidents in the future.

263.    On November 16, 2010, the Engineering Research Committee issued a report entitled the "Interim Report on Causes of the *Deepwater Horizon* Oil Rig Blowout and Ways to prevent Such Events" (the "Interim Report").   The Interim Report found that the numerous technical and operational breakdowns that contributed to the explosion on the *Deepwater Horizon*, and the resulting oil spill, were due to the "lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses."   Confirming the allegations above, the Interim Report criticized the co-owners' decision to use the risky long string casing design on the Macondo well, as well as the decisions to use only six centralizers, to conduct only a partial circulation of the drilling mud, and to not run a cement bond log.   The Interim Report concluded that of particular concern was the "lack of a systems approach that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety."

264.    On December 14, 2011, the Engineering & Research Committee published its final report titled "Macondo Well *Deepwater Horizon* Blowout:   Lessons For Improving Offshore Drilling." (the "Final Report"), which assessed "both the immediate and root causes that led to the loss of well control."   The Final Report presents the analysis performed by the Engineering & Research Committee and its conclusions in a series of Summary Findings, Observations, and Recommendations.   The summaries confirm the allegations above by concluding that:

"a series of questionable decisions in the days preceding the blowout . . . had the effect of reducing the margins of safety and . . . evidenced a lack of safety-driven decision making,"

*        *        *

"The actions, policies, and procedures of the corporations involved did not provide an effective system safety approach commensurate with the risks of the Macondo well. The lack of a strong safety culture resulting from a deficient overall systems approach to safety is evident in the multiple flawed decisions that led to the blowout. Industrial management involved with the Macondo well–Deepwater Horizon disaster failed to appreciate or plan for the safety challenges presented by the Macondo well."

*        *        *

"neither [of] the companies involved . . . made effective use of real-time data analysis, information on precursor incidents or near misses, or lessons learned in the Gulf of Mexico and worldwide to adjust practices and standards appropriately."

265.    In particular, the Final Report concluded that standard industry mud circulation practices were not completed at the Macondo well, and that the production casing needed to be reciprocated or rotated during cementing in order to propel cement into pathways that might otherwise be bypassed.  However, the Final Report states that because of Anadarko and BP's choice of a long string casing, "it was not possible to reciprocate or rotate the casing during the cementing operation … The minimum circulation of mud was not achieved in this well … [t]hus, the possibility of mud-filled channels or poor cement existed."  The Engineering & Research Committee observed that "[t]he use of a production liner rather than the long string could have … improve[d] the chances of good cement bonding."

### E.    Anadarko Sues BP And Admits That The Macondo Well Disaster Was Caused By A Series Of Deliberate Or Reckless Decisions Onboard The Deepwater Horizon

266.    Embroiled in litigation over who should bear the responsibility for cleaning up and paying for the costs associated with the oil spill, Anadarko filed cross claims (the "Cross Claim") against a number of parties involved in the drilling of the Macondo Well, including BP,

for contribution, indemnification, breach of contract, and for gross negligence and willful misconduct.

267.    Anadarko's Cross Claim placed the blame for the disaster solely on the shoulders of the other parties involved, but admitted that decisions made during the drilling of the well were "undertaken in wanton and willful disregard for the consequences" and "w[ere] a direct and proximate cause of the Blowout and the Spill."   Anadarko alleged, in relevant part, that "BP breached its duties to Anadarko by committing acts of . . . wanton and willful misconduct in reckless disregard of the rights and safety of others."   In particular, Anadarko alleged in the Cross Claim that BP's decision to use only 6 centralizers was "inadequate" and "was a direct and proximate cause of the Blowout and the Spill because had the production casing been properly centralized, it would have prevented the Blowout and the Spill."   Further, the Cross Claim alleged that BP "acted with willful and/or wanton disregard for the consequences of its actions" by "failing to implement a full "bottoms-up circulation of mud . . . despite the important safety-related information this procedure provides and despite industry practices and API recommendations."

