UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | Civ. Action No. 4:12-cv-00900 |
| | § | |
| In re ANADARKO PETROLEUM CORP. | § | ECF CASE |
| CLASS ACTION LITIGATION | § | |
| | § | Electronically Filed |
| | § | |
| | § | |

## MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Charles W. Schwartz
Texas Bar No. 17861300
Federal Bar No. 603
Skadden, Arps, Slate,
    Meagher & Flom LLP
1000 Louisiana, Suite 6800
Houston, Texas 77002
Telephone: (713) 655-5160
Fax: (713) 483-9160
Email: Charles.Schwartz@Skadden.com

*Attorney-in-charge for Defendants
Anadarko Petroleum Corporation, James T.
Hackett, Robert G. Gwin, and Robert P.
Daniels*

*Of Counsel*

Jay B. Kasner
*(Admitted Pro Hac Vice)*
Susan Saltzstein
*(Admitted Pro Hac Vice)*
Skadden, Arps, Slate,
    Meagher & Flom LLP
4 Times Square
New York, New York 10036-6518
Telephone: (212) 735-3000
Fax: (212) 735-2000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

NATURE AND STAGE OF THE PROCEEDING ....................................................... 7

FACTUAL BACKGROUND .......................................................................................... 7

    A.    Parties ................................................................................................ 7

    B.    Anadarko's Operations During the Proposed Class Period ..................... 8

    C.    Anadarko's Risk Disclosures During the Proposed Class Period ............ 9

    D.    The Operating Agreement ..................................................................... 10

    E.    The Explosion on the Macondo Prospect ............................................. 11

    F.    Alleged Misstatements During the Proposed Class Period .................... 11

STATEMENT OF ISSUES .......................................................................................... 13

ARGUMENT ............................................................................................................... 13

I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE
EXCHANGE ACT ............................................................................................. 13

    A.    Plaintiffs' Unsubstantiated Claims of Mismanagement Cannot State A
Claim for Securities Fraud ................................................................... 13

    B.    Plaintiffs Fail To Allege An Actionable Misstatement .......................... 15

        1.    Plaintiffs Fail To Adequately Plead That the Challenged
Statements Were Materially False and Misleading ................... 15

        2.    Challenged Statements Are Non-Actionable Puffery ................ 20

        3.    Statements Made by BP Are Not Attributable to Anadarko Under
*Janus* and Thus Are Not Actionable ........................................ 21

            (a)    Anadarko cannot be held liable for statements in the BP-
authored Macondo spill response plans ......................... 21

i

(b)    Anadarko cannot be held liable for post-spill statements made by BP executives ................................................................24

C.    The Amended Complaint Fails To Allege Facts Supporting A Strong Inference of Fraudulent Intent As To Each Defendant .........................................25

     1.    Any Inference of Fraudulent Intent Is Not Cogent And Is Less Compelling Than Non-Fraudulent Inferences ...........................................26

     2.    Plaintiffs Fail To Allege Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior or Recklessness .............................27

         (a)    Allegations concerning Anadarko's "access to information" regarding the Macondo operations fail to raise a strong inference of fraudulent intent .........................................................28

         (b)    Allegations concerning access to information about the oil spill flow rate do not raise a strong inference of fraudulent intent ...................................................................................33

         (c)    Allegations concerning BP's safety record and the OSRP and EP do not raise a strong inference of fraudulent intent ..........36

         (d)    Allegations concerning government investigations and lawsuits do not raise a strong inference of fraudulent intent .........37

         (e)    Anadarko's settlement with BP does not raise a strong inference of fraudulent intent. .........................................................41

     3.    Plaintiffs' Motive Allegations Fail As A Matter of Law .........................41

II.    PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT ............................................................................................46

III.    THE COURT SHOULD DISMISS THE AMENDED COMPLAINT WITH PREJUDICE .........................................................................................................46

CONCLUSION ....................................................................................................................47

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
    291 F.3d 336 (5th Cir. 2002) ........................................................................28

*Abrams v. Baker Hughes Inc.,*
    292 F.3d 424 (5th Cir. 2002) ................................................................. *passim*

*Acito v. IMCERA Group. Inc.,*
    47 F.3d 47 (2d Cir. 1995) ............................................................................43

*Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P.,*
    625 F.3d 185 (5th Cir. 2010) .......................................................................23

*In re Alamosa Holdings, Inc. Securities Litigation,*
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ........................................................37

*In re Australia & New Zealand Banking Group Ltd. Securities Litigation,*
    No. 08 Civ. 11278(DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........17

*In re Avon Products, Inc. Securties Litigation,*
    No. 05 Civ. 6803(LAK)(MHD), 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) ................43

*In re Axis Capital Holdings, Ltd. Securities Litigation,*
    456 F. Supp. 2d 576 (S.D.N.Y. 2006).........................................................44

*In re Azurix Corp. Securities Litigation,*
    198 F. Supp. 2d 862 (S.D. Tex. 2002) ....................................................3, 20

*In re BP p.l.c. Securities Litigation,*
    852 F. Supp. 2d 767 (S.D. Tex. 2012) ................................................. *passim*

*In re BP p.l.c. Securities Litigation,* 843 F. Supp. 2d 712 (S.D. Tex. 2012) ................................35

*In re Browning-Ferris Industries Inc. Securities Litigation,*
    876 F. Supp. 870 (S.D. Tex. 1995) ........................................................14, 41

*In re Capstead Mortgage Corp. Securities Litigation,*
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ................................................ *passim*

*In re Citigroup, Inc. Securities Litigation,*
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)..........................................................14

*City of Brockton Retirement System v. The Shaw Group, Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)..............................................................43

*Coates v. Heartland Wireless Communications, Inc.*,
55 F. Supp. 2d 628 (N.D. Tex. 1999) .......................................................26, 33

*ECA &  Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...................................................................17, 20

*In re Enron Corp. Securities Derivative & ERISA Litigation*,
761 F. Supp. 2d 504 (S.D. Tex. 2011) ..............................................................32

*In re Enron Corp. Securities Derivative & ERISA Litigation*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................42, 45

*Fait v. Regions Financial Corp.*,
655 F.3d 105 (2d Cir. 2011) ........................................................................18

*Financial Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ................................................................5, 15, 20

*Foley v. Transocean Ltd.*,
No. 10 Civ. 5233 (NRB), 2012 WL 933070 (S.D.N.Y. Mar. 20, 2012).............................2

*In re Ford Motor Co. Securities Litigation, Class Action*,
381 F.3d 563 (6th Cir. 2004) .......................................................................20

*In re Franklin Bank Corp. Securities Litigation*,
782 F. Supp. 2d 364 (S.D. Tex. 2011) .............................................................25

*Fulton County Employees Retirement System v. MGIC Investment Corp.*,
675 F.3d 1047 (7th Cir. 2012) ..........................................................4, 22, 24, 25

*In re Gildan Activewear, Inc. Securities Litigation*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009)..............................................................45

*Glazer Capital Management, LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) .......................................................................41

*Goldstein v. MCI Worldcom*,
340 F.3d 238 (5th Cir. 2003) .......................................................................29

*Hershfang v. Citicorp*,
767 F. Supp. 1251 (S.D.N.Y. 1991)................................................................37

*Hinerfeld v. United Auto Group*,
No. 97 Civ. 3533(RPP), 1998 WL 397852 (S.D.N.Y. Jul. 15, 1998)..............................18

iv

*Hopson v. MetroPCS Communications, Inc.*,
    No. 3:09-CV-2392-G, 2011 WL 1119727 (N.D. Tex. Mar. 25, 2011).............................45

*Indiana Electrical Workers' Pension Trust Fund IBEW v. The Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ................................................................... *passim*

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011)........................................................................ *passim*

*Johnson v. Siemens AG*,
    No. 09-Civ-5310 (JG)(RER), 2011 WL 1304267 (E.D.N.Y. Mar. 31, 2010) .................29

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)....................................................................44

*Kerr v. Exobox Technologies Corp.*,
    No. H-10-4221, 2012 WL 201872 (S.D. Tex. Jan. 23, 2012)......................................21, 23

*Kurtzman v. Compaq Computer Corp.*,
    No. Civ.A H-99-779, 2002 WL 32442832 (S.D. Tex. Mar. 30, 2002).............................42

*Lain v. Evans*,
    123 F. Supp. 2d 344 (N.D. Tex. 2000) ....................................................................2

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)....................................................................40

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ................................................................8, 33

*Malin v. XL Capital, Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................36

*Melder v. Morris*,
    27 F.3d 1097 (5th Cir. 1994) ....................................................................37

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
    218 F.R.D. 76 (S.D.N.Y. 2003) ................................................................40

*Mortensen v. AmeriCredit Corp.*,
    123 F. Supp. 2d 1018 (N.D. Tex. 2000) ..........................................................42

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ..............................................................6, 42, 43

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20,
2010*, 808 F. Supp. 2d 943 (E.D. La. 2011)......................................................41

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20, 2010*, 844 F. Supp. 2d 746 (E.D. La. 2012) ....................................................................40

*In re Optimal U.S. Litigation*,
   No. 10 Civ. 4095(SAS), 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) .....................23, 25

*R2 Investments LDC v. Phillips*,
   401 F.3d 638 (5th Cir. 2005) ...................................................................................25, 27

*Raab v. General Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ..............................................................................................24

*Reese v. Browne*, No. C08-1008MJP, Order Dismissing Case
   (W.D. Wash. Mar. 14, 2012) .............................................................................................2

*RSM Production Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009)..............................................................................40

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) .....................................................................................18, 20

*Saltz v. First Frontier, LP*,
   782 F. Supp. 2d 61 (S.D.N.Y. 2010)............................................................................5, 36

*Santa Fe Industries, Inc. v. Green*,
   430 U.S. 462 (1977).........................................................................................2, 13, 36

*Scanlan v. Texas A & M University*,
   343 F.3d 533 (5th Cir. 2003) .............................................................................................8

*In re Securities Litigation BMC Software, Inc.*,
   183 F. Supp. 2d 860 (S.D. Tex. 2001) .............................................................................20

*Sheppard v. Texas Department of Transportation*,
   158 F.R.D. 592 (E.D. Tex. 1994)......................................................................................32

*Southland Securities Corp. v. INSpire Insurance Solutions Inc.*,
   365 F.3d 353 (5th Cir. 2004) ......................................................................3, 13, 28, 31

*Taubenfeld v. Hotels.com*,
   385 F. Supp. 2d 587 (N.D. Tex. 2004) .............................................................................20

*Teamsters Allied Benefit Funds v. McGraw, III*,
   No. 09 Civ. 140(PGG), 2010 WL 882883 (S.D.N.Y. Mar. 11, 2010)...............................36

*Tuchman v. DSC Communications Corp.*,
   14 F.3d 1061 (5th Cir. 1994) .....................................................................2, 13, 30, 36

*United States ex rel. Adrian v. Regents of University of California*,
   363 F.3d 398 (5th Cir. 2004) ......................................................................................7, 46

*Williams v. WMX Technologies, Inc.*,
   112 F.3d 175 (5th Cir. 1997) ...............................................................................15, 18, 37

Defendants Anadarko Petroleum Corporation ("Anadarko" or the "Company"), James T. Hackett, Robert G. Gwin and Robert P. Daniels (the "Individual Defendants") move to dismiss the First Amended Consolidated Class Action Complaint ("Amended Complaint" or "AC").

## PRELIMINARY STATEMENT

On December 17, 2009, Anadarko invested approximately $24 million in the ordinary course of business to purchase a minority, non-operating interest in an oil and gas lease (the "Lease") for Mississippi Canyon Block 252 in the Gulf of Mexico (known as the "Macondo Prospect"). This investment represented less than one percent of Anadarko's $4.5 billion in capital expenditures for 2009 and was neither accompanied by fanfare nor mentioned – let alone touted – in the pages of Anadarko's relevant financial statements.[1]   Under the terms of the operating agreement, BP Exploration & Production Inc. ("BPEX," together with BP, p.l.c. and other affiliates, "BP") was the designated operator of the Macondo Prospect Lease, and was solely responsible for all operations on the leasehold. BP had the exclusive right and duty to conduct operations at the Macondo Prospect. BP designed the well, prepared the drilling plan, hired contractors, and either conducted or caused to be conducted all drilling and other exploration activities.

