UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | Civ. Action No. 4:12-cv-00900 |
| | § | |
| | § | |
| In re ANADARKO PETROLEUM CORP. | § | ECF CASE |
| CLASS ACTION LITIGATION | § | |
| | § | Electronically Filed |
| | § | |
| | § | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Charles W. Schwartz
Texas Bar No. 17861300
Federal Bar No. 603
Skadden, Arps, Slate,
    Meagher & Flom LLP
1000 Louisiana, Suite 6800
Houston, Texas 77002
Telephone: (713) 655-5160
Fax: (713) 483-9160
Email: Charles.Schwartz@Skadden.com

*Attorney-in-charge for Defendants
Anadarko Petroleum Corporation, James T.
Hackett, Robert G. Gwin, and Robert P.
Daniels*

*Of Counsel*

Jay B. Kasner
*(Admitted Pro Hac Vice)*
Susan Saltzstein
*(Admitted Pro Hac Vice)*
Skadden, Arps, Slate,
    Meagher & Flom LLP
4 Times Square
New York, New York 10036-6518
Telephone: (212) 735-3000
Fax: (212) 735-2000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .............................................................................................1

ARGUMENT ...........................................................................................................................3

I.    PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR OMISSION ....................3

    A.    Pre-Spill Statements Concerning "Legal Compliance" and "Risk Assessment" Are Neither False Nor Misleading ...........................................3

    B.    Mr. Daniels' Accurate Statement is Neither False Nor Misleading ........................5

    C.    Accurate Statements Concerning Insurance Reserves Are Neither False Nor Misleading ........................................................................................8

    D.    BP's Statements Are Not Attributable to Anadarko Under *Janus* ...........................9

II.    PLAINTIFFS FAIL TO ALLEGE SCIENTER AS TO EACH DEFENDANT ..............13

    A.    The "Core Operations" Theory Is Inapplicable ....................................................13

    B.    Plaintiffs Fail to Allege Sufficient Motive .............................................................16

    C.    Plaintiffs Fail to Allege Conscious Misbehavior or Severe Recklessness .............18

        1.    Plaintiffs fail to adequately allege that any of the defendants possessed specific information contradicting their public statements ...............................................................................................18

        2.    Alleged "red flags" do not establish a strong inference of scienter ...........23

        3.    Plaintiffs fail to adequately allege that additional facts establish a strong inference of fraudulent intent ...........................................................24

CONCLUSION.......................................................................................................................25

i

# TABLE OF AUTHORITIES

## CASES

Page(s)

*7547 Corp. v. Parker & Parsley Development Partners, L.P.*,
38 F.3d 211 (5th Cir. 1994) .......................................................................................7

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ...................................................................................20

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ...................................................................................17

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ...............................................................................23

*In re ArthroCare Corp. Securities Litigation*,
726 F. Supp. 2d 696 (W.D. Tex. 2010).....................................................................24

*Associated Builders, Inc. v. Alabama Power Co.*,
505 F.2d 97 (5th Cir. 1974) .................................................................................6, 13

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ...................................................................................12

*Berger v. Beletic*,
248 F. Supp. 2d 597 (N.D. Tex. 2003) ......................................................................9

*Board of Trustees of City of Ft. Lauderdale General Employees' Retirement System v.
Mechel OAO*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011)...............................................13

*In re BP P.L.C. Securities Litigation*,
852 F. Supp. 2d 767 (S.D. Tex. 2012) ..........................................................4, 5, 7, 9, 10

*In re BP P.L.C. Securities Litigation*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ............................................5, 7, 13, 19, 21

*In re Cabletron Systems, Inc.*,
311 F.3d 11 (1st Cir. 2002)......................................................................................20

*Chill v. General Electric Co.*,
101 F.3d 263 (2d Cir. 1996)......................................................................................23

*City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)........................................................................11

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*,
  442 F. App'x 672 (3d Cir. 2011) ........................................................................16

*Collmer v. United States Liquids, Inc.*,
  268 F. Supp. 2d 718 (S.D. Tex. 2003) .........................................................13, 14

*Diamond Offshore Co. v. A&B Builders, Inc.*,
  302 F.3d 531 (5th Cir. 2002) ............................................................................10

*Dorsey v. Portfolio Equities, Inc.*,
  540 F.3d 333 (5th Cir. 2008) ............................................................................14

*Edison Fund v. Cogent Investment Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008)..................................................................9

*In re Electronic Data Systems Corp. Securities & "ERISA" Litigation*,
  298 F. Supp. 2d 544 (E.D. Tex. 2004) ...............................................................19

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
  761 F. Supp. 2d 504 (S.D. Tex. 2011) ...........................................................8, 21

*In re Fannie Mae 2008 Securities Litigation*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010)..................................................................3

*In re Federated Department Stores, Inc. Securities Litigation*,
  No. 00 Cv 6362(RCC), 2004 WL 444559 (S.D.N.Y. Mar. 11, 2004)................14

*In re Franklin Bank Corp. Securities Litigation*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011) ...........................................15, 18, 20, 25

*Frederick v. Mechel OAO*,
  475 F. App'x 353 (2d Cir. 2012) ......................................................................15

*Freudenberg v. E\*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................19

*Fulton County Employees Retirement System v. MGIC Investment Corp.*,
  675 F.3d 1047 (7th Cir. 2011) ..........................................................................12

*Hopson v. MetroPCS Communications, Inc.*,
  No. 3:09-CV-2392-G, 2011 WL 1119727 (N.D. Tex. Mar. 25, 2011)................5

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) ......................................................................17, 19

*Iowa Public Employees' Retirement System v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010)................................................................................3

iii

*Janus Capital Group, Inc. v. First Derivative Traders,*
 131 S. Ct. 2296 (2011).................................................................9, 10, 12

*Krim v. pcOrder.com, Inc.,*
 Nos. A 00 CA 776 SS, A 00 CA 831 SS, A 01 CA 096 SS, 2002 WL 1185913
 (W.D. Tex. Apr. 12, 2002)...............................................................................8

*Lormand v. US Unwired, Inc.,*
 565 F.3d 228 (5th Cir. 2009) ...........................................................................5, 9

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
 513 F.3d 702 (7th Cir. 2008) .............................................................................14

*Malin v. XL Capital, Ltd.,*
 312 F. App'x 400 (2d Cir. 2009) ........................................................................16

*Matrixx Initiatives, Inc. v. Siracusano,*
 131 S. Ct. 1309 (2011)..............................................................................16, 22

*Nathenson v. Zonagen Inc.,*
 267 F.3d 400 (5th Cir. 2001) ......................................................................14, 17

*In re OCA, Inc. Securities & Derivative Litigation,*
 No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ............................20

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20,*
 *2010,* 808 F. Supp. 2d 943 (E.D. La. 2011)..............................................4, 25

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20,*
 *2010,* 844 F. Supp. 2d 746 (E.D. La. 2012)..................................................11

*Pipefitters Local No. 636 Benefit Plan v. Zale Corp.,*
 No. 11-10936, 2012 WL 5985075 (5th Cir. Nov. 30, 2012) ......................16, 18

*Plotkin v. IP Axess Inc.,*
 407 F.3d 690 (5th Cir. 2005) .............................................................................19

*Rosenzweig v. Azurix Corp.,*
 332 F.3d 854 (5th Cir. 2003) ........................................................................4, 13

*Rubinstein v. Collins,*
 20 F.3d 160 (5th Cir. 1994) ...............................................................................12

*Russo v. Bruce,*
 777 F. Supp. 2d 505 (S.D.N.Y. 2011)..............................................................17

*Santa Fe Industries, Inc. v. Green,*
 430 U.S. 462 (1977)................................................................1, 7, 18, 20, 23

*Securities & Exchange Commission v. Perry*,
 No. CV-11-1309 R, 2012 WL 1959566 (C.D. Cal. May 31, 2012) ...................................10

*Simmons v. Peavy-Welsh Lumber Co.*,
 113 F.2d 812 (5th Cir. 1940) .....................................................................................8

*South Ferry LP, No. 2 v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) ....................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..........................................................................................15, 16

