UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re ANADARKO PETROLEUM CORP. CLASS ACTION LITIGATION | Civ. Action No. 4:12-CV-00900<br><br>ECF CASE |

## LEAD PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

Lead Plaintiffs respectfully submit this response to Defendants' Notice of Supplemental Authority regarding *Sinay v. CNOOC Ltd.*, No. 12 Civ. 1513 (KBF), 2013 WL 1890291 (S.D.N.Y. May 6, 2013) ("*Sinay*"). *See* ECF No. 83. In *Sinay*, the court dismissed a cursory, 30-page securities fraud complaint alleging that a defendant oil company made false statements regarding its safety practices prior to spills at an oil well and, after the spills, falsely stated that the spills were under control. *Id.* at *2-4. Judge Forrest dismissed for a failure to plead scienter, holding that the complaint failed to provide "specific references to any information <u>available</u> to CNOOC [*i.e.,* the corporate defendant] or to <u>anyone</u> at CNOOC that contradicted CNOOC's statements" or "undermin[ed] the accuracy of those statements in any way." *Sinay* at **8-9 (emphasis added). Here, in contrast to *Sinay,* Lead Plaintiffs' detailed Complaint contains numerous allegations regarding information that Defendants had available to them or were aware of that directly contradicted or undermined their statements to Anadarko's investors regarding both post-spill statements and pre-spill..

First, the post-spill scienter allegations at issue in *Sinay* bear no resemblance to those alleged here. In *Sinay,* plaintiffs alleged that the defendant "must have been aware" its post-spill statements were false because it sat on a joint management committee with the operator of the well, conducted safety inspections, and was involved in the clean-up of the spills. *Id.* at *9. As

Judge Forrest held, however, the *Sinay* complaint contained no allegations about what contradictory information was known or available to the defendant. *Id.* ("There is not, for example, any allegation about what information was known to the joint management committee, what reports or presentations were given to that committee, or even what anyone on the committee might have said indicating … knowledge contradicting CNOOC's public statements," "[n]or is there an allegation even that CNOOC's involvement in post-spill clean-up efforts revealed to CNOOC that the spills were not under control" and "[n]or is there any allegation about what, if anything, was revealed during CNOOC's safety inspections").

Here, by contrast, the Complaint alleges in detail that, when Daniels falsely assured investors on May 4, 2010 that "we were not involved…at all" in "looking at the detail, well design or procedures" at the Macondo well, there was a wealth of information available to him demonstrating the falsity of that statement. For example, pursuant to the Joint Operating Agreement between Anadarko and BP, Anadarko contracted to receive, and did receive, extremely detailed information regarding the well, including "the current depth…lithological information, data on drilling fluids…information about drilling difficulties or delays…mud checks, mud lugs, and Hydrocarbon information, casing and cementation tallies, and estimated cumulative Costs." *See* ¶46; *see also* ¶¶48-57 (Anadarko had 24/7 access to information about the well and received "daily drilling reports, [mud] logs, geologic reports") *and* Browne Decl., Ex. A (JOA), § 5.7. The Complaint also alleges that Anadarko expressly approved departures from the initial well design (¶¶90-96) and approved multiple authorizations for expenditures showing extensive detail about the Macondo well and its procedures. ¶¶46, 47, 61-107, 235.

Moreover the Complaint includes numerous detailed factual allegations – including sworn testimony from Anadarko's own employees and from BP's primary contact with

Anadarko – establishing that, contrary to Daniels' statement, Anadarko was directly involved in "looking at" the "well design." *See, e.g.*, ¶13 (Anadarko received and reviewed well design plans and permits); *see also* Browne Decl., Ex. B (Beirne Tr.) at 60:4-11 (Defendants "…were well aware of what they signed" at the time of entering into the JOA), ¶¶41-42 (Anadarko received the well design plan and conducted its own geological evaluation of the well), ¶56 (BP confirmed that Anadarko reviewed well design plan). Thus, unlike the situation in *Sinay*, the Complaint here alleges in detail the contradictory information available to Daniels, and raises a strong inference that Daniels acted at a minimum recklessly. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007).[1]

Second, in contrast to *Sinay*, the Complaint in this case provides abundant allegations to support falsity and scienter for Anadarko's pre-spill statements regarding safety and rigorous risk management practices. For example, the Complaint alleges that Defendants had access to and were aware of information that contradicted their statements regarding Anadarko's supposedly "rigorous" risk management practices, including *inter alia*: (i) the egregiously false OSRP and EP, which violated MMS regulations (¶¶7, 14-15, 118, 121-37, 169, 173-79); (ii) BP's abysmal safety record (¶¶9, 239-47); and (iii) "24/7 real time" data and daily operations reports regarding the well that warned of the dangers involved in the risky, cost-cutting decisions made at the well, which Anadarko approved (¶¶10, 39-57, 61-107, 119).

---

[1] Further, this inference is particularly compelling in light of the circumstances in which Daniels' statement was made. Among other things, it was made during Defendants' first public disclosure following the spill, and at a time when the focus of the world – in particular, Anadarko's investors and Defendants themselves – was on the spill and Anadarko's potential liability. ¶¶147-151, 234-235, 284. Moreover, investors were entitled to trust that Daniels had accurate information – the Macondo well was under his authority, he had previously spoken repeatedly about Anadarko's expertise in the Gulf of Mexico, and had publicly emphasized Anadarko's supposedly "very, very rigorous[]" risk assessment practices. ¶¶211, 219, 278.

Dated: June 5, 2013	Respectfully Submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ John C. Browne
John C. Browne, *admitted Pro Hac Vice*
Jeremy P. Robinson, *admitted Pro Hac Vice*
Brett Van Benthysen, *admitted Pro Hac Vice*
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jeremy@blbglaw.com
brett@blbglaw.com

*Counsel for Lead Plaintiffs*

**AJAMIE LLP**

/s/ Thomas R. Ajamie
Thomas R. Ajamie, Texas Bar No. 00952400
Dona Szak, Texas Bar No. 19597500
John W. Clay, Texas Bar No. 00796366
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Tel: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
dszak@ajamie.com
jclay@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

4

## CERTIFICATE OF SERVICE

  I, Dona Szak, hereby certify that on June 5, 2013, I caused a true and correct copy of Lead Plaintiffs' Response to Defendants' Notice of Supplemental Authority to be served on the parties in the above-captioned action through the ECF system.

              /s/ Dona Szak
              Dona Szak