UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE: ANADARKO PETROLEUM CORP. CLASS ACTION LITIGATION | § § § § § | Civil Action No. 4:12-cv-0900<br><br>HON. KEITH P. ELLISON |

## MEMORANDUM AND ORDER

This case arises out of the April 20, 2010 Macondo well blowout and the resulting explosion on the drilling rig *Deepwater Horizon* which killed 11 people; injured dozens of others; and set off a chain of events culminating in 87 days of crude oil spilling directly into deepwater Gulf of Mexico. The Macondo well was a joint venture among BP Exploration & Production Inc. (together with its affiliates, "BP"), Anadarko Petroleum Corp. ("Anadarko" or the "Company"), and MOEX Offshore 2007 LLC. In the months following the disaster, lawsuits raising a variety of claims were filed across the country. Included in this mélange were lawsuits charging BP and Anadarko, separately, with committing securities fraud. The claims against BP were aggregated and transferred to this Court for pre-trial coordination by the Judicial Panel on Multi-District Litigation on August 10, 2010 (the "BP Class Action").[1] In that case, the Court has now ruled on three motions to dismiss filed by the BP defendants. *See In re BP p.l.c. Sec. Litig.* ("*BP I*"), 843 F. Supp. 2d 712 (S.D. Tex. 2012); *In re BP p.l.c. Sec. Litig.* ("*BP II*"), 852 F. Supp. 2d 767 (S.D. Tex. 2012); *In re BP p.l.c. Sec. Litig.* ("*BP III*"), --- F. Supp. 2d ---, 2013 WL 487011 (S.D. Tex. Feb. 6, 2013).

Anadarko also faced its own claims of securities fraud. This case began in the Southern District of New York as *Goodwin v. Anadarko Petroleum Corp.*, filed by an individual plaintiff

---

[1] *In re BP plc Securities Litigation*, 10-md-2185.

on behalf of purchasers of Anadarko common stock between June 12, 2009 and June 9, 2010. (Doc. No. 1.) It was later consolidated with related securities class actions against Anadarko. (Doc. No. 16.) Pension Trust Fund for Operating Engineers ("Operating Engineers") and the Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands" and, together with Operating Engineers, "Plaintiffs") were appointed as lead plaintiffs and ordered to file a consolidated amended complaint. (*Id.*; Doc. No. 17.)

On January 31, 2011, Plaintiffs filed the Consolidated Class Action Complaint in the Southern District of New York. (Doc. No. 20.) Defendants moved to dismiss the Consolidated Class Action Complaint. (Doc. No. 34.) After briefing on Defendants' motion was completed, but before a ruling issued, the judge assigned to the case granted Plaintiffs' motion to transfer it to the Southern District of Texas, where the securities fraud cases against BP had been aggregated. (Doc. No. 43.)

Once the case reached this Court, the parties agreed that Plaintiffs would amend the Consolidated Class Action Complaint, thereby abating the then-pending motion to dismiss and initiating a new round of briefing. (Doc. No. 68.) Plaintiffs filed the First Amended Consolidated Class Action Complaint in this Court on July 20, 2012. (Doc. No. 69 (the "Complaint" or the "Compl.").) Defendants then moved to dismiss the Complaint. (Doc. No. 73.)

The Court now rules on Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint (Doc. No. 73).  Having reviewed the motion, Plaintiffs' response (Doc. No. 77), Defendants' reply (Doc. No. 79), all papers in support thereof, and the parties' oral arguments, the Court finds that Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint (Doc. No. 73) must be **GRANTED IN PART** and **DENIED IN PART**.

## I.      SUMMARY OF THE COMPLAINT

### A.      The parties

Plaintiffs are Operating Engineers, a non-profit corporation that administers the employee benefit programs for over 35,000 participants of the International Union of Operating Engineers, Local 12, and their dependents and beneficiaries; and the Virgin Islands, a public pension fund for officials and employees of the Government of the Virgin Islands. (Compl. ¶¶ 22-23.) Plaintiffs represent a proposed class of persons and entities who purchased or otherwise acquired the publicly-traded securities of Anadarko between June 12, 2009 and June 9, 2010 (the "Proposed Class Period"). (*Id.* at 1.)

The Complaint names as defendants Anadarko Petroleum Corporation and three of its executives: James T. Hackett, Anadarko's Chief Executive Officer and Chairman of the Board of Directors, as well as President of the Company from 2003 to February 2010; Robert G. Gwin, Anadarko's Chief Financial Officer and Senior Vice President of Finance; and Robert P. Daniels (together with Hackett and Gwin, the "Individual Defendants"), Anadarko's Senior Vice President of Worldwide Exploration. (Compl. ¶¶ 25-27.) During the Proposed Class Period, Hackett sold over $61 million of Anadarko common stock. (*Id.* ¶ 25.) Gwin and Daniels are not alleged to have sold any Anadarko common stock during the Proposed Class Period.

### B.      Plaintiffs' allegations

#### 1.      Allegations of Anadarko's mismanagement of the Macondo well

Anadarko is one of the world's largest independent oil and gas exploration and production companies and has invested heavily in deepwater oil exploration and drilling in the Gulf of Mexico. (Compl. ¶ 30.) On October 1, 2009, Anadarko paid BP $24 million for a 25% interest in the Macondo well. (*Id.* ¶ 6.) BP retained a 65% interest in the well; the remaining 10%

was owned by a third company, MOEX Offshore 2007 LLC. (*Id*.) In addition to retaining a majority interest in the Macondo well, BP also served as operator of the drilling operations. (*Id*. ¶ 8.)

Plaintiffs fault Anadarko for poorly managing its investment in the Macondo well. They note that the Joint Operating Agreement ("JOA") provided Anadarko with the right to receive extensive information regarding BP's decisions and actions as operator. (Compl. ¶ 46.) Plaintiffs allege that, consistent with its contractual rights, Anadarko did in fact receive this information— through "day-to-day" contact between BP and Anadarko employees; through two web-site databases providing "real-time" access to data and information regarding drilling operations; through daily reports sent by BP summarizing the day's events at the rig; and through Authorization for Expenditure ("AFE") documents requesting additional funding for specific actions proposed by BP. (*Id*. ¶¶ 49-56.) Plaintiffs also emphasize that, under the JOA, BP could not engage in drilling activities costing more than $500,000 without first acquiring Anadarko's express approval. (*Id*. ¶ 46.) According to Plaintiffs, Anadarko approved every AFE submitted by BP. (*Id*.)

 Given its access to detailed information about BP's activities on the well, and its approval of BP's AFEs, Plaintiffs claim that Anadarko is equally at fault for the "risky" decisions made by BP as drilling operator which contributed to the April 20, 2010 tragedy. As explained in more detail in the Court's orders in the BP Class Action, such decisions included: (1) using a "long string" casing instead of a "liner/tieback" casing on the deepest section of the well; (2) using six centralizers instead of sixteen centralizers while lowering the long string casing into the well; (3) conducting only a partial circulation rather than a full circulation of drilling mud from the bottom to the top of the well before starting the cementing process; and (4)

failing to run a cement bond log following the cementing process to test the cement's integrity. (Compl. ¶¶ 75-107.) According to Plaintiffs, these decisions led to an improper cement job, which permitted hydrocarbons to escape through "channels" in the cement and eventually blow-out through the floor of the *Deepwater Horizon* rig. (*Id.* ¶ 109.)

The repercussions of the failed cement job are both well-known and tragic. The escaping gas ignited, triggering a series of explosions which killed 11 crew members and injured dozens of others. The rig burned for more than a day before it sank on April 22, 2010. (Compl. ¶ 109.) The collapse of the *Deepwater Horizon* damaged a pipe known as a "riser" connecting the rig to the well, which allowed oil to flow unimpeded into the Gulf of Mexico. (*Id.* ¶ 110.) The oil spill lasted 87 days, during which many attempts to plug the well failed. (*Id.* ¶¶ 113-17.) In total, approximately 206 million gallons of oil flowed into the Gulf. (*Id.* at 117.) Only a fraction of this amount was recovered. (*Id.* ¶¶ 113-116.)

Following the *Deepwater Horizon* explosion and the resulting oil spill, Anadarko blamed the disaster on BP's "reckless decisions and actions;" Hackett even declared, "Anadarko would have done things differently." (Compl. ¶¶ 18, 87.) Anadarko asserted legal claims against BP for contribution, indemnification, breach of contract, gross negligence, and willful misconduct. (*Id.* ¶ 266.) These claims have been settled, with Anadarko paying BP $4 billion and relinquishing its 25% interest in the well. (*Id.* ¶ 269.)

As noted above, Plaintiffs assert that Anadarko bore much more responsibility for the disaster than its post-spill actions and words indicate. But while laying blame for the *Deepwater Horizon* disaster at Anadarko's feet is a prominent theme in the Complaint, it is not the focus of the liability alleged therein. Instead, Plaintiffs seek compensation for Defendants' alleged

securities fraud. Plaintiffs claim that Defendants misled the investing public both before and after the April 20, 2010 disaster.