268.    Anadarko alleged that BP "fail[ed] to follow its own procedures and protocols, fail[ed] to follow industry standards, and fail[ed] to follow plans filed with the government agencies related to the Macondo Well …."   However, as a co-owner of the Macondo Well, Anadarko had both the right, obligation, and opportunity to supervise the decisions involved in the drilling process.   Through its status as co-owner and the express provisions in the JOA, Anadarko was provided all of the information concerning activities at the well, and in fact approved all material operational decisions at the well through 4 separate AFEs.

**F.    Anadarko Pays $4 Billion To BP To Settle Macondo-Related Claims**

269.    On October 17, 2011, Anadarko announced that it had reached an agreement with BP to settle the former co-owners' current and future claims (including allegations by Anadarko of willful and wanton conduct) associated with Macondo well disaster.  Under the terms of the agreement, Anadarko agreed to pay $4 billion to BP to settle the dispute over responsibility for the well explosion and resulting oil spill.  Also, Anadarko relinquished its 25% stake in the Macondo well.

270.    Anadarko's $4 billion payment to BP represented a significant departure from the Company's previous efforts, including Defendant Hackett's statement in June 2010 and Anadarko's Cross-Claim, to blame BP exclusively for the Macondo disaster.

**X.    ADDITIONAL SCIENTER ALLEGATIONS**

271.    As alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants Anadarko, Hackett, Gwin and Daniels knew or recklessly disregarded that the statements set forth above were materially false and misleading when made. Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

272.    Defendant Hackett's scienter is also established by the fact that he had an extremely powerful motive to defraud.  During the Class Period, Defendant Hackett sold over $61 million of Anadarko common stock in just a seven month period.  Hackett's sales, as reported in the Company's SEC filings, are reflected on the chart below:

| Name | Date | Shares | Price | Value |
|------|------|--------|-------|-------|
| Hackett, James | 9/18/2009 | 150,000 | $    64.62 | $   9,693,000 |
| Hackett, James | 9/18/2009 | 100,000 | $    62.49 | $   6,249,000 |
| Hackett, James | 9/18/2009 | 37,000 | $    64.56 | $   2,388,720 |
| Hackett, James | 3/31/2010 | 584,534 | $    73.11 | $ 42,735,281 |
| | **TOTALS** | **871,534** | | **$ 61,066,001** |

273.    The nature and timing of his sales were highly unusual.  Indeed, in just seven months during the Class Period, Defendant Hackett sold a total of 871,534 of his shares of Anadarko's common stock for total proceeds of $61,066,001 – this is in stark contrast to the fact that Hackett had not sold a single share of Anadarko's common stock in the two years preceding the Class Period.

274.    The timing and size of Defendant Hackett's sale of $42.7 million worth of stock on March 31, 2010 is particularly unusual.  This massive one-day sale of stock occurred after the Macondo project had suffered significant delays and just three weeks before the tragic Macondo well disaster.  This sale, of 584,534 shares on a single day represented a massive sell-off of 69% of Hackett's total Anadarko holdings at the time.[3]

275.    In addition, the $61,062,720 in proceeds that Defendant Hackett made from his sale of Anadarko stock during the Class Period is extremely large in comparison to his base salary ($1,567,500 per year, as of January 1, 2009 and unchanged effective November, 2009).  Accordingly, the proceeds of Defendant Hackett's stock sales during the Class Period are more than 38 times greater than his salary during that period, which is also suggestive of Defendant Hackett's scienter.

276.    Further, Defendant Hackett made no open market purchases of stock during the Class Period, which stands in stark contrast to the vast shareholdings he sold.  Defendant

---

[3] Notably, on March 17, 2010, Tony Hayward, then Chief Executive Officer of BP, sold 223,288 of his BP shares for proceeds of approximately £1.4 million – cashing-in approximately one-third of his holdings in BP.