Tragically, on April 20, 2010, an explosion occurred during well completion operations on the Macondo Prospect, killing eleven individuals and resulting in a massive oil spill that took months to contain. Following the explosion, daily news reports depicted in graphic detail the efforts exerted to control the flow of oil and its impact on the environment. Not surprisingly, numerous lawsuits, government investigations, and inquiries followed – many addressed to the causes of the disaster.

---

[1]   Indeed, Plaintiffs do not cite a single pre-spill statement by Anadarko or the Individual Defendants that referenced the Macondo Prospect specifically.

But not every tragedy has a remedy under the securities laws.  *See In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 772-78, 820 (S.D. Tex. 2012) ("*BP I*") (Ellison, J.) (dismissing securities complaint arising out of Macondo Prospect explosion); *Foley v. Transocean Ltd.*, No. 10 Civ. 5233 (NRB), 2012 WL 933070, at *1-3, *18 (S.D.N.Y. Mar. 20, 2012) (same); *Reese v. Browne*, No. C08-1008MJP, Order Dismissing Case at 2-3, 19-20 (W.D. Wash. Mar. 14, 2012) (dismissing securities complaint arising out of oil spills in Prudhoe Bay, Alaska).[2]  Indeed, this Court already has concluded in a securities action filed against BP – the majority owner and designated operator of the Macondo Prospect – that BP was not liable for certain statements it made during the proposed class period.  *See BP I*, 852 F. Supp. 2d at 819-20.  The statements at issue here – some not even authored by Anadarko; others that are not "statements" at all – are far more attenuated as Anadarko never touted its own – much less BP's – safety record in connection with the well.

The gravamen of Plaintiffs' complaint is that Anadarko "expressly approved and funded a series of extremely risky decisions" that ultimately resulted in the April 20, 2010 explosion and resultant oil spill.  (AC ¶¶ 36-49, 73-107.)  Plaintiffs' after-the-fact critiques, however, are no more than claims of alleged mismanagement that are not actionable under the securities laws.  *See Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 479 (1977); *Ind. Elec. Workers' Pension Trust Fund IBEW v. The Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008).  While Plaintiffs may disagree with the wisdom of the investment and its management, alleging disagreement with Anadarko's business decisions does not equate to fraud.  *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . . ."); *Lain v. Evans*, 123 F. Supp. 2d 344, 349 (N.D. Tex. 2000)

---

[2]        A copy of the *Reese v. Browne* opinion was included as an exhibit to Defendants' Notice of Supplemental Authority [Dkt. No. 64-4].

("Although it is clear that Plaintiff disagrees with Defendants' strategic business decision . . . Plaintiff fails to explain how the statements regarding those business decisions were materially misleading.").

Plaintiffs also fail to identify a single actionable misstatement or omission attributable to Defendants concerning the Macondo operations, a defect that is fatal to Plaintiffs' claim.  *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("[L]iability under Rule 10(b)(5) requires . . . that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading . . . .").  Nor do plaintiffs cite any pre-spill statement in Anadarko's filings with the Securities and Exchange Commission ("SEC") that even referenced the Macondo Prospect.

Plaintiffs, searching for *any* statement by Anadarko or its representatives concerning the Macondo operations prior to the spill, comb through Anadarko's financial statements, website, and marketing materials and turn up only non-actionable general remarks such as that "a safety-first culture is a way of life at Anadarko" (AC ¶¶ 4, 32, 183), that Anadarko is "a steward of the environment" (AC ¶¶ 32, 180), and that Anadarko is "disciplined in its risking methodology" (AC ¶¶ 34, 185).  Plaintiffs have not mounted any real challenge to the veracity of these remarks, which ultimately are no more than "obvious puffery" and corporate optimism that courts routinely hold are no basis for a fraud claim.  *See, e.g.*, *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 881-82 (S.D. Tex. 2002), *aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *see also BP I*, 852 F. Supp. 2d at 807, 811-14 (BP's promise to make safety a priority and its expressions of commitment to safety were non-actionable because they were insufficiently particular and immaterial to investors; BP's statements regarding its risk management were likewise "simply too vague to be false or material").  And Anadarko never

3

said one word in any of its public filings about the safety record or abilities of BP as a lease operator.

As for Plaintiffs' claim that certain post-spill statements made by Anadarko were "false" – those allegations are based on loose mischaracterizations of the statements themselves.  Take, for example, Plaintiffs' claim that Anadarko "assured investors that Anadarko . . . faced minimal financial liability (all of which would be covered by insurance) arising from the spill."  (AC ¶ 2.) Anadarko never made such a statement; Anadarko merely stated that it maintained insurance coverage up to a certain amount and estimated that its "net insurance coverage will likely total $177.5 million" less deductibles.  (AC ¶¶ 147, 230-31.)  Other challenges to Anadarko's post-spill statements are similarly deficient.  (AC ¶¶ 150, 234.)

Left without an actionable statement by Anadarko or the Individual Defendants, Plaintiffs, as a last resort, amend their complaint to focus on statements of others.  For example, Plaintiffs highlight BP's public Oil Spill Response Plan (a regional plan submitted by BP before Anadarko invested in the well and which does not even mention the Macondo Prospect), BP's Initial Exploration Plan (also submitted by BP before Anadarko invested in the well), and alleged public statements by BP executives "guesstimat[ing]" the spill flow rate.  These attribution claims are, of course, precluded by *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), which held that only the person or entity with "ultimate authority" over a statement can be held liable under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  *Janus*, 131 S. Ct. at 2302; *see also BP I*, 852 F. Supp. 2d at 819 (dismissing claims against BP entities that did not author the Macondo Initial Exploration Plan) (citing *Janus*, 131 S. Ct. at 2302); *Fulton County Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051-52 (7th Cir. 2012) (Easterbrook, C.J.) (*Janus* forecloses third-party liability for failure to correct misstatements of others).

4

Plaintiffs also fall woefully short of establishing fraudulent intent.  Plaintiffs must allege, with particularized facts, a strong inference of scienter as to each of the named Defendants that is cogent and at least as compelling as any opposing inference of non-fraudulent intent.  *BP I*, 852 F. Supp. 2d at 814-15.   Here, the Amended Complaint reflects a plausible, non-culpable explanation for Defendants' alleged conduct; Plaintiffs point to no testimony or any report suggesting anything other than that Anadarko employees believed that the operations were proceeding appropriately and they could not have predicted the tragedy of April 20, 2010, based on information supposedly conveyed to them.

Moreover, Plaintiffs fail to allege facts constituting strong circumstantial evidence of the requisite intent or severe recklessness.  *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  Plaintiffs merely allege that Anadarko had access to databases that provided "technical" information without identifying what specific information these technical databases conveyed that contradicted any of Anadarko's public statements or, more importantly, who actually looked at the data and what conclusions, if any, were drawn from them.  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431-32 (5th Cir. 2002) (allegations that "senior level executives" received "unidentified daily, weekly and monthly financial reports" were insufficient to establish scienter).  Likewise, Plaintiffs' allegations that Anadarko must have had access to two purported warning documents (AC ¶¶ 77, 93) are unsupported by any well-pled fact; no witness, no document, and no testimony puts those documents in the hands of Anadarko.  And Plaintiffs' allegation that BP's poor safety record was well known within the industry and that Anadarko and the Individual Defendants "should have known" (AC ¶ 137) of the alleged falsities in the OSRP and EP cannot support a claim of scienter.  *See Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 71-72 (S.D.N.Y. 2010), *aff'd*, No. 11-265-cv, 2012 WL 2096399 (2d Cir. June 12, 2012).

Plaintiffs' motive theory is likewise utterly implausible.  The central allegation consists of two stock sales by a single Individual Defendant, Mr. Hackett.  (AC ¶¶ 271-76.)  Plaintiffs do not allege that any other Individual Defendant purchased or sold Anadarko shares during the proposed class period, a factor weighing heavily *against* a finding of scienter.  *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 420-21 (5th Cir. 2001) (inference of scienter undermined where other defendants did not sell their shares during the relevant class period).  Further, Plaintiffs' motive allegations as to Mr. Hackett rest on the assumption that he sold stock in the face of drilling delays of which he is not alleged to have been aware and a future disaster that he could not possibly have foreseen.  This theory is even more implausible when one considers that Mr. Hackett's September 2009 sale occurred *before* Anadarko invested in the Lease.  The glaring absence of alleged facts suggesting that Mr. Hackett was aware of the progress on the Macondo Prospect or of any "warning" documents (or even raw data) when he sold shares on the same day he exercised options to purchase destroys any claim of scienter.

At the end of the day, the Amended Complaint comes nowhere close to alleging, with the requisite particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), that any Defendant fraudulently misstated or omitted a material fact.  Plaintiffs' claims under Section 10(b) should, therefore, be dismissed.  And because the Amended Complaint fails to state a claim under Section 10(b), Plaintiffs' derivative "control person" claims under Section 20(a) must also be dismissed.

The Amended Complaint should be dismissed with prejudice because, despite being given leave to amend after briefing closed on Defendants' motion to dismiss Plaintiffs' prior complaint, and despite having the benefit of the Court's recent opinions in two BP-related cases, Plaintiffs still have failed to state a claim that is plausible on its face.  As the Fifth Circuit has recognized, "'pleadings review is not a game where the plaintiff is permitted to file serial

amendments until he finally gets it right.  One opportunity to amend, in the face of motions that spelled out the asserted defects in the original pleadings, was sufficient under the circumstances.'"  *United States ex rel. Adrian v. Regents of Univ. of Cal.*, 363 F.3d 398, 404 (5th Cir. 2004).

## NATURE AND STAGE OF THE PROCEEDING

This action was commenced in the Southern District of New York before Judge Paul G. Gardephe, with two separate complaints: *Goodwin v. Anadarko Petroleum Corp.*, No. 1:10-cv-04905-PGG (S.D.N.Y. filed June 23, 2010) and *Harris v. Anadarko Petroleum Corp.*, No. 1:10-cv-05894-PGG (S.D.N.Y. filed Aug. 4, 2010).   On November 16, 2010, Judge Gardephe appointed the Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") and the Pension Trust Fund for Operating Engineers ("Operating Engineers") (together with Virgin Islands, the "Plaintiffs") as lead plaintiffs.

On January 31, 2011, Plaintiffs filed the Consolidated Class Action Complaint. Defendants moved to dismiss the Consolidated Class Action Complaint on March 17, 2011, and briefing on Defendants' motion closed on May 2, 2011.  On March 19, 2012, Judge Gardephe granted Plaintiffs' motion to transfer to the Southern District of Texas.  On May 22, 2012, the case was transferred to this Court.  Plaintiffs filed the Amended Complaint on July 20, 2012.

## FACTUAL BACKGROUND

### A.  Parties

Plaintiffs claim to have purchased Anadarko common stock and bonds between June 12, 2009 and June 9, 2010 (the "proposed class period").  (AC ¶¶ 22-23; AC at 1.)  They seek to represent "persons and entities" "who purchased or otherwise acquired the publicly-traded securities of Anadarko" during the proposed class period.  (AC at 1.)  According to their

certifications, Plaintiffs purchased Anadarko stock in May 2010, after Anadarko announced that there had been an explosion on the Macondo Prospect.  (Ex. 1.)[3]

Defendant Anadarko is among the world's largest independent oil and natural gas exploration and production companies.  (Ex. 3, at 2 (cited in AC ¶ 213).)  In 2009, Anadarko reported over $50 billion in assets, revenues exceeding $8.2 billion and over $4.5 billion in capital expenditures.  (*Id.* at 32.)

The Individual Defendants are Anadarko officers and directors.  James T. Hackett is Anadarko's Chairman and during the proposed class period was Chief Executive Officer; Robert G. Gwin is Chief Financial Officer; and Robert P. Daniels is Senior Vice President of Worldwide Exploration.  (AC ¶¶ 25-27.)