*Tuchman v. DSC Communications Corp.*,
 14 F.3d 1061 (5th Cir. 1994) ....................................................................................18

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.*,
 336 F.3d 375 (5th Cir. 2003) .....................................................................................3

*In re Van der Moolen Holding N.V. Securities Litigation*,
 405 F. Supp. 2d 388 (S.D.N.Y. 2005)............................................................................24

*Zuckerman v. Smart Choice Auto Group, Inc.*,
 No. 6:99-CV-237-ORL-28A, 2000 WL 33996254 (M.D. Fla. Aug. 29, 2000) ...............20

## STATUTES, RULES & REGULATIONS

Federal Rule of Civil Procedure 15(a) ...............................................................................3

30 C.F.R. § 250.146 ..................................................................................................10, 11

30 C.F.R. § 254.1 .....................................................................................................10, 11

30 C.F.R. § 254.30...................................................................................................11, 12

30 C.F.R. § 254.6 .........................................................................................................11

## PRELIMINARY STATEMENT

Plaintiffs' opposition attempts, repeatedly, to back far away from the central focus of the Amended Complaint[1] – that Defendants purportedly mismanaged Anadarko's minority interest in the Macondo Prospect.  But the opposition's mischaracterization of the Amended Complaint as presenting a "classic claim for securities fraud" (Op. 3) is contradicted by the Amended Complaint's paragraphs that tell quite a different story: one that criticizes decisions made with respect to the Macondo Prospect; assumes Anadarko must have known of alleged dangers; and blames Anadarko for every purportedly "bad" decision at the well.  It is precisely these types of mismanagement claims that were long ago rejected by the Supreme Court as non-actionable under the federal securities laws.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).

Plaintiffs' efforts to recast their mismanagement claims ought to be rejected.  First, Plaintiffs attempt to resuscitate the Amended Complaint by alleging that Mr. Daniels, Anadarko's Senior Vice President of Worldwide Exploration, speaking in response to an analyst question at an investor call that occurred after the spill, knowingly (or recklessly) made a false statement about Anadarko's involvement in the Macondo Prospect.  Putting aside (just for the moment) Plaintiffs' use of inaccurate, out of context, and cropped quotes, Mr. Daniels' accurate statement is neither false nor misleading.  Nor have Plaintiffs presented any well-pled allegation that any of the Defendants – including Mr. Daniels – acted with scienter.  And Plaintiffs may not impute knowledge to the Defendants under the "core operations" theory of scienter, a doctrine of questionable validity that in any event cannot apply to the Macondo Prospect, which amounted to less than one percent of the Company's annual capital expenditures.  (CS Ex. 10.)[2]

---

[1]   Unless otherwise indicated, all capitalized terms have the same meaning as in Defendants' opening brief.

[2]   Citations to "CS Ex. __" are to the exhibits to the Declaration of Charles W. Schwartz in support of Anadarko's motion to dismiss.

Second, the Supreme Court's decision in *Janus* forecloses Plaintiffs' attempt to hold the Defendants liable by claiming that Anadarko must be the speaker under the securities laws because a regulation allegedly made Anadarko jointly and severally responsible to ensure that the "Macondo Spill Response Plan" was filed with MMS. Even under the broadest reading of *Janus*, Anadarko cannot be deemed to have "made" the statements in documents that it is not adequately alleged to have helped create, review, or file, and which do not even mention Anadarko. Moreover, nowhere do Plaintiffs allege facts sufficient to create a strong inference that Anadarko knew (or was reckless in not knowing) that BP's estimates concerning its ability to respond to an oil spill were inaccurate. Nor could they; this was BP's information.

Quite simply, there is no plausible, let alone compelling, inference of scienter to be drawn from Plaintiffs' allegations, which paint the background of an ordinary business transaction and a tragic event, not manipulative and deceptive conduct. Indeed, the most compelling inference to be drawn from the Amended Complaint is that Anadarko representatives held the honest belief that operations at the Macondo Prospect were proceeding in a safe and appropriate manner, and were unaware of the dangers at the well. (MTD 26-27.)

Acknowledging that their motive allegation, "standing alone, may not be enough to plead scienter" (Op. 45), Plaintiffs resort to mere rhetoric. The motive "theories" Plaintiffs offer – that Anadarko "cut corners," "chose to roll the dice" on a reckless "gamble," and that Mr. Hackett "had knowledge that Anadarko was taking dangerous risks at the Macondo well" – are unsupported by a single witness, document, well-pled allegation, or even hearsay. Indeed, their allegations are contradicted by the Amended Complaint, which alleges that Anadarko approved (not rejected) requests for additional funding (AC ¶ 46), and that Anadarko personnel who purportedly were monitoring the well observed that "[i]t looks like operations are starting to go

well" (AC ¶ 52). The PSLRA requires Plaintiffs to plead particularized facts to support a strong inference of fraud. Here, there is none.

The Amended Complaint presents nothing like a "classic claim for securities fraud." If anything, Plaintiffs have made a classic overreach. There is no doubt that the events of April 20, 2010 were tragic. Nothing alleged against the Defendants in this case, however, amounts to securities fraud. The Amended Complaint ought to be dismissed with prejudice.[3]

## ARGUMENT

## I.    PLAINTIFFS FAIL TO PLEAD ANY MISSTATEMENT OR OMISSION

### A.    Pre-Spill Statements Concerning "Legal Compliance" and "Risk Assessment" Are Neither False Nor Misleading

Plaintiffs concede that not a single pre-spill statement addressed the Macondo Prospect. (MTD 16.) Instead, Plaintiffs' claim regarding pre-spill statements boils down to one assertion: that by "approving" the OSRP and EP, Anadarko converted generic statements concerning the Company's commitment to "legal compliance" and "risk assessment" into actionable misstatements. (See AC ¶¶ 57, 121-37, 173, 186, 196.)[4] Yet, as Plaintiffs concede, BP submitted and MMS approved these documents – which were used throughout the industry – long before Anadarko invested in the well. (AC ¶¶ 7, 44, 173.) Similarly, BP, not Anadarko,

---

[3]    Plaintiffs merely throw in a one-sentence, alternative request for leave to amend at the conclusion of their opposition. (Op. 48.) This does not satisfy Federal Rule of Civil Procedure 15(a), which requires an "'indication of the particular grounds on which the amendment is sought.'" *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (citation omitted). Thus, the Court should dismiss the Amended Complaint with prejudice.

[4]    Plaintiffs' cases are inapposite. (Op. 27.) *See Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (involving claims under the Securities Act of 1933 and holding the bespeaks caution inapplicable to risk management statements that are not forward-looking); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 404-06 (S.D.N.Y. 2010) (holding that specific statements concerning defendant's subprime risk analysis, such as that "in assessing participation in the subprime market, Fannie developed parameters 'to carefully calibrate exposure to layered risk,'" sufficiently material to survive motion to dismiss where in actuality "Fannie lacked evaluation models to analyze subprime mortgage pools" in the relevant time period).

was responsible for drilling activities and actions taken with respect to the operation of the well. (CS Ex. 25 at 20.) *See also In re Oil Spill*, 808 F. Supp. 2d 943, 963 (E.D. La. 2011).

Allegations regarding generalized statements concerning Anadarko's environmental and risk analysis fail to state a claim. (Op. 26-27.) *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). No reasonable investor would have interpreted these statements – such as that "[t]he guys spend an awful lot of time on risk assessment" (AC ¶ 219) – as promises that there would *never* be any safety problems at any of the thousands of properties, including non-operating properties with respect to which Anadarko prominently warned that it had "limited ability to influence or control." (MTD 10.) *See In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 807-08 (S.D. Tex. 2012) (*BP I*). And even if these statements were sufficiently specific, they refer only to analyses done with respect to wells that Anadarko itself drills, not those where it is a passive investor.[5] In context, it becomes clear that these statements cannot be rendered false by drilling activities that BP undertook in its role as operator at the Macondo Prospect – where Anadarko "had no personnel present." *In re Oil Spill*, 808 F. Supp. 2d at 963 (holding that "[a]ny access to information that Anadarko . . . may have had did not give rise to a duty to intercede in an independent contractor's operations") .