### 2.     Allegations of Defendants' pre-spill misrepresentations

Plaintiffs claim that, prior to April 20, 2010, Defendants falsely represented that safety was a top priority within Anadarko, and that safety would not be compromised in the search for higher profits. (Compl. ¶¶ 180-84, 199, 202-03.) Plaintiffs allege that these "safety first" representations were false because "Anadarko was not managing its projects, including the Macondo well, in a manner that was safe or designed to ensure environmental safety." (*Id*. ¶¶ 186, 206.)

Plaintiffs also allege that Defendants falsely represented that Anadarko actively managed risks in its operations. (Compl. ¶¶ 185, 190, 200, 214, 218-20.) These representations were purportedly false because Anadarko did not have "disciplined and rigorous risk management practices," as exemplified by its failure to "investigate BP's safety records and practices" prior to farming into the well, as well as its subsequent "approv[al of BP's] dangerous and high-risk operational decisions for the Macondo well" and its failure to "properly monitor operations" or to "exercise any oversight over BP" despite BP's egregious safety record. (*Id*. ¶¶ 186, 206, 221.)

Plaintiffs further allege that Defendants repeatedly touted Anadarko's successful track record and expertise in project management; deepwater exploration; and the Gulf of Mexico. (Compl. ¶¶ 188, 191-92, 194, 201, 204-05, 208-12.) Such statements were allegedly misleading because Anadarko failed to "meaningfully review" BP's governmental filings regarding the Macondo well or to "investigate BP's safety records and practices" prior to farming into the well. (*Id*. ¶¶ 189, 196.) Such statements were also allegedly misleading because Anadarko managed the Macondo project poorly by "approv[ing] dangerous and high-risk operational decisions" and

failing to "properly monitor operations" or to "exercise any oversight over BP." [2] (*Id.* ¶¶ 206, 221.)

Finally, Plaintiffs allege that Anadarko repeatedly certified that it had appropriate reserves and/or insurance coverage to cover foreseeable drilling-related liabilities. (Compl. ¶¶ 192, 201, 216.) These assurances were allegedly misleading because Anadarko failed to "meaningfully review" BP's governmental filings regarding the Macondo well or to "investigate BP's safety records and practices" prior to farming into the well. (*Id.* ¶ 196.) Such statements were also allegedly misleading because Anadarko "approved dangerous and high-risk operational decisions" on the Macondo project and failed to "properly monitor operations" or to "exercise any oversight over BP." (*Id.* ¶¶ 206, 221.)

It is important to note that none of the above pre-spill misrepresentations specifically concerned the Macondo well or Anadarko's involvement in that venture. It appears to be undisputed that Anadarko's involvement in the Macondo well—although technically a matter of public record—was not widely known until after the *Deepwater Horizon* explosion. (Compl. ¶ 140.)

Plaintiffs allege two additional pre-spill misrepresentations, which are noteworthy because they were not made by Anadarko or its employees. In February 2009 and June 2009, respectively, BP filed with the U.S. Department of the Interior's Minerals Management Service

---

[2] As the Court has tried to make clear, Plaintiffs repeat the same block paragraph as to the reason(s) why all of Defendants' pre-spill statements were false or misleading, with little to no tailoring as to the type of misrepresentation at issue. In addition to being deficient under Federal Rule of Civil Procedure 9(b), which mandates that circumstances constituting fraud be pled "with particularity," and under the Private Securities Litigation Reform Act ("PSLRA"), which mandates that Plaintiffs specify "the reason or reasons why [a] statement is misleading," 15 U.S.C. § 78u-4(b)(1), this undifferentiated approach to the pre-spill statements has made it difficult for the Court to determine exactly how any given statement is purported to be misleading.

("MMS") an Initial Exploration Plan ("EP") for the Macondo well and a regional Oil Spill Response Plan ("OSRP") for the Gulf of Mexico.[3] (Compl. ¶ 173.) But Anadarko did not become involved in the Macondo venture until late 2009. Plaintiffs allege that Anadarko is legally responsible for the content of the EP and the OSRP—including the alleged errors and omissions contained within—because it reviewed those documents; did not correct them; and therefore implicitly approved, ratified, and adopted them. (*Id.* ¶ 126.) The alleged inaccuracies contained within the EP include assertions that an oil spill at Macondo would have "sublethal" effects on surrounding marine life; that a blowout would be unlikely to have an impact due to "available equipment and personnel, techniques for containment and recovery and removal of the oil spill[;]" and that there is "little risk of contact or impact to the coastline and associated environmental resources" from an oil spill due to the well's distance from shore and the "response capabilities that would be implemented[.]" (*Id.* ¶ 176.) Similarly, the alleged misrepresentations contained within the OSRP are that BP could effectively respond to a "worst case discharge" of 250,000 barrels a day; that as much as 491,721 barrels per day could be effectively recovered; and that a sufficient number of "skimmer" vessels would be deployed in the event of a spill to prevent the oil from reaching shore.[4] (*Id.* ¶ 174.) Such statements were

---

[3] The MMS is now the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE").

[4] In a Rule 12(b)(6) motion to dismiss, the Court must accept as true a plaintiff's well-pleaded factual allegations. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007). The Court does not, however, accept as true factual allegations that are contradicted by documents on which they are based. *See U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) ("[When] an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls."). In the Complaint, Plaintiffs allege that the EP represented that the Macondo well co-owners could effectively respond to the worst case discharge scenario set forth in the OSRP. (Compl. ¶¶ 175, 178(b).) Contrary to this allegation, the EP stated that "*BP Exploration & Production Inc.* [had] the capability to respond . . . to a worst-case discharge . . . resulting from the activities

8

allegedly misleading because BP and Anadarko did not have adequate equipment, personnel, or techniques to respond to even a much smaller spill than that contemplated in the EP and OSRP, leading to disastrous consequences for marine life, the adjacent shoreline, and the local economies dependent on each. (*Id.* ¶¶ 113-18, 178.)

### 3.   Allegations of Defendants' post-spill misrepresentations

The remaining alleged misrepresentations occurred after the *Deepwater Horizon* explosion. Plaintiffs allege that Defendants repeatedly reassured investors that Anadarko's liabilities from the explosion and oil spill would be covered by insurance. (Compl. ¶¶ 230-32.) These representations were purportedly false because Defendants knew or recklessly disregarded that Anadarko's liabilities would far exceed the amount of insurance coverage. (*Id.* ¶ 233.)

Plaintiffs also allege that Daniels falsely stated that Anadarko had no involvement in the well design and procedures deployed at the Macondo well. (Compl. ¶ 234.) This representation was allegedly misleading because Anadarko had access to all "detail, well design [and] procedures" and approved all of the drilling decisions made by BP. (*Id.* ¶ 235.)

Finally, Plaintiffs claim that Anadarko can be held liable for a series of alleged misrepresentations made by two BP executives regarding the amount of oil spilling into the Gulf from the Macondo well. (Compl. ¶¶ 222-26.) Plaintiffs allege that Anadarko had approval authority over all public statements made about the well, and therefore Anadarko must have approved BP's release of drastically understated estimates of the oil flow. (*Id.* ¶ 227; see also *id.* ¶¶ 46-47.) Plaintiffs allege that Anadarko knew the estimates were misleading because: (1) it had access to internal data and/or reports within BP that cast doubt on the publicly released figures

---

proposed in our Exploration Plan." (Doc. No. 74-30, at 30 (emphasis added).)

and (2) one of Anadarko's own employees had calculated a spill rate much higher than that suggested by BP's executives. (*Id.* ¶¶ 225, 228-29.)

### C.    Plaintiffs' claims for relief

For the above alleged misrepresentations, Plaintiffs seek redress under Section 10(b) of the Securities and Exchange Act. Specifically, Plaintiffs assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 of the Securities and Exchange Commission ("SEC") against all Defendants. (Compl. ¶¶ 306-14.) They also assert violations of section 20(a) of the Exchange Act against Hackett, Gwin, and Daniels based on their alleged "control" of Anadarko's decision-making and public representations. (*Id.* ¶¶ 316-18.)

## II.    DEFENDANTS' MOTION

Defendants move to dismiss the Complaint for failure to state a claim for securities fraud or control person liability. Defendants fault Plaintiffs for seeking to recover under the securities laws for alleged mismanagement of the Macondo project. (Doc. No. 73, at 2, 13-14.) Defendants also raise a number of specific deficiencies regarding the alleged misrepresentations in the Complaint, including: (1) Plaintiffs have not adequately pled how the alleged misrepresentations were false or misleading; (2) Plaintiffs have not adequately pled scienter for any alleged misrepresentation; and (3) Defendants are not liable under the securities laws for alleged misrepresentations made by BP and BP executives.