Hackett's only acquisitions during the Class Period were securities he was granted by the Company.  In contrast, prior to the Class Period, Hackett purchased shares on the open market to supplement the grants he received directly from the Company.

277.    Defendants' scienter is further confirmed by the fact that Anadarko and the Individual Defendants knowingly or recklessly adopted the Macondo Spill Response Plan.  As discussed above, it has been widely recognized that these documents were blatantly false and misleading.  As experienced oil industry executives, the Individual Defendants did or should have instantly recognized their egregious falsity upon reviewing them.  And Defendants certainly had a duty to review these documents, consistent with their "rigorous due diligence" and other statements to investors, prior to agreeing to partner with BP on the Macondo well.  Indeed, given the extensive risks associated with deepwater drilling in the Gulf of Mexico – and their repeated statements to investors regarding their focus on safety – the Individual Defendants should have closely reviewed these documents upon entering into the partnership with BP.

278.    Indeed, Defendant Hackett publicly acknowledged that it was his decision "to buy a 25 per cent share of BP plc's Macondo well."  *See* ¶38.  And the Macondo well – because it was an exploratory well – was under the specific authority of Defendant Daniels, who at the relevant time was Anadarko's Senior Vice President, Worldwide Exploration and integrally involved in Anadarko's deepwater oil exploration activities.  Accordingly, Defendant Daniels and Hackett each should have reviewed the materially false and misleading OSRP and EP prior to partnering with BP.

279.    At an absolute minimum, after the Macondo spill occurred – when Anadarko's stock price was falling dramatically in response to concerns that the spill was not being adequately contained and Defendants were assuring investors that Anadarko was "<u>focused</u>" and

"actively involved" in the cleanup effort – Defendants had a duty to review the Macondo Spill

Response Plan.  Indeed, Following the April 20, 2010 explosion and resulting spill at the

Macondo well, Defendants were intently focused on the Macondo well and the spill response

effort.  And during the May 4, 2010 conference call, Defendant Hackett himself confirmed that

the spill was "foremost in everyone's mind" and assured investors that Defendants "remain

focused on managing through this event" and were "focused on making sure that this clean-up

occurs and assisting, as part of the full industry effort on this, assisting BP" in the spill response.

By this point, Defendants surely reviewed the OSRP and EP (and were reckless if they did not)

and were aware that the Macondo Spill Response Plan was essentially worthless.  Nonetheless,

they continued to conceal the fact that BP and Anadarko had essentially no plan in place to

respond to the spill, and instead falsely assured investors that Anadarko had limited

responsibility for the disaster and that its costs would be covered by insurance.

## XI.   LOSS CAUSATION

280.    Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth

above as if fully set forth herein.

281.    As alleged herein, Defendants' wrongful conduct directly and proximately caused

the economic loss suffered by Lead Plaintiffs and the Class.  Throughout the Class Period, as set

forth above, the market price of Anadarko securities was inflated by the material omissions and

false and misleading statements made by the Company and Defendants Hackett, Gwin, and

Daniels, which were widely disseminated to the securities markets, investment analysts and to

the investing public.  The false and misleading statements materially misrepresented to the

investing public the Company's financial results regarding Anadarko's business, operations, risk

profile and levels of insurance, and caused those securities to trade at prices in excess of their

true value.

282.     As a result, Lead Plaintiffs and the Class purchased Anadarko securities at artificially inflated prices.  When the truth about Anadarko was revealed to the market through several partial disclosures, the price of Anadarko's securities declined in response, as the artificial inflation caused by the Defendants' material omissions and false and misleading statements was removed from the price of Anadarko's securities, thereby causing substantial damage to Lead Plaintiffs and the Class.