### B.    Anadarko's Operations During the Proposed Class Period

During the proposed class period, Anadarko conducted domestic and international oil and gas exploration and production activities in the continental U.S., Alaska, the Gulf of Mexico, and in such countries as Algeria, China, and Ghana.  (Ex. 3, at 3, 5 (cited in AC ¶¶ 213-17).)  In the Gulf of Mexico, Anadarko owned an average 66% working interest in 575 blocks and operated 8 floating platforms.  (*Id.* at 5.)  It had an exploration track record in the region that included discovery of 32 fields and infrastructure including 11 hubs and 27 sub-sea wells.  (Ex. 24 (cited

---

[3]    Citations to "Ex." are to the exhibits to the Declaration of Charles W. Schwartz in Support of Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint ("Schwartz Decl.").  On a motion to dismiss, the Court may consider the full text of documents partially quoted in the Amended Complaint, as well as documents attached to the Amended Complaint as exhibits or incorporated by reference, and matters of which judicial notice may be taken, including public disclosure documents filed with the SEC.  *See Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (courts may consider documents referenced in the complaint and that are central to plaintiffs' claims); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996) (courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with the agency).

in AC ¶¶ 182).)  In 2009, Anadarko drilled seven development wells in the Gulf of Mexico alone and allocated 20% of its global capital budget to that region.  (Ex. 2, at 9; Ex. 3, at 5.)  Over the course of 2009, Anadarko made five deepwater discoveries in the Gulf of Mexico and increased its sales volume in the region by 13%.  (Ex. 3, at 34.)  The Company's onshore and international operations also reported increased productions and deepwater discoveries.  (*Id.*)

During the first quarter of 2010, Anadarko's sales volume in the Gulf region represented a 19% increase over the fourth quarter of 2009.  (Ex. 7, at 27.)  The Company's domestic onshore operations also experienced increased sales volume over the prior quarter.  (*Id.*)  Anadarko's second quarter activities reported consistent results:  increased sales volume over the second quarter of 2009, additional oil production and successful completion of several discovery wells.  (Ex. 8, at 42.)

### C.    Anadarko's Risk Disclosures During the Proposed Class Period

The risks associated with Anadarko's deepwater drilling activities were repeatedly disclosed to the investing public.  Throughout the proposed class period, in each of its Annual Reports and as incorporated in the Company's quarterly reports and other filings (many of which have been referenced in the Amended Complaint), Anadarko disclosed risks related to its operations in the Gulf and other locations that could negatively impact its business:

> Our operations and financial results could be significantly impacted by conditions in some of these areas, such as the Gulf of Mexico, because we explore and produce extensively in those areas.  As a result of this activity, we are vulnerable to the risks associated with operating offshore, including those relating to . . . remediation and other costs resulting from oil spills or releases of hazardous materials[.]

(Ex. 3, at 22-23; *see also* Ex. 2, at 21; Ex. 4, at 36; Ex. 5, at 27; Ex. 6, at 28; Ex. 9; Ex. 10; Ex. 11.)  With regard to operating risks, Anadarko reiterated in its disclosures:

> Our business is subject to all of the operating risks normally associated with the exploration for and production, gathering, processing and transportation of oil and

> gas, including hurricanes, blowouts, cratering and fire, any of which could result
> in damage to, or destruction of, oil and natural gas wells or formations or
> production facilities and other property and injury to persons.

(Ex. 2, at 23; *see also* Ex. 3, at 24; Ex. 4, at 38; Ex. 5, at 27; Ex. 6, at 28; Ex. 9; Ex. 10; Ex. 11.)

Anadarko also disclosed risks related to its investment in properties that the Company did not

operate:

> We have limited control over the activities on properties we do not operate.  Other
> companies operate some of the properties in which we have an interest.  We have
> limited ability to influence or control the operation or future development of these
> non-operated properties or the amount of capital expenditures that we are required
> to fund with respect to them.  Our dependence on the operator and other working
> interest owners for these projects and our limited ability to influence or control
> the operation and future development of these properties could materially
> adversely affect the realization of our targeted returns on capital and lead to
> unexpected future costs.

(Ex. 2, at 25; *see also* Ex. 3, at 26; Ex. 4, at 39; Ex. 5, at 27; Ex. 6, at 28; Ex. 9; Ex. 10;

Ex. 11.)

### D.    The Operating Agreement

On December 17, 2009, Anadarko executed an operating agreement (the "OA"), dated

October 1, 2009.  (Ex. 25 (cited in AC ¶ 39).)  Pursuant to the OA, Anadarko acquired a minority

non-operating interest in the Macondo Prospect Lease.  (*Id.*)  BPEX, as the designated operator,

held a controlling 65% interest in the Lease.  (AC ¶ 40.)  Anadarko purchased its non-operating

interest in the Lease for an initial payment of approximately $24 million.  (AC ¶ 38.)

BP, as designated operator, had the "exclusive right and duty to conduct (or cause to be

conducted) all activities or operations under th[e] Agreement."  (Ex. 25, § 5.1 at 20.)  According

to testimony referenced in the Amended Complaint by the OA drafter, BP representative Michael

Beirne, the OA was based on a model agreement in which it was "standard" that the operator

would design the well, prepare the drilling plan, and conduct the drilling activities.  (Ex. 28, at 63,

65 (cited in AC ¶¶ 41, 50-55).)  BP contracted for the use of Transocean Ltd.'s mobile offshore drilling unit *Deepwater Horizon* to conduct the operations.  (AC ¶¶ 61-63.)

### E.       The Explosion on the Macondo Prospect

On April 20, 2010, an explosion occurred on the *Deepwater Horizon* during well completion operations on the Macondo Prospect, killing eleven people and resulting in a discharge of  crude oil into the Gulf of Mexico from the *Deepwater Horizon*'s broken riser pipe and blowout-preventer.  (AC ¶ 1.)  On May 4, Anadarko reported that a full response and an investigation of the incident was being conducted.  (Ex. 7, at 43 (cited in AC ¶ 148).)  Anadarko informed investors that "as a non-operating interest owner [it was] currently unable to estimate any potential liability for costs arising in connection with this event, and whether the costs might exceed the coverage limits under [the Company's] insurance policies."  (*Id.*)  Anadarko executives further explained that they did not "know the ultimate substantial outcome" or "have an estimate of the expenses" of the oil spill.  (Ex. 18, at 7 (cited in AC ¶¶ 149-50).)

### F.       Alleged Misstatements During the Proposed Class Period[4]

Plaintiffs challenge a litany of verbal and written statements made during a nine month period, which begins six months *before* Anadarko even entered into the OA.  Many of the statements Plaintiffs highlight concern Anadarko's operations more generally, and of those made prior to the explosion, none pertains specifically to operations on the Macondo Prospect.  (AC ¶¶ 3, 30-31, 70-71, 191-92, 194-95, 201, 204-05, 208-14.)  Plaintiffs also cite statements concerning Anadarko's commitment and attention to safety and the environment, even though there are no allegations that impugn Anadarko's prior safety record.  (AC ¶¶ 4, 32-33, 180-86, 188-89, 199, 202-03.)  Indeed, among other things, Plaintiffs cite Anadarko's safety-related remarks made in

---

[4]       Available sources containing the alleged false and misleading statements referenced in the Amended Complaint are attached as exhibits to the Schwartz Decl.

the context of acknowledging receipt of an award from the EPA and the Seven-Year Continuing Excellence Award.  (Ex. 15 (cited in AC ¶ 199); *see also* Exs. 22, 16 (cited in AC ¶¶ 5, 202).)

Plaintiffs also highlight general statements where Anadarko discussed "risking methodology," which were made in the context of describing the process used to assess the potential range of economic outcomes for prospective explorations, not risks associated with safety of non-operating investments.  (AC ¶¶ 5, 34, 185, 190, 200, 214, 218-20.)  And even if read more broadly, none is specific or concerns the Macondo Prospect.

Plaintiffs draw attention to certain statements in BP's regional OSRP and the Macondo EP, which the Minerals Management Service ("MMS") expressly approved.  Moreover, these documents were both used in substantially similar form throughout the industry and authored by BP, not Anadarko.  *See BP I*, 852 F. Supp. 2d at 819 (noting BP's authorship of the EP).

Plaintiffs quote post-spill public statements made by BP executives in which the executives "guesstimate the oil flow rate."  (AC ¶ 226.)  Plaintiffs also mischaracterize post-spill statements made by Anadarko and its representatives that factually address (1) the company's insurance coverage, (2) expected spill cleanup costs, and (3) Anadarko's involvement in, and access to information concerning, the operations on the Macondo Prospect.  Plaintiffs omit to mention that these post-spill statements were made after the final sale by Mr. Hackett that allegedly provided the primary motivation for the fraud.

Plaintiffs allege that all Defendants are liable for purported false and misleading statements even though certain defendants did not make the challenged statements and were not present at the time the challenged statements were made.

**STATEMENT OF ISSUES**

1.  Whether Section 10(b) claims that essentially allege that a company mismanaged its operations should be dismissed under controlling case law that "internal corporate mismanagement" does not give rise to a Section 10(b) claim.  *See, e.g.*, *Santa Fe Indus.*, 430 U.S. at 479; *Tuchman*, 14 F.3d at 1070.

2.  Whether Section 10(b) claims should be dismissed for failure to plead actionable misrepresentations or omissions where they rely on (i) "generalized, positive statements" that are too "'vague'" to contain any "'concrete factual or material misrepresentation,'" *Southland*, 365 F.3d at 372, and (ii) statements over which non-defendants exercised "ultimate authority," which, under *Janus*, 131 S. Ct. at 2301-02, cannot give rise to a Section 10(b) claim.

3.  Whether Section 10(b) claims that rely on group pleading without any allegations about specific individuals' knowledge or reckless disregard of the falsity of any statements should be dismissed under *Southland*, 365 F.3d at 370-71, *Shaw*, 537 F.3d at 533, and other settled Fifth Circuit and Supreme Court law for failure to plead specific facts establishing a "strong inference of scienter" that is "cogent and compelling."

4.  Whether Section 20(a) claims should be dismissed where all Section 10(b) claims fail because "[c]ontrol person liability is secondary only." *Southland*, 365 F.3d at 383-84.

**ARGUMENT**[5]

**I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT**

> **A.    Plaintiffs' Unsubstantiated Claims of Mismanagement Cannot State A Claim for Securities Fraud**

It is well settled that mere allegations of corporate mismanagement are not actionable under the federal securities laws.  *See e.g.*, *Santa Fe Indus.*, 430 U.S. at 479-8; *Shaw*, 537 F.3d at 532-33; *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 549 (N.D. Tex. 2003).  A plaintiff cannot transform allegations of corporate mismanagement into securities fraud merely

---

[5]    The pleading standard applicable to this motion is set forth in *Shaw*, 537 F.3d at 532-33.

by pleading that the alleged mismanagement rendered the general statements about the corporation's business operations misleading. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) (holding that alleged inconsistency between Citigroup's general statements concerning its "risk management policies and historical business practices" and its specific risky transactions "amount[ed] to nothing more than a charge that Citigroup's business was mismanaged"), *aff'd sub nom. Albert Fadem Trust v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006).

Notwithstanding the Fifth Circuit's unequivocal admonition that "negligence, oversight or simple mismanagement" cannot "rise to the standard necessary to support a securities fraud action," *Abrams*, 292 F.3d at 433, Plaintiffs fault Anadarko and the Individual Defendants for allegedly "partner[ing] with BP" and "approv[ing] and fund[ing] a series of extremely risky decisions made in connection with drilling the [Macondo] well." (AC ¶¶ 2, 9-10, 16, 18, 38-39, 41, 45, 68, 70, 79-80, 82, 95-96, 105, 125, 236, 247.)   Plaintiffs criticize – in unabashed hindsight – the wisdom of numerous business decisions, some insufficiently ascribed to Anadarko, concerning the initial investment in the Lease, and Anadarko's  purported approval of BP's oil spill response plan (AC ¶ 9) and BP's decisions regarding the drilling and exploration operations, including: (i) BP's decision to use a long string casing for the drilled portion of the well; (ii) BP's decision to use an allegedly inadequate number of centralizers to place the well casing in the center of the well; and (iii) BP's decision not to perform a cement bond log to determine whether the cement had bonded to the casing.  (AC ¶¶ 73-107.)   Even if Plaintiffs were correct that Anadarko had "approved" BP's actions,  "[s]econd-guessing such judgments in the light of hindsight is simply not a basis for securities fraud."  *In re Browning-Ferris Indus. Inc. Sec. Litig.*, 876 F. Supp. 870, 901 (S.D. Tex. 1995).