Plaintiffs claim erroneously that Anadarko promised "*consistent* compliance with applicable environmental and safety regulations on *each* of its projects." (Op. 27.) Anadarko never made such a statement. Instead, Anadarko said that it "*operates* its worldwide assets in a

---

[5]    (*See* AC ¶ 33, cited in Op. at 26. ("[W]henever we undertake a new project, we work to understand the environmental issues and cultural considerations of an area. Then we create a balanced plan that couples new energy development with oftentimes innovate [sic] techniques *to protect the locations **in which we operate**.*"); AC ¶ 219, cited in Op. at 26 ("[T]he guys spend an awful lot of time on risk assessment subsurface risk assessment, commercial risk assessment[.] . . . We then take that assessment to a team that's internal to the exploration group of engineers and that's the exploration/engineering group who gets together with our facilities team, **our drilling team** and gets cost estimates for conceptual development plans."))

4

manner *consistent* with [its] core values to protect health and safety, and comply with all applicable . . . laws, regulations and internal standards." (AC ¶ 183; *see also* AC ¶ 203.) This statement is irrelevant, however, because Anadarko did not operate any assets in conjunction with the Macondo Prospect. Nor do Plaintiffs explain why alleged mismanagement regarding the Macondo Prospect contradicts the cited statement.[6]

Lastly, Plaintiffs mischaracterize the clear cautionary language in Anadarko's SEC filings. (Op. 28.) Far from "generic," these disclaimers explicitly disclose risks specific to Anadarko, that the Company was "vulnerable to the risks associated with operating offshore," including with respect to "costs resulting from oil spills," and that it had "limited control over the activities on properties we do not operate," such as the Macondo Prospect. (MTD 10, 17-18.) *See Hopson v. MetroPCS Commc'ns., Inc.*, No. 3:09-CV-2392-G, 2011 WL 1119727, at *17 (N.D. Tex. Mar. 25, 2011) (disclaimers precluded liability where cutionary language not a "boilerplate litany of risk factors generally applicable to all businesses; it identifies risks that are specific to [defendant]").[7]

### B.   Mr. Daniels' Accurate Statement is Neither False Nor Misleading

Mr. Daniels' remark that Anadarko was "not involved" in "looking at the detail, well design or procedures" regarding the Macondo Prospect is not contradicted by any allegation in

---

[6]     The alleged misstatements that survived dismissal in *BP II* specifically addressed whether BP had implemented the "Baker Panel" safety recommendations. *Compare In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 725, 756-58 (S.D. Tex. 2012) (*BP II*), *with BP I*, 852 F. Supp. 2d at 807-08 (generalized statements about BP's commitment to safety *not* actionable).

[7]     *Lormand* does not change the analysis. (Op. 28.) In that case, the plaintiffs alleged that the defendants "misled the public by concealing from it material facts of which they were aware." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 243 (5th Cir. 2009). The Court held that defendants' generic disclaimers were no defense because they did not contain "specific, concrete explanations that clearly identified and quantified *the clearly present financial dangers* to [defendant]." *Id.* at 247 (emphasis added). Here, Anadarko did not face any "clear and present dangers" at the time Defendants made the alleged statements regarding "legal compliance" and "risk assessment." Anadarko's SEC filings thus contained the most specific disclaimers possible. *See Hopson v. MetroPCS Commc'ns, Inc.*, No. 3:09-CV-2392-G, 2011 WL 1119727, at *17 (N.D. Tex. Mar. 25, 2011).

the Amended Complaint.[8]  On the May 4, 2010 conference call, Mr. Daniels was asked whether Anadarko was "part of . . . the well's design." (CS Ex. 18.)  Mr. Daniels responded – and Plaintiffs seem to agree[9] – that "[Anadarko] had farmed into this after the well had already spud. *So the well design and it's [sic] procedures, operating procedures were all done before we actually farmed in.*" (*Id.*)  Mr. Daniels added that "[w]hen you typically approve [non-operating investments like the Macondo Prospect], you basically approve just the capital spending level in the targeted zones from a geological perspective, as opposed to looking at the detail, well design or procedures." (CS Ex. 18.)  This statement is supported by the Amended Complaint, which confirms Anadarko's expenditure approval rights (AC ¶ 46, 65, 79), and the OA, which restricts the role of the non-operators with respect to well procedures, design and operation. (CS Ex. 25 at 20.)  *See also In re Oil Spill*, 808 F. Supp. 2d at 963 ("Under the [OA], BP was solely responsible for the drilling operations.").  When read in the proper context, there is nothing false or misleading about this statement.  *See Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 101 (5th Cir. 1974) ("The statement . . . must be read in context, in light of the circumstances in which it was made.") (internal quotation marks omitted).

Plaintiffs contend that Anadarko "expressly approved the well design plans before agreeing to become a co-owner of the Macondo well." (Op. 16.)  Yet their primary support for this assertion – Michael Beirne's testimony that the BP well plan was provided to Anadarko as part of the initial AFE – indicates only that Anadarko approved the request for funding, not that Anadarko actually analyzed or approved – let alone had "involvement" in – the well design plan

---

[8]     Plaintiffs  inaccurately quote Mr. Daniels as saying that Anadarko "had 'nothing at all to do' with the well design and procedures." (Op. 14.)  Those words are found nowhere in the May 4, 2010 transcript.

[9]     Plaintiffs acknowledge that BP had prepared the well design plan and permit applications by the summer of 2009, yet Anadarko did not sign the OA until December 17, 2009. (CS Ex. 25; AC ¶¶ 13, 41, 125; *see also* AC ¶ 7 ("Prior to making its . . . investment, Anadarko was provided . . . the well design plan.").)

itself. (AC ¶¶ 41, 46.) Allegations that Anadarko approved subsequent AFEs (AC ¶¶ 79-87, 95-96; 97-107) likewise merely show that Anadarko consented to additional spending, not that Anadarko analyzed, was involved with, or ratified operational decisions that were contractually under BP's exclusive domain.[10] And regardless, subsequent AFE approvals are irrelevant to determining the veracity of Mr. Daniels' statement, which clearly referred to Anadarko's activities *prior to* its investment. (CS Ex. 18.)

Allegations that Anadarko had access to information concerning the well design and activities at the well (AC ¶¶ 7, 13, 39-41,44-45, 60, 235) are similarly deficient because Plaintiffs fail to allege that Defendants actually analyzed the information allegedly provided to determine whether to make the initial investment or to approve subsequent AFEs.[11] Faulting Anadarko for investing in the exploration without reviewing the well design plan or other data amounts to nothing more than a non-actionable claim of mismanagement, as does faulting Anadarko for authorizing AFEs related to various operational decisions that in hindsight appear misguided. *See Santa Fe*, 430 U.S. at 479.[12] Tellingly, instead of focusing on whether

---

[10]    (CS Ex. 25 at 20.)

[11]    Plaintiffs rely on a single, self-serving e-mail from BP to the *Financial Times*: "'Personnel from the co-owners engaged in periodic communications with BP personnel about well design and other issues related to the well.'" (AC ¶ 56.) BP, of course, had an incentive to maximize the perceived role of the non-operators. And this email is so vague as to be meaningless. Virtually any communication between Anadarko and BP could fit into the email's description of the nature of the communications.