### III.    LEGAL STANDARDS

#### A.    Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Well-pleaded factual allegations must be taken as true, but the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion to dismiss, the court must limit itself to the contents of the pleadings, including attachments thereto, with two exceptions.  First, the Fifth Circuit allows the court to consider certain documents attached to the motion to dismiss.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  Such documents must be referenced in the complaint and central to the plaintiff's claim.  *Id.*; *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  Second, because this is a securities case, the court may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with those agencies.  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996).  However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents.  *Id.*

As is required for Rule 12(b)(6) analysis, the court must draw all reasonable inferences in favor of the plaintiff.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). However,

for scienter only, in keeping with the requirement of the Private Securities Litigation Reform Act ("PSLRA") that plaintiffs plead facts giving rise to a "strong" inference of scienter, the court must take into account plausible inferences opposing as well as supporting scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs I*"), 551 U.S. 308, 323-24 (2007). Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent. *Id.* at 324.

### B.    Section 10(b)

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. The Supreme Court has inferred from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs I*, 551 U.S. at 318. To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection

between the misrepresentation or omission and the loss.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009).

### 1.     Material Misrepresentations and Omissions

Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  *See Lormand*, 565 F.3d at 239; s*ee also Tellabs I*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to "curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims").  Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (noting that the PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud under Rule 9(b)).  The PSLRA enhances the requirements of Rule 9(b) in two ways.  First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).  Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at § 78u–4(b)(2)(A).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  These allegations constitute the "who, what, when, where, and how" required under

13

Rule 9(b) and the PSLRA.  *Id.*  What constitutes particularity will necessarily differ with the facts of each case.  *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).  A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is material as a matter of law.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318–22 (2011).  Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information.  *Id.* at 1321.  The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  *Id.* at 231-32; *see also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the 'total mix' of information available about the proposed investment").  Materiality is not judged in the abstract, but in light of the surrounding circumstances.  *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

With regard to misstatements, the PSLRA establishes a "safe harbor" protecting individuals and corporations from liability for certain forward-looking statements that prove

false.  To qualify for protection, the statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be immaterial.  15 U.S.C. § 78u–5(c)(1)(A)(i)–(ii).  Where a material forward-looking statement is not accompanied by cautionary language, a defendant may still claim safe harbor if plaintiff fails to prove that the defendant made the statement with "actual knowledge" as to its falsity.  *Id.* at § 78u–5(c)(1)(B).

### 2.    Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement.  *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 539 (5th Cir. 2008).  Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant; rather, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).  To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter.  *Tellabs I*, 551 U.S. at 319.

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public.").

Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Rosenzweig*, 332 F.3d at 866 (quoting *Nathenson*, 267 F.3d at 408).

For a complaint to adequately plead scienter, "Congress require[s] plaintiffs to plead with particularity facts that give rise to a 'strong'— i.e., a powerful or cogent—inference." *Tellabs I*, 551 U.S. at 323.  The inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences."  *Id*. at 324 (citation omitted) (internal quotation marks omitted).  Nonetheless, the "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id*.  In addition, "[t]he strength of an inference cannot be decided in a vacuum. . . . To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id*. at 323–24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id*. at 326 (quoting 15 U.S.C. § 78u–4(b)(2)(A)).

*Tellabs I* outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA.  551 U.S. at 322-23.   First, the allegations must, as in federal pleadings generally, be taken as true.  *Id*. at 322.  Second, the court may consider documents incorporated in the complaint by reference and matters subject to judicial notice.  *Id*.  The facts must be evaluated collectively, not in isolation, to determine

16

whether a strong inference of scienter has been pleaded. *Id*. at 322-23; *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter . . . each allegation of fraud must individually meet the particularity requirements of the PSLRA.") (citation omitted). Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs I*, 551 U.S. at 324. At the conclusion of this process, scienter has been adequately pled if the alleged facts, taken as true, give rise to an inference that the defendant intentionally or recklessly misled the public which is *at least* as compelling as any inference that the defendant acted non-culpably or merely negligently. *Id*.

Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Appropriate motive and opportunity allegations may, however, "'meaningfully enhance the strength of the inference of scienter.'" *Southland*, 365 F.3d at 368 (quoting *Nathenson*, 267 F.3d at 412). Corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). However, corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document. *Id*.

The Fifth Circuit has rejected the group pleading approach to scienter. *Shaw Group*, 537 F.3d at 534. As a result, the court may not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is

specifically pleaded." *Southland,* 365 F.3d at 365. Plaintiffs pleading fraud claims against individuals under section 10(b) and Rule 10b–5 must distinguish among defendants and allege the role of each. *Id*. The Court will then look to the "state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Shaw Group*, 537 F.3d at 533 (quoting *Southland*, 365 F.3d at 366).

### C.    Section 20(a) claims

Under section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a).  *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws").  Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, they necessarily fail to state a claim for control person liability under section 20(a).  *Blackwell*, 440 F.3d at 288.

IV.     ANALYSIS

Plaintiffs highlight 28 allegedly misleading statements issued or ratified by Defendants over an approximately one-year period. The Court will consider address these statements in seven broad categories, as indicated below.

A.      Representations of Anadarko's commitment to safety

Plaintiffs fault Anadarko for a number of public statements expressing a commitment to safety. The following alleged misrepresentations fall into this category:

- Plaintiffs highlight a series of undated statements found on Anadarko's website, including: a representation that Anadarko is "committed to safely producing the energy we all need in a manner that protect the environment, public health and supports our communities" (Compl. ¶ 180); that Anadarko is "committed to safely finding and producing the energy our world needs" and works to "safely leverage leading-edge technology to create pathways to new opportunities for energy development, while preserving the environment" (*id.* ¶ 181); that safety is a "top priority" within the company, with employees promoting a "culture of safety" in which "safety is no accident" (*id.* ¶ 182); and that a "safety-first culture is a way of life at Anadarko" (*id.* ¶ 183).

- In a press release issued October 20, 2009, Anadarko expressed its "commitment to . . . protecting the environment across all our operations." (*Id.* ¶ 199.)

- In a press release issued November 9, 2009, Hackett praised Anadarko and its employees for acting as "good stewards of the environment." (*Id.* ¶ 202.)

- In a statement issued November 11, 2009, after the passing of Hurricane Ida in the Gulf of Mexico, Anadarko stated that "[w]e will begin ramping up production as quickly and safely as possible[.]" (*Id.*)

- Also on November 11, 2009, Anadarko's Board of Directors adopted a revised Code of Business Conduct and Ethics, which stated that "Anadarko is committed to managing and operating its assets in a manner that protects and conserves the environment and is consistent with all environmental laws and regulations" and that "Anadarko will not compromise health or safety in the workplace." (*Id.* ¶ 203.)

Defendants argue that the above statements are not actionable because they are mere "corporate optimism" and "obvious puffery" which cannot support a fraud claim. (Doc. No. 73,

at 3-4, 17-18, 20-21.) They claim that none of the statements was phrased as, or would have been understood by investors as, guarantees, and that they therefore were not material to any investment decisions. (*Id*. at 17-18, 20-21.)

Defendants also fault Plaintiffs for failing to adduce facts suggesting that the above statements were false. The only detailed criticisms of Anadarko's safety practices in the Complaint occur in connection with Anadarko's alleged mismanagement of the Macondo project. But even assuming that the Macondo project demonstrated in practice a lack of commitment to safety, Anadarko's actions on a single, relatively small-scale project do not render false or misleading general statements regarding its overall commitment to safety. (Doc. No. 73, at 16-17.)

Finally, Defendants argue that Plaintiffs have not adequately alleged that any Individual Defendant, or any other high-ranking person whose knowledge can be imputed to Anadarko, was aware of Anadarko's allegedly reckless or negligent mismanagement of the Macondo project. Defendants claim that such a connection is required to suggest that the statements were made with the requisite scienter. (Doc. No. 73, at 28-33.)

The Court agrees that none of the above statements is actionable. Very similar statements, made by BP, were characterized as fraudulent in the securities fraud action lodged against BP. The Court noted why such statements could not provide the basis for a securities fraud claim against the BP Defendants:

> General statements about corporate "progress" are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision." [*City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005)]; *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws."). The statements listed above are all

in this vein, as they are generalized statements about BP's "commitment to safety," placement of "safety as the number one priority," and its leadership in "process safety management." (Compl. ¶¶ 269, 273, 275.) Even the very specific facts Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether "progress" was being made or whether safety was truly being "prioritized" as "# 1" or the "highest priority." Because Plaintiffs have failed to plead any misrepresentations related to BP's prioritization of safety with the particularity required under Rule 9(b) and the PSLRA, the identified statements are not actionable.

*BP II*, 852 F. Supp. 2d at 813-14. The Court's analysis applies with equal force to statements made by Defendants regarding Anadarko's "commitment to safety," dedication to the environment, and "safety-first culture," identified above.[5] Such statements are not actionable as securities fraud.

### B.    Representations of Anadarko's active management of risk

Plaintiffs claim that Defendants misrepresented how actively Anadarko managed the risks in its operations. The following alleged misrepresentations fall into this category:

- The Company's "Gulf of Mexico Fact Sheet"—posted on Anadarko's website and apparently undated—stated that Anadarko was "disciplined in its risking methodology[,]" which "incorporates a rigorous technical and commercial evaluation, risked economics for comparability and continuous high grading with commercial focus." (Compl. ¶ 185.)