283.     During the Class Period, Anadarko's common stock traded as high as $74.74 per share.  Immediately after the explosion, Anadarko securities fell slowly over the next few weeks as the true nature of Anadarko's involvement in the well and potential liability and the egregious deficiencies contained in the OSRP and EP were revealed.  On April 27, 2010, on news that the spill would be difficult to contain, Anadarko's common stock fell over $3 per share from a closing price of $73.18 per share on April 26 to $70.10 per share on April 27, a statistically significant drop of 4.2%, on above average trading volume of 5,335,300 shares. On April 29, 2010, in response to news that the spill was worse than initially thought, the price of Anadarko's common stock fell another $2.87 per share from a closing price of $70.20 per share on April 28 to $67.33 per share on April 29, a statistically significant drop of 4.1%, on high trading volume of 14,134,700 shares.  Finally, as a result of the partial disclosures on April 30, 2010 that initial clean-up efforts were proving ineffective, the spill was nearing the coastline and that Anadarko faced increased liability, the Company's stock continued to drop an additional $5.17 per share from the April 29 closing price of $67.33 per share to $62.16 per share on April 30, a statistically significant drop of 7.7%, on high trading volume of 21,079,010.

284.     Analysts and investors were comforted by Defendants May 3-4, 2010 assurances concerning the adequacy of the Company's insurance coverage, which were made in the

Company's May 3 press release, its May 4 10-Q and May 4 conference call.  Indeed, an analyst from HSBC noted Anadarko's representations "that it has insurance coverage for this incident of USD177.5m less deductibles of USD15m based on its 25% working interest position" and that "the Oil Pollution Act of 1990 … is likely applicable in the current circumstance," which could cap liability at $75 million.  Further, investors were reassured by Defendant Daniels' false claims that Defendants "were not involved" in "looking at the detail, well design or procedures" at the Macondo well.  These statements caused the price of Anadarko's common stock to rise to $64.40 per share on May 4, 2010.

285.   On May 5, 2010 a partial disclosure revealed that "rocketing" environmental recovery costs could reach $15 billion (contradicting Defendants' comments from the prior day) and that BP was looking to Anadarko to pay its share.  This partial truth informed investors as to Anadarko's exposure to cost associated with the clean-up effort and, as a result, the price of Anadarko's common stock fell $2.57 per share from the May 4 closing price of $64.40 per share to $61.83 per share on May 5, a statistically significant drop of 4%, on high trading volume of 11,184,700 shares.

286.   On May 7, 2010, in response to news that the uncontained spill could "lead to negative rating actions" for Anadarko, the Company's stock price fell by $2.07 per share from the prior day's closing price of $60.95 to $58.88 per share on May 7th, or approximately 3.4%, on high trading volume of 8,296,862 shares.

287.   On May 10, 2010, in response to concern over the ongoing response to the uncontained spill as well as revised and worsened spill estimates, Anadarko's common stock fell $1.25 per share from a closing price of $58.88 per share on the prior day's trading to $57.63 per share, or 2.1%, on a heavy trading volume of 13,281,750 shares.

288.    On May 11, 2010, Anadarko's shares continued to fall in response to news that "[a]n estimated three million gallons of oil have leaked into the Gulf of Mexico since the Apr. 20 explosion," and that the United States Justice Department was "stepping up its efforts to determine whether there was any "malfeasance"" in the disaster.  In response to this news, Anadarko's common stock fell $1.79 per share from a closing price of $57.63 per share on the prior day's trading to $55.84 per share, or 3.1%, on a heavy trading volume of 14,182,910 shares.

289.    On May 19, 2010, Anadarko partially revealed the extent of its potential liability in connection with the clean-up and response efforts at the Macondo well.  In response Anadarko's common stock fell $1.79 per share from a closing price of $58.04 per share on May 18, 2010 to $56.68 per share the following day, or 2.34%, on an above average trading volume of 6,336,735 shares.

290.    On May 28, 2010, additional partial disclosures regarding the ongoing spill, Anadarko's "unsuccessful" "efforts to stem the oil flow" and its increased potential liability were revealed.  The market reacted and Anadarko's common stock fell $3.24 per share from the May 27 closing price of $55.57 per share to $52.33 per share on May 28, a statistically significant drop of 5.8%, on high trading volume of 9,825,800 shares.