**B.    Plaintiffs Fail To Allege An Actionable Misstatement**

1.    Plaintiffs Fail To Adequately Plead That the Challenged Statements Were Materially False and Misleading

Plaintiffs have not pled with specificity why or how *any* of the purported misstatements were false and misleading.  *See Fin. Acquisition*, 440 F.3d at 287 (plaintiffs must "specify each allegedly misleading statement and the reason why it is misleading").  The Amended Complaint does not contain a single statement uttered by Anadarko prior to the accident in any of its filings submitted to the SEC concerning the operations on the Macondo Prospect or Anadarko's passive investment in the Lease.  Plaintiffs instead impermissibly rely on a hodgepodge of mainly edited statements cobbled together from a variety of sources and then broadly allege in hindsight that the statements described were rendered false and misleading because Anadarko allegedly failed to "properly investigate BP's safety record" and "meaningfully review" the operator's oil spill response plan, and allegedly approved the operator's "dangerous and high-risk operational decisions" at the Macondo Prospect (AC ¶¶ 189, 196, 206, 221)[6]:

- Statements concerning Anadarko's "commitment to safety and environmental compliance."   (AC ¶¶ 4, 32-33, 180-86, 188-89, 199, 202-03.)   Plaintiffs highlight statements such as that Anadarko was "committed to safely producing the energy we all need in a manner that protects the environment"; "Anadarko's Gulf of Mexico operations team views safety as a top priority"; "[s]afety and environmental stewardship are highly valued at Anadarko";[7] and "[a] safety-first culture is a way of life at Anadarko."  (Exs. 23, 24, 21, 22 (cited in AC ¶¶ 180, 182-83).)

---

[6]    Plaintiffs litter the Amended Complaint with lengthy quotations, liberally underline, and then declare in a conclusory fashion that "[t]he above statements were materially false and misleading" because of alleged omissions of misconduct concerning the Macondo Prospect operations.  (AC ¶¶ 173-236.)  Courts uniformly reject this inadequate pleading technique.  *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997) (dismissing claim that defendants made misstatements in prospectus because complaint "merely excerpt[ed] the prospectus and provide[d] no analysis of its contents or falsity").

[7]    Excerpting statements out of context, Plaintiffs omit the sentence "Anadarko has been recognized for its safety record with multiple Minerals Management Service National and District SAFE awards."  (Ex. 21 (cited in AC ¶ 182).)

- Statements concerning Anadarko's exploration and production activities. (AC ¶¶ 3, 30-31, 70-71, 191-92, 194-95, 201, 204-05, 208-14.) These statements describe, for example, "Anadarko's exploration success" demonstrated by Anadarko's "strong operational performance and the advancement of three mega-projects," including operations in Africa. (Ex. 9 (cited in AC ¶ 191).) Regarding the Gulf of Mexico, the statements pertain to Anadarko's activities in that region, but do not specifically mention the Macondo Prospect, for the obvious reason that Anadarko was not "operating" or "exploring" on the Macondo Prospect: "we have five discoveries out there," which include "Caesar/Tonga," "Samurai," "Vito," "Lucius," and "Heidelberg." (Ex. 20, at 3-4 (cited in AC ¶¶ 210-12).) Statements cited by Plaintiffs to claim that Anadarko "touted [its] project management skills" also refer to Anadarko's operating results with respect to "'mega projects'" and other "'exploration success.'" (AC ¶¶ 70-71, 194, 204, 210-12.)

- Statements concerning Anadarko's "risking methodologies." (AC ¶¶ 5, 34, 185, 190, 200, 214, 218-20.) Plaintiffs take these statements out of context and claim they "touted [Anadarko's] 'active' risk management practices." (Ex. 6 (cited in AC ¶ 200).) In actuality, the statements cited by Plaintiffs describe Anadarko's "risking methodology," which is "a rigorous technical and commercial evaluation" used to "pursue resource opportunities with meaningful potential to create substantial value for [their] shareholders." (Ex. 21 (cited in AC ¶¶ 5, 185).) "What that methodology seeks is to understand geological risk and a range of possible outcomes. And then ultimately, what reserve base can be generated from that range of geological outcomes." (Ex. 19, at 5 (cited in AC ¶ 190).)

None of these statements specifically concerns the Macondo Prospect or the Company's non-operating interest in the Lease. Rather, they are general statements concerning the overall operations of Anadarko globally and the Company's operations in the Gulf of Mexico generally. Plaintiffs also fail to allege why general comments concerning safety and the environment or Anadarko's exploration or production activities unrelated to the Macondo Prospect were rendered false and misleading by purported actions taken with respect to its single $24 million investment, an investment that pales in comparison to Anadarko's $4.5 billion of annual capital expenditures. *BP I*, 852 F. Supp. 2d at 804-05 (allegation that delayed maintenance on a single oil rig owned by defendant BP caused an oil spill did not render false the general, non-objectively verifiable statement in BP's 2008 annual report that "'[s]afety performance has been scrutinized by'" an internal committee tasked with assuring "'that group operational risks are identified and managed appropriately'" (citation omitted)).

16

Plaintiffs' conclusory allegation that Anadarko recklessly approved BP's decisions relating to the Macondo operations, even if true, could not possibly explain why statements about geological risk assessments and other statements outlined above were false and misleading.  *See BP I*, 852 F. Supp. 2d at 804-05 (allegation that delayed maintenance caused explosion and oil spill on a rig owned by BP did not establish falsity of statements regarding number of safety auditors and audits performed because the spill did not demonstrate that these numbers were incorrect).  Moreover, while Plaintiffs assert that Anadarko's Gulf of Mexico Fact Sheet and other generic statements are false (AC ¶¶ 5, 34, 218-20), Plaintiffs fail to allege why an accident at a single property – operated by a third party – would render false or misleading general statements, such as that Anadarko was "'disciplined in its risking methodology.'"  *Cf. BP I*, 852 F. Supp. 2d at 804-05; *see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278(DLC), 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) (alleged fraud regarding one business unit does not explain falsity of statement that "the operation of risk control is effective across the Company").

Moreover, general statements about safety, environmental compliance, exploration and production activities, and risking methodologies are not unequivocal guarantees and thus are not actionable.  *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (expressly rejecting claim that similar general statements concerning risk methodologies were guarantees).  No reasonable investor would have understood Anadarko's statements regarding safety and the environment or its risking methodologies as guarantees that Anadarko was accident-proof, either in its own drilling operations or in its more limited and dependant role as a non-operating investor.  *See id.*; *see also BP I*, 852 F. Supp. 2d at 807-08 (rejecting claim that general statements about risk management constituted securities fraud).  Indeed, Anadarko specifically warned investors that it was "vulnerable to the risks

17

associated with operating offshore, including those relating to . . . costs resulting from oil spills" in the Gulf of Mexico and elsewhere.  (Ex. 3, at 22-23.)  The risks inherent in Anadarko's business were fully disclosed such that no reasonable investor would be misled into believing these risks could not occur.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003).

Plaintiffs also fail to allege that statements concerning the adequacy of Anadarko's reserves and insurance (AC ¶¶ 14, 147-48, 151, 192, 201, 215-16, 230-33) are false and misleading.  In particular, Plaintiffs do not, as they must, explain why the statements they identify – that Anadarko "'maintain[s] insurance coverage'" (AC ¶ 215) and "maintains insurance policies" (AC ¶¶ 147, 230) – were misleading.  *See Williams*, 112 F.3d at 179.  Any claim that Anadarko failed to "anticipate the extent of necessary reserves, even if it amounts to mismanagement," which it does not here, "is not actionable under [the] federal securities laws." *Hinerfeld v. United Auto Grp.*, No. 97 CIV. 3533(RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998).  Indeed, reserve estimates are mere matters of "opinion" and thus can only be actionable if the "defendant's opinions were both false and not honestly believed when they were made."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (discussing loan loss reserves); *see also Capstead*, 258 F. Supp. 2d at 563 (projections of future performance and predictive statements not actionable unless speaker did not believe statement when made or lacked a reasonable basis for belief in accuracy of statement).  Here, Plaintiffs have not alleged any facts even suggesting that Defendants lacked a basis to believe in the adequacy of the reserves.

Moreover, Plaintiffs' allegation that Anadarko stated that it was sufficiently insured against the accident at the Macondo Prospect (AC ¶¶ 14, 147, 192, 230) is inconsistent with the actual statement at issue, which simply noted that Anadarko maintains insurance coverage "up to an aggregate level of approximately $710 million, less deductibles" and that "[b]ased on its 25-

18

percent non-operated interest," it estimated "its net insurance coverage [to be] approximately $177.5 million, less deductible of $15 million."  (Ex. 11 (cited in AC ¶ 147).)  Moreover, Mr. Hackett qualified a virtually identical statement, noting that Anadarko "maintain[ed] insurance policies that are designed to protect against *a portion* of financial losses occurring as a result of [events such as the Macondo spill]."  (Ex. 18, at 4 (emphasis added) (cited in AC ¶ 232.)  Mr. Hackett therefore left no doubt that the Company's insurance coverage was bounded and that costs may exceed policy limits.

Plaintiffs also fail to adequately allege that post-spill statements by Anadarko and its executives concerning Anadarko's involvement in the Macondo operation (AC ¶¶ 12-13, 150, 234-35) are false or misleading.  Mr. Daniels' accurate statement that "Defendants 'were not involved' in 'looking at the detail, well design or procedures'" (AC ¶¶ 150, 234-35) is not rendered misleading by Plaintiffs' allegation that Anadarko had access to "real-time" data and approved expenditures.  His statement, in fact, made clear that non-operators like Anadarko "typically" approve "capital spending" and that "well design or procedures" were completed by BP before Anadarko signed the OA on December 17, 2009 and, therefore, the Company was not involved in that process.  (Ex. 18 at 7 (cited in AC ¶¶ 150).)  In proper context, Beirne's testimony that Anadarko "had been provided with the well design plan"[8] (AC ¶ 13, 235) does not contradict Daniels' statement, much less render it false or misleading.

Lastly, the certifications attesting to the accuracy of Anadarko's disclosures (AC ¶¶ 193, 213, 217), which Plaintiffs claim contained misrepresentations, are not actionable because, as

---

[8]      (*See also* Ex. 37, at 2 (cited in AC ¶¶ 259-61) ("BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensure the safety and protection of personnel, equipment, natural resources, and the environment.").)

demonstrated above, Plaintiffs fail to plead a single misstatement or omission.  *See Fin.*

*Acquisition*, 440 F.3d at 290.

2.        Challenged Statements Are Non-Actionable Puffery

The Amended Complaint is also replete with references to "statements of corporate

optimism" and "obvious 'puffery'" that courts routinely dismiss.  *E.g.*, *Azurix Corp.*, 198 F.

Supp. 2d at 881.   The challenged statements generally fall squarely within the following

categories of non-actionable statements:

- *Vague aspirations* – statements such as:  "a safety-first culture is a way of life at Anadarko"; Anadarko is "committed to safely producing the energy we all need"; and "safety and environmental stewardship are highly valued" (AC ¶¶ 4, 180, 182) – are non-actionable.   Courts have held that similar statements are "'so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'"  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004), *see also Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 592 (N.D. Tex. 2004) ("Statements worded as vague optimism, not phrased in terms of guarantees, are not actionable under federal securities laws because reasonable investors will not rely on them.") (citations omitted).

- *Corporate optimism* – statements such as:  "demonstrated exploration success"; Anadarko's balance sheet has "a strong growth vehicle for a combination of low-risk and high-end exploration opportunities"; and "2009 was a very successful year in advancing our strategy and illustrating the high quality of our portfolio" (AC ¶¶ 194, 195, 208) – also constitute classic vague, soft, puffing statements.  *See Azurix Corp.*, 198 F. Supp. 2d at 881-82; *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001).

- *Self-praises* – statements such as:  "we are very, very good at managing projects" and "[w]e feel like we are a premier operator out here" (AC ¶¶ 210-211; *see also* AC ¶ 205) – are also non-actionable puffery.  *See Rosenzweig*, 332 F.3d at 869 ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial. . . . For example, the Dow Jones News Service article, in which a company spokesperson said, 'Our fundamentals are strong,' is obviously immaterial puffery.").

Courts have also found general statements concerning risking methodology, such as those

identified here, to be "no more than 'puffery' which do[] not give rise to securities violations."