[12]    Plaintiffs' cases acknowledge that, where securities fraud claims are premised on mismanagement, they must be based on very specific misstatements or omissions rather than generalized statements such as those alleged here. (Op. 14-15.) *Compare BP II*, 843 F. Supp. 2d at 756-58 (generalized statements about BP's commitment to safety not actionable) *and BP I*, 852 F. Supp. 2d at 807-08, 814 (generalized statements about BP's competitiveness in the industry, risk management system and focus on safety "too vague to be false or material" and thus not actionable) *with BP II*, 843 F. Supp. 2d at 725, 756-58 (statements concerning implementation of specified metrics set forth in report issued by independent panel charged with reviewing company's safety procedures actionable) *and BP I*, 852 F. Supp. 2d at 779, 797-98 (statements concerning "specific information about [a company-wide safety program referred to as the Operating Management System], including the number of sites in which the program was implemented and statistical percentages demonstrating that the Company was on track with implementation" actionable); *see also 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 216 (5th Cir. 1994) (allegations that proxy statement failed to make adequate disclosure about specifics of valuation method applied in
*(cont'd)*

Defendants *looked at* well designs and procedures, or whether non-operators typically review the same, Plaintiffs endeavor to cast in a negative light the alleged design departures (Op. 16), highlighting their attempt to impermissibly convert claims of mismanagement into securities fraud claims.[13]

### C.   Accurate Statements Concerning Insurance Reserves Are Neither False Nor Misleading

Plaintiffs do not adequately allege that any statements about insurance coverage are false or misleading.  Instead, Plaintiffs claim that "Defendants knew (or should have known) that they faced costs . . . far exceeding $177.5 million."  (Op. 29.)  Yet none of the statements in the Amended Complaint purports to estimate the extent of liability associated with the accident; rather they state an objectively verifiable fact available to management: that the company has insurance that covers "*a portion*" of potential losses.  (CS Ex. 18 at 4.)

Indeed, on the May 4, 2010 earnings call Plaintiffs reference, Mr. Gwin, responding to a question about "future costs" related to the Macondo Prospect, noted that "[i]t's difficult to make accruals when you don't have an estimate of the expenses."  (CS Ex. 18 at 7.)  And in a 10-Q filed the same day as the press release Plaintiffs reference, Anadarko informed investors that it was "currently unable to estimate any potential liability for costs arising in connection with [the

---

*(cont'd from previous page)*
determining partnership interests); *Krim v. pcOrder.com, Inc.*, Nos. A 00 CA 776 SS et al., 2002 WL 1185913, at *1 (W.D. Tex. Apr. 12, 2002) (allegations that registration statements and prospectuses falsely "(1) 'represented [issuer] had a viable business plan and was able to generate and report accurate operating and financial information on a timely basis,' and (2) represented [controlling shareholder of issuer] was not competing with [issuer] for revenue." (citation omitted)).

[13]    Although courts generally must accept factual allegations in a complaint as true,  the Court need not do so here where Plaintiffs' allegations are unsupported by the very documents upon which the they purport to rely.  *See e.g.*, *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.");  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 522 n.7 (S.D. Tex. 2011).

spill], and whether the *costs might exceed the coverage limits* under [the Company's] insurance policies." (CS Ex. 7 at 43.)[14] Because these insurance coverage statements were neither false nor misleading, they are not actionable. *See Berger v. Beletic*, 248 F. Supp. 2d 597, 603 (N.D. Tex. 2003).[15]

Plaintiffs charge that Anadarko had a "duty to speak the full truth" regarding the expected spill-related liabilities when it provided statements concerning insurance reserves. (Op. 29.) They do not, however, allege that Defendants possessed any estimates of the expected liabilities at that time. Plaintiffs' assertion that the *Globe and Mail* article published two days after Anadarko's press release speculating that spill-related liabilities could "soar as high as $15 billion" (Op. 29), does not controvert Defendants' claims that they had no estimate as to *Anadarko's* expected liability. Nor do Mr. Hackett's innocuous assertions that the spill was "foremost in everyone's mind" or that Anadarko was "focused on making sure that this clean-up occurs and assisting, *as part of the full industry effort on this,* assisting BP." (CS Ex. 18 at 2, 8, cited in Op. 29 (emphasis added).)

### D.    BP's Statements Are Not Attributable to Anadarko Under *Janus*

Anadarko did not "make" the statements in either the OSRP or EP. (MTD 21-23.) First, both documents were filed with MMS by BP – not Anadarko. *See Janus*, 131 S. Ct. at 2304-05;

---

[14]    Mr. Gwin also noted that the extent to which insurance would cover costs of the accident depended in part on the (as yet unknown) duration of the spill: "[I]f you think in terms of the rate of spend that we heard coming out of the unified command at this stage of about $6 million to $8 million per day, obviously, our coverage in the $178 million range would represent about two to three months. . . . [but] there's a lot of uncertainty around how far this will go into the future and what the ultimate remediation costs will be." (CS Ex. 18 at 6.)

[15]    Plaintiffs' disclaimer cases – *Lormond* and *Edison Fund* – have no bearing on the analysis for two reasons. First, Defendants' statements concerning cost estimates are not "disclaimers" or "precautionary language," as Plaintiffs urge (Op. 29-30), but instead refer to what was currently known regarding expected spill-related liabilities. Second, unlike *Lormond* and *Edison Fund*, Plaintiffs here fail to allege that Defendants were aware of any cause for concern at the time the statements were made – nor that they omitted known material facts. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008).

*BP I*, 852 F. Supp. 2d at 779-80.  Second, there is nothing on the face of either plan to indicate that any statements therein came from Anadarko.  *See Janus*, 131 S. Ct. at 2305.  Indeed, both plans prominently display either the BPEX name or the BP logo on every page, and neither mentions Anadarko or the other non-operator.  *See id.*, 131 S. Ct. at 2302; *BP I*, 852 F. Supp. 2d at 819.  And the alleged misstatements in the plans relate only to BP's ability to respond to an oil spill at a BP-operated site.[16]  No reasonable Anadarko investor would have considered these documents as Anadarko's speech.  Under *Janus*, therefore, BP was the sole author and maker of the statements in both plans.  *BP I*, 852 F. Supp. 2d at 819.[17]

Plaintiffs attempt to seek solace in *Janus*' statement that the maker of the statement in that case bore "the statutory obligation to file the prospectuses with the SEC."  131 S. Ct. at 2304. (Op. 19-22.)  Plaintiffs' focus on a single *Janus* factor – to the exclusion of all others – not only turns *Janus* on its head, but also relies on a fundamental misreading of the regulations at issue. The provision Plaintiffs cite, 30 C.F.R. § 250.146, provides that co-lessees are jointly and severally responsible for fulfilling the obligations under the relevant regulations, "*unless otherwise provided in these regulations.*"  30 C.F.R. § 250.146 (emphasis added).  The regulations provide, however, that only "the owner or operator of an oil handling, storage, or transportation *facility* . . . must submit a spill-response plan [*i.e.*, an OSRP] . . . for approval."  30 C.F.R. § 254.1 (emphasis added).  BP was the operator of the entire leasehold and Transocean

---

[16]    *See, e.g.*, CS Ex. 30 at 7-1 ("I hereby certify that BP Exploration and Production Inc. has the ability to respond to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.").

[17]    Morever, Plaintiffs do not allege that Defendants prepared, reviewed or signed the plans.  *S.E.C. v. Perry*, No. CV-11-1309 R, 2012 WL 1959566, at *8 (C.D. Cal. May 31, 2012) ("[T]he SEC's allegations based on the DSPP prospectuses fail as a matter of law because Defendants did not prepare, review, or sign the prospectuses, and thus were not the 'makers' of the statements contained therein.").

was the owner and operator of the *Deepwater Horizon*.[18]  Anadarko had no statutory obligation

to submit an OSRP.  *See* 30 C.F.R. §§ 250.146, 254.1.  Moreover, Anadarko could not have the

statutory obligation to file either plan because both were submitted months before Anadarko

invested in the well.  (MTD 22 n.10.)[19]

Plaintiffs again misread the regulations when they erroneously argue that "Anadarko had

a legal duty to ensure that the Macondo Oil Spill Response Plan was accurate throughout the

process of drilling the Macondo well."  (Op. 22.)  *See* 30 C.F.R. § 254.30.  In so doing, Plaintiffs

again conflate the OSRP and the EP.  The aforementioned regulation deals only with "response

plans" like the OSRP – *not* initial exploration plans like the EP.  *See id.*  Moreover, section

254.30 does not impose a duty to correct an OSRP where an owner or operator[20] discovers that

---

[18]    Though always a vessel, *see Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 542 (5th Cir. 2002) (semi-submersible rig is a vessel), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009), "[a] mobile offshore drilling unit is classified as a facility when engaged in drilling or downhole operations" for purposes of certain MMS regulations. 30 C.F.R. § 254.6. "Owner or operator means, in the case of an offshore facility, any person owning or operating such offshore facility." *Id.* "[T]he DEEPWATER HORIZON, a mobile offshore drilling unit ("MODU"), was owned and operated by one or more of the Transocean entities." *In re Oil Spill*, 844 F. Supp. 2d 746, 747 (E.D. La. 2012).