- At the Morgan Stanley Energy Conference on July 8, 2009, Anadarko's Vice President of Exploration stated that the Company seeks "to understand geological risk and a range of possible outcomes" and that it has a "separate risk assessment team that interacts with each of our exploration teams to help them understand these risk factors." (*Id.* ¶ 190.) He also stated, "the bottom line is—the point I want you to take away from this is that we have a consistent process. It is rigorous

---

[5] If anything, the showing of fraud is even less compelling in this case than in the BP Class Action. Whereas the BP Plaintiffs alleged "very specific facts" to "show the falsity of [the BP Defendants'] statements," *BP II*, 852 F. Supp. 2d at 813-14. Plaintiffs here have not made any genuine attempt to demonstrate why Defendants' statements were misleading, as required under the PLSRA and FRCP 9(b). For example, Plaintiffs do not allege that Anadarko suffered any prior safety mishaps, or that Anadarko sought to conceal such mishaps from the public eye. In fact, Plaintiffs' only indictment of Anadarko's safety record concerns the *Deepwater Horizon* explosion. But fraud-by-hindsight is not a valid theory under Rule 10b. *See, e.g., In re Browning-Ferris Indus. Inc. Sec. Litig.*, 876 F. Supp. 870, 901 (S.D. Tex. 1995).

and it's applied throughout the world to each of the prospects we drill." (*Id.*)

- Anadarko's Form 10-Q for the third quarter of 2009, filed November 3, 2009, stated that Anadarko's worldwide resources "help form an optimized global portfolio where both surface and subsurface risks are actively managed." (*Id.* ¶ 200.) A nearly identical statement appeared in Anadarko's Form 10-K for 2009, filed February 23, 2010." (*Id.* ¶ 214.)

- At Anadarko's 2010 Annual Investor Conference on March 2, 2010, two of the Individual Defendants spoke at some length on the matter of Anadarko's risk management. Hackett stated, "We have a mindset towards exploration, prudent exploration, managed internationally in a very strong risk-management perspective[.]" (*Id.* ¶ 218.)

- Also at the 2010 Annual Investor Conference, Daniels stated that the Anadarko exploration group "spend[s] an awful lot of time on risk assessment, subsurface risk assessment, commercial risk assessment, so that we can make the best decisions when we invest the Company's capital." (*Id.* ¶ 219.) He explained that Anadarko has a "Risk Consistency Team" known as the "RCT" which "use[s] a methodology, Rowe's methodology . . . we're very rigorous about it and we get every single opportunity through that group and it's not a onetime event." (*Id.*) He stated, "At the end of [consulting with RCT], we feel like we've got a very good subsurface assessment of resource ranges and they are probabilistic resource ranges and subsurface risk assessment, based on the criterias that we have listed below which are the critical elements for hydrocarbon trapping and accumulation." (*Id.*) Finally, Daniels stated, "We can get new data that can help either minimize the risk or give us a better understanding. We can take technology to the existing data and help move those things up again, through our constant process of evaluating the risk, up into the area where there would be one that we would consider for investment." (*Id.* ¶ 220.)

Defendants challenge the above statements on the same grounds as the "safety-first"

representations, discussed previously. They argue that the statements are nothing more than

generalized "corporate optimism." (Doc. No. 73, at 3-4, 17-18, 20-21.) They fault Plaintiffs for

failing to explain with particularity how the statements were false. (*Id.* at 16-17.) And they claim

that Plaintiffs have not adequately alleged scienter, because they have not shown that any high-

ranking person whose knowledge can be imputed to Anadarko was aware of the alleged failure

to assess and manage risk on the Macondo project. (*Id.* at 28-33.)

Plaintiffs' response makes clear that they rely on Anadarko's actions respecting the

22

Macondo project to substantiate their claim that the above statements regarding consistent, rigorous risk assessment were false. (Doc. No. 77, at 26-27.) Plaintiffs rebut the point that Anadarko's actions on a single, relatively small-scale project cannot demonstrate the statements' falsity by emphasizing that Defendants "were telling investors they were doing one thing— namely, 'consistent[ly]' . . . and rigorously assessing risk—when, in fact, they were not." (*Id.* at 28.)

The Court agrees that the statements in this category would be adequately pled as false if they represented that a specific course of conduct was undertaken with each and every project, and if Plaintiffs alleged specific facts indicating that the course of conduct was not undertaken as represented. But none of the statements meets both of these requirements.

Four of the statements fail because they are too general to support the characterization suggested by Plaintiffs. The statement on the Company's "Gulf of Mexico Fact Sheet" that Anadarko was "disciplined in its risking methodology" made no concrete promises regarding actions that Anadarko had or would take in the future to evaluate exploration prospects. (Compl. ¶ 185.) Similarly, statements from 2009 SEC filings regarding Anadarko's "optimized-global portfolio where both surface and subsurface risks are actively managed" also lacked any objective criteria on which to judge their accuracy. (*Id.* ¶¶ 200, 214.) Finally, a fourth alleged misrepresentation simply stated that Anadarko strived for "prudent exploration, managed internationally in a very strong risk-management perspective." (*Id.* ¶ 218.) Like the first three statements, this statement is "'too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision.'" *BP II*, 852 F. Supp. 2d at 813 (quoting *Bridgestone*, 399 F.3d at 671).

Two of the risk management statements arguably do make concrete representations about

Anadarko's risk management methodology. The first, made by Anadarko's Vice President of Exploration at a conference in July 2009, indicated that a "separate risk assessment team interacts with each of our exploration teams to help them understand [geological risk]," a process "applied through the world to each of the prospects we drill." (Compl. ¶ 190.) The second, made by Defendant Daniels at a conference in March 2010, expounded on Anadarko's use of a "Risk Consistency Team" looking at "subsurface risk assessment [and] commercial risk assessment" through a methodology known as "Rowe's methodology." (*Id.* ¶ 219.) According to Daniels, this process was employed on "every single opportunity" and was not a "onetime event." (*Id.*)

Both of these statements are sufficiently detailed to support a claim of securities fraud, but only if Plaintiffs have also alleged specific facts indicating that the statements falsely portrayed Anadarko's risk management practices. To show falsity, Plaintiffs rely exclusively on allegations relating to the Macondo investment. Plaintiffs claim that Anadarko's purported failure to assess the risk of the Macondo project prior to farming in, combined with its purported failure to manage risk during the life of the project, belie the specific assertions made regarding Anadarko's consistent, rigorous risk methodology. (Compl. ¶¶ 186, 196, 206, 221; Doc. No. 77, at 26-28.)

The Court does not find Plaintiffs' criticisms of the way Anadarko handled the Macondo project sufficient to render the above statements inaccurate. As repeatedly emphasized by Defendants, the Macondo investment was relatively slight in the scheme of Anadarko's overall business. While Defendants point to a figure not contained within the Complaint itself, there are other indications that the Macondo project was not a headlining project for Anadarko.[6] For

---

[6] According to Defendants, Anadarko's $24 million initial investment in the Macondo well represented less than one percent of Anadarko's worldwide capital expenditures for 2009. (Doc. No. 73, at 1.)

example, Plaintiffs note that Anadarko is "one of the world's largest independent oil and gas exploration and production companies." (Compl. ¶ 30.) Yet it held only a 25% interest in the Macondo project, purchased for only $24 million, and it was not even the operator. (*Id*. ¶¶ 38, 45.) In fact, the Macondo project apparently did not rate a single public mention in Anadarko's press releases or public filings before the *Deepwater Horizon* spill. (*Id*. ¶¶ 140, 230; Doc. No. 73, at 3, 16.) Therefore, even if Plaintiffs' allegations are true, and Anadarko failed to employ its risk methodology on the Macondo investment, this one discrepancy is not sufficient to create the inference that Anadarko was not, in fact, employing a risking methodology across its operations. *See BP I*, 852 F. Supp. 2d at 804-05 (finding that allegations of a "backlog of maintenance jobs and missing documents on one of BP's rigs" did not undercut a representation that BP was "scrutinizing safety incidents").[7]

Even if the relatively small scale of the Macondo project is not sufficient to undermine Plaintiffs' allegations of falsity, it is fatal to Plaintiffs' allegations of scienter. The statements at issue were delivered in July 2009 and March 2010, respectively. In order for the Macondo project's alleged lack of risk assessment to be relevant to the issue of falsity, and for the statements' speakers to have possessed the intent to deceive, they must have known about it at the time of their statements. But the first statement was made *before* Anadarko farmed in to the Macondo project. This fact destroys any inference of scienter for the July 2009 statement.