291.    On May 30, 2010, a partial disclosure concerning the reckless decisions made by BP and Anadarko in drilling the well was revealed.  Then, when the markets opened on June 1, 2010, investors learned that the "top kill" effort to stop the flow of oil failed and that the spill response being conducted pursuant to the OSRP and the EP was proving to be ineffective.  In response to these concerns, the price of Anadarko's common stock plummeted by over $10.27 per share – a precipitous drop of over 19.5% – from the May 28 closing price of $52.33 per share

to close at $42.10 per share on June 1, on extraordinarily high trading volume of over 44.8 million shares, which wiped out over $5 billion in market capitalization in a single day.  As set forth above in ¶165, on June 2, 2010, <u>RBC Capital Markets</u> published an analyst report that linked the decline in the price of Anadarko's common stock to the unsuccessful oil spill containment and response effort at the Macondo well.

292.    Partial disclosures made between June 2, 2010 and June 8, 2010 revealed additional truths about Anadarko and the spill.  As set forth above in ¶¶165-168, these additional disclosures revised the potential liability for the spill upward to $40 billion and forecast the potential environmental penalties on the parties to the Macondo well.   In response to these disclosures, Anadarko's stock price declined on June 8 more than 4.5% from the prior day's closing price to $42.80 on extremely heavy volume.

293.    On June 9, 2010, news reports fully exposed the glaring and egregious false statements, errors and omissions contained in the Oil Spill Response Plan and Exploration Plan, Anadarko's bonds were placed on a "negative credit watch" due to the massive liability it faced from the spill and increased political pressure was exerted on the Macondo co-owners to end the spill.  In response, the price of Anadarko's common stock plummeted another 19% to just below $34.50 per share from their June 8 close of $42.80 per share on an extraordinarily high trading volume of over 45,636,020 shares, which wiped out an additionally $4.1 billion in the Company's market capitalization in a single day.

294.    As a result of their purchases of Anadarko securities during the Class Period and the corrections removing the artificial inflation in the prices paid for those securities, Lead Plaintiffs and the Class suffered economic harm under the federal securities laws.

## XII.   CLASS ACTION ALLEGATIONS

295.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Anadarko between June 12, 2009 and June 9, 2010, inclusive (the "Class") and who were injured thereby.  Excluded from the Class are Defendants, members of the family of each of the Individual Defendants, executive officers and/or directors of Anadarko, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

296.   Throughout the Class Period, Anadarko's common stock was actively traded on the NYSE, which is an efficient market.  Numerous securities analysts published reports about Anadarko during the Class Period, including analysts from Argus Research Company, Bernstein Research, Buckingham Research, Credit Suisse, Deutsche Bank, Fitch, HSBC, Jeffries & Co., JP Morgan, Macquarie (USA), Morgan Stanley, Oppenheimer, RBC Capital, Sadif Investment Analytics, Scotia Capital, Sun Trust, Validea, and Wells Fargo.  Hundreds of thousands of Company shares were traded every day during the Class Period, and over ten million Anadarko shares were traded on numerous days.

297.   The members of the Class are so numerous that joinder of all members is impracticable.  As of March 31, 2010, the Company had over 494.74 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Anadarko or its

transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

298.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws, and sustained damages as a result of the conduct complained of herein.

299.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Lead Plaintiffs seek to represent.

300.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, risk profile and management of Anadarko;

(c)    whether and to what extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

(d)    whether Defendants acted with scienter;

(e)    whether Defendants named in Lead Plaintiffs' claim pursuant Section 20(a) of the Exchange Act are controlling persons of the Company;

112

(f)      whether reliance may be presumed pursuant to the fraud-on-the-market rule and/or the fraud-created-the-market rule;

(g)      whether the members of the Class have sustained Damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

(h)      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   <u>INAPPLICABILITY OF THE STATUTORY SAFE HARBOR</u>

301.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nevertheless because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or lacked a reasonable basis, and/or the forward-looking statement was authorized and/or approved by an executive officer of Anadarko who knew and/or recklessly disregarded that those statements were false when made.