*ECA & Local 134*, 553 F.3d at 205-06 (JP Morgan's statements "regarding its 'highly

disciplined' risk management and its standard-setting reputation for integrity" were "no more

20

than 'puffery'"); *see also BP I*, 852 F. Supp. 2d at 807-08 ("statements represent[ing] that BP could 'keep up momentum' while simultaneously focusing on safe operations, 'take on and manage risk,' and, with the Board of Directors at the helm, 'set expectations of how risk is managed'" [were] "'of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation'" (second alteration in original) (quoting *Southland*, 365 F.3d at 372)).

        3.      Statements Made by BP Are Not Attributable to Anadarko Under *Janus* and Thus Are Not Actionable

        (a)      Anadarko cannot be held liable for statements in the BP-authored Macondo spill response plans

Plaintiffs' conclusory claim that the statements in the OSRP and EP are "attributable" to Anadarko (AC ¶ 173) must fail, because Anadarko did not "make" those statements under *Janus*. 131 S. Ct. at 2301 ("Under Rule 10b-5, it is unlawful for 'any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities.' To be liable, therefore, [defendant] must have 'made' the material misstatements in the prospectuses." (ellipsis and first alteration in original; citation omitted)). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302; *see also Kerr v. Exobox Techs. Corp.*, No. H-10-4221, 2012 WL 201872, at *9 (S.D. Tex. Jan. 23, 2012) (Ellison, J.).  In *Janus*, the Supreme Court held that an investment adviser, Janus Capital Management LLC ("JCM"), did not "make" certain statements in prospectuses issued to investors. Although JCM "was

significantly involved in preparing the prospectuses,"[9] JCM was not liable because another entity, Janus Investment Fund, filed the prospectuses with the SEC.  *Janus*, 131 S. Ct. at 2304-05.

Just as JCM did not "make" any of the allegedly misleading statements in *Janus*, Anadarko did not "make" any of the statements in the OSRP or the EP; BP did.  *See Janus*, 131 S. Ct. at 2304-05.  BP, not Anadarko, filed the OSRP (Ex. 31) and EP (AC ¶ 124) with the MMS.[10]  *See id*.  There is no allegation that Anadarko in fact filed the OSRP or EP and falsely attributed them to BP.  *See id.*  Nor did anything on the face of the OSRP or EP indicate that any statements therein came from Anadarko rather than BP[11] – a legally independent entity that has transacted at arm's length with Anadarko (Exs. 30-31.)  *See id.* at 2305.

Perhaps most critically, Anadarko did not *author* either the OSRP or the EP; BP entities did.  *BP I*, 852 F. Supp. 2d at 819.  Only the author of a statement "makes" the statement for the purpose of Section 10(b) and Rule 10b-5 liability.  *See id.*  In *BP I*, the Court held that none of

---

[9]    Notably, Plaintiffs here do not – and cannot – claim that Anadarko had any involvement in preparing the OSRP or EP, see *infra*, making Plaintiffs' attribution allegation all the more nonsensical.

[10]    As for the EP, the Joint Marine Board Investigation provides that the operator alone had the obligation to "[i]nclude the well in its approved Exploration Plan."  (Ex. 37, at 158-59 & n.400 (citing 30 C.F.R. § 250.410 (2011)).)  As for the OSRP, that document is a *regional* spill plan that outlines BP's purported ability to respond to a spill in the Gulf of Mexico in general.  It does not once mention Anadarko or the Macondo Prospect.  (Ex. 31.)

Moreover, Anadarko could not have had the statutory obligation to file the OSRP and EP as a temporal matter, because both were filed with the MMS months before Anadarko contracted with BP and purchased its minority interest in the Lease.  (AC ¶¶ 6, 44, 173.)  Nor could Anadarko  have had the duty to *correct* the EP or the OSRP after investing in the well.  *See Fulton Cnty. Emps.*, 675 F.3d at 1051-52 ("Fulton proposes to get around *Janus Capital* by asserting that MGIC had a duty to correct any errors Williams or Draghi made.  But no statute or rule creates such a duty – if there were one, *Janus Capital* itself would have come out the other way.").

[11]    Indeed, neither the OSRP nor the EP so much as mentions Anadarko or the other non-operators.  (Exs. 30-31.)

the named defendants – including certain BP entities – "made" statements in the Macondo EP because BPEX, which was not a named defendant, "was the entity responsible for authorship," and so plaintiffs did not bring their claim against "the responsible party." *Id.* (citing *Janus*, 131 S. Ct. at 2302). For the same reason that the named BP entities did not "make" statements in the EP, a document branded only by BPEX, Anadarko did not "make" the statements in the very same EP, which does not even *mention* Anadarko. The same holds true for the OSRP, which not only does not mention Anadarko, but does not even mention the Macondo Prospect.[12] Anadarko cannot be liable as an author of BP's spill response plan for the entire Gulf region merely because Anadarko invested as a non-operator in a single lease that BP happened to own in the Gulf.

Plaintiffs also fail to adequately allege that they relied on the statements in BP's OSRP or EP to their detriment. Even if these documents could be said to have been publicly disseminated during the proposed class period, Plaintiffs cannot seriously argue that any reasonable investor, when determining whether to invest in Anadarko, considered documents authored and filed by BP, about BP, and that do not so much as mention Anadarko. *See Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 194 (5th Cir. 2010) (holding that "explicit attribution" to the defendant is required to show reliance under Section 10(b)).

Lastly, Plaintiffs' inadequately pled claim – repeated in conclusory fashion throughout the Amended Complaint – that Anadarko "adopted" the OSRP and EP (AC ¶¶ 126, 173, 186, 198, 206, 221, 246, 277) could not establish that Anadarko is liable for statements therein. *See Kerr*, 2012 WL 201872, at *13 (dismissing claim that corporation was liable for statements in

---

[12]    Anadarko would not have "made" the statements in the OSRP or EP even if those documents did list Anadarko. *See In re Optimal U.S. Litig.*, No. 10 Civ. 4095, 2011 WL 4908745, at *6 (S.D.N.Y. Oct. 14, 2011) ("The EMs' designation of OIS on the cover page is also insufficient to establish [OIS's] liability under *Janus*.").

tradability opinion letter allegedly "adopted" by the corporation because the corporation "cannot be said to have 'made' the statements . . . under *Janus*."); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993) ("The securities laws require [a company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company].").

> (b)   Anadarko cannot be held liable for post-spill statements made by BP executives

Plaintiffs similarly fail to adequately allege that Anadarko had "ultimate authority" over statements made by BP executives estimating the spill flow rate (AC ¶¶ 222-28).  *See Janus*, 131 S. Ct. at 2302; *see also Fulton Cnty. Emps.*, 675 F.3d at 1051 (rejecting argument that statements by corporate executives were "made" by large equity holder because the executives, not the equity holder, "had ultimate authority over their own statements"); *BP I*, 852 F. Supp. 2d at 819 (citing *Janus* and dismissing claim that BP was liable for statements made by BP executive David Rainey because Rainey was not a named defendant).  Because BP executives Dean Suttles and Tony Hayward, and not Anadarko or any of the Individual Defendants, allegedly made the flow rate statements referred to in the Amended Complaint (AC ¶¶ 222-26), Plaintiffs have "not brought their claim against the responsible part[ies]."  *BP I*, 852 F. Supp. 2d at 819.

Plaintiffs' assertion that Anadarko was obligated under the OA to approve BP's statements (AC ¶¶ 46-47, 228-29), which provides that proposals for news releases require the unanimous agreement of the Parties (Ex. 25, § 9.1 at 44), does not establish Anadarko's ultimate authority over BP's statements.  Nowhere do Plaintiffs allege that Anadarko *in fact* approved BP's statements.  Indeed, the very document cited by Plaintiffs suggests that there was no requirement to obtain consent of any party in the event of an emergency.  Specifically, the OA provides:

24

> In an emergency involving extensive property damage, loss of human life, or
> other clear emergency and where there is insufficient time to obtain approval from
> the other Parties, the Operator may furnish factual information necessary to
> satisfy legitimate public interest or governmental authorities having jurisdiction.
> The Operator shall immediately notify the Parties of the information furnished in
> response to the emergency.

(*Id.*)  Nor did Anadarko have a duty to "correct" (AC ¶ 229) the non-attributable flow rate statements under *Janus*. *See Fulton Cnty. Emps.*, 675 F.3d at 1051-52.

Lastly, Anadarko's 25% investment in the Macondo Prospect, standing alone, cannot support Plaintiffs' claim that Anadarko is responsible – wholesale – for statements made by BP. *See, e.g.*, *Fulton Cnty. Emps.*, 675 F.3d at 1051 (46% equity holder of corporation was not liable for statements made by executives of the corporation); *Optimal*, 2011 WL 4908745, at *5 (100% shareholder of corporation not liable for Explanatory Memoranda filed by corporation with Bahamian authority).

### C.     The Amended Complaint Fails To Allege Facts Supporting A Strong Inference of Fraudulent Intent As To Each Defendant

Plaintiffs "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005).  A plaintiff may meet the scienter requirement by showing that, with respect to the statement or omission, the defendant acted either intentionally or with severe recklessness. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 376 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).  Allegations of motive and opportunity standing alone will not suffice. *Abrams*, 292 F.3d at 430.  Plaintiffs' allegations fail to meet this exacting standard.

1.    Any Inference of Fraudulent Intent Is Not Cogent And Is Less Compelling Than Non-Fraudulent Inferences

Plaintiffs' allegations fail to support the requisite strong inference of scienter at least as compelling as any opposing inference of nonfraudulent intent.  Plaintiffs' theory – to the extent one can be discerned – is that Anadarko jeopardized its investment by ignoring red flags, which could potentially expose Anadarko to significant liability, all for the sole purpose of conferring personal benefits on a single executive.  Other than this unfounded claim, demonstrated below as entirely deficient, the Amended Complaint offers absolutely no explanation why Defendants, either individually or collectively, would act in such an economically irrational way.  *See Coates v. Heartland Wireless Commc'ns, Inc.*, 55 F. Supp. 2d 628, 643-44 (N.D. Tex. 1999) (finding allegations implausible where plaintiffs did not explain "why defendants would be motivated to commit fraud on an entire market when their misconduct would be quickly revealed").

Plaintiffs' insufficient allegation that Anadarko was focused on "cutting cost and bringing projects in on time and under budget" does not support their innuendo that Anadarko sacrificed safety for costs with respect to the Macondo Prospect operations.  (AC ¶ 17.)  To the contrary, according to the Amended Complaint, Anadarko approved BP's multiple requests for *additional* funds.  (AC ¶¶ 64-65, 79, 83.)  Plaintiffs' conclusory allegation that Anadarko failed to conduct adequate "due diligence" and "cut corners" is also inconsistent with the equally conclusory allegations that Anadarko representatives "monitored drilling on the Macondo well" by maintaining "'day-to-day' contact" and "regular email communications" with a BP representative and that "'five or six' Anadarko personnel" were given access to a particular database.  (AC ¶¶ 50-52, 55, 72.)

The more compelling and cogent inference to be drawn from the Amended Complaint is that Anadarko representatives, who allegedly were given access to only certain types of

information about operations on the Macondo Prospect, had no reason to believe that operations were not proceeding in a safe and appropriate manner.  Plaintiffs' complaint actually supports this inference, citing an email attributed to Anadarko representative Robert Quitzau, who purportedly observed:  "It looks like operations are starting to go well."  (AC ¶ 52.)  Mr. Quitzau later testified that Anadarko had "no concerns about the safety of the well" and that Anadarko had no reason to believe that BP would be unable to safely complete the well.  (*See* Ex. 33 at 192:13-19; *see also id.* at 57:10-13, 58:14-22, 94:24-95:2, 137:17-138:2; Ex. 34 at 403:14-404:1, 594:21-595:11.)[13]  Paul Chandler, an Anadarko project geologist, also testified that he was not aware of anyone at Anadarko that was concerned about the ability of the Deepwater Horizon rig or its crew to safely drill the Macondo well.  (Ex. 32 at 320:9-18.)[14]  At the end of the day, Plaintiffs utterly fail to demonstrate that any specific information alerted – or could have alerted – Anadarko to problems at the Macondo Prospect.