[19]    *City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395 (S.D.N.Y. 2011) (Op. 19-20), could not be further from the facts here. In *City of Roseville*, the defendant corporation held all of the stock of, and entirely controlled, the company that "made" an alleged misstatement. *Id.* at 417-18. The court held that the defendant also "made" the statement under *Janus* because, by virtue of its ownership of the primary "maker" of the statement, it "had control over the content of the message, the underlying subject matter of the message, and the ultimate decision of whether to communicate the message." *Id.* at 418. Here, in contrast, Plaintiffs have not alleged that Anadarko had control over either BP generally or the contents of the plans specifically. Nor could they; Anadarko did not even purchase its minority interest in the lease until months *after* BP submitted – and MMS approved – the plans, meaning that Anadarko could not possibly have controlled their contents. (AC ¶¶ 6, 44, 173.) *City of Roseville* also undermines Plaintiffs' contention that Anadarko had a duty to correct the plans. *See* 814 F. Supp. 2d at 417. There, the court held that a corporate director cannot be liable for a registration statement that is filed before she joins the board – even though the registration statement *remains false after she becomes a board member. Id.* The same holds true here; Anadarko cannot be held liable for failing to correct BP's plans that were filed long before Anadarko purchased its minority stake in the well.

[20]    Notably, just as only the "owner" or "operator" – here, Transocean or BP – is obligated to *file* the OSRP, only the "owner" or "operator" is obligated to *revise* the OSRP. *See* 30 C.F.R. §§ 254.1, 254.6.

the plan contained incorrect information at the time of filing. *Id.*[21] Even if Plaintiffs' flawed theory were correct and Anadarko had an obligation to ensure that a plan was filed, there was no statutory obligation to correct a plan that was allegedly flawed from the outset. *See id.; see also Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051-52 (7th Cir. 2012).[22]

Plaintiffs also cling to the conclusory assertion that BP's plans were "publicly attributed to Anadarko." (Op. 24.) Neither plan, however, mentions Anadarko. (MTD 22-23; CS Exs. 30, 31). *See Janus*, 131 S. Ct. at 2302. Nor does the argument that "investors attributed the plan to Anadarko" pass muster. (Op. 24.) Plaintiffs offer not a single well-pled fact that supports that bald claim. And simply referencing a purported decline in Anadarko's stock price says nothing at all about the reasons for that decline. Yet Plaintiffs fail to cite a single well-pled fact linking disclosures concerning BP's plans to any decline in Anadarko's stock price. Any connection that Plaintiffs wish to draw between news that BP's plans contained inaccuracies and Anadarko's stock price drop is specious at best.

Plaintiffs' opposition claims that Anadarko "made" certain flow-rate statements by BP executives because the OA gave Anadarko approval authority over certain BP press releases. (Op. 30.) But the OA does not grant Anadarko approval authority "[i]n an emergency involving

---

[21]    The regulation at issue provides that "you must submit revisions to your plan for approval . . . whenever: (1) A change occurs which significantly reduces your response capabilities; (2) A significant change occurs in the worst case discharge scenario or in the type of oil being handled, stored, or transported at the facility; (3) There is a change in the name(s) or capabilities of the oil spill removal organizations cited in the plan; or (4) There is a significant change to the Area Contingency Plan(s)." 30 C.F.R. § 254.30. Plaintiffs have not alleged that any of these eventualities have occurred.

[22]    *Rubinstein v. Collins*, 20 F.3d 160 (5th Cir. 1994), (Op. 23), has no application here. There, the defendants themselves allegedly made "various optimistic projections" that later became materially misleading. *Id.* at 170 & n.41. Here, in contrast, Anadarko did not make the allegedly false statements in BP's plans. Similarly, in *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005), (Op. 23), the defendant listened silently as another corporate officer made statements the defendant knew were false. *Id.* at 262. Here, Defendants did not "listen" at all: BP filed the plans long before Anadarko invested in the Macondo Prospect, meaning that Defendants could not possibly have known of the alleged falsities in the plans at the time the statements were "made." (AC ¶¶ 6, 44, 173.)

extensive property damage, loss of human life, or other clear emergency and where there is insufficient time to obtain approval from the other Parties." (CS Ex. 25, § 9.2 at 45.) And, critically, Plaintiffs do not allege with any degree of particularity that BP either discussed the flow rate statements with Anadarko beforehand or that Anadarko in fact approved the statements. Instead, Plaintiffs allege only that Defendants "must have" agreed to the release of the statements in accordance with the OA. (*Id.*) Because this assertion is contradicted by the OA itself, Plaintiffs' claim must fail. *See, e.g., Associated Builders*, 505 F.2d at 100 ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint." (citation omitted)).[23]

## II.   PLAINTIFFS FAIL TO ALLEGE SCIENTER AS TO EACH DEFENDANT

### A.   The "Core Operations" Theory Is Inapplicable

Recognizing that the Amended Complaint is devoid of allegations sufficient to raise a strong inference of fraudulent intent, Plaintiffs introduce a new "core operations" theory of scienter in their opposition. (Op. 32-34.) What Plaintiffs fail to mention, however, is that courts in this Circuit and elsewhere have questioned outright the viability of this pleading method in light of the PSLRA's "rigorous pleading standards." *See, e.g., Rosenzweig*, 332 F.3d at 867-68 (rejecting argument that failure of defendant's core business supported inference that defendants knew or recklessly disregarded defendant's true prospects for success); *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 871-73 (S.D.N.Y. 2011)

---

[23]   Factual disputes that concern a conflict between an allegation in a complaint and an exhibit to the complaint that contradicts the allegation are appropriate for disposition on a motion to dismiss, and *BP II* does not indicate otherwise. *See BP II*, 843 F. Supp. 2d at 773 (not involving a discrepancy between an exhibit and an allegation and merely holding that "[w]hether the facts will actually establish that BP [had the requisite scienter] is an issue for trial").

(questioning the continuing viability of the "core operations" theory of scienter), *aff'd sub nom Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 753-54 (S.D. Tex. 2003) (core operations theory, without more, "is inadequate to plead scienter").

In those instances where the core operations inference has not been explicitly rejected, it is reserved for extraordinary cases. *See In re Federated Dep't Stores, Inc. Sec. Litig.*, No. 00 CV 6362(RCC), 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (activities must be "'essential to the survival'" of the company (citation omitted)).[24]   Indeed, Plaintiffs' own cases catalogue the narrow circumstances in which activities may be labeled "core operations," and highlight why application of the doctrine is inappropriate here. *See, e.g.*, *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001). (Op. 32.) *Nathenson* involved statements made by a thirty-five employee company and its CEO regarding patents that were described as "crucial" to the company's lone product. *Id.* at 424-25. As described in the company's SEC filings, "'[s]ubstantially all of the Company's efforts and expenditures over the next few years will be devoted to'" a single drug and "'the Company's future prospects are substantially dependent on'" that drug. *Id.* at 422 (citation omitted). The above factors, taken together, "only barely" supported the required strong inference of scienter. *Id.* at 425.[25]

---

[24]     Plaintiffs erroneously cite *South Ferry LP, No. 2 v. Killinger* for the proposition that the core operations theory is appropriate in the PSLRA context. (Op. 32, n. 15.) To the contrary, *South Ferry* makes clear that core operations inferences "usually fall short of the PSLRA standard" and apply only in "rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." 542 U.S. 760, 784, 786 (9th Cir. 2008) (citation omitted).

[25]     *Makor Issues & Rights, Ltd. v. Tellabs Inc.* involved similar extraordinary circumstances. There, the CEO made repeated false statements related to the company's two most important products, one of which accounted for more than half the company's sales. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 706, 709, 711 (7th Cir. 2008). And *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008), involved statements by the top executives of a no-employee, "one-trick pony" company that existed solely to make loans to an eight-employee company that also was controlled by the defendants. *Id.* at 342. In light of those "special circumstances," the court held that the defendants either knew or were reckless in not knowing about the alleged fraud. *Id.* at 342-43.