The second statement was delivered by Defendant Daniels, who was Anadarko's Senior Vice President of Worldwide Exploration. To support the inference that Daniels was aware of the alleged lack of risk assessment on the Macondo well—in other words, the inference that

---

[7] The Court might have reached a different conclusion if Plaintiffs had alleged facts indicating that the lack of risk assessment and risk management on the Macondo well was representative of a widespread business practice which contradicted Defendants' public assertions. But no such theory was pled, or would be supported by Plaintiffs' current allegations.

Daniels spoke with an intent to dissemble—Plaintiffs rely on: (1) the importance of the deepwater drilling segment generally and (2) the importance of the Macondo project specifically. (Doc. No. 77, at 32-34.)

As to the first—the importance of deepwater drilling generally—Plaintiffs cite cases in which courts have inferred scienter from the fact that an alleged misrepresentation concerned a business unit or a product that was fundamental to a company's success, such as when a business is built around a single product. (Doc. No. 77, at 32-33.) The analogy is unconvincing. These cases generally involve whether a top executive knew of a particularly damaging piece of information regarding a core driver of business. *See, e.g., Nathenson*, 267 F.3d at 424-25 (finding that scienter is "barely" established when the company consisted of only 35 employees and its CEO, and the patents at issue were "crucial" to the company's sole product). But the piece of information at issue here is the fact that the Macondo well allegedly did not undergo a risk assessment. Even if true, this piece of information is unlikely to have reached the top ranks of the organization prior to any event which proved the lack of a risk assessment foolhardy. In other words, regardless of the importance of deepwater drilling or the Gulf of Mexico to Anadarko, it cannot be presumed that Anadarko's top executives knew the most granular details regarding operations within those business segments.

Plaintiffs' second argument is equally unconvincing. As noted above, the Macondo investment was not a signature investment for Anadarko. It did not rate publicity or fanfare. Anadarko took only a minority interest and was not the drilling operator. Plaintiffs have not sufficiently alleged that this well was so vital to the company—prior to the events of April 20, 2010—that its senior executives would have been fully apprised of its every activity and detail.

Plaintiffs' obligation under the PSLRA is to allege facts giving rise to an inference of

scienter that is at least as likely as the alternative. They have not carried their burden. The far more likely prospect is that Daniels simply did not know whether or not the Macondo well had undergone the type of risk assessment addressed by his statements at the 2010 Annual Investor Conference.  Therefore, even if Plaintiffs have adequately alleged the falsity of his statement, they have not created a strong inference that he delivered the statement with knowledge of or reckless disregard for its falsity.

## C.    Representations of Anadarko's success in project management, deepwater exploration, and the Gulf of Mexico

Plaintiffs also allege that Defendants made misleading statements regarding Anadarko's prior successes and expertise, particularly in project management, deepwater exploration, and the Gulf of Mexico. The following alleged misrepresentations fall into this category:

- On June 12, 2009, Hackett was quoted in the Energy Tribune as stating that Anadarko's cutting-edge technology to produce oil from deepwater sources "makes us scratch our heads as to why our government still holds so much of our natural resources off limits. We've proven we can develop these resources safely while protecting the environment[.]" (Compl. ¶ 188.)

- In a press release issued August 3, 2009, Hackett touted "the excellent performance of our exploration teams, which have announced six deepwater discoveries so far this year" and stated that this "exploration success, coupled with our strong operational performance . . . continues to deliver excellent value today and positions the company to do so in the future." (*Id*. ¶ 191.) These statements were incorporated in Anadarko's Form 10-Q for the second quarter of 2009, filed on August 4, 2009. (*Id*. ¶ 192.)

- During Anadarko's presentation at the EnerCom Incorporated Oil & Gas Conference on August 13, 2009, the Vice President of Operations stated that Anadarko has "an industry-proven track record of project execution and development" and that "[w]e manage where we drill and at what pace we drill throughout our assets." (*Id*. ¶ 194.) He also stated that it was "a great time to invest in Anadarko" due to its "combination of both low-risk and high-end exploration opportunities[.]" (*Id*. ¶ 195.)

- During an earnings conference call conducted on November 3, 2009, Hackett credited Anadarko's "successful deepwater exploration program" for the decision

to "pursu[e] an aggressive appraisal drilling schedule during the remainder of this
year and throughout 2010." (*Id.* ¶ 201.)

- During the Bank of America Securities Energy Conference on November 18,
  2009, Daniels stated, "The outside consultants that do project management,
  benchmarking, have consistently shown that Anadarko is one of the industry
  leaders in this and this is so important when you see that exploration success, how
  we translate that into value for our shareholders. So that's critically important to
  us." (*Id.* ¶ 204.)

- At the Wells Fargo Securities MLP Pipeline and E&P, Energy Services & Utility
  Symposiums on December 9, 2009, Anadarko's Vice President of Investor
  Relations stated, "one thing that we are very proud of is our project management
  skills. We have a track record of being the industry leader in on-time, on-budget
  delivery of these megaprojects." (*Id.* ¶ 205.)

- In a press release issued February 1, 2010, Hackett stated, "2009 was a very
  successful year in advancing our strategy and illustrating the high quality of our
  portfolio." (*Id.* ¶ 208.) Similar statements were made by Anadarko executives on
  an earnings conference call held February 2, 2010. (*Id.* ¶ 209.)

- On February 3, 2010, during the Credit Suisse Group Energy Summit, Daniels
  touted Anadarko's project management expertise by stating: "[W]e are very, very
  good at managing projects both from a time and a capital standpoint and bringing
  these very large megaprojects on production, on time, and on budget." (*Id.* ¶ 210.)
  Daniels also emphasized Anadarko's Gulf of Mexico expertise, stating that
  deepwater Gulf of Mexico "is the only place we focus now. We feel like we are a
  premier operator out here. We have got demonstrated exploration success . . .
  [t]he infrastructure we have is established and we can utilize that, and it shows
  very clearly our operating capabilities. The fact that we were able to bring those
  online, develop discoveries that we had already had, have very efficient
  operations, and utilize that existing infrastructure to drive more value." (*Id.* ¶
  211.) Daniels also stated, "[I]t really speaks to efficiencies, it speaks to the
  success of the exploration program, and the project management skills of our
  teams that we are able to drive our capital costs down, keep things on time and on
  budget, and grow our production in that kind of fashion." (*Id.* ¶ 212.)

Once again, Defendants argue that the above statements are: (1) non-actionable
"corporate optimism;" (2) not adequately alleged to be false; and (3) not adequately alleged to
have been made by an individual with the requisite scienter. (Doc. No. 73, at 15-18, 20-21, 28-
33.)  This time, however, Plaintiffs have not defended the statements. They did not address these
statements at all in their opposition to Defendants' motion, and they did not discuss them at the

hearing on Defendants' motion. Their silence is telling.

The problems with the above statements are several-fold: (1) four of the statements were made *before* Anadarko partnered on the Macondo well, thus destroying any theory that they are made false by Anadarko's actions on that project; (2) all of the statements are generalized, optimistic statements which made no concrete promises or representations; (3) even if Anadarko's actions on the Macondo well belied the statements, Plaintiffs have not provided any other instances in which Anadarko's wells or investments turned out poorly; and (4) all of the statements were made prior to the *Deepwater Horizon* incident, and Plaintiffs have not shown that Anadarko's top executives knew any details regarding how the project was unfolding and thus spoke with the requisite scienter. Because Plaintiffs have not adequately pled the statements' falsity, or the scienter of the statements' speakers, none of the statements regarding Anadarko's success in project management, deepwater exploration, or the Gulf of Mexico is actionable.

### D.   Representations of the expected consequences of and BP's ability to respond to a deepwater oil spill

Plaintiffs seek to hold Anadarko liable under the Exchange Act for alleged misrepresentations contained within the Macondo well EP and BP's OSRP for the Gulf of Mexico. The following alleged misrepresentations fall into this category:

- The EP—filed on February 23, 2009—stated that BP had the ability to respond to a "worst case discharge" of 162,000 barrels per day at the Macondo well. (Compl. ¶ 175.) Elsewhere, it claimed that an oil spill would be "sublethal" to adult fish and shellfish; would have no impact due to "proven equipment and technology" for responding to oil spills; and likely would not result in oil reaching the shore due to the site's distance from the coastline and the expected response capabilities. (*Id.* ¶¶ 176-77.)

- The OSRP—last revised and filed with the U.S. government on June 30, 2009—stated that up to 491,721 barrels of oil could be recovered per day in the event of an oil spill and that BP "maintain[ed] the necessary spill containment and

recovery equipment to respond effectively to spills" in the Gulf. (*Id*. ¶¶ 173-74.) Additionally, the OSRP indicated that an oil spill from BP's activities would not harm fish, marine mammals or birds; would not mar coastal beaches; would impair water quality only temporarily; and that BP would marshal sufficient "skimmer" vessels to skim spilled oil from the surface before it had a chance to reach the shoreline. (*Id*. at ¶ 174.)