302.    Lead Plaintiffs have alleged the following based upon the investigation of Lead Plaintiffs' counsel, which included a review of SEC filings by Anadarko, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, related litigation, and media reports, and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## XIV.   PRESUMPTION OF RELIANCE

303.    At all relevant times, the market for Anadarko's common stock was an efficient market for the following reasons, among others:

(a)     Anadarko's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Anadarko filed periodic public reports with the SEC and the NYSE;

(c)     Anadarko regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Anadarko was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

304.    As a result of the foregoing, the market for Anadarko securities promptly digested current information regarding Anadarko from all publicly available sources and reflected such information in Anadarko's stock price. Under these circumstances, all purchasers of Anadarko

common stock during the Class Period suffered similar injury through their purchase of Anadarko common stock at artificially inflated prices and the presumption of reliance applies.

## XV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

305.   Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

306.   During the Class Period, Defendants Anadarko, Hackett, Gwin and Daniels carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Anadarko's business, operations, risk profile, foreseeable liability exposure, and the intrinsic value of Anadarko common stock; (ii) enable defendants to artificially inflate the price of Anadarko shares; (iii) enable Defendant Hackett to sell over $61 million of his privately-held Anadarko shares while in possession of material adverse non-public information; and (iv) cause Lead Plaintiffs and other members of the Class to purchase Anadarko common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

307.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially inflated market prices for Anadarko's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are

sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

308.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Anadarko as specified herein.

309.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, to falsely assure investors of Anadarko's intrinsic value, performance, and continued substantial growth.  These acts included, among other things the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements issued-about Anadarko, its business operations, and its future prospects not misleading.  Defendants also engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Anadarko common stock during the Class Period.

310.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and to disclose such facts.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Anadarko's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations risk profile, foreseeable insurance liability, cost, expenses, and earnings throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking steps necessary to discover whether those statements were false or misleading.

311.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Anadarko common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Anadarko's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Anadarko common stock during the Class Period at artificially high prices and were damaged thereby.

312.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class did not know the misstatements were materially false and misleading.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired Anadarko's publicly-traded securities, or, if they had acquired such publicly traded securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

313.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

314.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### COUNT TWO

### FOR VIOLATIONS OF SECTION 20(A) OF
### THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS

315.     Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

316.     Defendants Hackett, Gwin and Daniels acted as controlling persons of Anadarko within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

317.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

318.     As set forth above, Defendants each violated Section 10(b) and Rule 1 0b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly-traded securities during the Class Period.

## DEMAND FOR JURY TRIAL

319.     Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiffs as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.     Awarding rescission and/or rescissory damages in favor of Lead Plaintiffs and the other members of the Class;

D.     Awarding prejudgment interest and/or opportunity cost damages in favor of Lead Plaintiffs and the other members of the Class;

E.     Awarding Lead Plaintiffs and the Class the fees and expenses incurred in this action, including attorneys' fees and expert fees; and

F.     Granting such other and further relief as the Court may deem just and proper.

Dated:  July 20, 2012

**AJAMIE LLP**

Thomas R. Ajamie
Texas Bar No. 00952400
Dona Szak
Texas Bar No. 19597500
John W. Clay
Texas Bar No. 00796366
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Tel: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
dszak@ajamie.com
jclay@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

Respectfully Submitted,

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

/s/ John C. Browne
John C. Browne - Attorney in Charge
Jeremy P. Robinson
Brett Van Benthysen
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
johnb@blbglaw.com
jeremy@blbglaw.com
brett@blbglaw.com

*Counsel for Lead Plaintiffs*