2.      Plaintiffs Fail To Allege Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior or Recklessness

Where a plaintiff fails to adequately allege that the defendants had motive to commit fraud (as demonstrated below), "the strength of its circumstantial evidence of scienter must be correspondingly stronger."  *R2 Invs.*, 401 F.3d at 644.  Plaintiffs must allege that defendants acted intentionally or with "severe recklessness."  *Shaw*, 537 F.3d at 533.  The Fifth Circuit has held that "severe recklessness" is present only in extreme circumstances that "'involve not merely simple or even inexcusable negligence'" but rather "'an extreme departure from the

---

[13]      The Amended Complaint refers to Mr. Quitzau's deposition testimony at paragraph 120.

[14]      The Amended Complaint quotes from Mr. Chandler's deposition testimony at paragraphs 42-43.

standards of ordinary care.'"  *Id.* (citation omitted).  Allegations that a defendant "should have known" are insufficient to allege severe recklessness.  *See Capstead*, 258 F. Supp. 2d at 564.

The Fifth Circuit has "rejected the group pleading approach to scienter."  *Shaw*, 537 F.3d at 533.  It is therefore not enough for Plaintiffs to identify the Individual Defendants as corporate officers (AC ¶¶ 25-28) and cite boilerplate language that they all were "in possession of material adverse non-public information" (AC ¶ 309).  *See BP I*, 852 F. Supp. 2d at 814-15.  Plaintiffs must instead "'distinguish among defendants and allege the role of each with respect to "each act or omission" in the alleged fraud.'"  *Id.* at 814 (citation omitted).  Of course, none of the Individual Defendants may be held liable for statements not directly attributable to him.  *Id.* at 819 (citing *Janus*, 131 S. Ct. at 2302).  Likewise, in order to adequately plead scienter as to Anadarko, Plaintiffs must, and here do not, "link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement."  *Id.* at 818; *see also Southland*, 365 F.3d at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter . . . .").

> (a)    Allegations concerning Anadarko's "access to information" regarding the Macondo operations fail to raise a strong inference of fraudulent intent

Plaintiffs allege that "Anadarko was kept fully apprised of all activities" on the Macondo Prospect and had access to "real time" drilling data via INSITE and Well Space database systems.  (AC ¶¶ 8, 41, 46, 48-57.)  But where Plaintiffs contend that Defendants had access to contrary facts, they must "'specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them.'"  *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002) (citation omitted); *Abrams*, 292 F.3d at 432 (scienter

allegations insufficient where "plaintiffs point to no specific internal or external report available at the time of the alleged misstatements that would contradict them").

Plaintiffs entirely fail to meet their burden.  Plaintiffs cite internal communications or documents generated outside of Anadarko (AC ¶¶ 10, 37, 76-78, 90-93, 106, 163), but fail to allege, as they must, that any of the Individual Defendants or any particular representative of Anadarko whose knowledge can be imputed to the Company received the information.  *See BP I*, 852 F. Supp. 2d at 818 ("Because 'an essentially subjective statement of mind' is an element of a cause of action for fraud, 'the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation,' and may not simply be imputed to the corporation on general principals of agency." (quoting *Southland* 365 F.3d at 366)); *Goldstein v. MCI Worldcom*, 340 F.3d 238, 252 (5th Cir. 2003) (knowledge of adverse information by "individual who reported" directly to individual defendants insufficient to establish scienter).

Plaintiffs fail to demonstrate that Anadarko exhibited severe recklessness with respect to BP's decision to use six centralizers.  (AC ¶ 93.)  Plaintiffs allege only that an April 18, 2010 Halliburton report purportedly revealing safety problems with BP's decision (AC ¶ 93) and BP's Forward Plan Review from mid-April were "shared with Anadarko" or "available to Anadarko" (AC ¶¶ 76, 77, 93).  Even if true, Plaintiffs do not, as they must, allege facts linking the purported warning documents to each Individual Defendant.  *See Shaw*, 537 F.3d at 535 (explaining that pleadings of scienter may not rest on the inference that a defendant must have been aware of a fraudulent statement based on his position in the company); *cf. Johnson v. Siemens AG*, No. 09-CV-5310 (JG)(RER), 2011 WL 1304267, at *16 (E.D.N.Y. Mar. 31, 2010) (noting the massive scale of the defendant's operations and concluding that "[i]t is hardly plausible that the company's management reviewed daily status reports prepared by field engineers to track the implementation of individual contracts").  Indeed, Plaintiffs' unsupported

assertion regarding Anadarko's receipt of the Halliburton report is debunked by Beirne's testimony and the testimony of Robert Quitzau.  (*See* Ex. 34 at 640:11-20 ("Q.  Did you see any OptiCem reports or other modeling by Halliburton regarding the number of centralizers being recommended for the Macondo well?  A.  I did not.").)[15]

Unsurprisingly, Plaintiffs do not explain how purported warning documents created in mid-April 2010 (AC ¶¶ 76, 93, 95), *after* most of the alleged misstatements were made, support their contention that Defendants knew the challenged statements were false when made.  *See Tuchman*, 14 F.3d at 1069 (testimony that a product had not been as rigorously tested as usual in spite of prior statements that company had a "total commitment to quality" did not raise inference of scienter).  Because Plaintiffs fail to plausibly connect each Individual Defendant to any material non-public information, there can be no strong inference of scienter.  Indeed, Mr. Daniels did not sign any of the SEC filings identified in the Amended Complaint, and not all of the Individual Defendants were present at many of the events outlined by Plaintiffs.  The Fifth Circuit has long-since rejected the group-pleading doctrine and, thus, Plaintiffs' allegations fail. *See Shaw*, 537 F.3d at 533-34.

---

[15]  Beirne testified as follows:

> Q: Did you ever see any communication with the non-operating parties from you or anyone else that said: By the way, we chose to use six centralizers even though we received a Halliburton OptiCem which said there would be a severe gas potential if we did it?

> A: No.  I was not involved or have seen any communications on that subject.

(Ex. 28, at 76-77 (cited in AC ¶ 41, 50-55, 80-82, 95, 125-26, 235).)

The testimony cited in the Amended Complaint and above was given in connection with the investigation by the Joint United States Coast Guard/Bureau of Ocean Energy Management (formerly the MMS) (the "Joint Board").  The purpose of the testimony was for the Joint Board to understand "the nature of the information that might have flowed between the parties."  (Ex. 28, at 114.)

Plaintiffs also assume, without adequate support, that Anadarko knew of BP's alleged "failure" to conduct a "proper" cement job (AC ¶¶ 97-107) and fail to allege who at Anadarko received what specific information and when and how that information was communicated. *Cf. Abrams*, 292 F.3d at 432.   Plaintiffs' generalized and unsupported allegation that Anadarko "ought to have known" better (AC ¶ 104) is insufficient to establish recklessness. *See Capstead,* 258 F. Supp. 2d at 564 (allegation that defendants "should have known," by itself, cannot establish recklessness).

Plaintiffs allege that "BP gave 'five or six' Anadarko personnel access to" the INSITE database (AC ¶ 51) and that "Anadarko personnel also had regular email communications with BP personnel" (AC ¶ 55).   Yet wholly absent from the Amended Complaint are any specific factual allegations that the information conveyed any visibility into safety issues at the Macondo Prospect that rendered any of the highlighted statements untrue.[16] *See Southland*, 365 F.3d at 370-71; *Abrams*, 292 F.3d at 432.   Indeed, Anadarko representatives who actually monitored the company's investment in the Macondo Prospect – and whose depositions are cited in the Amended Complaint – have testified that they were not aware of any concerns within the company regarding safety issues with the *Deepwater Horizon* or its operations and that they personally had no such concerns.   (*See, e.g.*, Ex. 32 at 320:9-18; Ex. 35 at 241:7-18.)   And at least two Anadarko witnesses testified that, as a non-operating investor, Anadarko did not evaluate the drilling and operational decisions of BP.   (Ex. 32 at 321:22-25; Ex. 35 at 211:17 – 212:1.)

---

[16]     Michael Beirne, the BP representative whom Plaintiffs allege was the "primary contact between BP and Anadarko concerning the Macondo well" and whose testimony Plaintiffs liberally quote in the Amended Complaint (AC ¶¶ 41, 50-55), testified that he did "not provide" Anadarko with any "risk information."   (Ex. 28, at 25-26.)

Moreover, this Court need not accept Plaintiffs' allegations as true where, as here, they are unsupported by the very documents upon which Plaintiffs purport to rely.  *See e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 522 n.7 (S.D. Tex. 2011) ("If an exhibit attached to the complaint contradicts an allegation in the complaint, the exhibit controls."); *Sheppard v. Texas Dep't of Transp.*, 158 F.R.D. 592, 597 (E.D. Tex. 1994) ("[A] court may rely upon a defendant's exhibit when it is referred to in the plaintiff's complaint and is central to plaintiff's claim.").  Plaintiffs, for instance, claim that a document entitled "BP's Daily Operations Report-Partners (Completion)" "specifically discusses the fact that only six centralizers were going to be used with respect to the long string casing."  (AC ¶ 95 (emphasis added).)  In fact, it appears that the document, dated April 19, 2010, merely refers to "6 CENTRALIZERS" in a summary of the prior day's operations.  (Ex. 27 (cited in AC ¶ 95 (emphasis added)).)  Similarly, BP's Forward Plan Review does not warn, as Plaintiffs suggest, that using a long string casing could create a condition causing a "blowout."  (Ex. 26 (cited in AC ¶ 76).)[17]

Regardless, Plaintiffs fail to explain why the supposed red flags concerning the long string casing, the centralizers, or the cement job, even if adequately alleged to have been known by any – much less all – of the Defendants, would have alerted them that general statements concerning Anadarko's unrelated operations or operations as a whole were false and misleading.[18]  *See Abrams*, 292 F.3d at 433 (the fact that defendant corporation was overhauling

---

[17]    Copies of the Daily Operations Report and Forward Plan Review are available at http://democrats.energycommerce.house.gov/index.php?q=news/chairmen-send-letter-to-bp-ceo-prior-to-hearing.  Only page 2 of the 5-page Daily Operations Report was available on the relevant website.

[18]    The inference Plaintiffs wish to draw with respect to the allegation – that Anadarko "admitted" that the *Deepwater Horizon* oil spill resulted from "reckless" and "willful misconduct" (AC ¶ 237-38) – is not consistent with the statement, which observed that "[t]he
*(cont'd)*

its accounting system did not "command an inference that company officials should have . . . assumed that financial data reported under the old system was inaccurate").

Finally, Plaintiffs' allegation that BP's decision to not run a cement bond log or to use a long string casing and six centralizers "departed from standard industry protocols" would not establish fraudulent intent with respect to any of the Defendants as to any of the statements during the proposed class period. *See e.g.*, *Lovelace*, 78 F.3d at 1020 ("Plaintiffs' bare allegation about industry custom is precisely the type of conclusory allegation that motivated the heightened pleading standards of Rule 9(b) in the first place."); *Coates*, 55 F. Supp. 2d at 636 ("Even had plaintiffs asserted that the policy violated industry standards, such violations would alone be insufficient without corresponding fraudulent intent.").[19]

> (b)    Allegations concerning access to information about the oil spill flow rate do not raise a strong inference of fraudulent intent

Plaintiffs fail to sufficiently plead that flow rate statements allegedly made by BP executives raise an inference of scienter with respect to Anadarko and the Individual Defendants. Plaintiffs provide only a single internal source for Anadarko's alleged "knowledge" that seasoned BP executives misled the public in statements to the press regarding the post-spill flow rate:  "a 'back of the envelope' calculation" performed by Anadarko engineer Dawn Peyton.[20]

---

*(cont'd from previous page)*

mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions."  (Ex. 17  (cited in AC ¶ 237).)

[19]    Plaintiffs' merely allege impermissible fraud by hindsight through their citation to the testimony of oil industry executives criticizing the decision to use the long string casing, which Plaintiffs claim was contrary to industry custom.  (AC ¶¶ 84-86.)  *See Coates*, 55 F. Supp. 2d at 635-36.