Here, even if core operations were a viable theory, Plaintiffs fail to articulate how a non-operating investment of $24 million in a single well – in comparison to a balance sheet of tens of billions of dollars in assets involving thousands of properties – was so critical to Anadarko's operations that its officers must have known of the alleged problems at the Macondo Prospect and how they allegedly contradicted the Company's public statements. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356-57 (2d Cir. 2012) ("There is no indication in the [complaint] that orders from these customers constituted as 'significant [a] part of [Mechel's] business,' . . . . Accordingly, even assuming [the core operations theory] continues in unabated vitality, it does not apply here." (second and third alterations in original) (citation omitted)).[26]

Nor does the nature of the spill require the imposition of an inference that Defendants intended to deceive or defraud investors after the fact. For example, in *In re Franklin Bank Corp. Sec. Litig.*, this Court rejected the notion that the need for an accounting restatement demonstrated scienter as to a bank's chairman, noting that "[t]he nature of accounting problems that lead to restatement of a company's financials, for instance, can 'easily arise from negligence, oversight, or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action.'" *See* 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011) (citation omitted), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) . Here, that Anadarko was focused on the spill following the incident, or that it was "foremost in everyone's mind" (Op. 34), does not lead to, or even support, an inference of scienter.

---

[26]     And simply because Anadarko and its executives were "focused" on the spill after April 20, 2010, does not create a plausible inference under the "core operations" theory (or any theory of scienter for that matter) that Defendants intended to defraud investors. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 388 (S.D. Tex. 2011) (Ellison, J.), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).

Finally, that some cases hold that a court *may* make an inference that a defendant should have known of problems based on the "core operations" theory does not mean that such an inference is the most compelling under *Tellabs, Inc. v. Makor Issues & Rights, Ltd. See* 551 U.S. 308, 324 (2007). Here, the allegations in the Amended Complaint more logically support the nonculpable inference that Anadarko personnel believed that operations at the Macondo Prospect were proceeding appropriately and in a safe manner. *See Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, No. 11-10936, 2012 WL 5985075, at *5 (5th Cir. Nov. 30, 2012) (holding that most compelling inference was that defendant acted with intent to maintain good appearances rather than to defraud). (*See* MTD 26-27.)[27]

## B.   Plaintiffs Fail to Allege Sufficient Motive

Plaintiffs concede that a desire to "bring projects in on time and under budget" is not a sufficient motive because, under well-settled law, it amounts to a desire to maintain the appearance of corporate profitability.[28] (Op. 45.) Nor do Plaintiffs dispute that "[c]ourts routinely hold [] that insider sales by a single defendant are insufficient to give rise to a strong inference of scienter where . . . the remaining individual defendants did not sell any shares."

---

[27]     The allegation that Mr. Hackett had a personal interest in the Macondo Prospect such that the Court should impute to him knowledge of the well's problems (Op. 33), is contradicted by the very article Plaintiffs cite for the proposition that Mr. Hackett "personally made the decision to [sic] "to buy a 25 percent share of BP plc's Macondo well.'" (AC ¶ 38.) Plaintiffs conveniently omit the beginning of that sentence, which stated that Mr. Hackett "thought he was making a *routine decision* when he decided to buy a 25 percent share of BP Plc's Macondo well last December." *See* Edward Klump & Stanley Reed, *BP Spill Tars Hackett's Anadarko Deepwater Drilling Success*, Bloomberg (Jul. 22, 2010), *available at* http://www.bloomberg.com/news/2010-07-22/bp-spill-tars-hackett-s-anadarko-success-built-on-deepwater-drilling-finds.html (emphasis added).

[28]     Plaintiffs argue that this insufficient motive should nevertheless contribute to an overall picture of scienter. (Op. 45.) But an amalgam of deficient motives cannot add up to a sufficient one. *See Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009) ("[H]aving concluded that none of plaintiffs' allegations showed even a weak inference of scienter, there is no logical way that the District Court could then have determined that the combined effect of the allegations would form a strong inference of scienter."); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011) (even when viewed holistically "zero plus zero equals zero"). Plaintiffs are also wrong to contend that *Matrixx* endorsed "mundane" motives (Op. 45, n. 30); nothing in the court's analysis of recklessness endorsed "mundane" motives. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) (noting that the absence of motive is relevant although not dispositive).

*Russo v. Bruce*, 777 F. Supp. 2d 505, 517 (S.D.N.Y. 2011); *see also Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002).[29]

Plaintiffs concede that the timing of Mr. Hackett's alleged trading weighs against an inference of scienter because the trades occurred before any of the alleged "problems" associated with the Macondo Prospect supposedly surfaced several days before the event on April 20, 2010. (Op. 46-47; MTD 27.) But Plaintiffs argue that Mr. Hackett "was attuned to the significant delays onboard the *Deepwater Horizon*, including the 'lost circulation event' in early March (¶66) and that Anadarko already agreed to two AFE's (¶¶60, 64) for the fatally flawed rig which was already over budget." (Op. 46-47.) Putting aside the incongruous notion that delays and other events aboard a single rig, where BP was drilling a well in which Anadarko held a non-operating interest, would have caused Mr. Hackett to sell a significant portion of his shares, the Amended Complaint nowhere alleges with particularity that Mr. Hackett was actually aware of these events or their potential significance. It is not enough to allege that Mr. Hackett – or any Defendant – must have known of problems based on their position with the Company. *Ind. Elec. Workers' Pens. Trust Fund IBEW v. The Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (scienter may not rest on the inference that a defendant must have been aware of a fraudulent statement based on his position in the company).

Plaintiffs' argument that it is "irrelevant" that Mr. Hackett's first sale was several months prior to the explosion ignores that the sale occurred three months before Anadarko even signed the OA. (MTD 43.) Plaintiffs also falsely claim that "Defendants admit Hackett had not sold a

---

[29]    The cases Plaintiffs cite do not support an inference of scienter against Mr. Hackett because, here, no other insiders are alleged to have sold stock, and Plaintiffs also fail to adequately allege that Mr. Hackett, acting alone, had the opportunity to commit the fraud independently. (Op. 46, n. 32.) Plaintiffs' own case supports the argument that any inference of scienter is undermined where only one of the individual defendants sold shares during the relevant class period. *Nathenson*, 267 F.3d at 420-21.

single share of Anadarko's stock in the two years preceding the Class Period." (Op. 46)  On the contrary, Mr. Hackett sold 250,000 shares in August 2007, which occurred within the two years preceding the proposed class period that began in June 2009.  (MTD 45.)[30]

### C.    Plaintiffs Fail to Allege Conscious Misbehavior or Severe Recklessness

Plaintiffs fail to adequately allege motive and thus, scienter must be judged solely on Plaintiffs' ability to demonstrate strong circumstantial evidence of conscious misbehavior or severe recklessness. *See Franklin Bank*, 782 F. Supp. 2d at 376.  This burden is correspondingly greater in the absence of motive. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994).  Plaintiffs fail to meet this standard.

> 1.    Plaintiffs fail to adequately allege that any of the defendants possessed
>        specific information contradicting their public statements

Plaintiffs fall far short of alleging Defendants' knowledge of contemporaneous information contradicting their public statements.  (MTD 28-36.)  Their conclusory allegation that Anadarko failed to "meaningfully review" BP's spill plans is merely another claim of mismanagement that does not raise a strong inference of scienter. *See Santa Fe*, 430 U.S. at 477, 479.  Plaintiffs argue, in essence, that high-level executives at Anadarko had a duty to fact-check the OSRP or EP – which were used in virtually identical form widely throughout the industry – even after MMS approved them.  (MTD 37.) *Cf. Pipefitters*, 2012 WL 5985075, at *5 (it is not severely reckless for corporate officers to rely on vice president of marketing to provide accurate information and follow company guidelines).  But even if Defendants *had* reviewed the plans,

---

[30]    Plaintiffs also do not dispute that the alleged stock sales in September 2009 were *not* suspicious in size when viewed in the context of comparable trading history, which was omitted from the Amended Complaint.  (Op. 46-47.)  Nor do Plaintiffs adequately plead that the amount of the alleged stock sales in March 2010 (39% of Mr. Hackett's total holdings) was suspicious.  Finally, Plaintiffs argue that unvested options should not be considered in calculating the percentage of holdings sold (Op. 47 n. 35), but as Defendants explained (and case law supports), the better view is to consider both vested and unvested options.  (MTD 45 n. 24.)

there is no basis to infer they would have formed conclusions about BP's ability to respond to a spill that contradicted BP's own plans. (*See* CS Ex. 25 at 20.) *See also BP II*, 843 F. Supp. 2d at 736 ("Like BP's [EP], the Regional OSRP provided estimates of the amount of oil *BP* could recover during a spill.") (emphasis added).