The Court is quite familiar with the EP and the OSRP and the alleged misrepresentations contained within. It previously determined, in connection with the BP Class Action, that the statements in the documents were adequately pled to be false; were material to BP's investors; and were so starkly and egregiously untrue in light of future events that scienter had been demonstrated for the corporate signatory to the documents. *See BP I*, 843 F. Supp. 2d at 762-63, 775-76, 789-91. The Court is now confronted with the question of whether these findings can be cross-applied to BP's non-operating partner on the Macondo project.

### 1.    Whether Anadarko "made" the statements

The unique question posed by this lawsuit is whether Anadarko can be held liable under the Exchange Act for securities fraud premised on its failure to correct the alleged falsehoods contained in documents prepared and filed by its partner, BP. Defendants claim, based on the Supreme Court case *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), that they are not liable under the securities laws for alleged misrepresentations made by BP. (Doc. No. 73, at 21-24.) Defendants cite language in *Janus* that the "maker" of a statement for purposes of Rule 10b liability is the "person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 131 S. Ct. at 2302. Defendants argue that Anadarko did not have *any* authority over the documents—which were written and submitted by BP—much less ultimate authority over them. (Doc. No. 73, at 22-23.)

Plaintiffs agree that *Janus* is the controlling precedent, but characterize its holding differently. Plaintiffs contend that "*Janus* held . . . that a party who has a <u>statutory obligation</u> to

make a statement is liable under the securities laws if that statement is false." (Doc. No. 77, at 3.) The following is the passage from *Janus* on which Plaintiffs rely:

> Under this rule, JCM did not "make" any of the statements in the Janus Investment Fund prospectuses; Janus Investment Fund did. *Only Janus Investment Fund—not JCM—bears the statutory obligation to file the prospectuses with the SEC.* The SEC has recorded that Janus Investment Fund filed the prospectuses. There is no allegation that JCM in fact filed the prospectuses and falsely attributed them to Janus Investment Fund. Nor did anything on the face of the prospectuses indicate that any statements therein came from JCM rather than Janus Investment Fund—a legally independent entity with its own board of trustees.

131 S. Ct. at 2304-05 (citations omitted) (emphasis added). According to Plaintiffs, unlike in *Janus*, federal regulations—specifically, 30 C.F.R. § 250.146(a)[8]—required BP and its co-lessees to file and maintain an adequate EP and OSRP. (Doc. No. 77, at 4.) Plaintiffs argue that more than one party can be considered the "maker" of a statement for Rule 10b, "particularly if the statutory obligation to file a document and ensure its accuracy is shared." (*Id*. at 19 (relying on *City of Roseville Employees' Retirement Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011).)

Defendants dispute both Plaintiffs' characterization of the MMS regulations at issue, and the implications under *Janus* assuming that Plaintiffs' characterization of the regulations is accurate. While Defendants appear to raise a valid complaint that Plaintiffs have improperly conflated regulations governing the EP and the OSRP,[9] the Court finds it unnecessary to delve

---

[8] "When you are not the sole lessee, you and your co-lessee(s) are jointly and severally responsible for fulfilling your obligations under the provisions of 30 CFR parts 250 through 282 and 30 CFR parts 550 through 582 unless otherwise provided in those regulations." 30 CFR § 250.146(a).

[9] As previously noted, Plaintiffs contend that 30 C.F.R. § 250.146(a) requires BP and its co-lessees to file and maintain both an EP and an OSRP. Defendants do not appear to contest the proposition that one of the leasehold obligations for which Anadarko was "jointly and severally responsible" was filing an EP for the leasehold. But Defendants dispute that § 250.146(a) makes

into the mechanics of these regulations. Even if Plaintiffs' reading is correct, they have not demonstrated under *Janus* that Anadarko is properly considered the maker of statements within the EP and OSRP.

In *Janus*, the Supreme Court held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 131 S. Ct. at 2302. It is true that the Supreme Court noted, in its analysis of which entity had such authority in the case before it, that only one entity had the "statutory obligation to file the prospectuses with the SEC." *Id*. at 2304. Plaintiffs attempt to transform this one element into the dispositive question that must be considered. The Court finds this reading of *Janus* too inflexible. While a joint statutory obligation to file a document could mean that two entities are both "makers" of a statement, the Court declines to read *Janus* as mandating such a conclusion.

Ultimately, the dispositive issue is chronology. Anadarko was not involved in the Macondo project when the EP and OSRP were drafted and filed. Therefore, Anadarko literally could not have "made" the misleading statements within the documents. The result might be different if Anadarko had participated in the drafting of the EP and OSRP as a co-lessee on the Macondo lease. Then, perhaps, the federal regulations making co-lessees jointly and severally responsible for leasehold obligations would be sufficient to consider Anadarko a "maker" of statements within the EP and OSRP, even if Anadarko was not expressly listed on the documents or designated as a "filer." But in the absence of these crucial facts, the MMS regulation making

---

co-lessees "jointly and severally responsible" for submitting an OSRP. They note that a separate provision limits the obligation to file an OSRP to "'the owner or operator of an oil handling, storage, or transportation *facility*[.]'" (Doc. No. 79, at 10 (quoting 30 C.F.R. § 254.1).) Defendants argue that this regulation does not apply to a non-operator and non-owner such as Anadarko.

co-lessees "jointly and severally" responsible for fulfilling certain regulatory obligations is not sufficient to consider Anadarko a "maker" of statements drafted and disseminated months before it was involved in the Macondo project.[10]

### 2. Scienter

Additionally, the PSLRA requires Plaintiffs to allege facts giving rise to a "strong inference" that Anadarko made—or, in this case, did not correct—the alleged misrepresentations in the EP and OSRP with intent to deceive or with severe recklessness. 15 U.S.C. § 78u-4(b)(2)(A); *Flaherty & Crumrine*, 565 F.3d at 207. To support an inference of scienter for Defendants' alleged failure to correct misrepresentations in the EP and OSRP, Plaintiffs rely heavily on the Court's findings in the BP Class Action.[11] (Doc. No. 77, at 35-36.) But scienter cannot be assumed for <u>Anadarko</u> or its executives simply because a separate group of plaintiffs adequately alleged the scienter of   <u>BP</u>. An independent analysis of Plaintiffs' allegations is required.

Even assuming that Plaintiffs' theory of fraud-after-the-fact is viable, Anadarko occupies a different position vis-à-vis the documents than did BP. BP actually wrote the EP and OSRP; Anadarko simply "failed" to correct them. Thus, to determine whether Anadarko's lack of action was accompanied by the required scienter, a predicate factual question must be addressed—

---

[10] The chronology of events also defeats Plaintiffs' alternative argument, that *Janus* permits liability against Anadarko because investors attributed statements in the EP and OSRP to Anadarko based on its status as a participant in the Macondo well. (Doc. No. 77, at 24.) Even if Plaintiffs are correct that the investors widely believed Anadarko to be a maker of the statements, such belief does not substitute for the requirement that Anadarko must have had "ultimate authority" over the "content [of the statement] and whether and how to communicate it." *Janus*, 131 S. Ct. at 2302. Nothing in *Janus* suggests otherwise.

[11] In the BP Class Action, the Court found that the misrepresentations in the EP and OSRP were so egregious that they alone created a sufficient inference of corporate scienter. *See BP I*, 843 F. Supp. 2d at 791.

whether anyone with authority that can be imputed to Anadarko actually reviewed the EP and OSRP. The Complaint alleges in multiple places that Anadarko "received," "approved," "ratified," and/or "adopted" the EP and OSRP. (*E.g.,* Compl. ¶¶ 126, 186, 198, 206, 221, 235.) But nowhere does the Complaint expressly allege that Anadarko actually reviewed the document, or identify the person alleged to have done so.

The securities law requires a very specific state of mind for liability. Negligence is not sufficient. Neglect is not sufficient. To bear financial responsibility for a deception played on the investing public, a defendant must have intended to deceive or been reckless regarding the accuracy of his statements. This requirement clearly cannot be met if he is not adequately alleged to have been aware of the misleading statement.[12] Therefore, in addition to the fact that Anadarko cannot be considered a "maker" of alleged misrepresentations in the EP and OSRP, the Court finds that Plaintiffs have not adequately alleged Anadarko's scienter for those statements.

### E.    Representations of Anadarko's insurance coverage and reserves

Plaintiffs claim that Defendants misrepresented the adequacy of Anadarko's insurance coverage and/or reserves to cover the liabilities associated with its drilling activities, both generally and specifically with regards to the Macondo well. The following alleged misrepresentations fall within this category:

- Anadarko's Form 10-Q for the second quarter of 2009, filed August 4, 2009, stated that Anadarko had reviewed the Company's risk profile and properly reserved for and insured against foreseeable drilling-related liabilities. (Compl. ¶ 192.) Similar statements appeared in Anadarko's Form 10-Q for the third quarter

---

[12] Defendants note another flaw regarding Plaintiffs' scienter allegations: Plaintiffs have not explained how Anadarko or its employees would have been in a position to realize the inaccuracy of representations regarding BP's ability to respond to an oil spill. (Doc. No. 85, at 28:14-29:23.) The Court agrees that the Complaint, at present, does not address this point.

of 2009, filed November 3, 2009 (*id.* ¶ 201); and in Anadarko's Form 10-K for 2009, filed February 23, 2010 (*id.* ¶ 216).