[20]    Peyton qualified this estimate as "a two-minute calculation" that she "made up with a ton of assumptions." (Ex. 35 at 55:4-5, 54:15-16.)  Importantly, Peyton also stated that she "didn't have any access to any kind of real data" and that she "definitely did not have enough

*(cont'd)*

(Ex. 35 at 10:18-11:5 (cited in AC ¶ 225)).  Plaintiffs do not allege that any representative of Anadarko whose knowledge can be imputed to the Company ever knew of Peyton's estimate, *BP I*, 852 F. Supp. 2d at 817-18, let alone whether or why Anadarko should deem it more credible than those referenced by Messrs. Suttles or Hayward.

Plaintiffs also do not allege that any representative of Anadarko whose knowledge can be imputed to the Company received internal BP documents containing estimates of the flow rate.[21] *Id.*  Plaintiffs allege that "Anadarko had access to . . . these documents and reports pursuant to Section 5.1 of the JOA" (AC ¶ 229), but that section provides for BP's "Exclusive Right to Operate" and says nothing about access to information.  (Ex. 25, § 5.1 at 20.)  Section 5.7, which Plaintiffs may have intended to reference, merely requires BP to furnish information "as soon as reasonably practicable."  (*Id.* § 5.7 at 22.)  Plaintiffs do not allege that it would be "reasonably practicable" for BP to provide the flow rate documents to the non-operators within one week under the emergency circumstances, nor whether BP actually provided those documents to Anadarko. Regardless, Plaintiffs fail to explain why Anadarko would have considered the estimates contained in these internal BP documents superior to the estimates BP provided to the public.

Lastly, as discussed in more detail below, Plaintiffs do not provide a reason why Anadarko would hide the truth from the market: the sole economic beneficiary of the alleged

_____

*(cont'd from previous page)*
information to make any kind of an accurate determination of flow rate."  (*Id.* at 54:16-17, 55:5-7.)

[21]     These documents include (1) a report titled "Estimation of the Oil Released from the Deepwater Horizon Incident," and (2) an analysis purportedly applying the ASTM international standard "Guide for Visually Estimating Oil Spill Thickness on Water."  (AC ¶ 228.)

fraud, Mr. Hackett, completed his stock sales on March 31, 2010 – nearly a month before BP's first allegedly false statement concerning the flow rate.  (AC ¶¶ 222, 272.)

This Court's opinion in the second Macondo-related case, *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012) (Ellison, J.) ("*BP II*"), does not alter any of the foregoing analysis.  In *BP II*, the Court dismissed securities fraud claims against most of the individual defendants.  *Id.* at 778-83.  The Court sustained the complaint against the BP corporate entities and two BP senior executives in part because the executives allegedly gave false estimates of the spill rates while in possession of data supporting far higher rates.  *Id.* at 772-73.  For example, BP's Chief Operating Officer for Exploration and Production allegedly claimed in an interview that "somewhere between one and five thousand barrels a day is probably the best estimate we have today," despite the presence of a BP corporate document allegedly indicating potentially higher flow rates.  *Id.* at 773.  The Court also refused to dismiss claims that "BP seriously overstated the 'progress' it has made in implementing" a BP-specific report arising out of a "string of prior safety failures in BP's operations."  *Id.* at 758-59.  Finally, the Court allowed the claims that BP had misrepresented both the size of the spill that it was prepared to respond to as well as its general spill response capabilities.  *Id.* at 762-63.

Here, the Amended Complaint includes no similar actionable misstatements or omissions by Anadarko or the Individual Defendants.  To begin with, there are no allegations that Defendants made any statements about the flow rate or that they were in possession of internal BP documents that contradicted either the statements by BP's senior executives (statements for which Anadarko would not be liable) or Anadarko's own statements.  The Amended Complaint includes no allegation that any corporate executive whose knowledge can be imputed to Anadarko knew of Dawn Peyton's "back of the envelope" flow rate calculation.  As for Anadarko's safety record, the Company is not, unlike BP, alleged to have overstated its progress

35

in responding to concrete steps called for in a report arising out of prior safety failures.  Nor is Anadarko alleged to have misrepresented its own spill response capabilities.  *BP II* thus provides no support for Plaintiffs' attempt to hold the Defendants liable for alleged misstatements or omissions related to the tragedy.

> (c)   Allegations concerning BP's safety record and the OSRP and EP do not raise a strong inference of fraudulent intent

Plaintiffs' conclusory allegation that Anadarko failed to "properly investigate BP's safety record" and "meaningfully review the woefully inadequate Macondo Spill Response Plan" (AC ¶¶ 186, 196, 206, 221, 246-47) is just another claim of mismanagement insufficient to raise a strong inference of scienter.  *See Santa Fe Indus.*, 430 U.S. at 477, 479.  Plaintiffs do not allege with any degree of particularity that Anadarko and each of the Individual Defendants knew or recklessly disregarded contemporaneous facts alerting each of them of any red flags with respect to the operator's safety record or the purported inadequacy of the operator's OSRP and EP.

Plaintiffs' allegation that BP's "abysmal safety record was well-known within the [] industry" (AC ¶¶ 239-47) is deficient.  *Cf. Saltz*, 782 F. Supp. 2d at 72 (rejecting "[a]n inference of scienter based on publicly available red flags" available in the industry); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 142 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).  Again, Plaintiffs' allegation is, at base, a disagreement with the wisdom of Anadarko's investment decision and, ultimately, no more than a claim of mismanagement.  *See Tuchman*, 14 F.3d at 1070.  Moreover, BP's safety violations cited by Plaintiffs do not relate in any way to BP's deepwater drilling operations, and therefore, should not be expected to have given Anadarko any cause for concern.  *See Teamsters Allied Benefit Funds v. McGraw III*, No. 09 Civ. 140, 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010) ("government investigations cited in the Complaint are irrelevant to alleged misconduct" and therefore insufficient to raise scienter);

*Hershfang v. Citicorp*, 767 F. Supp. 1251, 1258 (S.D.N.Y. 1991).  To the contrary, as reported in

the Presidential Commission's Report:   "In recent years in the Gulf of Mexico, BP's safety

offshore drilling record was reportedly excellent."  (Ex. 29 at 222.)

Plaintiffs' claim that Defendants knew of or recklessly ignored the deficiencies in the

OSRP and EP must also fail[22]  (AC ¶¶ 131, 135, 169, 277-79) because "fraud by hindsight" has

long been rejected as a means of alleging securities fraud.   *Melder v. Morris*, 27 F.3d 1097,

1101 n.8 (5th Cir. 1994); *see also In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832,

866 (N.D. Tex. 2005) ("Fraud by hindsight is not an actionable claim under the securities laws.").

Plaintiffs offer no testimony or evidence to even suggest that Anadarko knew of the deficiencies

in the OSRP and EP.  Moreover, the purported errors in the plans, reported after-the-fact, such as

listing mammals not found in the Gulf of Mexico or outdated contact information for wildlife

experts, do not reveal anything about Anadarko's state of knowledge concerning BP's OSRP or

EP – both of which were filed with (and approved by) the MMS months before Anadarko

contracted with BP and purchased its minority interest in the Lease.  (AC ¶¶ 6, 44; AC ¶ 173.)

    (d)    Allegations concerning government investigations and lawsuits do not
raise a strong inference of fraudulent intent

Plaintiffs assert that "both preliminary and final conclusions" of government

investigations "confirm that the decisions approved by Anadarko directly contributed to the

disaster and were made in an effort to save costs while sacrificing safety."  (AC ¶ 253.)  Absent

from any of Plaintiffs' allegations, however, is a citation of any government report that

concludes *Anadarko* acted recklessly.  (AC ¶¶ 254-65.)  Indeed, no government agency or court

---

[22]     Plaintiffs' reliance on after-the-fact newspaper clippings cannot establish Defendants'
alleged knowledge or recklessness.  *See Williams*, 112 F.3d at 179-80 (holding that complaint
failed to plead fraud with particularity and concluding that reliance on newspaper clippings while
failing to identify specific statements made by defendants was "fatal" to plaintiffs' claims).

has ever concluded that Anadarko played any substantive role in the events that led to the blowout, explosion, and sinking of the *Deepwater Horizon* and ensuing oil spill.

*The Presidential Commission.*   Plaintiffs attempt to create the false impression that Anadarko was found to be at fault by claiming that the "Presidential Commission concluded, among other things, that the 'immediate causes of the Macondo well blowout' were 'identifiable mistakes by BP *[and others]* . . . that reveal[ed] . . . systematic failures in risk management . . . .'"  (AC ¶ 257 (emphasis added).)   Contrary to Plaintiffs' quotation, the Presidential Commission's final report actually concluded that "[t]he immediate causes of the Macondo well blowout can be traced to a series of identifiable mistakes made by *BP, Halliburton, and Transocean* that reveal such systematic failures in risk management . . . ."  (Ex. 29, at vii (emphasis added).)   The quoted material, which is deleted by Plaintiffs' allegations, does not mention Anadarko.

*The Congressional Energy Committee Investigation.*   Plaintiffs refer to a June 14, 2010 letter from the Congressional Energy Committee to BP's then-CEO Tony Hayward regarding Mr. Hayward's planned testimony before the Subcommittee.  (Ex. 36 (cited at AC ¶¶ 255).)   As with so many of the sources cited in the Amended Complaint, however, the letter does not once mention Anadarko, and provides no support for the claim that Anadarko acted willfully or recklessly regarding the Macondo well.   In fact, the text of the letter cited by Plaintiffs relates solely to the Subcommittee's focus on "five crucial decisions made by BP."  (*Id.*)

*The Joint Marine Board Investigation.*   Plaintiffs present an entirely misleading picture of the September 14, 2011 Marine Board Report.   For example, Plaintiffs would have the Court believe that the Marine Board Report concluded that Anadarko was involved in the "crucial decisions" that "sacrificed safety in order to reduce the cost to the co-owners and not delay completion of the well any longer."  (AC ¶ 260.)   But the report says no such thing.   Instead, it

concludes that "BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensure the safety and protection of personnel, equipment, natural resources, and the environment."  (Ex. 37, at 2 (cited in AC at ¶¶ 259-61).)

Anadarko is mentioned on exactly 7 of the 212 pages of the Marine Board Report.  (*See* Ex. 37 at 10, 17, 19, 25, 26, 27, 35.)  Not one of those instances refers to Anadarko having any culpability for the well explosion or subsequent oil spill.  And while the report notes that Anadarko approved AFEs (authorizations for expenditures) submitted by BP in the ordinary course, it expressly concludes that "[t]he Panel found no evidence, other than reviewing this information and approving the AFEs, indicating that Anadarko or MOEX were directly involved in decisions related to the design or drilling of the Macondo well."  (Ex. 37 at 26-27.)  The Marine Board report thus fails to support the claim that Anadarko engaged in willful or reckless misconduct.

*The Engineering & Research Committee.*  Plaintiffs mischaracterize the National Academy of Engineering and National Research Council report and attempt to insert Anadarko where it is not mentioned.  Again, however, the report itself contradicts Plaintiffs' allegations. For example, the Amended Complaint refers to "Anadarko and BP's choice of a long string casing."  (AC ¶ 265.)  Yet the report, in which Anadarko is mentioned exactly 3 times over 113 pages, (*cf.* Ex. 38 at 9, 74, 112), does not identify the long string casing as Anadarko's choice. Instead, it concludes that, "[a]s the operator, BP designed the well and specified how it was to be drilled, cased completed, and temporarily abandoned."  (Ex. 38, at 74, (referred to in AC at ¶¶ 264-65).)

*The Government Complaint.*  Plaintiffs also rely on allegations from a complaint filed by the government seeking to recover against BP, Transocean, Anadarko, and others, for claims

brought under the Oil Pollution Act ("OPA") and the Clean Water Act ("CWA").  (AC ¶¶ 248-49.)  These unadjudicated allegations – which do not support an inference of fraudulent intent – are immaterial as a matter of law and should be disregarded.  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976); *see also RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("[P]aragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial . . . ."), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (Pollack, J.) ("[R]eferences to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial . . . .").