*BP II* confirms that, for a finding of scienter, the individual defendant must have a far more intimate knowledge of the subject matter of the alleged misstatements than any Defendant here is alleged to possess.[31]   In *BP II*, the CEO of BP, Tony Hayward, publicly "took responsibility for BP's process safety efforts and was the key individual tracking that progress" – including the implementation of specific safety reforms.   843 F. Supp. 2d at 759, 783.   Mr. Hayward was thus imputed with the knowledge that BP had drawn up inadequate spill response plans and had failed to properly implement safety recommendations. *Id.*   Here, Plaintiffs do not allege – nor can they – that any Defendant personally undertook to oversee Anadarko's process-safety procedures let alone BP's process-safety procedures.   Moreover, Defendants here were far removed from BP's ability to respond to an oil spill than was Mr. Hayward, who allegedly was personally responsible for BP's process-safety efforts.[32]

---

[31]   Plaintiffs mistakenly contend that the Fifth Circuit's ban on group pleading does not apply "where the Complaint alleges that each defendant personally made statements or signed false SEC filings." (Op. 39.)   To the contrary, plaintiffs must also allege that each individual defendant had the requisite scienter with respect to his own alleged false statements, *Shaw*, 537 F.3d at 533.   Neither of Plaintiffs' cases counsel otherwise. *See In re Elec. Data Sys. Corp. Secs. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004) (plaintiffs "pointed to specific meetings, reports, and practices whereby [individual defendants] were made actually aware of" problems with a contract regarding which the individual defendants allegedly made misstatements); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) (applying "group pleading doctrine").

[32]   *Plotkin v. IP Axess Inc.*, 407 F.3d 690 (5th Cir. 2005), (Op. 37), is equally unavailing.   In *Plotkin*, the defendant, a struggling corporation, failed to do basic due diligence before entering into a deal that it proclaimed would increase revenues thirty-fold. *Id.* at 700.   Here Anadarko made no mention of the Macondo Prospect in any public announcement or SEC filing prior to the spill and the investment amounted to a tiny fraction of Anadarko's capital expenditures.   Moreover, the due diligence that Plaintiffs charge Anadarko with here – assessing BP's spill response capabilities – is far from basic.

Plaintiffs' contention that Defendants authorized "additional short-cuts" with respect to the well also amounts to a non-actionable claim of mismanagement. *See Santa Fe*, 430 U.S. at 477, 479. And the AFEs Plaintiffs refer to are merely approvals by Anadarko of *additional spending* on the Macondo Prospect above and beyond its initial investment (AC ¶¶ 64-65, 79, 83), and thus do not support Plaintiffs' apparent claim that the Company was taking inappropriate "cost-cutting" measures. (Op. 37.)

Plaintiffs' allegations regarding the existence of "specific reports and databases" (Op. 37-38), are irrelevant to the scienter analysis because Plaintiffs' do not put any of these reports or data in the hands of any Individual Defendant, nor anyone whose knowledge can be imputed to Anadarko. (AC ¶¶ 37, 46-49, 93-95, 105, 249.) *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002). Instead, Plaintiffs argue that Anadarko executives should be charged with reviewing reports and data concerning a drilling procedure conducted by another company at a well where Anadarko had not a single employee on staff, based on bald claims that Mr. Hackett "made the decision to invest in the well" or that Mr. Daniels "was in charge of the Gulf of Mexico." (Op. 37.) *Cf. Franklin Bank*, 782 F. Supp. 2d at 376 ("Conclusory allegations that a defendant 'should have known' about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter.").[33]

---

[33]    None of the cases Plaintiffs cite stands for the proposition that mere "access" to information can support a finding of scienter. (Op. 37-38.) *See In re Cabletron Sys. Inc.*, 311 F.3d 11, 39, 41 (1st Cir. 2002) (finding scienter against corporation where "complaint makes adequate particularized allegations of large-scale fraudulent practices over time," against five corporate officials who engaged in insider trading and against a corporate officer who allegedly "directed some of the fraudulent practices surrounding fictitious sales" but not against director who nonetheless "did receive [relevant] reports"); *In re OCA, Inc. Sec. and Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *17 (E.D. La. Dec. 14, 2006) (holding that several circumstances, "when considered together, [were] sufficient to raise a strong inference of scienter" as to the CEO and former CFO regarding accounting misstatements, including the importance of the . . . receivables allegedly misstated; the severity of internal control problems at the company; the defendants' involvement in the internal corporate accounting procedures; and the Sarbanes-Oxley certifications executed by the defendants); *Zuckerman v. Smart Choice Auto Grp., Inc.*, No. 6:99-CV-237-ORL-28A, 2000 WL 33996254, at *3 (M.D. Fla. Aug. 29, 2000 (defendant CFO "had motive to recklessly or knowingly report
*(cont'd)*

Moreover, the Individual Defendants did not, as Plaintiffs suggest, represent that they personally "performed a thorough environmental and risk analysis on every project." (Op. 38.) They said only that when the *Company* undertakes a new project, it works to "understand the environmental and cultural considerations of an area" and to create a balanced plan to "protect the locations *in which we operate*." (AC ¶ 33.) This statement says nothing about the analysis that the Individual Defendants perform – nor about the analysis that Anadarko performs on wells operated by third parties. And Plaintiffs' argument that certifications of Anadarko's SEC filings raise an inference of scienter is just another red herring. (Op. 38.) As *BP II* holds, certifications are only probative of scienter where, unlike here, the complaint adequately alleges that certifying defendant possessed specific contemporaneous information that contradicted the company's public statements. *See BP II*, 843 F. Supp. 2d at 780.

Plaintiffs' claim that Anadarko approved expenditures on April 15, 2010, with knowledge of safety risks involving the use of the long-string casing and six centralizers (Op. 37-38; AC ¶¶ 78, 90), is contradicted by the fact that the Halliburton report was generated three days later and by Plaintiffs' failure to allege when the Forward Review Plan was supposedly made available to Anadarko. (MTD 29.)[34] Plaintiffs repeatedly assert that Anadarko was aware of BP's decision to use six centralizers, which they baldly conclude was inconsistent with the initial

---

*(cont'd from previous page)*
that Smart Choice had good earnings because his compensation package had incentive provisions tied to the Company's financial performance").

[34]   Plaintiffs assert that "resolution of this factual dispute is inappropriate when ruling on a motion to dismiss." (Op. 40-41.) While that may be the general rule, there is an exception for circumstances in which a source cited in the complaint flat-out contradicts a factual allegation therein. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 522 n.7 (S.D. Tex. 2011). Michael Beirne, the BP representative whom Plaintiffs allege was the "primary contact between BP and Anadarko concerning the Macondo well," testified that he never saw communications with Anadarko concerning the Haliburton report. (MTD 30-31.) Because a source cited in the complaint conclusively resolves whether Anadarko received Haliburton's simulation (it did not), the Court may rule on this supposed "factual dispute" at this stage of the proceeding.

well plan (Op. 17, 37), but fail to mention that the Daily Operations Report they cite refers to an action that had already been implemented.  (CS Ex. 27.)  Plaintiffs' failure to allege *when* Anadarko should have known that a cement bond log was not performed is unsurprising because, according to Plaintiffs' allegation, a cement bond log was scheduled to be performed on *April 20, 2010*, but was canceled by BP that day.  (AC ¶ 103.)  These allegations negate any inference that Anadarko knew *before* the accident of any risks or that BP did not perform a cement bond log. Plaintiffs' after-the-fact allegations that these decisions departed from industry standards do not establish scienter as to any Defendant.  (MTD 30.)  And, Mr. Hackett's observation that mounting evidence shows *BP* acted recklessly in operating the well is certainly not an admission that *Anadarko* acted recklessly in managing its investment, which, even if sufficiently pled, would at most state a claim of mismanagement.