- Separately, the 2009 Form 10-K stated: "As protection against financial loss resulting from . . . operating hazards, we maintain insurance coverage, including certain physical damage, employer's liability comprehensive general liability and worker's compensation insurance." (*Id.* ¶ 215.)

- Anadarko issued a press release on May 3, 2010, acknowledging its 25% interest in the Macondo well and stating "The company maintains insurance policies designed to provide financial protection for such events, for its share of gross covered costs up to an aggregate level of approximately $710 million, less deductibles. Based on its 25-percent non-operated interest, the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million." (*Id.* ¶ 230.)

- Anadarko's Form 10-Q for the first quarter of 2010, filed May 4, 2010, reiterated the above statement, including that, "the company estimates its net insurance coverage will likely total approximately $177.5 million, less deductibles of $15 million." (*Id.* ¶ 231.)

- On May 4, 2010, Anadarko hosted an earnings conference call during which Hackett stated that Anadarko's insurance "is designed to cover costs associated with stopping the hydrocarbon release, drilling relief wells, clean-up and other liabilities of and associated costs. Based on our 25% nonoperated interest, we estimate our deductibles will total about $15 million and our insurance will cover net cost to [Anadarko's] working interest 25% up to approximately $178 million." (*Id.* ¶ 232.)

### *1.* *Pre-spill statements*

As to the statements which occurred prior to the *Deepwater Horizon* disaster—and which represent that appropriate insurance and reserves have been put into place for *anticipated* drilling-related liabilities—Defendants argue that Plaintiffs are required to establish that Defendants either did not believe this to be true or did not have an adequate basis for believing it to be true. (Doc. No. 73, at 18.) Defendants claim that Plaintiffs have not made such a showing. (*Id.*)

The issue identified by Defendants is when "forward-looking" or optimistic statements have adequately been pled as fraudulent. It is very clear that a prediction is not adequately pled

as fraudulent simply because the prediction later turned out to be incorrect. *See Rubinstein*, 20 F.3d at 166. Rather, every predictive statement contains implied statements of existing fact which may not be true at the time the statement is made. These include: "1) [t]he speaker genuinely believes the statement is accurate; 2) there is a reasonable basis for that belief; and 3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement." *Id*.

This provides Plaintiffs with two avenues for pleading an actionable claim as to the predictive statements regarding Anadarko's insurance coverage and reserves. First, Plaintiffs could allege that the statements were made without a subjective belief in their accuracy, or with severe recklessness for whether or not they were accurate.[13] *See Rubinstein*, 20 F.3d at 169-70. Second, Plaintiffs could allege that the statements were made with knowledge of undisclosed facts that seriously undermined the statements' accuracy. *See id*. at 170.

Unfortunately, Plaintiffs have not clarified under which of these theories the statements were alleged to be false. In fact, they did not address these statements at all in their opposition to Defendants' motion, and they did not defend them at the hearing on Defendants' motion.

Although the Court does not have the benefit of briefing or argument from Plaintiffs, it appears that Plaintiffs have not pled specific factual allegations which would support an inference that Defendants' predictive statements were made: (1) with specific knowledge that the reserves were inadequate; (2) with reckless disregard for whether the reserves were inadequate; or (3) while withholding Anadarko-specific, materially adverse facts that undermine the adequacy of the reserves. As a result, the pre-spill statements regarding the adequacy of

---

[13] If the statements are covered by the statutory "safe harbor" provision, Plaintiffs would be required to show intent to deceive, and not merely recklessness. *Nathenson*, 267 F.3d at 409. Defendants, however, do not appear to be claiming that safe harbor applies.

Anadarko's insurance coverage and/or reserves are not actionable as fraud.

### 2.    *Post-spill statements*

As to the statements which occurred after the *Deepwater Horizon* disaster—which Plaintiffs characterize as false reassurances that Anadarko's liabilities would be fully covered by insurance—Defendants argue that Plaintiffs have misconstrued the statements. (Doc. No. 73, at 18-19.) Defendants note that the statements represented only that insurance existed and detailed the policy limits regarding coverage. Defendants argue that no defendant ever represented or implied that the insurance policy would fully cover costs. (*Id.*)

Plaintiffs counter that the sin here is of omission. They cite the adage that "'a duty to speak the full truth arises when a defendant undertakes a duty to say anything.'" *Lormand*, 565 F.3d at 249 (quoting *Rubinstein*, 20 F.3d at 170). Thus, because Defendants took it upon themselves to discuss the details of Anadarko's insurance coverage, Defendants should have clarified that the expected costs far exceeded the coverage limits. (Doc. No. 77, at 28-29.)

The Court agrees with Defendants that Plaintiffs have mischaracterized the statements at issue. Plaintiffs claim that the post-spill statements suggested to investors that Anadarko's losses would be fully covered by insurance. (Doc. No. 77, at 28-29.) But nowhere is that representation made. Instead, all three statements assert one or more of the following: (1) Anadarko maintained insurance that covered these sorts of costs; (2) the insurance limit in the aggregate (i.e., for all parties) was $710 million; (3) Anadarko's share of the aggregate insurance was $177.5 million (i.e., 25% of $710 million); and (4) Anadarko was subject to $15 million in deductibles. None of these specific points has been discredited.

Instead, Plaintiffs complain that, by describing the details of the insurance coverage, Defendants implied that the losses would fall within the coverage limits. This construction of the

statements is simply not reasonable. Investors can be presumed to understand how insurance works and what happens if costs exceed coverage limits.

Moreover, the document in which one statement appears—Anadarko's Form 10-Q for the first quarter of 2010—separately stated that "as a non-operating interest owner [Anadarko is] currently unable to estimate any potential liability for costs arising in connection with this event, and whether the costs might exceed the coverage limits under [the Company's] insurance policies." (Doc. No. 74-7, at 4.) Likewise, during the May 4, 2010 conference call in which another statement was made, Hackett separately clarified that, with regards to the *Deepwater Horizon* disaster, "we maintain insurance policies that are designed to protect against *a portion* of potential financial losses occurring as a result of such events." (Doc. No. 74-18, at 5 (emphasis added).) This contemporaneous, additional language directly forecloses Plaintiffs' theory that the post-spill statements regarding insurance coverage lulled investors into believing that Anadarko's losses would be fully covered by insurance.

F.       **Representations of the oil spill rate**

Plaintiffs seek to hold Anadarko liable for statements made by BP executives regarding the estimated flow of oil from the Macondo well into the Gulf of Mexico. The following alleged misrepresentations fall within this category:

- At a press conference held on April 28, 2010, BP's Chief Operations Officer Douglas Suttles stated that BP's best estimate of the spill rate was "1,000 barrels of oil per day[.]" (Compl. ¶ 222.)

- During an appearance on ABC's The Early Show on April 29, 2010, Suttles reiterated that BP's best estimate of the spill was "somewhere between one and five thousand barrels a day[.]" (*Id*. ¶ 223.) He made a similar statement during an appearance on NBC's The Today Show on April 29, 2010. (*Id*. ¶ 224.)

- On May 5, 2010, BP's CEO Tony Hayward submitted to an interview with the Houston Chronicle in which he stated that the estimated flow rate was "5,000 barrels a day." (*Id*. ¶ 226.)

### 1. *Whether Anadarko "made" the statements*

Once again, Plaintiffs' allegations raise the issue of whether Anadarko can be held liable for alleged misrepresentations made by BP. In the case of the spill-rate statements, however, no federal regulation renders Anadarko legally responsible for BP's statements. Instead, Plaintiffs rely on a contractual provision in the JOA which obligated BP to acquire permission from Anadarko before making public statements about the Macondo well:

> Any Party may propose for issuance a News Release about the activities or operations covered by this Agreement by submitting the text of the News Release to the Parties. A News Release proposal requires the unanimous agreement of the Parties. . . . If a Party fails to respond [to a proposal], the Party shall be deemed to have not approved [the proposed News Release].

(Doc. No. 74-25 ("JOA"), at § 9.1.) Based on this provision, Plaintiffs allege that Anadarko "must have" approved BP's statements.[14] (Compl. ¶ 227.) Thus, Plaintiffs argue, Anadarko had approval authority for the statements as required by *Janus* and may be deemed to have "made" them for purposes of Rule 10b. (Doc. No. 77, at 30-31.)

Defendants argue that Plaintiffs' reliance on section 9.1 of the JOA is misplaced, because that section does not and cannot establish that Anadarko *actually* approved BP's statements. (Doc. No. 73, at 24.) Defendants also note that § 9.2 expressly permits BP, without pre-approval from Anadarko, to "furnish factual information necessary to satisfy legitimate public interest or governmental authorities having jurisdiction" in cases of "emergency involving extensive property damage, loss of human life, or other clear emergency[.]" (*Id.* at 24-25 (quoting JOA §

---

[14] In their opposition to Defendants' motion, Plaintiffs include a footnote suggesting that they continue to receive information regarding Anadarko's involvement in the Macondo disaster, including information that "Anadarko was directly involved with BP in determining spill rates after the disaster." (Doc. No. 77, at 12 n.3.) This allegation is not in the Complaint and cannot be considered at this time. *See Collins*, 224 F.3d at 498 ("In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto.").