Finally, Plaintiffs allege that Judge Barbier's summary judgment ruling on the government's CWA and OPA claims is evidence of Anadarko's "willful or reckless misconduct" at the Macondo well.  (*Cf.* AC ¶ 252.)  But Judge Barbier's ruling included no findings of willful or reckless misconduct by Anadarko.  Instead, Judge Barbier merely held that, because of its contractual relationship with BP, Anadarko was a "responsible party" under the OPA and a co-owner of the Macondo well for purposes of the CWA.  *See In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in Gulf of Mexico, on April 20, 2010*, 844 F. Supp. 2d 746, 755-56, 761 (E.D. La. 2012).  Both of those statutes impose strict liability based on a defendant's status, and Anadarko's state of mind was not at issue in Judge Barbier's ruling.  On the contrary, Judge Barbier ruled in that case that the plaintiffs' allegations, which are virtually identical to Plaintiffs' allegations here, do not support even a plausible claim that Anadarko was merely *negligent*, let alone reckless, because none of the allegations support an inference that Anadarko had a right of operational control over any of the activities allegedly resulting in the explosion

and oil spill.  Judge Barbier therefore dismissed all negligence claims against Anadarko.  *See In re Oil Spill by the Oil Rig "DEEPWATER HORIZON" in Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 963 (E.D. La. 2011) ("Any access to information that Anadarko . . . may have had did not give rise to a duty to intercede in [BP's] operations – especially because Plaintiffs have not alleged in their Complaint that Non-Operating Defendants had access to any information not already available to BP and Transocean personnel either onshore or on the rig.").

> (e)   Anadarko's settlement with BP does not raise a strong inference of fraudulent intent.

The fact that Anadarko settled its contractual dispute with BP does not support a strong inference of scienter.  In no way was the settlement an admission of liability on the part of Anadarko, and it bears no relevance to Anadarko's or any Individual Defendants' state of mind, either before or after the oil spill.  *Cf. Browning-Ferris*, 876 F. Supp. at 887-89 & n.5 (defendant's settlement of $30 million antitrust lawsuit did not render materially misleading an earlier disclosure that lawsuit would not have material adverse effect on the company).  Moreover, even where a defendant has admitted liability in a settlement agreement, courts have held "these agreements [are] not sufficient to meet the pleading requirements of the PSLRA" because "the admissions in these settlement agreements [are] largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter."  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (affirming dismissal of securities fraud claims and holding that settlement agreement with the DOJ and SEC did not create strong inference of scienter).

> 3.   Plaintiffs' Motive Allegations Fail As A Matter of Law

Plaintiffs offer two theories of motive, both of which are insufficient.  First, Plaintiffs allege in conclusory fashion that the desire to avoid further delays and to "bring projects in on

time and under budget" (AC ¶ 17) in a cost-cutting culture (*id.*) allegedly led the Company to approve the operator's "dangerous choices" in order to keep stock prices high.  (AC ¶¶ 17-19.) But these allegations fail to establish motive as a matter of law.  *See Mortensen v. AmeriCredit Corp.*, 123 F. Supp. 2d 1018, 1025 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd mem.*, 240 F.3d 1073 (5th Cir. 2000) (per curiam); *Capstead*, 258 F. Supp. 2d at 564 (the Fifth Circuit has "made it clear that a motive to raise capital, . . . and the desire to sell stock at inflated prices, are all insufficient to support an inference of scienter").

Second, Plaintiffs allege that, with respect to Mr. Hackett, a fraudulent motive may be inferred from his purported stock sales on September 18, 2009 and March 31, 2010.  (AC ¶¶ 271-76.)  Plaintiffs do not allege, however, that Individual Defendants Gwin or Daniels – or any other Anadarko official for that matter – engaged in a single trade.  This lack of coordinated trading by Gwin, Daniels or others not only destroys any allegations of motive as to them, it cuts against an inference of scienter more generally.  *See Abrams*, 292 F.3d at 435 (holding that only insider sales in "suspicious amounts or suspicious times is probative of scienter" and "even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period"); *Kurtzman v. Compaq Computer Corp.*, No. Civ.A. H-99-779, 2002 WL 32442832, at *15 (S.D. Tex. Mar. 30, 2002) (holding that in light of two defendant executives' positions at defendant company and "their complete lack of trading" in the relevant time period, trading by a third defendant was "not sufficiently probative to raise a strong inference of scienter").[23]

---

[23]      *Nathenson*, 267 F.3d at 420-21 (inference of scienter undermined where other defendants did not sell their shares during the relevant class period); *In re Enron Corp. Sec., Derivative & "ERISA Litig."*, 258 F. Supp. 2d 576, 594 (S.D. Tex. 2003) ("[A]n insider's 'sales do not support the "strong inference" required by the statute where the rest of the equally knowledgeable

*(cont'd)*

The timing of Mr. Hackett's alleged trading weighs against an inference of scienter.  For instance, although Plaintiffs repeatedly cite the Halliburton Report and a BP Forward Plan Review and Daily Operations Report (albeit without well-pled allegations that these documents were known to the Individual Defendants), the sales at issue took place *before* the documents were created.  (AC ¶¶ 76, 93, 95.)  Plaintiffs' allegations notwithstanding, it is impossible to infer that Mr. Hackett acted on information that did not yet exist.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (stock sales occurring before company insider became aware of allegedly adverse undisclosed information "fail[ed] to provide any inference of an intent to deceive the public").  Also, the September 2009 sales occurred seven months before the alleged revelation of the "truth" in May-June 2010 and three months before Anadarko even signed the OA.  Since "the prototypical example" of suspicious trading "involves sales 'shortly before the public disclosure of negative information,'" *In re Avon Prods., Inc. Sec. Litig.*, No. 05 Civ. 6803 (LAK)(MHD), 2009 WL 848017, at *22 (S.D.N.Y. Feb. 23, 2009) (citation omitted), this temporal gap is inconsistent with any claimed inference of scienter.  *See Nathenson*, 267 F.3d at 420-21 (holding that trades three months before a public disclosure of negative information were "'unrelated to any Company announcements'" and thus insufficient to support a strong inference of scienter); *City of Brockton Ret. Sys. v. The Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2008) (10-week gap between sale and disclosure of accounting issue undermining scienter).

Plaintiffs' timing theory for the March 31, 2010 sale is equally implausible.  The allegedly suspicious nature of this trade, according to Plaintiffs, stems from the fact that it

---

*(cont'd from previous page)*

insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.'") (citation omitted).

purportedly occurred (i) three weeks before the explosion and oil spill, and (ii) after the project allegedly had encountered "significant delays."  (AC ¶ 274.)  But there is no basis to conclude that Mr. Hackett was somehow clairvoyant and could have predicted the April 20-22, 2010 tragedy.    The timing of this event in relation to the March 2010 trade, therefore, is "at best fortuitous."  *In re Axis Capital Holdings, Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) (refusing to infer scienter where timing of trade in relation to curative disclosure (i.e., the filing of a complaint) "was purely a matter of chance").

Likewise, there is no well-pled allegation that Mr. Hackett had contemporaneous knowledge of "significant delays" at the Macondo Prospect.  In any event, Plaintiffs fail to plead a logical relationship between Mr. Hackett's purported reason for trading in March 2010 (i.e., alleged delays) and the Amended Complaint's theory of fraud, which does not plead misstatements, omissions or initial corrective disclosures addressed to purported delays at the Macondo Prospect.  Without such a causal link, motive allegations are insufficient.  *Cf. Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.").

And Plaintiffs do not explain how Mr. Hackett's trading history provides a motive for him to mislead the public regarding (1) the post-blowout flow rate, (2) the company's insurance coverage, (3) the company's expected spill cleanup costs, and (4) the company's involvement in, and access to information concerning, the Macondo operations.  Mr. Hackett completed his stock sales on March 31, 2010 – nearly a month before the blowout and BP's first allegedly false statement concerning the flow rate.  (AC ¶¶ 1, 222, 272.)  It defies logic that Mr. Hackett would mislead the public to prop up Anadarko's share price after he had already sold stock.

44

Plaintiffs also fail to raise a cogent and compelling inference that the alleged stock sales were suspicious in size.  For instance, Plaintiffs try to derive a fraudulent motive from Mr. Hackett's claimed disposition of 287,000 shares in September 2009.  (AC ¶¶ 271-72.)  But Mr. Hackett's trading history, which is omitted from the Amended Complaint, shows that he made comparable sales in August 2007.  (*See* Ex. 12 (reflecting sale of 250,000 shares).)  These prior transactions weigh against a finding of scienter.  *See Shaw*, 537 F.3d at 544 (noting that "plaintiffs tell only half the story" and that SEC filings referenced in complaint revealed that trades were not suspicious in light of prior sales omitted from the complaint).  Plaintiffs fall short with their claim that Mr. Hackett sold "69% of [his] total Anadarko holdings" on March 31, 2010. (AC ¶ 274.)  In fact, SEC filings confirm that Mr. Hackett still held 919,054 shares following this sale, leaving him with retained holdings of approximately 61% – not the 31% claimed by Plaintiffs.  (Ex. 14, at 52-53; Ex. 13.)[24]  Viewed in context with other circumstances surrounding this transaction (such as its innocuous timing), the size of Mr. Hacketts's March 2010 sale is not unusual.  *See Enron Corp.*, 258 F. Supp. 2d at 594 ("Context is critical to the analysis."); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 n.5 (S.D.N.Y. 2009) (holding that 53% sale was not unusual if considered holistically with "the other relevant factors to be considered").

---

[24]  This figure includes both exercisable and unexercisable options.  *See Hopson v. MetroPCS Commc'ns, Inc.*, No. 3:09-CV-2392-G, 2011 WL 1119727, at *14 n.14 (N.D. Tex. Mar. 25, 2011) (taking into account the executive defendants' total holdings, not merely vested holdings).

## II.    PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT

The Amended Complaint does not allege facts sufficient to support a primary violation of Section 10(b) of the Exchange Act.  Absent a primary violation of Section 10(b), Plaintiffs' secondary claims under Section 20(a) must fail as well.  *See Shaw*, 537 F.3d at 545.

## III.    THE COURT SHOULD DISMISS THE AMENDED COMPLAINT WITH PREJUDICE

Although courts typically grant leave to amend after dismissing a complaint for the first time, this is not the typical case.  The Fifth Circuit's opinion in *United States ex rel. Adrian v. Regents of Univ. of Cal.*, 363 F.3d 398 (5th Cir. 2004), is instructive.  In *Adrian*, the plaintiff crafted his second amended complaint after evaluating the defendants' motion to dismiss the first amended complaint.  *Id.* at 404.  In dismissing the second amended complaint, the district court denied leave to amend a second time, stating that "'pleadings review is not a game where the plaintiff is permitted to file serial amendments until he finally gets it right.  One opportunity to amend, in the face of motions that spelled out the asserted defects in the original pleadings, was sufficient under the circumstances.'"  *Id.*  The Fifth Circuit affirmed, holding that it was not an abuse of discretion to refuse leave to amend under such circumstances.  *Id.*

Here, Plaintiffs already sought (and were granted) leave to amend after fully considering and responding to Defendants' motion to dismiss the Consolidated Class Action Complaint.  This was itself a tacit admission that Plaintiffs' initial complaint lacked merit.  Moreover, the Amended Complaint was drafted with the benefit of the Court's guidance in *BP I* and *BP II*, yet Plaintiffs still cannot articulate a colorable claim against the Defendants.  Accordingly, the Amended Complaint should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

Dated:  September 21, 2012.

Respectfully submitted,

*/s/ Charles W. Schwartz*
Charles W. Schwartz
Fed. Bar No. 603
Texas Bar No. 17861300
Email: Charles.Schwartz@Skadden.com
Skadden, Arps, Slate,
   Meagher & Flom LLP
1000 Louisiana, Suite 6800
Houston, Texas 77002
(713) 655-5160 – Telephone
(713) 483-9160 – Facsimile

*Attorney-in-charge for Defendants*
*Anadarko Petroleum Corporation, James T.*
*Hackett, Robert G. Gwin, and Robert P. Daniels*

*Of Counsel*

Jay B. Kasner
*(Admitted Pro Hac Vice)*
Email: Jay.Kasner@Skadden.com
Susan Saltzstein
*(Admitted Pro Hac Vice)*
Email: Susan.Saltzstein@Skadden.com
Skadden, Arps, Slate,
   Meagher & Flom LLP
4 Times Square
New York, New York 10036-6518
(212) 735-2628 – Telephone
(917) 777-2628 – Facsimile

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on September 21, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel who have registered with this Court.  All others were served a copy via U.S. mail postage prepaid.


           */s/ Charles W. Schwartz*
           Charles W. Schwartz