Plaintiffs incorrectly argue that *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011), allows them to plead scienter against the Individual Defendants without alleging that they received specific information contradicting their statements.  (Op. 40.)  The complaint in *Matrixx* alleged with great specificity not only that the defendants possessed detailed reports revealing a correlation between use of a drug and a specific side effect, but also that defendants took steps to investigate the issue while actively concealing it from the public.  And, "[m]ost significantly," the defendants publicly suggested that studies had confirmed the drug did not have the side effect when, in fact, they had not conducted any studies and the scientific evidence could not confirm the safety of the drug.  *Id.*  In contrast, there is no such false representation here.

With respect to Mr. Daniels, Plaintiffs merely assert that "there is a strong inference that Daniels – who was head of the division in charge of deepwater oil exploration and repeatedly

discussed Anadarko's deepwater drilling operations on conference calls – was also knowledgeable and informed about operations on the well." (Op. 33 (citations omitted).)[35] Yet there is no allegation that Mr. Daniels was focused on Anadarko's non-operating interest in the Macondo Prospect or that he ever – let alone repeatedly – discussed it on conference calls.

      2.     Alleged "red flags" do not establish a strong inference of scienter

Plaintiffs boldly pronounce that "BP's poor safety history was common knowledge in the industry" and that "any reasonable executive would have recognized the risk of serious safety hazards." (Op. 42.)[36] But Plaintiffs fail to allege with any degree of particularity that any of the Defendants knew or recklessly disregarded contemporaneous facts alerting them of any red flags with respect to BP's safety record. (MTD 36.) Plaintiffs suggest that investing in a well operated by BP, the largest producer in the Gulf of Mexico, constituted a red flag in and of itself. (Op. 42.) This unfounded claim warrants dismissal. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).

Grasping at straws, Plaintiffs rehash claims of mismanagement repackaged as supposed indications of "severe recklessness" on the part of the Individual Defendants. (Op. 43.) But Plaintiffs do not even adequately allege that any Anadarko personnel were "alerted to warnings,"

---

[35]     And the sole case Plaintiffs cite for this proposition – *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) (Op. 33) – provides Plaintiffs no support. *Adams* held that the plaintiffs had adequately pleaded scienter as to a company's CEO because (1) the CFO knew of the alleged false statements, militating in favor of a finding that the CEO had the same information; and (2) the falsity was substantial, comprising more than 25% of the company's reported net income. *Id.* at 1106. Here, there is no allegation that anyone who directly reports to Mr. Daniels – an equivalent of the CFO in *Adams* – knew of problems with Anadarko's involvement in Macondo. Moreover, the $24 million initial investment in the well comprised only a tiny fraction of Anadarko's total capital expenditures.

[36]     Plaintiffs' assertion in their Opposition that "BP's poor safety history was . . . known to Anadarko executives" is found nowhere in their Amended Complaint. (Op. 42.) The Amended Complaint instead repeatedly alleges that Anadarko "failed to properly investigate BP's safety record and practices" (AC ¶¶ 186, 206, 221), and also baldly asserts that "Defendants either knew or were reckless in not knowing about BP's abysmal safety record prior to partnering with BP" (AC ¶ 247) – yet another empty, unsupported non-actionable claim of mismanagement. *See Santa Fe*, 430 U.S. at 479.

much less any Individual Defendant.   Of course, even if low-level Anadarko personnel were ever alerted to warnings as to drilling procedures, that is of no moment, because these alerts as alleged do not demonstrate that BP was drilling the well in an unsafe manner, nor do "instances of cement integrity issues" or a "lost circulation event." (*Id.*)  Plaintiffs' innuendo that these (likely routine) issues should have demonstrated to Anadarko that there would be an accident at the well – and hence inspired Anadarko executives to review BP's spill response plan, to perform due diligence as to BP's spill response capabilities, and to unilaterally put in place a more "comprehensive spill response plan" on BP's behalf – cannot support an actionable claim. (*Id.*)

Unlike here, the cases Plaintiffs rely on involve specific red flags that, if taken as true, rendered false the alleged misstatements. (Op. 42.) *See In re ArthroCare Corp. Secs. Litig.*, 726 F. Supp. 2d 696, 715-16 (W.D. Tex. 2010) (news articles concerning accounting irregularities that were subject of misstatements); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 405 (S.D.N.Y. 2005) (NYSE examination report concerning illegal proprietary trading that was subject of misstatements).  Here, in contrast, even if BP's safety was "poor," that fact alone could not render false any of the alleged statements, such as generic assertions that Anadarko "create[s] a balanced plan that couples new energy development with oftentimes innovative techniques to protect the locations in which we operate." (AC ¶ 33.) Likewise, even if "possible shallow gas" and "shallow water flow" required BP to "take additional care" at the well, and even if the well experienced a lost circulation event and cement integrity issues, those facts do not render false Anadarko's generic statements about its own operations. (Op. 43.)

3.   Plaintiffs fail to adequately allege that additional facts establish a strong inference of fraudulent intent

Neither Anadarko's post-spill cross claim against BP nor its settlement with BP bear on the Individual Defendants' state of mind. (Op. 43-44.)  These actions cannot demonstrate

scienter before the spill because the Individual Defendants cannot be charged with knowledge of information that did not yet exist. *See Franklin Bank*, 782 F. Supp. 2d at 376.   Moreover, Plaintiffs' post-spill allegations concern (1) public flow rate estimates made by BP executives (Op. 30-31), (2) Anadarko's involvement in the well as a non-operator (Op. 15-18), and (3) Anadarko's insurance coverage (Op. 28-29).   None relates to BP's operational decisions at the well, which are the subject matter of the cross claim and settlement.

Anadarko's alleged liability under the Clean Water Act and Oil Pollution Act, which impose strict liability based on a defendant's status, is also irrelevant.  (MTD 40.)   In fact, Judge Barbier's opinion made clear that Anadarko was not even negligent, let alone severely reckless, with respect to its involvement in the Macondo Prospect, because Anadarko did not have operational control over any of the activities allegedly resulting in the accident.  (MTD 40-41.) *See In re Oil Spill*, 808 F. Supp. 2d 943, 963 (E.D. La. 2011).

## CONCLUSION

Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

Dated:  December 17, 2012            Respectfully submitted,

                                     /s/ Charles W. Schwartz
                                     Charles W. Schwartz
                                     Fed. Bar No. 603
                                     Texas Bar No. 17861300
                                     Email: Charles.Schwartz@skadden.com
                                     Skadden, Arps, Slate,
                                         Meagher & Flom LLP
                                     1000 Louisiana, Suite 6800
                                     Houston, Texas 77002
                                     (713) 655-5160 – Telephone
                                     (713) 483-9160 – Facsimile

                                     *Attorney-in-charge for Defendants*
                                     *Anadarko Petroleum Corporation, James T.*
                                     *Hackett, Robert G. Gwin, and Robert P. Daniels*

*Of Counsel*

Jay B. Kasner
*(Admitted Pro Hac Vice)*
Email: Jay.Kasner@skadden.com
Susan Saltzstein
*(Admitted Pro Hac Vice)*
Email: Susan.Saltzstein@skadden.com
Skadden, Arps, Slate,
    Meagher & Flom LLP
4 Times Square
New York, New York 10036-6518
(212) 735-2628 – Telephone
(917) 777-2628 – Facsimile

26

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the counsel who have registered with this Court.  All others were served a copy via U.S. mail postage prepaid.


*/s/ Charles W. Schwartz* _____
Charles W. Schwartz