9.2).)

The question under *Janus* of whether Anadarko is a co-"maker" of the oil spill representations because it approved BP's statements is a close one. The Court agrees with Plaintiffs that it cannot decide a factual dispute at the motion to dismiss stage and therefore must accept as true the allegation that Anadarko approved the spill-rate statements under § 9.1 of the JOA. But the alleged facts in *Janus* involved an investment advisor drafting prospectuses to be issued by its mutual funds client, which were misleading in ways that may only have been known to the investment advisor itself. *See* 131 S. Ct. at 2312 (Breyer, J. dissenting). Nonetheless, the Supreme Court found that the investment advisor—*even though it allegedly wrote the misleading statements with knowledge of how they were misleading*—did not "make" the statements because it was not required to and did not actually file the prospectuses with the SEC: the mutual funds did. *Id.* at 2304-05. The Supreme Court found that the investment advisor did not have "*ultimate* authority" over the statements, including "whether and how to communicate [them]." *Id.* at 2302, 2304-05 (emphasis added).

The Court fails to discern a principled distinction between the investment advisor in *Janus* and Anadarko here. Even if Anadarko gave BP permission to use the spill estimates, there are no allegations that it directed BP as to when and where to use them. Nor are there allegations that the statements were made in Anadarko's name. Anadarko may have had a hand in the decision to use them, but Plaintiffs have not shown that Anadarko had *ultimate* authority and control. Therefore, *Janus* seems to mandate the conclusion that Anadarko is not liable under the securities laws for the issuance of the spill-rate estimates.

### 2.   *Anadarko's scienter*

Defendants also note that Plaintiffs have not adequately alleged Anadarko's scienter

40

regarding BP's allegedly misleading statements about the spill rate. (Doc. No. 73, at 33-36.) In contrast to BP's statements in the EP and OSRP, Plaintiffs have alleged Anadarko's direct participation in the spill-rate statements—allegations that Defendants deny—and have alleged specific facts suggesting that Anadarko approved the statements despite possessing contrary information.[15] The Court need not analyze the adequacy of these allegations for scienter purposes, however, because *Janus* does not support holding Anadarko responsible for BP's use of the spill rate estimates.

### G.   Representations of Anadarko's involvement in the Macondo well

Finally, Plaintiffs allege that the following statement by Daniels misrepresented Anadarko's previous involvement in the Macondo well:

- On May 4, 2010, Anadarko hosted an earnings conference call during which the participants were asked, "How passive typically are you when you are a nonoperator? Were you a part of . . . the well's design on Macondo?" (Compl. ¶ 234.) Daniels responded, "[T]he well design and [its] procedures, operating procedures were all done before we actually farmed in. When you typically approve these as a nonoperator, you basically approve just the capital spending level in the targeted zones from a geological perspective, as opposed to looking at the detail, well design or procedures. We were not involved in that at all on this well." (*Id.*)

Defendants contend that this statement that Anadarko was "not involved" in "looking at the detail, well design or procedures" on the Macondo well was accurate because the well design and procedures were established before Anadarko farmed in to the project.[16] (Doc. No. 73, at

---

[15] The Complaint references a spill-rate calculation performed by Anadarko employee Dawn Peyton. (Compl. ¶¶ 225, 228.) It also references two documents created within BP casting doubt on the accuracy of the spill-rate statements and alleges that these documents were provided to Anadarko. (*Id.* ¶¶ 228-29.)

[16] At the hearing on Defendants' motion, Defendants suggested that Daniels's statement was ambiguous, or had been misconstrued by Plaintiffs as an assertion that Anadarko had "nothing at all to do with the well design and procedures on the Macondo well." (Doc. No. 85, at 14:15-24.) The Court finds no ambiguity in Daniels's statement and disagrees that Plaintiffs' interpretation

19.) Defendants also assert that Plaintiffs have not shown that Daniels participated in any suspicious trading activity or that he had any personal motivation to misrepresent Anadarko's involvement in the well, and that therefore Plaintiffs had not presented a compelling inference of scienter. (*Id*. at 42; Doc. No. 79, at 18.)

Plaintiffs respond that the Complaint is "replete" with very detailed allegations contradicting Daniels's representation. These include allegations that Anadarko approved the well design before executing the JOA; that Anadarko had continuous access to real-time data and summaries regarding BP's drilling operations; and that Anadarko specifically authorized deviations from the original well design, including the decision to use six centralizers instead of sixteen during the cementing process. (Doc. No. 77, at 16.) With such allegations, they argue that they have more than adequately alleged the falsity of Daniels's very specific, factual, and objectively verifiable response to the question at issue.[17] (*Id*. at 17.)

Plaintiffs also contend that they have sufficiently alleged Daniels's scienter. They note that, after the *Deepwater Horizon* explosion, Anadarko and its executives were completely focused on the well and the oil spill. (Doc. No. 77, at 34.) Moreover, Daniels's statement was unequivocal—"[w]e were not involved in that at all on this well"—which supports that he was at least reckless for speaking without knowledge of Anadarko's involvement on the Macondo well. (*Id*. at 34-35.)

---

of the statement is unwarranted or improper.

[17] In their reply, Defendants counter that these allegations merely show that Anadarko decided to invest in the well and approved subsequent AFEs—i.e., that they wrote the checks—not that they "actually analyzed the information allegedly provided." (Doc. No. 79, at 7.) Defendants may of course raise this factual dispute as a defense to Plaintiffs' claim, but it would be inappropriate at this stage to disregard Plaintiffs' factual allegations that Anadarko both received and reviewed copious amounts of data from the Macondo well. *See Cent. Laborers' Pension Fund*, 497 F.3d at 550 (noting that, in a Rule 12(b)(6) motion to dismiss, the Court must accept as true a plaintiff's well-pleaded factual allegations).

The Court agrees that Plaintiffs have sufficiently identified the way in which Daniels's quote was misleading. Additionally, viewing the statement in isolation, the inference that Daniels spoke with knowledge that his statement was misleading, or with reckless disregard for whether it was true, is "cogent and compelling"—particularly because he spoke so directly and did not use any qualifying or hedging words.

Of course, there are factors which weigh against the inference of scienter. The above statement was apparently an isolated occurrence, not repeated by Daniels or any other Anadarko executive. Moreover, Daniels is not alleged to have engaged in any suspicious trading activity. This suggests that Daniels simply misspoke on the conference call, and that the statement was not part of a coordinated scheme to blunt the effect of the oil spill on Anadarko's share price. Although the Court agrees that this inference is compelling, it cannot determine that it is more compelling than the alternative. Therefore, it finds the statement actionable under the PLSRA.

## V.    LEAVE TO AMEND

Defendants urge the dismissal of all claims with prejudice without leave to amend. (Doc. No. 73, at 6-7.) In response, Plaintiffs request leave to amend if Defendants' motion is not denied, but do not indicate what they would include in any amendment. (Doc. No. 77, at 48.)

As noted above, the Court finds that one statement in the Complaint, made by Defendant Daniels, is adequately pled under the PSLRA and Rule 9(b). Full dismissal is therefore not warranted. Nonetheless, because so much of Plaintiffs' case has been found deficient, the Court anticipates that leave to amend may be requested.

The Court declines categorically to prohibit repleading, as Defendants urge. But because this case has been pending since June 2010, the Court cannot categorically permit repleading either. Therefore, if Plaintiffs wish to amend their Complaint to rehabilitate any of the statements

43

found non-actionable, Plaintiffs are instructed to file a motion for leave within 30 days of the entry of this order. In the motion, Plaintiffs should specifically identify the new allegations they propose to include in an amended complaint, and how those allegations will address the Court's concerns expressed herein.

## VI.    CONCLUSION

It is ordered that Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint (Doc. No. 73) is **GRANTED IN PART**. The Court finds that Plaintiffs have not adequately pleaded section 10(b) violations based upon the alleged misrepresentations contained within the following paragraphs of the Complaint: paragraphs 174-77, 180-83, 185, 188, 190-92, 195, 199-205, 208-09, 212, 214-16, 218, 220, 222-224, 226, and 230-32. As Plaintiffs have not adequately pleaded a section 10(b) violation based on any alleged misrepresentation made by Defendants James Hackett and Robert Gwin, the Section 10(b) claims against them are hereby dismissed.

The Court finds that Plaintiffs have adequately pleaded section 10(b) violations against Defendants Anadarko Petroleum Corporation and Robert Daniels based upon the alleged misrepresentation contained within paragraph 234 of the Complaint. Therefore, in all other respects, Defendants' motion is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 15th day of July, 2013.

_Keith P. Ellison_

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE